KARL R. LINDEGREN, SBN 125914
klindegren@fisherphillips.com
SARINA SALUJA, SBN 253781
ssaluja@fisherphillips.com
USAMA KAHF, SBN 266443
ukahf@fisherphillips.com
SEAN T. KINGSTON, SBN 276099
skingston@fisherphillips.com
ANDREW C. CRANE, SBN 285211
acrane@fisherphillips.com
FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

*Attorneys for Plaintiff*
Karma Automotive LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARMA AUTOMOTIVE LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>LORDSTOWN MOTORS CORP., an Ohio corporation; STEVE BURNS, an individual, JOHN LEFLEUR, an individual, DARREN POST, an individual, RICH SCHMIDT, an individual, ROGER J. DURRE, an individual, HONG XIN HUAN (A.K.A "GEORGE" HUAN), an individual, and DOES 1 through 50, inclusive,<br><br>Defendants. | **CASE NO.:**<br><br>**COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES:**<br><br>1. Violation of the Computer Fraud & Abuse Act, 18 U.S.C. §§ 1030, *et seq.*—Count I;<br>2. Violation of the Computer Fraud & Abuse Act, 18 U.S.C. §§ 1030, *et seq.*—Count II;<br>3. Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*;<br>4. Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426.1 *et seq.*;<br>5. Breach of Contract – Count I;<br>6. Breach of Contract – Count II;<br>7. Tortious Interference with Contract – Count I;<br>8. Tortious Interference with |

1

Contract – Count II;
9. Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;
10. Breach of Duty of Loyalty.

Plaintiff Karma Automotive LLC ("Plaintiff" or the "Karma"), by and through its undersigned counsel, hereby brings this Complaint for temporary and preliminary injunctive relief and damages against Defendants Lordstown Motors Corp. ("LMC"), four LMC executives named Steve Burns, John LeFleur, Darren Post, and Rich Schmidt ("LMC Individual Defendants"), and former Karma employees Roger "Joe" Durre and Hong Xin "George" Huan ("Employee Defendants") and, in support thereof, avers as follows:

## I. INTRODUCTION

1.     This is a classic corporate espionage case where a luxury electric automotive company (LMC) stole another automotive company's (Karma) trade secrets and poached its employees. LMC brazenly stole secrets about Karma's infotainment system and poached a specialized team of Karma employees (from project managers to engineers) who were designing it.  LMC had a "Trojan Horse" strategy. LMC pretended to be engaged in a five-month due diligence period, culminating in a fraudulent "partnership letter" and a promise that the first payment would be issued shortly. The courtship was a ruse; the check never arrived. Instead, LMC secretly poached and onboarded key Karma employees and started stealing Karma's secrets. LMC pulled out of the fake deal at the last minute so it could use Karma's stolen trade secret and confidential information to create its own "LMC Infotainment Group" (which never existed before) in California (where LMC had no presence prior) in order to save itself **$4.6 Million.** In short, LMC cut out the middle man (Karma) out and stole its ideas and employees in order to save money. This project was projected to bring in **over Three Billion Dollars ($3,000,000,000) in revenue** by 2024 to Karma.

2.     In fact, the forensic evidence conducted to date shows that almost immediately after entering into a non-disclosure agreement with Karma, LMC systematically planned to poach Karma's employees, one employee at a time, while at the same time reviewing and having those employees copy trade secret and confidential information and exploring the possibility of creating its own "LMC Infotainment Group." Not only that, LMC apparently incentivized at least two of Karma's former employees to accept job offers from and begin to work for LMC *while they were still employed by and working for Karma* so they could ensure that these employees downloaded, saved, and sent to their personal email addresses all of Karma's confidential and proprietary information to help LMC start the new "LMC Infotainment Group" and recreate the technology itself, which they did.

3.     In short, contrary to LMC's slogan on its website which states "If you want something better, Work for It," here, LMC's actions followed this slogan instead:

## II. SUMMARY OF ACTION

4.     LMC gained access to Karma's trade secrets for five months while pretending to engage with Karma in due diligence over a deal with Karma that was projected to bring in **over Three Billion Dollars ($3,000,000,000) in revenue** by 2024. After leading Karma down this path and promising that it would be issuing

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

its first payment shortly, LMC suddenly cancelled the deal. It turns out that LMC was conspiring and colluding with Defendant Durre, Karma's key manager who was supposed to be working to secure this deal for Karma but instead was playing double agent. LMC, which until now has had no employees or operations in California, made a side deal with Durre to recruit over to LMC his entire Karma team that was working on the LMC project along with all the Karma trade secrets, confidential information, work product, and know-how that LMC needed to develop the project in-house without Karma.

5.     Karma recently uncovered forensic evidence showing that, several days before cancelling the deal with Karma, LMC hired and on-boarded Roger J. Durre ("Durre", referred to as "Joe"), Karma's Director of Engineering and one of the key project managers on the proposed deal with LMC who himself had on behalf of Karma signed the Mutual Non-Disclosure Agreement ("MNDA") between Karma and LMC, and Defendant Durre performed significant work for LMC for several weeks while still employed by Karma with access to all its trade secrets. As an agent for LMC during the weeks in which he was employed by both entities, Durre downloaded and copied electronic files containing Karma's trade secrets and then attempted to permanently delete thousands of files from Karma's computer system.

6.     This conspiracy was directed and orchestrated by LMC's top executives who are named in this Complaint. According to LMC's own estimate, as stated in an email from a top LMC executive to Durre seven days before LMC cancelled the deal with Karma, by stealing Karma's trade secrets and hiring the Karma team that worked with those trade secrets, LMC expected to save $4.6 million over what it would have paid Karma had LMC proceeded with the deal. LMC's project "Endurance," as it was called, with all of the devastating and irreparable harm it intended to do to Karma, would have been more accurately named project "Espionage."

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

7.     Once LMC and Durre had taken substantial steps to steal Karma's trade secrets, and after Durre had secretly begun working for LMC while continuing to work for Karma, LMC abruptly terminated its partnership with Karma and proceeded to use the stolen trade secret information to work on developing the same infotainment package that Karma had been developing. LMC, Durre, and other former Karma employees and contractors now working for LMC continue to engage in their malicious conduct by continuing to use Karma's confidential and trade secret information to raid Karma's employees to leave their employment with Karma and join LMC.

8.     As a result of LMC's, Durre's, and others' intentional and malicious conduct, Karma was defrauded of millions of dollars in development resources and time spent on the LMC deal, a deal that based on LMC's projected volume would have resulted in over three billion dollars ($3,000,000,000) in revenue for Karma.

9.     In addition, Karma's valuable trade secrets are currently in the possession of LMC, Defendants Durre and Hong Xin "George" Huan ("Huan"), Karma's Software Systems Architect, who was also hired by LMC and downloaded and copied Karma's confidential information while concurrently working for Karma, and the other former Karma employees. These Defendants' continued possession of Karma's trade secrets risks irreparable harm to Karma and the loss of tens of millions of dollars in research and development. Karma has also been irreparably harmed by the sudden and secret defection to LMC of at least ten (10) of Karma's employees and contractors who were part of Karma's infotainment team. Due to their particular job duties, Durre, Huan, and other key members of the infotainment team were granted an exception to Karma's policy preventing activation of USB ports on Karma computers. However, they abused that special exception by downloading thousands of files containing Karma's trade secrets and confidential information to external storage devices and failing to return this information to Karma.

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

10.     Karma seeks immediate injunctive relief from this Court to compel Defendants to refrain from disclosing and using any of Karma's confidential and trade secret information and to order them to return to Karma the property that they stole.

11.     Karma will be irreparably harmed if Defendants are not ordered to: return the property that they stole; cease interfering with Karma's employment agreements with its current employees, and cease operating in direct competition with Karma using its confidential and trade secret information.

## II. THE PARTIES

12.     Karma Automotive LLC is a manufacturer of luxury electric vehicles, components, hardware, and software, maintaining its principal place of business in Orange County, California. Karma is licensed to conduct business in California. Karma conducts business throughout the United States.

13.     Plaintiff is informed and believes and, on that basis, alleges that Lordstown Motors Corporation ("LMC") is a manufacturer of vehicles, maintaining its principal place of business in Ohio.

14.     Plaintiff is informed and believes and, on that basis, alleges that Steve Burns ("Burns") is a resident of the State of Ohio. Burns is the Chief Executive Officer of LMC.

15.     Plaintiff is informed and believes and, on that basis, alleges that John LeFleur ("LeFleur") is a resident of the State of Ohio. LeFleur is the Chief Operations Officer of LMC.

16.     Plaintiff is informed and believes and, on that basis, alleges that Darren Post ("Post") is a resident of the State of Ohio. Post is the Chief Technology Officer of LMC.

17.     Plaintiff is informed and believes and, on that basis, alleges that Rich Schmidt ("Schmidt") is a resident of the State of Ohio. Schmidt is the Chief Production Officer of LMC.

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

18.     Plaintiff is informed and believes and, on that basis, alleges that Roger "Joe" Durre ("Durre") is a resident of the State of California, residing in the County of Orange, California. From December 5, 2016 through September 1, 2020, Durre was employed by Karma. Durre was employed by Karma as Director, Infotainment Systems at Karma's headquarters at 9950 Jeronimo, Irvine, California 92618.

19.     Plaintiff is informed and believes and, on that basis, alleges that Hong Xin "George" Huan ("Huan") is a resident of the State of North Carolina. From June 26, 2017 through August 28, 2020, Huan was employed by Karma. Huan was employed by Karma as Software System Architect at Karma's headquarters at 9950 Jeronimo, Irvine, California 92618.

## III. JURISDICTION & VENUE

20.     The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §1331 because this action involves claims asserted pursuant to 18 U.S.C. § 1030, *et seq*. and 18 U.S.C. § 1836, *et seq*.

21.     The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 to consider Karma's claims under California common law and the California Uniform Trade Secret Act, as well as Karma's claim under Ohio law against LMC for breach of contract.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

## Karma's Trade Secrets

23.     Over the course of at least six years and through substantial efforts and financial investment, Karma has developed, compiled and maintained a wealth of trade secret information (hereinafter referred to as Karma's "Trade Secrets") that it uses in serving the needs of its clients, which has enabled it to achieve and secure a competitive edge over other manufacturers of automobiles, automotive hardware,

and automotive software, and in particular over other electric vehicle systems manufacturers. Karma's Trade Secrets include, but are not limited to:

    a. Karma's source code, engineering plans, and cost structure for Karma's cloud-based system to send new software and software updates to the consumer over the air;

    b. Karma's source code, engineering plans, and cost structure for Karma's system to deliver messages communicating vehicle event actions automatically to drivers;

    c. Karma's project planning documents, including internal estimates and figures to develop the projects, including a breakdown of discrete tasks and projects to complete and the amount of expected labor time and costs to complete them;

    d. Karma's internal processes for developing a vehicle – from building a factory, to how to synchronize suppliers, to Karma's guidelines for quality assurance;

    e. Karma's files and records regarding customers, prospective customers, independent contractors, subcontractors, vendors, and suppliers and their profiles, preferences, specifications, account history, and habits;

    f. information and documents pertaining to Karma's analyses and forecasts of production capacity and readiness to meet client and partner needs;

    g. the documents, methods and systems used by the Company in soliciting, marketing, selling and providing its products and services to its customers, including, but not limited to, comparison pricing analyses, presentation formats and contents, and strategic plans;

    h. financial and accounting information, such as budgets, cost, pricing and billing information and revenues and profit margins; and

/ / /

i. other non-public information of Karma that would be valuable for a competitor or other person or entity to have.

24. Karma's Trade Secrets, all of which were compiled and developed by Karma over many years through substantial efforts and expense, are not known to the public. Karma's Trade Secrets are not readily ascertainable in Karma's industry or in any type of trade or public directory or any other source. Additionally, this information was obtained with considerable time, effort and expense to Karma, and is not readily ascertainable by others who find this information to be valuable. For example, Karma's Trade Secrets related to its research and development in infotainment systems, including designs, software source code, component specifications, sourcing and supply chain coordination, and cost information, are valuable precisely because they give Karma a competitive advantage of being the first to market with its technology. This information in the hands of a competitor would enable the competitor to bypass months and even years of research and development the competitor would have had to do on its own.

25. Karma's Trade Secrets are valuable to Karma and their value lies primarily in being kept secret and not generally known. For that reason, Karma's Trade Secrets are valuable to Karma, and their value lies primarily in being kept secret and not generally known. For that reason, Karma has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees and contractors Karma's need to keep this information a secret; (b) requiring, as a condition of employment or contractual engagement, that all employees and contractors promise not to use or disclose this information, except in the performance of their duties for Karma; (c) having employees and contractors execute confidentiality and non-disclosure agreements, which instruct Karma's employees and contractors not to disclose, reproduce or use this information without Karma's consent; (d) limiting access and/or restricting access to this information by employees and contractors on a need-to-know basis; (e)

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

requiring unique usernames and passwords to access source code and related data on Karma's computer systems and databases; and (f) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Karma's computer system, servers, and networks, requiring that Trade Secrets be kept in secure locations when not in use, and requiring dual-factor authentication for remote access and VPN access to Karma's systems.

26. Additionally, Karma entered into confidentiality and non-disclosure agreements with employees, contractors, vendors, suppliers, and business partners, including LMC, which prohibited all employees, contractors, vendors, suppliers, and business partners from disclosing, reproducing or using this information without Karma's consent.

27. Karma has also implemented a policy of disabling all USB ports on all Karma computers to prevent anyone from plugging in any flash drives or external drives or devices through any USB port. Certain employees were granted a special exception to enable them to use the USB ports on their Karma computers. This exception was limited to employees who required frequent USB access on their Karma computers for purposes of an ongoing and frequent job task. Requests for an exception were evaluated on an individual case-by-case basis and required approval from a Karma executive level officer responsible for the employee's department. A request for an exception would be approved if (a) the job task cannot be completed by any other approved means, and (b) the job task was frequent enough that it required ongoing access. The request for an exception would be denied if data exchange or transfer could happen by a different approved venue like a network drive, OneDrive, or SharePoint. It would also be denied if the need was temporary.

/ / /

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

28.     The Employee Defendants were both granted an exception to the USB access policy described above because their particular engineering jobs involved frequent and ongoing need to transfer data via the USB port

29.     In the course and scope of their duties as senior engineering employees, managers or contractors of Karma, the Employee Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Trade Secrets for the purpose of performing their job duties for Karma.

30.     In the course and scope of LMC's MNDA with Karma, LMC and the LMC Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Trade Secrets from use and disclosure for a competitive purpose.

### Karma's Confidential Information

31.     In addition to Trade Secrets (as defined above), Karma maintains other information as confidential that has value for Karma in being kept confidential, or that Karma has legal or contractual obligations to maintain as confidential but does not qualify as a trade secret under applicable state or federal law (such information is referred to herein as "Confidential Information").

32.     Karma's Confidential Information encompasses all information belonging to Karma other than Trade Secrets (as defined above) that is proprietary and confidential in nature, whether the information is reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, and whether the information is simply in an employee's head, that: (a) has been provided to the employee during his/her employment with Karma; (b) the employee has gained access to while employed by Karma; and/or (c) was developed by the employee in the course of his/her employment with Karma.

33.     Karma's Confidential Information includes all information, correspondence, documents, and other property (whether tangible or intangible)

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

that Karma owns pursuant to California Labor Code section 2860 that do not qualify as a trade secret under applicable state or federal law. California Labor Code section 2860 states: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

34.    Examples of Karma's Confidential Information include, but are not limited to:

a.  information believed by Karma to be a Trade Secret (as defined above) that ultimately does not qualify as a trade secret under applicable state or federal law but nonetheless was maintained by Karma as confidential;

b.  the non-trade secret but still proprietary or confidential methodologies, strategies, programs, and systems used by Karma in managing assets, liabilities, and risk and/or in soliciting, marketing, selling and providing services to its customers;

c.  private and confidential communications with Karma's vendors, suppliers, and consultants;

d.  non-trade secret but still confidential or private information of third parties that Karma has contractual and/or legal obligations to maintain as confidential, including all customer information that Karma and its employees are restricted from disclosing by federal, state or local statutes or regulations;

e.  non-trade secret but still proprietary or confidential financial and accounting information of Karma (such as cost, pricing information, price lists, financial policies and procedures, revenues, and profit margins, targets, and forecasts);

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

    f.  non-trade secret but still proprietary or confidential information concerning Karma's current and prospective customers and vendors (including, but not limited to, customer and vendor lists and similar compilations, and information that customers and vendors expect Karma to keep as confidential);

    g.  non-trade secret but still proprietary or confidential information concerning Karma's consultants, independent contractors, and vendors (including lists of all the foregoing); and

    h.  personnel files and employment-related records of Karma's current and former employees (including, but not limited to, information related to the hiring, recruitment, retention, and termination of its current and former employees, as well as information related to their job duties, assignments, skills, training, performance, discipline, promotions, compensation, benefits, leaves of absence, and medical files).

35.    Information received from a third party under contractual confidentiality obligations is valuable to Karma for a number of reasons regardless of its trade secret status, including that disclosure or use of this information in violation of the contract with the third party may subject Karma to legal liabilities, destroy the relationship with that third party, and deprive Karma of all the benefits of its investment in that relationship. This information would also be valuable to a competitor if it is obtained or acquired by the competitor without any contractual obligation associated with the information as it would be tantamount to free discovery of information.

36.    Information about Karma's infotainment engineering employees is valuable to Karma because it has invested substantial resources over the years in recruiting, training, and providing opportunities to these employees to hone their skills and participate in developing Karma's cutting-edge technology. This

information is valuable to a competitor or a company like LMC looking to develop its own infotainment system by enabling the competitor to bypass all the time and resources otherwise needed to recruit top talent. With access to Karma's team as a cohesive group, not just to one-off information about individual employees, a competitor would be able to target their recruiting efforts and know exactly who to recruit especially if that employee has been working on the same exact technology the competitor is planning to develop. Rather than hiring recruiters, posting job ads on public websites, making cold calls, and asking for referrals to potential candidates, among other recruiting activities, the competitor would know these are the particular employees it needs to recruit as they are already a cohesive team.

37.   As with Trade Secrets, Karma's Confidential Information is valuable to Karma, and its value lies primarily in being kept secret and not generally known. For that reason, Karma has taken steps reasonable under the circumstances to maintain the secrecy of its Confidential Information, such as: (a) emphasizing to employees and contractors Karma's need to keep this information a secret; (b) requiring, as a condition of employment or contractual engagement, that all employees and contractors promise not to use or disclose this information, except in the performance of their duties for Karma; (c) having employees and contractors execute confidentiality and non-disclosure agreements, which instruct Karma's employees and contractors not to disclose, reproduce or use this information without Karma's consent; (d) limiting access and/or restricting access to this information by employees and contractors on a need-to-know basis; (e) requiring unique usernames and passwords to access this information on Karma's computer systems; and (f) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Karma's computer system, servers, and networks, requiring that Confidential Information be kept in secure locations when not in use, and requiring dual-factor authentication for

14

remote access and VPN access to Karma's systems.

38.     Karma has also implemented a policy of disabling all USB ports on all Karma computers to prevent anyone from plugging in any flash drives or external drives or devices through any USB port. Certain employees were granted a special exception to enable them to use the USB ports on their Karma computers. This exception was limited to employees who required frequent USB access on their Karma computers for purposes of an ongoing and frequent job task. Requests for an exception were evaluated on an individual case-by-case basis and required approval from a Karma executive level officer responsible for the employee's department. A request for an exception would be approved if (a) the job task cannot be completed by any other approved means, and (b) the job task was frequent enough that it required ongoing access. The request for an exception would be denied if data exchange or transfer could happen by a different approved venue like a network drive, OneDrive, or SharePoint. It would also be denied if the need was temporary.

39.     The Employee Defendants were both granted an exception to the USB access policy described above because their particular engineering jobs involved frequent and ongoing need to transfer data via the USB port.

40.     In the course and scope of their duties as senior engineering employees, managers or contractors of Karma, the Employee Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Confidential Information for the purpose of performing their job duties for Karma.

41.     In the course and scope of LMC's MNDA with Karma, LMC and the LMC Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Karma's Confidential Information from use and disclosure for a competitive purpose.

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

**Employee Defendants' Contractual Obligations to Karma**

42.     As a condition of Employee Defendants' assignment and placement at Karma, Employee Defendants were given access to Karma's Trade Secrets and Confidential Information (as defined above) in order to perform their contractual duties for Karma. Employee Defendants knew or should have known of the confidential nature of this information and the fact that this information was the property of Karma and was not to be used or disclosed without Karma's express consent.

43.     Specifically, Employee Defendants each executed a Confidentiality Agreement with Karma that prohibits the unauthorized disclosure and use of Karma's proprietary and trade secret information including, but not limited to, Karma's source code, including source code written or developed by Employee Defendants in the course of performing services for Karma. True and correct copies of the Confidentiality Agreements signed by Durre and Huan are attached hereto as **Exhibits 1 and 2**, respectively, and are incorporated herein by reference.

44.     The Confidentiality Agreement requires that Employee Defendants: (1) hold Karma's Trade Secrets and Confidential Information in the strictest confidence; (2) use Karma's Trade Secrets and Confidential Information only while working at Karma in furtherance of performing services for Karma; (3) not use Karma's Trade Secrets and Confidential Information for Employee Defendants' own benefit or the benefit of any other party (including a competitor of Karma); (4) not copy Karma's Trade Secrets and Confidential Information; (5) not transmit or share Karma's Trade Secrets and Confidential Information in any manner to anyone; and (6) return all Karma's Trade Secrets and Confidential Information and property at the conclusion of their assignment at Karma.

/ / /

/ / /

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

45.     Specifically, Section 5 of the Confidentiality Agreement requires Employee Defendants to return all company property upon the termination of Employee Defendants' employment or independent contractor relationship with Karma.

**LMC's Contractual Obligations to Karma and the Endurance Project**

46.     In or around February 2020, LMC's Chief Technology Officer and named defendant Darren Post contacted Defendant Durre at Karma to discuss developing the infotainment system for LMC's new fleet of electric pick-up trucks, referred to as "Endurance". Infotainment refers to the in-vehicle entertainment systems, as well as the connectivity equipment and systems of the entertainment, which includes the hardware, software, and cloud-based systems and services. Among some of the cutting-edge and unique features Karma has developed is a sophisticated cloud system to send new software and software updates to the consumer over the air, as well as a system to deliver messages communicating vehicle event actions automatically to drivers.

47.     Thereafter, on February 7, 2020, Karma entered into a Mutual Non-Disclosure Agreement ("MNDA") with LMC to permit the parties to exchange confidential and trade secret information as part of due diligence and exploring having Karma develop the infotainment system for LMC's new fleet of electric vehicles. Among other things, the MNDA specifically prohibited the use or disclosure of confidential or trade secret information of the parties. A true and correct copy of the MNDA is attached hereto as **Exhibit 3**.

48.     For several months, Karma's infotainment development team worked with LMC employees Darren Post (Chief Technology Officer), Zak Stelmaszek (Director of Electrical Engineering), Jonathan Wood (Purchasing Manager), among others from LMC, to hammer out the deal. This involved providing LMC access to Karma's trade secrets and a peek at Karma's computer source code, designs, cost and pricing information, vendor and supplier relationships, human

capital and skills capabilities of Karma's software engineers, and other sensitive and proprietary information. All of this access that LMC was afforded was subject to the MNDA.

49. After some months of discussions around the potential parameters of the project, in April 2020, Karma submitted a Statement of Work for the project, which included a rough quote. Defendant Durre was appointed to lead the project for Karma. Little did Karma know that it was around this time that Defendant Post of LMC started to scheme with Defendant Durre to potentially cut out Karma, as more fully described below.

50. In June 2020, LMC informed Karma that it selected Karma for the Endurance project, and on June 11, 2020, Karma and LMC entered into a Letter of Intent that detailed the infotainment services Karma would provide for the Endurance project. The Letter of Intent represented the parties' intent to work together in good faith to negotiate, prepare, execute, and deliver definitive agreements governing the scope of the Endurance project. The Letter of Intent specifically emphasized that the MNDA remained in full force and effect.

51. On or about June 24, 2020, Defendant Durre (as Karma's project lead) submitted an updated quote for Karma's services to LMC.

52. On July 9, 2020, LMC informed Karma that they would be moving forward with the project and would issue its initial payment "shortly."

53. Throughout the months of June and July 2020, after having been in talks over this deal since February 2020, LMC gave every indication to Karma that it intended to move forward with utilizing Karma's services

**The Scheme to Steal Karma's Trade Secrets and Confidential Information and Raid Karma's Employees**

54. Contrary to its representations to date, suddenly and without warning, on August 6, 2020, LMC terminated the Letter of Intent, without prior notice, informing Karma that LMC had "decided to move in a different direction with

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

respect to [Karma's] current offering." In its letter terminating the Letter of Intent, LMC stated it would "return, destroy, and/or erase and confidential information received from Karma." A true and correct copy of the email and letter that LMC sent to Karma on August 6, 2020 terminating the Letter of Intent is attached hereto as **Exhibit 4**.

55.   Karma is informed and believes, and on that basis alleges, that what LMC meant by "different direction", which Karma did not discover until very recently, was the fruition of LMC's plan to steal and misappropriate Karma's Trade Secrets and Confidential Information and key employees to enable LMC to develop the infotainment for the Endurance project in-house and to start its own "LMC Infotainment Group" in California, where it had absolutely zero presence prior to initiating talks with Karma in February.

56.   Given LMC's plan to misappropriate and steal Karma's Trade Secrets and Confidential Information, LMC also never fulfilled its obligation to return, destroy, or erase Karma's Trade Secrets and Confidential Information which it had received under the parties' MNDA.

57.   Karma's investigation to date – which is ongoing and has not been completed – has revealed that LMC began coordinating with Durre as early as **April 2020** to plan the transition of Defendant Durre's team over to LMC along with all their know-how and Karma's confidential and trade secret information.

58.   The forensic evidence recovered from Durre's work computer reveals the following timeline regarding LMC's scheme, specifically LMC Individual Defendants Post and LeFleur in collaboration with Defendant Durre, to misappropriate Karma's Trade Secret and Confidential Information:

59.   On March 30, 2020, less than two months after LMC and Karma entered into the MNDA (February 7, 2020), Defendant Durre began to communicate with a commercial real estate agent using a personal email account accessed on a web browser on his Karma-owned computer about looking for

commercial office space. Durre continued this email conversation on and off for several months until he connected this real estate agent with LMC's Chief Operating Officer LeFleur on August 5, 2020 to help LMC look for commercial real estate in Orange County, California, where Durre's new LMC infotainment team would be located. Durre had no legitimate business purpose for engaging in this correspondence or looking for commercial office space in connection with his job at Karma or with the LMC-Karma Endurance deal. True and correct copies of these email exchanges, which were recovered from Durre's Karma computer, are collectively attached hereto as **Exhibit 5**.

60.    On April 2, 2020, Defendant Durre was communicating with Defendant Post of LMC to discuss an internal LMC organization chart and advise LMC on how the structure would "sell with investors." This email exchange was on Defendant Durre's personal Gmail account instead of his Karma email account and had no legitimate purpose in connection with the LMC-Karma Endurance deal. A true and correct copy of this email exchange, also recovered from Durre's Karma computer, is attached hereto as **Exhibit 6**.

61.    On July 30, 2020, seven (7) days before LMC cancelled the deal with Karma, Post sent an email to Durre with the subject "Endurance Infotainment Systems Cost Savings Estimate: justify LMC Infotainment - West." At the time of this email, LMC did not have any infotainment development operations or employees on the west coast of the US. In this email, Post seeks help from Durre to quantify the savings that LMC would realize by hiring Durre and his team and proceeding with project Endurance in-house without Karma. By Post's own estimate, LMC would save $4.6 million by hiring Durre and his Karma team and taking advantage of all their work product and Karma's trade secrets and confidential information. This email reflects clear evidence of the intent to sabotage the deal with Karma, raid its workforce, and misappropriate Karma's trade secrets. A true and correct copy of the July 30, 2020 email is attached hereto as **Exhibit 7**.

62.     On August 1, 2020, Defendant Durre received an offer letter from LMC to become LMC's Director of Software, and the emails he received from LMC around this time that Karma recovered from his Karma computer show that he was enrolled as an employee in LMC's Paylocity system by August 3, 2020. True and correct copies of this offer letter and subsequent emails showing Durre's enrollment with LMC, which were found on Durre's Karma computer, are attached collectively hereto as **Exhibit 8**.

63.     LMC's scheme involved senior executives at LMC all the way up to its CEO Steve Burns. On August 4, 2020, two days before LMC canceled the deal with Karma, Burns and several other LMC executives (including Schmidt and Post) exchanged emails regarding the hiring of Defendant Durre and growing his new team quickly, as well as looking for commercial real estate space in Orange County. A true and correct copy of this email is attached hereto as **Exhibit 9**. Defendant Post accidentally forwarded this email exchange to Defendant Durre's Karma email account instead of Durre's personal account, as Defendant Post immediately tried to "recall" the message unsuccessfully. A true and correct copy of the recall message is attached hereto as **Exhibit 10**.

64.     Notwithstanding, Defendant Durre did not resign from Karma until September 1, 2020 and did not inform Karma of his intent to leave until August 27, 2020 – meaning he had access to Karma's Trade Secrets and Confidential Information for a full month while he was working for and on behalf of LMC. A true and correct copy of Durre's resignation letter is attached hereto as **Exhibit 11**. Significantly, LMC did not terminate the Letter of Intent with Karma until August 6, 2020 – when LMC was assured that its scheme of poaching Karma's infotainment development team was in action by having Defendant Durre work as a double agent. Indeed, Durre began using and accessing an LMC email account on his Karma laptop on August 5, 2020, and created bookmarks to at least two LMC SharePoint folders that same day:

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

a. https://lordstownmotors.sharepoint.com/teams/InfotainmentandConnectedVehicle-Management

b. https://lordstownmotors.sharepoint.com/teams/InfotainmentandConnectedVehicle.

65. Between July 28, 2020, just a few days before he received his offer letter from LMC and became employed by LMC on August 3, 2020, and September 1, 2020, Defendant Durre utilized removable storage devices and cloud services to copy and download to these external locations at least seven of Karma's files or folders containing Trade Secrets and Confidential Information, including but not limited to highly confidential and valuable software information.

66. Specific examples of confidential and trade secret information Durre stole from Karma include:

**a. July 28, 2020: H3 Karma eBOM _2018_07_024**

  i. This document is on a removable drive that was connected to Durre's computer via USB.

  ii. This document contains all of the cost structures of different components of a brand-new electric SUV. This is unrelated to any work on the LMC project.

  iii. Karma spent approximately $32.3 million developing this project in collaboration with a global auto manufacturer with which Karma had entered into a mutual non-disclosure agreement to protect this information.

  iv. This document is extremely valuable to Karma and to competitors because it provides a roadmap to Karma's process for building SUV components, as well as the cost of each component. A competitor could utilize this document to bypass 18 months of time it would otherwise take them to develop, build, and price an electric SUV.

22

### b. August 5, 2020: Quote 7 BOM Breakdown

    i. This document is on a Western Digital Book removeable storage device, Serial No. D6F8ED2D.

    ii. This document contains the cost breakdown of the infotainment system Karma was developing for LMC's Endurance deal.

    iii. Karma spent months developing the specifications and costs for the various components for the Endurance deal.

    iv. This document is valuable to Karma because it represents months of work for development of an infotainment service for an electric SUV. This document would be used as a baseline for potential future opportunities. This document is also particularly valuable to LMC because it was internal to Karma and was never supposed to be shared with LMC. This document will allow LMC to replicate the exact cost structure of the infotainment system Karma was to develop for LMC. This helps advance LMC's scheme of stealing Karma's trade secrets in order to build its own infotainment system in-house, without Karma.

    v. Access to this file was limited to only those Karma employees who were involved in pricing quotes for the Endurance deal with LMC (several of whom have left employment with Karma to join LMC).

### c. August 14, 2020: HC Planning Document for Engineering Team

    i. This document is on a Western Digital Book removeable storage device, Serial No. D6F8ED2D.

    ii. This document contains Karma's engineering team's internal estimates and figures to develop the HC project, including a breakdown of discrete tasks and projects to complete and the

1    amount of expected labor time and costs to complete them.

2    iii.  Karma spent several months developing this document.

3    iv.  This document is extremely valuable to Karma and to competitors because it provides a precise breakdown of the discrete tasks, needs, and human capital to move forward on the project. This would provide a competitor a months' long head start on its development and planning stages.

**d.  August 14, 2020: Specifications and Process Documents for KPDS**

i.   This document is on a Western Digital Book removeable storage device, Serial No. D6F8ED2D.

ii.  This document contains a roadmap for Karma's internal processes for developing a vehicle – from building a factory, to how to synchronize suppliers, to Karma's guidelines for quality assurance.

iii.  This document is extremely valuable to Karma and to competitors because it essentially constitutes Karma's internal model for building a vehicle from the ground floor to a finished product. In the hands of a competitor, it would allow the competitor to replicate Karma's processes for building a vehicle and quality assurance processes.

**e.  August 19, 2020: Roadmaps Project Document**

i.   This document is on a Western Digital Book removeable storage device, Serial No. D6F8ED2D.

ii.  This document contains internal development information regarding Karma's future designs for infotainment technology developments and other future vehicle developments.

iii.  This document is extremely valuable to Karma and to competitors because it provides direct insight into Karma's

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

research and development for the core of its business – vehicle development and vehicle technology development. This would allow a competitor to learn the progress Karma has made internally on new vehicle and technology innovations and copy that work product.

**f.   August 31, 2020: Licenses and Contracts with Vendor**

    i.   These documents are on a Western Digital My Book removable storage device, Serial No. D6F8ED2D.

    ii.   These documents contain information on costs and volumes of potential projects being collaborated on with a vendor. These relate to future infotainment systems that vendor and Karma are developing together.

    iii.   Both Karma and vendor have entered into non-disclosure agreements to protect this information.

    iv.   These documents are extremely valuable to Karma and to competitors because they evidence collaboration plans for development of future infotainment technology. They contain not only Karma's internal development, but vendor's as well.

**g.   September 1, 2020: CGW Internal Projects**

    i.   This document is on a Western Digital My Book removable storage device, Serial No. 574341563541363732383336.

    ii.   This document contains internal project information to develop hardware and software for an internal gateway, which includes information on planning for the next generation of vehicle infotainment systems.

    iii.   This document is extremely valuable to Karma and to competitors because it provides internal strategic planning for future projects that are not even yet at market.

FP 39002579.1

### h.  September 1, 2020: Project Documents for the K1_2 Project

    i.  This document is on a Western Digital Book removeable storage device, Serial No. D6F8ED2D.

    ii.  This document contains internal projects specifications for Karma's Revero GT vehicle, and development plans for future models.

    iii.  Karma has spent years developing this vehicle and continues to spend significant labor hours in developing future specifications for the vehicle.

    iv.  These documents are extremely valuable to Karma because they represent internal project documents for one of Karma's top-flight vehicles in the market. A competitor could utilize these documents to duplicate the specifications for the Revero GT vehicle and build their own competing vehicle.

67.    Durre's last day of employment with Karma was September 1, 2020, and on this day his access to Karma's systems and email was deactivated.

68.    When Defendant Durre became employed by LMC on August 3, 2020, and especially because he was hired by LMC into a managerial position, Durre no longer had proper authorization from Karma to access Karma's computer systems. Karma never consented to or authorized any LMC employee or manager to access its computer systems. To the extent Durre continued to access Karma's system after he became employed by LMC, such access was in his capacity as an LMC employee and for the benefit of LMC, and therefore his access was unauthorized, or he obtained authorization under false pretenses. Defendant Durre's prior authorization to access Karma's systems became null and void on August 3, 2020. Thereafter, Durre lied to Karma and concealed material information from Karma to enable himself to continue to gain access to Karma's systems and steal its trade secrets. Karma would not have allowed Defendant Durre

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

to maintain access to its computer systems if it knew that he started employment with LMC on August 3, 2020 in a managerial position.

69.     LMC's scheme to hire Karma employees while they continued to work for Karma did not end with Defendant Durre. On September 21, 2020, Defendant Durre used his LMC email account to send an email to the Karma email address of a former Karma employee, and then-current LMC employee, Brian Green (who had resigned from Karma to join LMC on August 21, 2020 and prior to that was part of Karma's infotainment team that was working on the Karma-LMC Endurance project). A true and correct copy of this email is attached hereto as **Exhibit 12**. This September 21 email appears to have been accidentally sent by Durre to Green's old Karma email account as Green did not have access to that account after his employment with Karma ended on August 21, 2020. The September 21 email revealed an earlier email in the same email chain on August 24, 2020 where Defendant Durre was using his LMC email account to communicate regarding LMC business with five (5) former Karma employees or contractors (Durre, Steven Punak, Brian Green, George Huan, and Bradley Westerhof). As of August 24, 2020, when this email was circulated, all five individuals had LMC email addresses and at least two of them (Durre and Huan) were still employed by Karma and had access to Karma's systems while the rest had recently joined LMC.

70.     Defendant Durre did not end at merely stealing Trade Secrets from Karma. Between 11:23 p.m. on August 31, 2020 and 4:59 p.m. on September 1, 2020, his last day of employment at Karma, Defendant Durre also intentionally deleted and "double deleted" thousands of files in Karma's OneDrive SharePoint system and hard drive so that this information could not be recovered by Karma. This intentional sabotage constitutes a criminal act and was done with the intent to cripple Karma's ability to remain competitive in the marketplace against the new infotainment team Durre and other former Karma employees and contractors had

established at LMC. Durre was never authorized or permitted to delete any of his work product or work files from Karma's SharePoint. He had no legitimate business reason for doing so.

71.    Separate and apart from the downloading and copying of Karma's Trade Secrets and Confidential Information described above, Karma's investigation and review of Defendant Durre's Karma email account shows that he forwarded from his Karma email account to his personal email account numerous emails containing vendor and pricing information, along with "Endurance" project-related information (some of which contain Trade Secrets and/or Confidential Information), beginning prior to him giving Karma his notice of resignation, but after he received his job offer from LMC. Durre had no legitimate Karma-business related purpose to send these emails to his personal email account. Specifically, Durre forwarded emails from his Karma email account to his joe.durre@gmail.com or rjdurre@aol.com accounts as follows:

   a.   August 3, 2020 - re 'Document 1' which is a list of positions that would be part of an Infotainment Engineering Team.

      •   This document represents a blueprint of an infotainment development or engineering department and closely follows the Karma organizational structure, and therefore could be used as a roster for LMC to use to raid Karma's employees for an in-house infotainment department. Durre had no legitimate business purpose for sending this information to his personal email account on the day he became employed by LMC.

   b.   August 3, 2020- re IVI PoC with GmbH-from Vendor

      •   This document contains Confidential Information regarding audio/video distribution in vehicles and a proposed specific proof of concept designed for Karma's use, received from a software vendor subject to an NDA.

c. August 3, 2020- re Hydra and LiDAR- from Vendor
- This document contains Confidential Information regarding Lidar Sensors received from a Lidar sensor vendor subject to an NDA.

d. August 3, 2020- re Sales Deck from Vendor
- This document contains Confidential Information regarding Connected Vehicle Services received from a Connected Vehicle Service vendor subject to an NDA.

e. August 3, 2020- re Telematic Reference from Vendor
- This document contains Confidential Information on the design of a telematics control device received from a communications and positioning module solutions and u-blox vendor subject to an NDA.

f. August 3, 2020- re WELLS schematic from Karma internal team
- This document contains non-public operational and cost projection information for an internal Karma project. This can be used by a competitor to duplicate Karma's blueprints and cost preparations for a similar project. This is the next generation of DIS/Cluster hardware and software for Karma vehicles and was intended to be sold to LMC under the original Letter of Intent.

g. August 4, 2020- re NDA_List with prospective vendors
- This document contains Confidential Information in the form of Karma's prospective vendor list, which Karma does not share outside of the company. This document has taken years for Karma to develop through its years of working with vendors and would allow a competitor to know exactly which vendors Karma prefers for its projects. This is a hand-picked and vetted

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

list of vendors that would take a competitor time and efforts to vet and is the complete list of vendors that comprise the Karma Infotainment system.

h. August 5, 2020- re ACU6 Pro Auto mechanical file from Vendor

- This document contains Confidential Information regarding a new global telematics control device received from a telematics control vendor subject to an NDA.

i. August 5, 2020- re Benchmark pricing for a TCU from internal teammate

- This document contains non-public pricing information that Karma intended to use for the Endurance project that was never previously shared with LMC. Durre had no legitimate business purpose to send this information to his personal email account. This information could easily be used by LMC to skip the steps of soliciting pricing information, and instead use Karma's efforts that were never shared with LMC.

j. August 12, 2020- re PR SP Contract Extension 200214

- This document contains the terms of a contract extension with one of Karma's key contracted vendors. This information identifies one of Karma's preferred vendors (which Karma does not share outside of the company) along with the terms of engagement between the two companies. This could be used by a competitor to bid against Karma for this particular vendor's services, or to simply bring this vendor on board with the LMC's new Infotainment Team.

k. August 15, 2020- re Global High-End Auto Manufacturer Infotainment System

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

- This document contains non-public information regarding Karma's work for Porsche in providing an infotainment system for one of its vehicles. It contains a high-level summary of the construction and pricing of the infotainment system, which would be valuable to a competitor to use either to create its own infotainment system by copying Karma's information, or to use to compete with Karma to offer similar infotainment services to Karma's business partners.

l.   August 19, 2020- re SDK Evaluation- regarding Vendor

- This document contains Confidential Information regarding Automotive Artificial Intelligence received from an automotive artificial intelligence vendor subject to an NDA.

m. August 19, 2020- re ESM Charging, from Vendor

- This document contains Confidential Information regarding CAN communication protocol and design received from an external sound module vendor subject to an NDA.   This document pertains to a system that was to be sold to LMC under the Letter of Intent or as a component to the marketplace.

n.   August 19, 2020- re Quotes needed for new audio system

- This document contains Confidential Information regarding product features and design received from an audio amplifier and speaker vendor subject to an NDA.

o.   August 19, 2020- re Forms from Vendor

- This document contains Confidential Information regarding human perception artificial intelligence received from a human perception artificial intelligence vendor subject to an NDA.

p.   August 19, 2020- re Vendor information

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

- This document contains Confidential Information infotainment system design received from an infotainment system vendor subject to an NDA.

q. August 19, 2020- re NDA and W-9 from Vendor

- This document contains non-public information regarding one of Karma's preferred vendors, which Karma does not share outside of the company. Karma has developed its preferred vendors through its years of working with several vendors, and this information would allow a competitor to know exactly which vendors Karma prefers for its projects.

r. August 20, 2020- re K---- and Geo, from Vendor

- This document contains Confidential Information regarding flash memory technology received from a memory chip electronics vendor subject to an NDA.

s. August 31, 2020- internal presentation with targeted list of suppliers

- This document contains the identity of several of Karma's preferred suppliers, which Karma does not share outside the company. This information has taken years for Karma to develop through its years of working with various suppliers. This information would enable a competitor to know exactly which suppliers Karma prefers for its projects.  Combined with the schematics for each of the proposed suppliers' systems, which Durre forwarded to himself or downloaded, LMC would be able to quickly establish a relationship and continue with Karma's designs.

t. August 31, 2020- re Solution Design, from Huan to internal team

- This document contains architectural designs for an aspect of the infotainment system Karma was developing for the

32

Endurance deal. This document, which was never shared with LMC, would allow a competitor to copy Karma's designs for a portion of the infotainment system. This is highly confidential and Karma spent significant resources on developing it. It could also be used to harm Karma as it can be used to hack the Karma FOTA system.

u. September 1, 2020- re Q2/2020 Update WayRay, from internal team.

- This document contains Confidential Information regarding display technology received from an electronics vendor subject to an NDA.

72. Karma is informed and believes that Defendant Huan participated in the scheme, based upon Karma's forensic investigation of Defendant Huan's Karma-owned computer. Specifically, the forensics investigation of Huan's computer reveals the following evidence of Defendant Huan's furtherance of LMC's scheme to create its own "LMC Infotainment Group":

a. On June 2, 2020, Huan utilized a removable storage device connected to his Karma computer to copy and download to external locations at least five (5) Karma files containing Trade Secrets and Confidential Information, including but not limited to highly confidential and valuable software information, component costs, supply chain information, and documents and data containing specifications and blueprints for speaker systems, video systems, and software code. Huan had no legitimate business reason in connection with any work he may have been performing for Karma at the time to be downloading any of these files to an external location outside Karma's control.

b. On June 2, 2020, Huan created a folder on an external storage device called: D:\ghuan_ca\Karma\NewOrg\lmc. Included within that folder were documents relating to the LMC Infotainment Connected System,

33

such as Karma's Investment Rate of Return Calculations and Feature Content and Timing. Huan never turned over this external storage device to Karma. Thus, unless if he destroyed it, there is no question he is currently in possession of files containing Karma's Trade Secrets and Confidential Information.

c. Huan copied and downloaded an additional five (5) files to his removable storage device from August 14 through 27, 2020, after LMC had cancelled the project, after he had given notice of his resignation, and after he had begun working for LMC and using an LMC email account. These additional files included documents relating to Karma's Infotainment Connected System and its System Architecture. Huan had no legitimate business reason in connection with any work he may have been performing for Karma at the time to be downloading these files to an external device outside Karma's control.

d. On August 31, 2020, three days after Huan's employment with Karma ended and his access to Karma systems and email was suspended, and the day before he returned the Karma laptop to the company, Huan attempted to delete all 57,000-plus files and folders located in his 'C:\ghuan_ca' base folder. Huan had no authorization to access any Karma computer after August 28, 2020.

e. Also, on August 31, 2020, Huan accessed several Karma-related folders on his Karma laptop. Huan did not have authorization to access this Karma computer after August 28, 2020.

73. Karma is informed and believes and, on that basis, alleges that LMC continues to use Karma's stolen information to develop the infotainment system for its new fleet of electric pickup trucks, and to raid Karma's employees to further its scheme of bringing over Karma information with new employees and to hinder

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

Karma's ability to develop its own cutting-edge technology.

74.     Because LMC continues to retain and use Karma's Trade Secrets and Confidential Information – and continues in its scheme to raid Karma's employees and damage Karma's ability to compete in the marketplace – Karma's damages are ongoing and significant. First, the loss of the Endurance deal with LMC represents an anticipated loss of over three billion dollars in anticipated future revenue for Karma through 2024.

75.     LMC also currently retains significant amounts of Karma's Trade Secrets and Confidential Information and can use that information to compete with Karma and develop the infotainment system for Endurance pickup trucks "in-house" – at a significant saving, using cutting-edge technology developed by Karma. The damages in lost business opportunities are significant.

76.     In addition, some of the files taken by Durre and LMC are subject to NDA's between Karma and third parties. The taking of these files may expose Karma to potential claims under those third-party NDA's. Durre and the other former Karma employees did not have authorization from any of those third parties to take and retain possession of those files outside of the course of their employment with Karma, and LMC certainly had no authorization to use Durre and others to acquire possession of those files.

## COUNT I

## (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.*)

## Against LMC and LMC Individual Defendants

77.     Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 76.

78.     Karma's computers used by Employee Defendants are "protected computers" within the meaning of 18 U.S.C. § 1030(e) because they are computers purchased by Karma then issued to Employee Defendants, who used the computers for the purposes of performing services for Karma. Similarly, Karma's SharePoint

drive and other repositories of Karma's data reside on protected computers under Karma's exclusive control.

79.    Karma is informed and believes, and thereon alleges, that Durre and Huan were acting as agents of LMC prior to their resignations from Karma in August 2020.

80.    Therefore, Karma is informed and believes that LMC and the LMC Individual Defendants, acting through their agents, Durre and Huan, knowingly, intentionally, and with the intent to defraud Karma, accessed Karma's computers without authorization in an effort to download and transfer files containing Karma's confidential and proprietary files and trade secrets, as well as to delete and purge files from Karma's computer systems. Karma never authorized any employee or agent of LMC to access LMC's computer systems.

81.    As a result, LMC and LMC Individual Defendants furthered their intended fraud upon Karma and caused Karma damages and loss to Karma's computer systems in excess of $5,000.

82.    As a consequence of the foregoing, Karma has suffered and will continue to suffer irreparable harm and loss, and has sustained damages including but not limited to loss of the stolen property, loss of the work product Durre and Huan were expected to produce for Karma, and the cost of Karma's investigation of Employee Defendants' retention and access of Karma's confidential and trade secret information after they became employed by LMC, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

83.    Karma has no adequate remedy at law for these injuries unless and until LMC and LMC Individual Defendants are ordered to return Karma's property, Trade Secrets, and Confidential Information and restrained from using Karma's Trade Secrets, and Confidential Information in the future, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

protect its interest.

84.    Karma, therefore, is entitled to temporary, preliminary and permanent injunctions, as prayed for herein, ordering LMC and LMC Individual Defendants to return the property and information they stole from Karma and prohibiting LMC and LMC Individual Defendants from further acts of misuse and disclosure of Karma's Trade Secrets, and Confidential Information, as alleged herein.

## COUNT II

### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*.)

### Against Employee Defendants

85.    Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 84.

86.    Karma's computers used by Employee Defendants are "protected computers" within the meaning of 18 U.S.C. § 1030(e) because they are computers purchased by Karma, and then issued to Employee Defendants, who used the computer for the purposes of performing services for Karma.

87.    Karma is informed and believes, and thereon alleges, that Employee Defendants knowingly, intentionally, and with the intent to defraud Karma accessed Karma's computers either without authorization or with authorization they obtained under false pretenses and based on lies, misrepresentations, and failure to disclose material facts that Employee Defendants were legally and contractually obligated to disclose to Karma, in an effort to download and transfer files containing Karma's confidential and proprietary files and trade secrets, as well as to delete and purge files from Karma's computer systems. While Employee Defendants previously were granted access to Karma's computers in connection with their employment with Karma, such access and authorization became null and void when the Employee Defendants became employed by LMC. Karma never authorized or consented to Employee Defendants accessing Karma's computer systems in their capacity as agents and employees of LMC.

FP 39002579.1

88.    As a result, Employee Defendants furthered their intended fraud upon Karma and caused Karma damages and loss to Karma's computer systems in excess of $5,000.

89.    As a consequence of the foregoing, Karma has suffered and will continue to suffer irreparable harm and loss, and has sustained damages including but not limited to loss of capital, loss of the stolen property, loss and disclosure of the work product Employee Defendants were engaged to produce for Karma, and the cost of Karma's investigation of Employee Defendants' retention and access of Karma's computers after they become employed by LMC, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

90.    Karma has no adequate remedy at law for these injuries unless and until Employee Defendants is ordered to return Karma's property, Trade Secrets, and Confidential Information and restrained from using Karma's Trade Secrets and Confidential Information in the future, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interest.

91.    Karma, therefore, is entitled to temporary, preliminary and permanent injunctions, as prayed for herein, ordering Employee Defendants to return the property they stole from Karma and prohibiting Employee Defendants from further acts of misuse and disclosure of Karma's Trade Secrets, and Confidential Information, as alleged herein.

## COUNT III

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)**

**Against All Defendants**

92.    Plaintiff re-alleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 91.

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

93.    Karma's Trade Secrets alleged above constitute trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836).

94.    Karma's Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from use of the Trade Secrets.

95.    Karma has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring unique usernames, passwords, and dual-factor authentication to access Karma's computer systems and records, restricting access to the most sensitive trade secret information to only those with a business need to know or access the information for purposes of performing their job for Karma, and having employees, contractors and third parties sign agreements which expressly prohibit the use, removal and disclosure of such information.

96.    The foregoing conduct of Defendants constitutes an actual and threatened misappropriation and misuse of Karma's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1836.

97.    Defendants' actions with respect to Karma's Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Karma of the benefits of Karma's own substantial investment and efforts and steal the fruits of years of Karma's labor.

98.    As a proximate result of Defendants' acts as alleged above, Karma to date has suffered, and will continue to suffer, actual damages, including, but not limited to, loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be proven at trial. As a further proximate result of the misappropriation, Karma is informed and believes that Defendants have been unjustly enriched as a result of the misappropriation of Karma' Trade Secrets. The amount of this unjust enrichment cannot presently be ascertained.

/ / /

FP 39002579.1

99.   Karma is informed and believes that Defendants continue to possess, use, and disclose Karma's misappropriated Trade Secrets. Defendants' conduct therefore threatens further wrongful misappropriation, use, disclosure, and destruction of Karma' Trade Secrets.

100.   As a proximate result of Defendants' acts as alleged above, Karma will continue to suffer actual damages in an amount to be proven at trial unless Defendants are enjoined.

101.   Karma has no adequate remedy at law for these injuries unless and until Defendants are restrained from using Karma' misappropriated Trade Secrets in the future and ordered to return such information and property to Karma, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interest. Karma' damages are not easily quantified but include, and are not limited to, its lost profits and productivity as a result of damage to its reputation, goodwill, disruption of its operations, and time and resources spent investigating Defendants' unlawful conduct, in an amount to be proven at trial.

102.   Karma, therefore, is entitled to temporary, preliminary, and permanent injunctions, as prayed for herein, prohibiting Defendants from further acts of misuse and disclosure of Karma' misappropriated Trade Secrets and ordering Defendants to return such Trade Secrets to Karma immediately.

103.   Karma is informed and believes that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful, as revealed by Defendants' conduct described above. Karma is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C).

104.   Karma is entitled to an award of attorneys' fees pursuant to 18 U.S.C. §1836(b)(3)(D).

/ / /

/ / /

FP 39002579.1

## COUNT IV

**(Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426.1 *et seq.*)**

**Against All Defendants**

105.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 104.

106.   Karma's Trade Secrets alleged above constitute trade secrets under the California Uniform Trade Secrets Act (California *Civil Code* sections 3426 *et seq.*) and contain information which is not generally known to the public or to Karma's competitors, who can obtain economic value from its disclosure and use it in their own interest since it was compiled based on Karma's years of experience in business. This information is a valuable asset in that it provides Karma a competitive advantage over others. As set forth herein above, Karma has made reasonable efforts to keep this information secret, including having employees execute confidentiality agreements, setting forth confidentiality rules and policies, and implementing security systems on its computer system to prevent unauthorized access or disclosure.

107.   Defendants' actions with respect to Karma's Trade Secrets, as alleged above, were a deliberate scheme and plan to deprive Karma of the benefits of its own substantial investment and efforts and steal the fruits of years of Karma's labor.

108.   As a proximate result of Defendants' acts as alleged above, Karma to date has suffered, and will continue to suffer, actual damages in an amount to be proven at trial. As a further proximate result of the misappropriation, Karma is informed and believes that Defendants have been unjustly enriched as a result of the misappropriation of Karma's Trade Secrets. The amount of this unjust enrichment cannot presently be ascertained.

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

109.   Karma is informed through Defendants' own written admissions and believes that Defendants continue to use and disclose Karma's misappropriated Trade Secrets. Defendants' conduct therefore threatens further wrongful misappropriation, use, and disclosure of Karma's Trade Secrets.

110.   As a proximate result of Defendants' acts as alleged above, Karma will continue to suffer actual damages in an amount to be proven at trial unless Defendants are enjoined.

111.   Karma has no adequate remedy at law for these injuries unless and until Defendants are restrained from using Karma's misappropriated Trade Secrets in the future and ordered to return such information and property to Karma, because calculations of damages will be difficult, and Karma will be compelled to bring multiple suits to protect its interest. Karma's damages are not easily quantified but include, and are not limited to, its lost profits and productivity as a result of damage to its reputation, goodwill, disruption of its operations, and time and resources spent investigating Defendants' unlawful conduct, in an amount to be proven at trial.

112.   Karma, therefore, is entitled to temporary, preliminary and permanent injunctions, as prayed for herein, prohibiting Defendants from further acts of misuse and disclosure of Karma's misappropriated Trade Secrets and ordering Defendants to return such information and property to Karma immediately.

113.   Karma is informed and believes that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful, as revealed by Employee Defendants' conduct described above. Karma is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by California *Civil Code* section 3426.3.

114.   Karma also is entitled to an award of attorneys' fees pursuant to California *Civil Code* section 3426.4.

/ / /

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

## COUNT V

### (Breach of Contract-Count I)

### Against Employee Defendants

115.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 114.

116.   Karma and Employee Defendants are parties to the Confidentiality Agreement.

117.   Karma has performed all of the terms and conditions required of Karma under the Confidentiality Agreement.

118.   Employee Defendants' obligations under the Confidentiality Agreement are valid, enforceable and binding on Employee Defendants.

/ / /

119.   Despite their contractual obligations, Employee Defendants materially breached the Confidentiality Agreement based on the conduct described in the preceding paragraphs by, among other things, (a) taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information, (b) accepting employment with LMC, which created a conflict of interest with Karma, and (c) soliciting, recruiting or inducing Karma's employees to leave Karma and join LMC. Karma has been damaged by Employee Defendants' breaches of the Agreement in an amount to be proven at trial.

## COUNT VI

### (Breach of Contract-Count II)

### Against LMC

120.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 119.

121.   Karma and LMC are parties to the MNDA.

122.   Karma has performed all of the terms and conditions required of Karma under the MNDA.

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

FP 39002579.1

123.  LMC's obligations under the MNDA are valid, enforceable and binding on LMC.

124.  Despite its contractual obligations, LMC materially breached the MNDA based on the conduct described in the preceding paragraphs by, among other things, taking, disclosing, transferring, removing, misusing, and/or misappropriating Karma's Trade Secrets and Confidential Information.

125.  LMC also breached the duty of good faith and fair dealing under the MNDA by engaging under false pretenses in talks with Karma for Karma to provide services to LMC only to make a side deal with Karma's infotainment team to hire them directly for the project and cut out Karma from the deal.

126.  Karma has been damaged by LMC's breaches of the MNDA in an amount to be proven at trial.

127.  Because LMC expressly consented to injunctive relief in Section 13 of the MNDA, and because damages alone may not provide Karma with a complete or adequate remedy, Karma is also entitled to temporary, preliminary and permanent injunctive relief prohibiting LMC from directly or indirectly breaching the MNDA.

## COUNT VII

### (Tortious Interference with Contract)

### Against LMC and LMC Individual Defendants

128.  Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 24, 31 through 76, and 115 through 127 only.

129.  Karma has valid and enforceable confidentiality agreements with its employees and contractors, including, but not limited to Employee Defendants.

130.  LMC and LMC Individual Defendants knew or should have known of these former employees' contracts with Karma.

131.  LMC and LMC Individual Defendants willfully and intentionally interfered with these agreements, without privilege to do so, by aiding, abetting,

and assisting Employee Defendants in breaching their contractual obligations to Karma, including but not limited to their obligations to immediately return all of Karma's Confidential Information upon the end of their employment, to not use or disclose Karma's Confidential Information for their own benefit or outside the scope of their employment with Karma, to not solicit Karma's employees, and in Durre's and Huan's case, to not work for another employer in a position with similar duties to their job at Karma or that would create a conflict with their work for Karma.

132. LMC's and LMC Individual Defendants' misconduct was independently tortious and unlawful because it involved the conspiracy to recruit and hire Karma's infotainment team and have them work as double agents for Karma and LMC at the same time.

133. As a direct and proximate cause of LMC's and LMC Individual Defendants' misconduct, Karma suffered injuries, including, but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Karma's employment relationships, vendor relationships, and supplier relationships. Because LMC's and LMC Individual Defendants' tortious conduct was willful and malicious, Karma seeks exemplary damages.

## COUNT VIII

### (Tortious Interference with Prospective Economic Advantage)

### Against Employee Defendants

134. Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 24, 31 through 76, and 115 through 133 only.

135. Due to the Letter of Intent and LMC's assurances that payment was to be made "shortly," Karma had a reasonable expectation of receiving the benefits of its relationship with LMC for the production of infotainment systems for the Endeavor project.

136.   Employee Defendants knew or should have known of Karma's relationship with LMC.

137.   One or more Employee Defendants willfully and intentionally interfered with the relationship, without privilege to do so, by aiding, abetting, and assisting LMC in ending its relationship obligations to Karma.

138.   Employee Defendants' misconduct was independently tortious and unlawful because Employee Defendants breached their duty of loyalty by making a side deal with LMC while they were employed by Karma, which resulted in LMC ending its relationship obligations to Karma.

139.   Employee Defendant' conduct was a substantial factor in causing Karma's harm.

/ / /

140.   As a direct and proximate cause of Employee Defendants' misconduct, Karma suffered injuries, including, but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Karma's goodwill, business reputation, confidential information, trade secrets, employment relationships, vendor relationships, and customer relationships. Because Employee Defendants' tortious conduct was willful and malicious, Karma seeks exemplary damages.

## COUNT IX

### (Unfair Competition in Violation of Cal. Business and Professions Code § 17200 *et seq.*)

### Against All Defendants

141.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 24, 31 through 76, and 115 through 140 only.

142.   This is a claim for unfair business practices arising under California Business and Professions Code sections 17200 et seq., which prohibits unfair

46

competition.

143.   This cause of action for unfair competition is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of Employee Defendants while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Karma-LMC deal, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC, (b) LMC's and LMC Individual Defendants' breach of contract, breach of the duty of good faith and fair dealing, and unlawful raiding of Karma's workforce while at the same time promising Karma that the Endurance project deal is going through, (c) Defendants' conversion of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest, and (d) Defendants' other deceptive and unfair business practices that are alleged in this Complaint.

144.   On information and belief and in violation of California Business and Professions Code sections 17200 et seq., Defendants improperly misappropriated, removed, retained, and/or began using Karma's Confidential Information that Karma owns in accordance with Labor Code § 2860, as alleged above.

145.   Defendants' actions are part of a deliberate scheme and plan to deprive Karma of the benefits of its own substantial investment and efforts and to steal the fruits of several years of its labor, and to give Defendants an unfair competitive advantage.

146.   As a proximate result of Defendants' acts as alleged above, Karma to date has suffered, and will continue to suffer damages, unless Defendants are enjoined from using Karma's Confidential Information that each of them has misappropriated. Thus, as a proximate result of Defendants' wrongful acts, Karma

is entitled to restitution as provided for by California Business and Professions Code sections 17200 et seq. and a constructive trust in which Defendants as constructive trustees, hold their income, profits, commissions, fees, revenues or other funds, received as a result of their wrongful acts alleged herein above, for Karma's benefit.

147.   Defendants' wrongful conduct in using and/or disclosing and/or threatening to use or disclose Karma's Confidential Information will continue unless and until enjoined and restrained by order of this Court. Without such involvement, Defendants' conduct in stealing the fruits of Karma's business investments will cause great and irreparable injury to Karma's business in that Karma will lose and/or is at risk to lose employees by virtue of the Confidential Information that Defendants have obtained and misappropriated wrongfully.

148.   Karma has no adequate remedy at law for the injuries currently being suffered in that Defendants will continue to wrongfully use and/or disclose or be a threat to use or disclose Karma's Confidential Information that was wrongfully misappropriated, including but not limited to any information concerning Karma's employees that is not generally available to the public at large. Karma is entitled to a temporary, preliminary and permanent injunction against Defendants, as prayed herein.

149.   Defendants' conduct was willful and malicious, oppressive, fraudulent, despicable and in conscious disregard of the rights of Karma, and the resulting harm to Karma. Defendants acted with the intent to cause injury and to obtain an unfair competitive advantage over Karma in the market place. Therefore, Defendants are liable for restitution and exemplary and/or punitive damages in an amount to be established according to proof at trial for unfair competition, and a permanent injunction against Defendants is warranted enjoining Defendants' unfair competition as alleged in the prayer below.

/ / /

150.   The rights invoked herein petition for, implicate, invoke, and demand the enforcement of important rights affecting the public interest. Furthermore, because the relief sought will provide a significant benefit to the general public at large, Karma is entitled to an award of attorneys' fees to reimburse Karma for attorneys' fees incurred by undergoing the burden of seeking the private enforcement of statutes vindicating important public rights, including the right of the public to be free from illegal restraints of trade, unfair competition, and violations of the California Business and Professions Code.

## COUNT X

### (Breach of Duty of Loyalty)

### Against Employee Defendants

151.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 24, 31 through 76, and 128 through 150 only.

152.   Employee Defendants had and have a duty of loyalty to Karma by virtue of their duty to act for the benefit of Karma in matters connected with their contractual and employment relationship with Karma and by the special confidence reposed in them by Karma in connection with their exposure and access to Karma's Confidential Information.

153.   This cause of action is not based on the misappropriation of any Trade Secrets. Rather, Karma bases this cause of action on (a) the actions of Employee Defendants while they were still employed by Karma in breach of their duty of loyalty and/or contract with Karma including, but not limited to, being employed by and working for LMC while still employed by Karma, sabotaging and undermining the Karma-LMC deal, recruiting or supporting the recruiting of Karma employees for the benefit of LMC, and conspiring with LMC, (b) Employee Defendants' conversion and misappropriation of a separate category of information defined above as Confidential Information, which excludes by definition any trade secrets, and in which Karma has a separate, legally cognizable property interest,

and (c) Employee Defendants' other breaches of their duty of loyalty that are alleged in this Complaint.

154.   Employee Defendants breached their duty of loyalty owed to Karma by working for LMC while still employed by Karma and by supporting LMC's conspiracy to sabotage the LMC-Karma deal and enable LMC to recruit and hire Karma's infotainment team in-house and proceed with the Endurance Project without Karma.

155.   Employee Defendants' breaches of the duty of loyalty have directly and proximately caused Karma to suffer damages.

156.   The actions of Employee Defendants were and are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Karma entitling Karma to an award of punitive damages.

157.   But for an exercise of the equitable powers of this Court, Karma will be irreparably injured and harmed by Employee Defendants' continuing breaches of their duty of loyalty to Karma.

## REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINAY INJUNCTIVE RELIEF

158.   Plaintiff realleges and incorporates by this reference the allegations set forth in Paragraphs 1 through 157.

159.   Karma demonstrated, and the evidence to be presented at a hearing and/or trial will show, that Karma has a likelihood of success on the merits of one or more of its claims set forth in its Complaint.

160.   The CFAA, 18 U.S.C. § 1030(g) authorizes and provides an adequate, independent basis for the temporary restraining order and preliminary injunctive relief sought by Karma.

161.   Karma will be irreparably harmed without temporary (immediate) and preliminary injunctive relief that restores the status quo ante between Karma and Defendants before Defendants committed one or more of the wrongful acts

described in this Complaint.

162.   A balancing of the equities favors the entry of a temporary restraining order, followed by preliminary injunctive relief upon a hearing before the Court, in favor of Karma and, without the entry of such relief, Karma will suffer a greater hardship than Defendants would suffer if such relief were entered.

163.   Karma has no adequate remedy at law.

164.   It is in the public interest that confidential information remain protected and that the integrity of protected computers remains intact, rather than the alternative: unabated breaches of confidentiality agreements, disclosures of confidential and trade secret information and the hacking of computers by individuals and entities who are not authorized to access such computers or who access such computers in excess of their authorized access for the purposes of committing fraud, transferring information and/or destroying information that resides on protected computers.

## **PRAYER FOR RELIEF**

WHEREFORE, for the wrongful acts of Defendants complained of in the foregoing causes of action, Karma respectfully requests the following relief

A.   Judgment in its favor and against Defendants;

B.   Temporary, preliminary, and permanent injunctive relief, including a temporary restraining order, prohibiting any further wrongful possession, disclosure, and/or misuse of Karma's confidential and trade secret information, and preventing Defendants from profiting or benefiting from their wrongful conduct;

C.   An order that Defendants return to Karma, and purge from their possession, custody and control, any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations or derivations, which were removed from Karma or Karma-owned computer issued to Employee Defendants by Karma, or which were obtained by Defendants or anyone acting on their behalf or in concert with him;

D.     An order that Defendants return any and all confidential and/or trade secret information of Karma, and an order prohibiting any further use or benefit from the use of said information;

E.     An award of compensatory damages to Karma in an amount to be determined at a hearing and/or trial including, but not limited to, the attorney's fees, computer forensic fees and costs Karma has incurred to investigate and address Defendants' unauthorized access and improper use of Karma's computers;

F.     An order directing Defendants to disgorge all gross revenues and profits that they or anyone acting in concert or participation with them received as a result of their wrongful conduct, in an amount to be determined at trial;

G.     An award in favor of Karma for its costs associated with this action, including without limitation its attorneys' fees pursuant to the common law and under the Defend Trade Secrets Act, California Uniform Trade Secrets Act, and California *Business and Professions Code* section 17203;

H.     An award in favor of Plaintiffs for their costs, damages and computer forensics and related investigation fees and costs pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.;

I.     An award of exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C) and California *Civil Code* section 3426.3.

J.     An award of punitive damages in an amount to be determined at trial;

K.     An award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and California *Civil Code* section 3426.4.

L.     Compensation to Karma for any unjust enrichment enjoyed by Defendants, including restitution of all revenues, gains, profits, and advantages obtained by Defendants as a result of their wrongful and unlawful conduct, in an amount to be determined at a hearing and/or trial;

/ / /

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1

M. An award of pre-judgment and post-judgment interest as permitted by law;

N. An order imposing a constructive trust;

O. An order that Employee Defendants comply with the Confidentiality Agreement;

P. An order that LMC comply with the MNDA; and

Q. Any such other legal and equitable relief as the Court deems appropriate.

Dated: October 30, 2020            FISHER & PHILLIPS LLP

By:/s/  Usama Kahf
KARL R. LINDEGREN
SARINA SALUJA
USAMA KAHF
SEAN T. KINGSTON
ANDREW C. CRANE
Attorneys for Plaintiff
KARMA AUTOMOTIVE LLC

## **<u>DEMAND FOR JURY TRIAL</u>**

Karma demands trial by jury to the fullest extent as allowed by law.

Dated: October 30, 2020            FISHER & PHILLIPS LLP

By:/s/  Usama Kahf
KARL R. LINDEGREN
SARINA SALUJA
USAMA KAHF
SEAN T. KINGSTON
ANDREW C. CRANE
Attorneys for Plaintiff
KARMA AUTOMOTIVE LLC

COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES
FP 39002579.1



## CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT
## AND ARBITRATION AGREEMENT

As a condition of my employment with Karma Automotive LLC., its affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1. At-Will Employment.

   I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY AN OFFICER OF THE COMPANY (OTHER THAN ME). I ACKNOWLEDGE THAT THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT THE OPTION EITHER OF THE COMPANY OR MYSELF, WITH OR WITHOUT NOTICE.

2. Confidential Information.

   A. Company Information. I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of an officer of the Company (other than me), any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding the Company's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

   B. Former Employer Information. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information (including, but not limited to, software, source and object code, developments, techniques, inventions, processes, technology, designs and drawings) or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any

Exhibit_1
Page_1



such employer, person or entity unless consented to in writing by such employer, person or entity.

C. <u>Third Party Information</u>. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. <u>Inventions.</u>

A. <u>Inventions Retained and Licensed</u>. I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements and trade secrets that were made by me prior to my employment with the Company (collectively referred to as "Prior Inventions"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B. <u>Assignment of Inventions</u>. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company and hereby assign to the Company, or its designee, all my rights, titles and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the entire period of time I am in the employ of the Company (whether before or after the execution of this Agreement) (collectively referred to as "Inventions"), except as provided in Section 3.F below. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company (whether before or after the execution of this Agreement) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such invention.

Exhibit_1
Page_2



C. <u>Inventions Assigned to the United States</u>. I agree to assign to the United States government all my right, title and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company    and the United States or any of its agencies.

D. <u>Maintenance of Records</u>. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company.  The records will be available to, and remain the sole property of, the Company at all times.

E. <u>Patent and Copyright Registrations</u>.  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any

copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable
because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

F. <u>Exception to Assignments</u>.  I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on <u>Exhibit A</u>.

4. <u>Conflicting Employment</u>.  I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my

Exhibit_1
Page_3



employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5. <u>Returning Company Documents</u>.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3.D. In the event of the termination of my employment, I agree to sign and deliver the "<u>Termination Certification</u>" attached hereto as <u>Exhibit C</u>.

6. <u>Notification of New Employer</u>.  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7. <u>Solicitation of Employees</u>.  I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

8. <u>Conflict of Interest Guidelines</u>. I agree to diligently adhere to the Conflict of Interest Guidelines attached as <u>Exhibit D</u> hereto.

9. <u>Representations</u>. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company.  I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

10. <u>Arbitration and Equitable Relief.</u>

   A. <u>Arbitration</u>. IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, SHAREHOLDER, AFFILIATE OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2,  INCLUDING SECTION

Exhibit_1
Page_4



1283.05 (THE "RULES") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990,   THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION OR WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS.   I FURTHER UNDERSTAND

THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. Procedure.  I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH ITS NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW.   I UNDERSTAND THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR AAA EXCEPT THAT I SHALL PAY THE FIRST $200.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION I INITIATE. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING.

C. Remedy.   EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY.   ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW WHICH THE COMPANY HAS NOT ADOPTED.

D. Availability of Injunctive Relief. IN ADDITION TO THE RIGHT UNDER THE RULES TO PETITION THE COURT FOR PROVISIONAL RELIEF, I AGREE THAT ANY PARTY MAY

Exhibit_1
Page_5



ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF

THE CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION OR LABOR CODE §2870. I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E. Administrative Relief. I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

F. Voluntary Nature of Agreement. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED
FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT I AM WAIVING MY RIGHT TO A JURY TRIAL. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

11. General Provisions.

A. Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by the laws of the State of California without regard to the conflict of law provisions thereof. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

B. Entire Agreement. This Agreement, along with my offer letter of employment, sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless

Exhibit_1
Page_6



in writing signed by an officer of the Company (other than me) and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

C. Severability. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

D. Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

Signature of Employee: _____

Print Name of Employee: _____

Date: 12/05/16

Acknowledged and agreed:

KARMA AUTOMOTIVE LLC.

By: _____

Print Name: _____

Title: _____

Signature Page to KARMA AUTOMOTIVE LLC.

Confidential Information, Invention Assignment and Arbitration Agreement

Exhibit_1
Page_7



## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number or Brief Description

_____ No inventions or improvements

___*6*___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: _____

Date: ___12/05/16___

Exhibit_1
Page_8



## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

1. Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   a) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   b) Result from any work performed by the employee for the employer.

2. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Signature of Employee: _____

Print Name of Employee: _____

Date: _____12/05/16_____

Exhibit_1
Page_9



## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Karma Automotive LLC., its affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information, Invention Assignment and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information, Invention Assignment and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

Signature of Departing Employee: _____

Print Name of Departing Employee: _____

Date: _____

Exhibit_1
Page_10



## EXHIBIT D

### CONFLICT OF INTEREST GUIDELINES

It is the policy of Karma Automotive LLC., (the "Company") to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided. Any exceptions must be reported to an officer of the Company and written approval for continuation must be obtained.

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Confidential Information, Invention Assignment and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales or markets with competing Companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

Exhibit_1
Page_11



12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

Acknowledged and agreed:

Signature of Employee: _____

Print Name of Employee: _____

Date: _____

Exhibit_1
Page_12



**CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT
AND ARBITRATION AGREEMENT**

As a condition of my employment with Karma Automotive LLC., its affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1. <u>At-Will Employment</u>.

   I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY AN OFFICER OF THE COMPANY (OTHER THAN ME). I ACKNOWLEDGE THAT THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT THE OPTION EITHER OF THE COMPANY OR MYSELF, WITH OR WITHOUT NOTICE.

2. <u>Confidential Information</u>.

   A. <u>Company Information</u>. I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of an officer of the Company (other than me), any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding the Company's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

   B. <u>Former Employer Information</u>. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information (including, but not limited to, software, source and object code, developments, techniques, inventions, processes, technology, designs and drawings) or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any

Exhibit_2
Page_1



such employer, person or entity unless consented to in writing by such employer, person or entity.

C. <u>Third Party Information</u>. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. <u>Inventions.</u>

A. <u>Inventions Retained and Licensed</u>. I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements and trade secrets that were made by me prior to my employment with the Company (collectively referred to as "Prior Inventions"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B. <u>Assignment of Inventions</u>. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company and hereby assign to the Company, or its designee, all my rights, titles and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the entire period of time I am in the employ of the Company (whether before or after the execution of this Agreement) (collectively referred to as "Inventions"), except as provided in Section 3.F below. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company (whether before or after the execution of this Agreement) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such invention.

Exhibit_2
Page_2



C. <u>Inventions Assigned to the United States</u>. I agree to assign to the United States government all my right, title and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company    and the United States or any of its agencies.

D. <u>Maintenance of Records</u>. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings and any other format that may be specified by the Company.  The records will be available to, and remain the sole property of, the Company at all times.

E. <u>Patent and Copyright Registrations</u>. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any

copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable
because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

F. <u>Exception to Assignments</u>. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on <u>Exhibit A</u>.

4. <u>Conflicting Employment</u>. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my

Exhibit_2
Page_3



employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5. <u>Returning Company Documents</u>.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3.D. In the event of the termination of my employment, I agree to sign and deliver the "<u>Termination Certification</u>" attached hereto as <u>Exhibit C</u>.

6. <u>Notification of New Employer</u>.  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7. <u>Solicitation of Employees</u>.  I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

8. <u>Conflict of Interest Guidelines</u>. I agree to diligently adhere to the Conflict of Interest Guidelines attached as <u>Exhibit D</u> hereto.

9. <u>Representations</u>.  I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.  I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company.  I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

10. <u>Arbitration and Equitable Relief.</u>

A. <u>Arbitration</u>. IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND  IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, SHAREHOLDER, AFFILIATE OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2,  INCLUDING SECTION

Exhibit_2
Page_4



1283.05 (THE "RULES") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990,  THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION OR WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS.  I FURTHER UNDERSTAND

THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. <u>Procedure</u>. I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH ITS NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW.  I UNDERSTAND THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR AAA EXCEPT THAT I SHALL PAY THE FIRST $200.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION I INITIATE. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING.

C. <u>Remedy.</u>  EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY.  ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.  NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW WHICH THE COMPANY HAS NOT ADOPTED.

D. <u>Availability of Injunctive Relief</u>. IN ADDITION TO THE RIGHT UNDER THE RULES TO PETITION THE COURT FOR PROVISIONAL RELIEF, I AGREE THAT ANY PARTY MAY

Exhibit_2
Page_5



ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF

THE CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION OR LABOR CODE §2870. I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E. <u>Administrative Relief</u>. I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

F. <u>Voluntary Nature of Agreement</u>.   I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE.   I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED
FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT I AM WAIVING MY RIGHT TO A JURY TRIAL.   FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

11. <u>General Provisions</u>.

A. <u>Governing Law; Consent to Personal Jurisdiction</u>.  This Agreement will be governed by the laws of the State of California without regard to the conflict of law provisions thereof. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

B. <u>Entire Agreement</u>.  This Agreement, along with my offer letter of employment, sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless

Exhibit_2
Page_6



in writing signed by an officer of the Company (other than me) and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

C. Severability. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

   D. Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.


Signature of Employee: _____

Print Name of Employee: ___George Huan___

Date: __6/5/2017__


Acknowledged and agreed:

KARMA AUTOMOTIVE LLC.

By: _____

Print Name: _____

Title: _____


Signature Page to KARMA AUTOMOTIVE LLC.

Confidential Information, Invention Assignment and Arbitration Agreement

Exhibit_2
Page_7



## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Identifying Number or Brief Description

_____ No inventions or improvements

___✓___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: _____ Hong Xin  George Huan _____

Date: _____ June 6, 20'7 _____

Exhibit_2
Page_8

Granted US Patents: Inventor **Hong Xin George Huan**

- *US 8,233,877 - July 2012* "Discontinuous Reception of Burst for Voice Calls"
- *US 8,280,429 - October 2012* "Thermal Energy Control in a Mobile Transceiver"
- *US 8,150,446 - April 2012* "Thermal Energy Control in a Mobile Transceiver"

Exhibit_2
Page_9



## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

1. Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   a) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   b) Result from any work performed by the employee for the employer.

2. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Signature of Employee: _____

Print Name of Employee: _Hong Xia George Huen_

Date: _June 5, 2017_

Exhibit_2
Page_10



## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Karma Automotive LLC., its affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information, Invention Assignment and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information, Invention Assignment and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

Signature of Departing Employee: _____

Print Name of Departing Employee: _____

Date: _____

Exhibit_2
Page_11



## EXHIBIT D

### CONFLICT OF INTEREST GUIDELINES

It is the policy of Karma Automotive LLC., (the "Company") to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided. Any exceptions must be reported to an officer of the Company and written approval for continuation must be obtained.

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Confidential Information, Invention Assignment and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales or markets with competing Companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

Exhibit_2
Page_12



12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

Acknowledged and agreed:

Signature of Employee: _____

Print Name of Employee: ___ Hong Xin George Huan

Date: ___ June 6, 2017

Exhibit_2
Page_13

## MUTUAL NON-DISCLOSURE AGREEMENT

THIS MUTUAL NON-DISCLOSURE AGREEMENT (this "*Agreement*") is entered into between **Lordstown Motors Corp.,** a Delaware corporation ("*LMC*") and **Karma Automotive, LLC.** (the "*Company*" and together with LMC, the "*Parties*" and each individually, a "*Party*") as of 02/7/20 (the "*Effective Date*"), to protect the confidentiality of certain confidential information of the Parties exchanged in connection with **supplying hardware, software and consulting services** (the "*Permitted Use*"). For purposes of this Agreement, when one Party is disclosing Confidential Information to the other Party, the Party disclosing its Confidential Information is referred to as the "*Disclosing Party*" and when one Party is receiving Confidential Information from the other Party, the Party receiving the other Party's Confidential Information is referred to as the "*Receiving Party*."

1.     As used in this Agreement, "*Confidential Information*" means any and all non-public, confidential and/or proprietary information provided by the Disclosing Party to the Receiving Party, whether furnished before, on or after the date of this Agreement, in any form or medium, whether or not marked or designated as nonpublic, confidential or proprietary, and regardless of the preparer or the manner in which such information is furnished, including any and all notes, analyses, interpretations, compilations, memoranda, reports, studies and other documents or materials prepared by the Receiving Party or its representatives to the extent they contain, reflect or are otherwise based upon, in whole or in part, any such information. Without limiting the foregoing, Confidential Information includes any information that the Receiving Party knows or reasonably should know, is Confidential Information of the Disclosing Party, and any information regarding the Disclosing Party's and its affiliates': (a) patents and patent applications; (b) trade secrets; and (c) ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, software programs, software source documents, and formulae related to the current, future, and proposed products and services of the Disclosing Party and its affiliates, including without limitation the Disclosing Party's and its affiliates' information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, marketing plans and information the Disclosing Party or its affiliates provides regarding any third party person. As used in this Agreement, (a) the term "*person*" means a natural person, corporation, limited liability company, partnership, association, governmental agency or other entity, and an "*affiliate*" of a specified person means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the person specified and (b) the term "*representative*" means any director, officer, employee, agent, lender, partner or representative, including without limitation, any accountant, attorney or financial advisor of a person.

2.     Subject to Section 4, the Receiving Party agrees that at all times and notwithstanding any termination or expiration of this Agreement it will hold and will cause its representatives to hold in strict confidence and not disclose to any person any Confidential Information of the Disclosing Party, except as approved in writing by the Disclosing Party, and the

1

Exhibit_3
Page_1

Receiving Party will not use or permit the use of (whether by the Receiving Party's representatives or otherwise) the Confidential Information of the Disclosing Party for any purpose other than the Permitted Use. The Receiving Party will also protect the Disclosing Party's Confidential Information with at least the same degree of care that the Receiving Party uses to protect its own Confidential Information, but in no case, less than reasonable care. The Receiving Party will limit access to the Disclosing Party's Confidential Information to only those of its representatives having a need to know the Disclosing Party's Confidential Information in connection with the Permitted Use and who have signed confidentiality agreements containing, or are otherwise bound by, confidentiality obligations at least as restrictive as those contained herein. The Receiving Party shall be responsible for any breach of this Agreement by any of its representatives.

3.    Without the express prior written consent of the Disclosing Party, the Receiving Party will not, nor will the Receiving Party permit any of its representatives to, disclose to any person any information with respect to (i) the fact of its receipt of or access to any of the Disclosing Party's Confidential Information (ii) the fact, nature or status of any discussions between the Parties regarding the Permitted Use, or (iii) any other facts or information with respect to the nature, terms or status of any discussions regarding the Permitted Use between the Parties.

4.    Confidential Information shall not include any information that the Receiving Party can demonstrate with competent evidence:

    (a)    was in the public domain at the time it was disclosed to the Receiving Party or enters the public domain subsequent to the time it was disclosed to the Receiving Party, in each case, other than as a result of any direct or indirect act or omission by the Receiving Party or its representatives;

    (b)    was in the Receiving Party's possession free of any obligation (including any professional, contractual legal or fiduciary obligation) of confidence at the time it was disclosed to the Receiving Party; or

    (c)    was developed by employees or agents of the Receiving Party who had no access to and who did not otherwise use, rely on or reference any of the Disclosing Party's Confidential Information in connection with such development.

5.    Notwithstanding the above, the Receiving Party may disclose certain Confidential Information of the Disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is legally compelled by a valid order of a court or other governmental body having jurisdiction. In such circumstances, the Receiving Party shall provide the Disclosing Party with prompt written notice in advance of such disclosure in order to permit the Disclosing Party to seek a protective order or take other action it deems appropriate.  In such circumstances, the Receiving Party shall use reasonable efforts assist the Disclosing Party in obtaining a protective order preventing or other reasonable assurances that confidential treatment will be accorded the Disclosing Party's Confidential Information. If, in the absence of a protective order, the Disclosing Party or any of its

Exhibit_3
Page_2

representatives are, in the written opinion of the Receiving Party's legal counsel, compelled as a matter of law to disclose the Disclosing Party's Confidential Information, then the Receiving Party or such representatives may disclose to the person compelling such disclosure or as it orders only that part of the Disclosing Party's Confidential Information as is required by law to be disclosed and will use reasonable efforts to limit the scope of disclosure and obtain confidential treatment therefor.

6.    The Receiving Party will promptly notify the Disclosing Party in the event of any loss or unauthorized disclosure of any of the Disclosing Party's Confidential Information by the Receiving Party or its representatives.

7.    Upon the earlier of termination or expiration of this Agreement, or at any time upon written request (which includes e-mail) of the Disclosing Party, the Receiving Party will, at the Disclosing Party's option, promptly return to the Disclosing Party or destroy and cause the Receiving Party's representatives, to return or destroy any of the Disclosing Party's Confidential Information in its and their possession. Promptly following such return or destruction, the Receiving Party shall provide the Disclosing Party with a certificate duly executed by any authorized officer of the Receiving Party certifying the Receiving Party's compliance with this Section 7.

8.    A Disclosing Party's Confidential Information is and shall remain the sole property of the Disclosing Party. The Receiving Party recognizes and agrees that nothing contained in this Agreement will be construed as granting any property rights, by license or otherwise, to any of the Disclosing Party's Confidential Information disclosed under this Agreement, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on the Disclosing Party's Confidential Information. The Receiving Party will not make, have made, use or sell for any purpose any product or other item using, incorporating or derived from the Disclosing Party's Confidential Information. Neither this Agreement nor the disclosure of a Disclosing Party's Confidential Information hereunder shall result in any obligation on the part of either Party to enter into any further agreement with the other Party, license any products or services to the other Party, or to require the Disclosing Party to disclose any particular part of the Disclosing Party's Confidential Information. Nothing in this Agreement creates or shall be deemed to create any employment, joint venture, or agency relationship between the Parties.

9.    Confidential Information will not be reproduced in any form except as required to accomplish the Permitted Use. Any reproduction by the Receiving Party of the Disclosing Party's Confidential Information will remain the property of the Disclosing Party and will contain any and all confidential or proprietary notices or legends that appear on the original, unless otherwise authorized in writing by the Disclosing Party.

10.    Except as otherwise expressly provided in this Agreement, the Parties' obligations under this Agreement will terminate three (3) year(s) after the Effective Date; provided, however, that (a) Sections 7, 8, 10, 11, 12, 13, 14, 17, and 19 of this Agreement shall survive termination, (b) no termination shall relieve the Receiving Party of any liability in respect of any breach of this Agreement by the Receiving Party prior to termination and (c) the

3

Exhibit_3
Page_3

obligations of confidentiality and use restrictions set forth in this Agreement with respect to a Disclosing Party's Confidential Information that qualifies as a trade secret under applicable law shall survive for so long as such Disclosing Party's Confidential Information qualifies as a trade secret under applicable law.

11.     NEITHER DISCLOSING PARTY NOR ITS REPRESENTATIVES MAKES ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY OF ITS CONFIDENTIAL INFORMATION AND NEITHER DISCLOSING PARTY NOR ITS REPRESENTATIVES SHALL HAVE ANY LIABLITY TO THE RECEIVING PARTY OR ITS REPRESENTATIVES RESULTING FROM USE OF THE DISCLOSING PARTY'S CONFIDENTIAL INFORMATION BY THE RECEIVING PARTY OR ITS REPRESENTATIVES.  WITHOUT LIMITING THE FOREGOING, THE DISCLOSING PARTY IS PROVIDING CONFIDENTIAL INFORMATION ON AN "AS IS" BASIS FOR USE BY THE RECEIVING PARTY AT ITS OWN RISK AND THE DISCLOSING PARTY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

12.     This Agreement and any action related thereto will be governed, controlled, interpreted, and defined by and under the laws of the State of Ohio, without giving effect to any conflicts of laws principles that require the application of the law of any other jurisdiction. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement and covenants that neither it nor any of its representatives will assert (whether as plaintiff, defendant or otherwise) any right to trial by jury in any forum in respect of any legal action arising out of or related to this Agreement.

13.     The Parties hereby agree that a breach of this Agreement by such Party or its representatives will cause irreparable damage to the Disclosing Party for which recovery of money damages alone would be inadequate, and, accordingly, the Disclosing Party will be entitled to seek prompt specific performance and injunctive relief as remedies for any violation of this Agreement by the Receiving Party or its representatives, in addition to any and all other remedies available at law or in equity.

14.     If any provision of this Agreement is found by a proper authority to be unenforceable or invalid, such unenforceability or invalidity will not render this Agreement unenforceable or invalid as a whole and, in such event, such provision will be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions. No failure or delay in exercising any right hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.

15.     Neither Party will not assign or transfer any rights or obligations under this Agreement without the prior written consent of the other Party. Any attempted assignment or transfer

Exhibit_3
Page_4

in violation of the foregoing will be null and void. Notwithstanding the foregoing, LMC may assign this Agreement to a successor-in-interest to LMC's business, whether such assignment occurs in connection with a direct or indirect sale of substantially all of LMC's assets, equity, a merger, or otherwise.

16.     Neither Party will export, directly or indirectly, any U.S. technical data acquired by such Party from the other Party pursuant to this Agreement, or any products utilizing such data, in violation of the United States export laws or regulations.

17.     All notices or reports permitted or required under this Agreement will be in writing and will be delivered by personal delivery, electronic mail, or by certified or registered mail, return receipt requested, and will be deemed given upon personal delivery, five (5) days after deposit in the mail, or upon acknowledgment of receipt of electronic transmission. Notices will be sent to the addresses and email addresses set forth at the end of this Agreement or such other address as either party may specify in writing.

18.     Each Party agrees that the software programs of the other Party may contain valuable confidential information and agrees that it will not modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the other Party's Confidential Information without the prior written consent of the other Party.

19.     This Agreement is the final, complete and exclusive agreement of the Parties with respect to the subject matters hereof and supersedes and merges all prior discussions between the Parties with respect to such matters. No modification of or amendment to this Agreement will be effective unless in writing and signed by the Party to be charged. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which when taken together will constitute one and the same agreement. Electronic copies of signatures will be deemed to be originals for all purposes.

*[Remainder of page intentionally left blank]*

4825   462 7503 2

Exhibit_3
Page_5

The parties have executed this Non-Disclosure Agreement as of the Effective Date.

**LMC:**

**LORDSTOWN MOTORS CORP.**

By: _____

|  |  |
|---|---|
| Name: | Darren Post |
| Title: | Chief Engineer |
| Email: | Darren.Postt@lordstownmotors.com |

Address:      2300 Hallock-Young Road, S.W.
                     Lordstown, Ohio 44481

**THE COMPANY:**

**Karma Automotive LLC**

DocuSigned by:

*Joe Durre*

By: _____
                     034E517215494A3...

|  |  |
|---|---|
| Name: | Joe Durre |
| Email: | jdurre@karmaautomotive.com |
| Address: | 9950 Jeronimo Rd, Irvine, CA. 92618 |

6

Exhibit_3
Page_6



**From:** Steven Slawson <steven.slawson@lordstownmotors.com>
**Sent:** Thursday, August 6, 2020 8:20 PM
**To:** Lewis Liu <LLiu@karmaautomotive.com>; Jeff DeFrank <JDeFrank@karmaautomotive.com>
**Subject:** Termination of LOI

Dear Mr. Liu and Mr. DeFrank,

LMC appreciates your interest in our vehicle design.  After careful review, LMC has decided to move in a different direction with respect to your current offering.  Attached is the letter terminating the LOI.
Best wishes to Karma in your future endeavors.

Regards,
**Steven Slawson**
Director of Purchasing

**M** (216) 925-8577
2300 Hallock Young Road, Lordstown OH 44481
lordstownmotors.com

#RIDEWITHLORDSTOWN

Exhibit_4
**Page_1**

August 6, 2020

Karma Automotive LLC
9950 Jeronimo Road
Irvine, CA  92618

Attn:   Lewis Lui – Lliu@karmaautomotive.com
        Jeff Defrank – JdeFrank@karmaautomotive.com

RE:     Termination of Letter of Intent dated June 11, 2020

Gentlemen:

Please be advised that upon further review of the specifications, quotations and offerings of Karma Automotive LLC ("Karma") under pursuant to the Letter of Intent dated  June 11, 2020, Lordstown Motors Corp. ("LMC") has determined that the gap in material costs and the engineering expense targets are significant and outside the parameters and expectations of LMC with respect to these services and materials.  Therefore, effective immediately, LMC hereby notifies you of its termination of the Letter of Intent and will cease all communications with Karma related to the pursuit of any sourcing agreements, product supply agreements, development and consulting agreements, and any ancillary agreements.

Pursuant to the Confidentiality Agreement dated February 7, 2020, we request all confidential information delivered to Karma by LMC (and any of its associated vendors), both hardcopies and digital copies be returned, destroyed and/or erased related to the Letter of Intent.  We will return, destroy and/or erase any confidential information received from Karma in return.

If you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

*Steven Slawson*

Steven Slawson
Director of Purchasing

Cc:   Darren Post
      Thomas V. Canepa

Exhibit_4
Page_2

Hi John

Yes. We are slowly coming back.  I think we can start looking again but the team may be larger than what I first expected.  The corporate office may combine my engineering team with a service center and admin offices.   Let me gather some more details.

Do you have time for a call this week to brainstorm?

Thanks,
Joe


Thanks, Joe

---

**From:** John Cazort <jcazort@tenantbase.com>
**Sent:** Wednesday, July 29, 2020 11:42:54 AM
**To:** Roger Durre <rjdurre@aol.com>
**Subject:** Re: Initial Survey - Flex Space

Hi Joe,

I hope this email finds you well. I wanted to touch base to see if you had started to reconsider the flex space we discussed a few months back. There are a few spaces that recently entered the market that I believe would be a good fit.

Please let me know if you would like me to send the listing over.

Thank you,

**John Cazort**
*Associate Advisor*
*BRE License #02099560*
*C 949-933-5692 | jcazort@tenantbase.com*
*1500 Quail St, Suite 500*
*Newport Beach, 92660*
www.tenantbase.com


Tuesday, April 28, 2020 at 10:23:37 PM PDT, Roger Durre <rjdurre@aol.com>:
Hi John,

Things are on hold as the COVID-19 epidemic runs its course.   I appreciate your support and will check back in once we get reorganized.

Thanks,
Roger


Thanks, Joe

Exhibit_5
Page_1

**From:** John Cazort <jcazort@tenantbase.com>
**Sent:** Tuesday, April 14, 2020 9:43:55 AM
**To:** Roger Durre <rjdurre@aol.com>
**Subject:** Re: Initial Survey - Flex Space

Hi Roger,

I hope you're staying healthy and safe. I just left you a voicemail regarding your commercial space requirement. I wanted to see if you had taken a look at the availability survey is sent over on 3/30 and if any of the building caught your eye.

Please don't hesitate to reach out to me if you would like to tour any of the properties.

Best regards,

**John Cazort**
*Associate Advisor*
*BRE License #02099560*
*C 949-933-5692 | jcazort@tenantbase.com*
*1500 Quail St, Suite 500*
*Newport Beach, 92660*
www.tenantbase.com


Monday, March 30, 2020 at 7:38:40 PM PDT, John Cazort <jcazort@tenantbase.com>:
Hi Roger,

Im glad we were able to connect today. Find attached is an initial survey of properties. The reason for asking about the number of employee working on a daily basis is most properties have an allocated number of parking spaces per squa re footage without the option of street parking, usually 3 spaces per 1,000 square feet. We have run into problems for this reason in the past when trying to keep the footprint small.

I will continue to keep an eye out for alternative options. Please let me know if you have any additional questions or would like to set up tours for any of the properties on the survey.

Best regards,

**John Cazort**
*Associate Advisor*
*BRE License #02099560*
*C 949-933-5692 | jcazort@tenantbase.com*
*1500 Quail St, Suite 500*
*Newport Beach, 92660*
www.tenantbase.com

Exhibit_5

**Page_2**

**From:** John LaFleur <John.lafleur@lordstownmotors.com>
**Sent:** Tuesday, August 04, 2020 2:22 PM
**To:** rjdurre@aol.com; Joe Durre <joe.durre@lordstownmotor s.com>
**Subject:** FW: LA Office

Hi Joe,

Welcome aboard! I am beginning the search for office space in the Ervine area for your team as well as interviewing additional personnel in the Sales, Engineering and HR roles. Let me know when you are available to chat so I can begin to narrow down the areas that I shou ld look at. I plan to be out there the week of 8/17 and can meet with you to investigate possible locations.

John

**John LaFleur**
Chief Operat ing Officer

**M** (513) 315-1046
2 300 Hallock Young Road, Lordstown OH 44481
john.lafleur@lordstownmotors.com
www.lordstownmotors.com

Sent from Mail for Windows 10

---

**From:** Rich Schmidt
**Sent:** Tuesday, August 4, 2020 4:18 PM
**To:** John LaFleur; John Vo
**Subject:** Fwd: LA Office

John L please reach out the new Director of software there to support finding the best location.

< o:p>

Exhibit_5
Page_3

FYI on initial feedback from commercial realtor

**From:** rjdurre@aol.com <rjdurre@aol.com>
**Sent:** Thursday, August 06, 2020 9:13 AM
**To:** 'joe.durre@lordstownmotors.com ' <joe.durre@lordstownmotors.com>
**Subject:** FW: Available Commercial Space

**From:** John Cazort <jcazort@tenantbase.com>
**Sent:** Wednesday, August 05, 2020 1:25 PM
**To:** Roger Durre < rjdurre@aol.com>
**Cc:** Colin McKibbin <cmckibbin@tenantbase.com>; Peter Dumaine <peter@tenantbase.com>
**Subject:** Available Commercial Space

Hi Joe,

It was great to reconnect with you yesterday. We are excited to assist you with s ecuring a new location.

Attached is a broad search of properties that are available in Irvine . I set the size perimeter between 13,000 and 25,000 square feet. Please let me know if you would like me to expand any of these perimeters. We will still need to verify if the landlords are ok with the use and then have you check with the city.

In the meantime, please review and let us know any feedback you may have. Please feel f ree to call, text or email us if you have any questions.

Thank you,

**John Cazort**
*Associate Advisor*
*BRE License #02099560*
*C 949-933-5692 | jcazort@tenantbase.com*
~~*1500 Quail St, Suite 500*~~
~~*Newport Beach, 92660*~~
~~www.tenantbase.com~~

Exhibit_5
**Page_4**

John,

I had to cancel my trip to CA next week but I am still planning to come out the week of 8/24.

I was involved in a car accident (hit and run) on Wednesday and I am dealing with some injuries. Let's discuss my schedule for the week of 8/24.

Sorry for the last minute schedule change

John

Get Outlook for iOS

---

**From:** John Cazort <jcazort@tenantbase.com>
**Sent:** Thursday, August 13, 2020 4:41 PM
**To:** John LaFleur; Roger Durre
**Cc:** Colin McKibbin; Peter Dumaine
**Subject:** Re: FW: Available Commercial Space

Hi John and Joe,

I have attached the brochure for the old Mini dealership. Please let me know if you have any specific questions.

We will have a walk through of the space next week.

Thank you,

On Tue, Aug 11, 2020 at 8:21 AM John Cazort <jcazort@tenantbase.com> wrote:

Hi John,

Thank you for sending these over! We will get started digging up all the information on these as well. In the meantime, did you review Alton Plaza which was sent over in a different email?

Best,

On Tue, Aug 11, 2020 at 7:34 AM John LaFleur <John.lafleur@lordstownmotors.com> wrote:

Hi John,


It was good to chat with you the other day. I was wondering if you had any ideas for me to consider for our Irvine office needs.

Exhibit_5

Page_5

I did find a few places in addition to the two vacant dealerships in the Irvine area. They are as follows:

      8775-8785 Research Dr, Irvine CA

      40 Tesla, Irvine CA

      27 Hughes, Irvine CA

      17771 Micthell N, Irvine CA

Perhaps we can talk today and set up some appointments for next week while I am in Irvine (8/19 or 8/20)

Regards

John

**John LaFleur**

Chief Operating Officer

**M** (513) 315-1046

2300 Hallock Young Road, Lordstown OH 44481

john.lafleur@<u>lordstownmotors.com</u>

<u>www.lordstownmotors.com</u>

Exhibit_5

**Page_6**

**From:** John Cazort <jcazort@tenantbase.com>
**Sent:** Wednesday, August 05, 2020 1:25 PM
**To:** Roger Durre <rjdurre@aol.com>
**Cc:** Colin McKibbin <cmckibbin@tenantbase.com>; Peter Dumaine <peter@tenantbase.com>
**Subject:** Available Commercial Space

Hi Joe,

It was great to reconnect with you yesterday. We are excited to assist you with securing a new location.

Attached is a broad search of properties that are available in Irvine. I set the size perimeter between 13,000 and 25,000 square feet. Please let me know if you would like me to ex pand any of these perimeters. We will still need to verify if the landlords are ok with the use and then have you check with the city.

In the meantime, please review and let us know any feedback you may have. Please feel free to call, text or email us if you have any questions.

Thank you,

**John Cazort**
*Associate Advisor*
*BRE License #02099560*
*C 949-933-5692 | jcazort@tenantbase.com*
*1500 Quail St, Suite 500*
*Newport Beach, 92660*

www.tenantbase.com

Exhibit_5
**Page_7**

--
**John Cazort**

Exhibit_5
**Page_8**

Thanks Darren.  We spoke briefly about not just infotainment but electronics and software in general.&n bsp; What do you think about including ADAS into this role?  I think it's important and sells well with investors.

Joe

---

**From:** Darren Post <darren.post@lordstownmotors.com>
**Sent:** Thursday, April 02, 2020 11:49 AM**To: Joe.Durre@gmail.com**
**Subject: EE Infotainment and Connectivity Org Chat - Draft 4-2-2020**

Exhibit_6
**Page_1**

| From: | Darren Post <darren.post@lordstownmotors.com> |
|---|---|
| Sent time: | 07/30/2020 04:24:04 PM |
| To: | Joe Durre |
| Subject: | Endurance Infotainment Systems Cost Savings Estimate: justify LMC Infotainment - West |

Hi Joe,

Can you help quantify the savings that a LMC Infotainment Group could save versus the Karma System quote?  Here is the quote:

| Start | 6 | | $2,415,949.05 | |
|---|---|---|---|---|
| Core | 6 | | $1,627,572.90 | 9 |
| Core+ | 8 | | $658,535.19 | 5 |
| Add T&A | 5 | | $162,385.46 | 2 |
| Full Team | 25 | | $ 3,929,911.88 | |

System B

| | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|
| NRE (ED&D, Tooling, continuous support, etc.) | $7,082,250 | $975,000 | $650,000 | $325,000 | $325,000 | |
| Cloud and Connectivity Support | $325,000 | $325,000 | $325,000 | $325,000 | $325,000 | Subject to final Scope |

Note: Cloud and Connectivity Support to be extended out through length of services contract.

This will help me justify the cost for LMC Infotainment West.  From the above System B quote, LMC would pay Karma $10.982 million.

- I estimate with your LMC group, the Endurance infotainment development costs would be salaries + tooling + some ED&D + some cloud/conn costs:  $3.9 M + $2 M tooling & ED&D + $0.5 million cloud & connectivity = $5.9 million,

- With a total savings of $4.6 million overall versus Karma's cost of $10.98 million
  - (Savings detail: $2 million in ED&D, and 2022-2024 costs of ($650K + $325K + $325) and all or a portion of the cloud & connectivity costs in all years ($325K / year for 2020 to 2024) – total of $4.6 million savings is my estimate.)

- I think you could also save $500 / vehicle in BOM costs (let me know your estimate)

Let me know your thoughts on my savings estimates.

Regards,

Darren

**Darren Post**
Chief Engineer

**O** (586) 634-8406 | **M** (586) 634-8406
2300 Hallock Young Road, Lordstown OH 44481
lordstownmotors.com

#RIDEWITHLORDSTOWN

Exhibit_7

Page_1

# LMC August 2020

Saturday, August 01, 2020        8:53 AM



Lordstown Motors Corp 2300 Hallock-Young Road, S.W., Lordstown, OH 44481 USA

TO: Roger "Joe" Durre

**Re: Offer Letter and Confirmation of Employment Terms**

On behalf of the entire team at Lordstown Motors Corp., it is my pleasure to extend the following offer of employment for the position of Director, Infotainment and Connected Vehicle Engineering.

The Director, Infotainment and Connected Vehicle Engineering position is a Full-Time, Salary / Exempt position reporting to Darren Post, Chief Engineer.

**The Compensation Package details are listed below:**

**Salary:** $285,000 / year; paid bi-weekly.
**Vacation:** You will earn 80 hours (10 days) of paid vacation on your first day of employment, front-loaded. Thereafter you will earn vacation in accordance with any then-current vacation policy implemented by LMC.
**Benefits:** As a full-time employee, you are eligible for medical, dental and vision insurance, short and long-term disability, and life insurance. The specifics of the benefits are covered in the summary plan documents. You can review all benefits offered by LMC by copying and pasting this link into your browser: https://www.brainshark.com/wisdom/LMCNewHireBenefits2020
**Stock Options:** Subject to the approval of the Company's Board of Directors or its Compensation Committee and following the adoption by the Company of an equity incentive plan in the September 2020 timeframe, you will be granted 2,000 shares. The exercise price per share of the Option will be determined by the Board of Directors or the Compensation Committee when the Option is granted. The Option will be subject to the terms and conditions applicable to options granted under the Company's Stock Plan (as adopted, the "Plan"), as described in the Plan and the applicable Stock Option Agreement.

**Start Date & Agreement Terms:**

The official start date of this position will be August 3, 2020. Your employment with Lordstown Motors Corp. will be "at-will" and either party can terminate the relationship at any time with or without cause or notice.

**This offer is contingent upon:**

- Verification of your right to work in the United States, as demonstrated by your completion of the I-9 Form upon hire and your submission of acceptable documentation verifying your identity and work authorization within three days of starting employment.
- Satisfactory completion of a background investigation, for which you will receive a link for from Checkr upon offer acceptance.
- Your execution of LMC's Confidentiality and Proprietary Rights Agreement where applicable.

We look forward to you joining our team at LMC!

Exhibit_8

**Page_1**

We look forward to you joining our team at LMC!

Sincerely,

Jaimie Green

**Please Sign in the Space Below**

$X$ _____

| Type here to sign |

Screen clipping taken: 8/1/2020 8:54 AM



Roger Durre,

Lordstown Motors Corp has requested you complete several tasks. To complete these tasks, you will need to use the below credentials.

Company ID: 88629
User Name: joe.durre
Password: Will be sent separately for security reasons.

Upon login, you will be prompted to change your password. Please remember your credentials and keep them secure.



Screen clipping taken: 8/1/2020 9:05 AM



Your new employer, Lordstown Motors Corp, has created you a temporary password. You will need to

Exhibit_8
**Page_2**

Your new employer, Lordstown Motors Corp, has created you a temporary password. You will need to use this password along with the information sent in a separate email to complete a few tasks.

Password: GQ&*bf+WD

After login, you will need to change your password. Please remember your information and keep it safe.

**View Event**

Screen clipping taken: 8/1/2020 9:06 AM

Exhibit_8

**Page_3**

**Sent:**      Tue, 04 Aug 2020 23:49:24 GMT
**From:**      "Darren Post" <darren.post@lordstownmotors.com>
**To:**        "Joe Durre" <JDurre@karmaautomotive.com>
**Subject:**   Fwd: LA Office

Joe,

There is a push for the Bay Area such as: Wamo, Uber, Lift, Cruise and of course ex Tesla people.

Please  research and Identify other automotive technology companies in the LA to Orange County area beyond Karma, Rivian and FF motor.  I need the facts to make level the playing field.

Thanks,

Darren

Get Outlook for iOS

---

**From:** Rich Schmidt <Rich.schmidt@lordstownmotors.com>
**Sent:** Tuesday, August 4, 2020 4:03 PM
**To:** Steve Burns; Darren Post
**Cc:** Jeffrey Kenny; Caimin Flannery
**Subject:** RE: LA Office

Steve,

Yes agree we should use one base in Cailfornia for both Software engineering, sales and we have to have a service area as well.

I discussed this with Caimin earlier this am, I think for now because we have John hired in Irvine we should look for something close to there on a short term base (3 to 6 months) lease in Irvine area.

As Caimin and Jeff finalize their  west coast tour and determine best locations for them as well then we could finalize the best location for both sides.

As for the engineering side currently only one on the team, however we'll be growing this quickly. I ask Jaimie for now just offer California base on the location until we finalize the location.

As you know software engineering is strong in Irvine (Karma, FF Motors, Rivian) and Silicone valley (Apple, Google, Tesla, Seres, Oracle, Facebook, Waymo, Zoox, Uber, Lift, Chargepoint)

I think sales and marketing great in both locations. Service would be better in the Bay of course this all the car companies there (Wamo, Uber, Lift, Cruise and of course  ex Tesla people as well if Caimin or Jeff wanted.

Lets investigate some more but agree with the concept of all in one location.

**Rich Schmidt**
Chief Production Officer

M (925) 321-4770
2300 Hallock Young Road, Lordstown OH 44481
Rich.Schmidt@lordstownmotors.com

Exhibit_9
Page_1

**From:** Steve Burns <Steve.burns@lordstownmotors.com>
**Sent:** Tuesday, August 4, 2020 3:43 PM
**To:** Darren Post <darren.post@lordstownmotors.com>; Rich Schmidt <Rich.schmidt@lordstownmotors.com>
**Subject:** LA Office

Rich,

I was thinking that if we are going to have a software office out in LA, maybe it could double as our sales/service dealership.

What do you think?  Could the software team benefit from having a few bays with lifts for testing and developing their software?

Thanks,
Steve

Sent from Mail for Windows 10

Exhibit_9
Page_2

**Sent:**      Tue, 04 Aug 2020 23:51:57 GMT
**From:**      "Darren Post" <darren.post@lordstownmotors.com>
**To:**        "Joe Durre" <JDurre@karmaautomotive.com>
**Subject:**   Recall: LA Office

Darren Post would like to recall the message, "LA Office".

Exhibit_10
Page_1

Letter of Resignation
Roger (Joe) Durre

30 Tall Cedars
Irvine, CA, 92620
Date: 8/25/2020

Shen Zhang
VP Electrical Engineering
Karma Automotive LLC
9950 Jeronimo Road
Irvine, California, 92618

Dear Shen Zhang,

I am resigning from my position as Director, Infotainment Systems and Connected Car effective, Tuesday, September 1st, 2020.

I have enjoyed leading the team and working on the myriad of projects during my time at Karma.  I thank you for the opportunity to work for Karma and wish you all the best in your future endeavors.  I look forward to staying in touch.

Here is my contact information in the event you need anything:  rjdurre@aol.com and my mobile number is 727-421-8128, please feel free to contact if you need anything.

Sincerely,

Exhibit_11
Page_1

| | |
|---|---|
| **To:** | Stevens, Scott[Scott.Stevens@vector.com] |
| **Cc:** | Brian Green[BGreen@karmaautomotive.com] |
| **From:** | Joe Durre[joe.durre@lordstownmotors.com] |
| **Sent:** | Mon 9/21/2020 1:28:24 PM (UTC-07:00) |
| **Subject:** | RE: PREEvision Overview |

Hi Scott,

Looks good to meet Wed. at 12PST.  I'll get with Brian on major content to focus on.  Most users will be here in Irvine, CA. but we are all WFH (no building yet) so this will need to be an MS Teams meeting format and not in person.

Getting started with the latest version would be great.

Thanks,
Joe

**From:** Stevens, Scott <Scott.Stevens@vector.com>
**Sent:** Monday, September 21, 2020 8:36 AM
**To:** Joe Durre <joe.durre@lordstownmotors.com>
**Subject:** RE: PREEvision Overview

Hello Joe,

Very good.  I'll asked the sales team to create a quote using the numbers you provided below and subscription licenses.  I've already reached out the the Global product line manager to get an update on the Vector-hosted option for consideration.  As far as I know they were just completing the T&Cs.

Last week, I started working on some planning for the training.  Since you have enough users for a Lordstown group class, we just need to discuss the contents so that we can give you a quote.  We have some flexibility to combine or exclude topics, based on you initial use cases.  Let's setup a call this week to review those details.  How about Wednesday 11 or 12 PST?

We can get you started right away with test installs this week.  A new release will be available today or tomorrow.  I'll provide download and licensing instructions as soon as it is available.

Best regards,

Scott

**From:** Joe Durre <joe.durre@lordstownmotors.com>
**Sent:** Friday, September 18, 2020 8:11 PM
**To:** Stevens, Scott <Scott.Stevens@vector.com>
**Cc:** Training <Training@vector.com>
**Subject:** RE: PREEvision Overview

Hi Scott,

11, plus an admin.

Exhibit_12
Page_1

**PREEvision**

| | | |
|---|---|---|
| Architect | 1 | 3 |
| Function Designer | 6 | 10 |
| | 1 | 4 |
| | 1 | 2 |
| Electric Designer | 2 | |
| | | 2 |
| | | 2 |
| Viewer | | |
| IT admin with CP | 1 | |
| Colaboration Platform is require for all licenses (server) | 11 | |
| Intro training | Online | |

Thanks,
Joe

---

**From:** Stevens, Scott <Scott.Stevens@vector.com>
**Sent:** Monday, September 14, 2020 7:40 AM
**To:** Joe Durre <joe.durre@lordstownmotors.com>
**Cc:** Training <Training@vector.com>
**Subject:** RE: PREEvision Overview

++ Training

Hi Joe,

Sure.  I've added our training department to this thread.  How many people would you like to include in the training quote?

Best regards,

Scott

---

**From:** Joe Durre <joe.durre@lordstownmotors.com>
**Sent:** Friday, September 11, 2020 7:57 PM
**To:** Stevens, Scott <Scott.Stevens@vector.com>
**Subject:** RE: PREEvision Overview

Hi Scott,

Can you get me a training quote?  I believe the beginning one was 4 days.

Thanks,
Joe

---

**From:** Stevens, Scott <Scott.Stevens@vector.com>
**Sent:** Wednesday, August 26, 2020 1:10 PM
**To:** Joe Durre <joe.durre@lordstownmotors.com>; Anderson, Tony <Tony.Anderson@vector.com>
**Cc:** Stark, Alex <Alex.Stark@vector.com>; George Huan <george.huan@lordstownmotors.com>; Brian Green <brian.green@lordstownmotors.com>; Steve Punak <steve.punak.ext@lordstownmotors.com>; Zak Stelmaszek <Zak.Stelmaszek@lordstownmotors.com>; Andre Beduschi <Andre.Beduschi@lordstownmotors.com>; Vino Pathmanathan <Vino.Pathmanathan@lordstownmotors.com>; Bradley Westerhoff <bradley.westerhoff@lordstownmotors.com>
**Subject:** RE: PREEvision Overview

All:  Thank you for time and very good questions.  Attached you will find the slides from the presentation yesterday.  Next step is to schedule demo to show an example that connects a requirement to a  functional architecture down to signal on the bus.  Scott to coordinate with Zak to schedule the demo, as soon as possible.

Exhibit_12
Page_2

Best regards,

Scott Stevens

N.A. Product Line Director - PREEvision
Vector North America, Inc.
39500 Orchard Hill Place, Ste.400
Novi, MI 48375 USA
Direct (office):  248.504.6467


PREEvision – Model-Based E/E Development

Tell us how we are doing: https://vector.com/vi_feedback_sales_en.html




-----Original Appointment-----
**From:** Stevens, Scott
**Sent:** Monday, August 24, 2020 1:24 PM
**To:** Stevens, Scott; joe.durre@lordstownmotors.com; Anderson, Tony
**Cc:** Stark, Alex; George Huan; Brian Green; Steve Punak; Zak Stelmaszek; Andre Beduschi; Vino Pathmanathan; Bradley Westerhoff
**Subject:** PREEvision Overview
**When:** Tuesday, August 25, 2020 4:00 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** WebEx

@joe.durre@lordstownmotors.com – please forward as needed.

Agenda:

- Introductions
- Overview of PREEvision
- Discuss Use Cases for Lordstown


**Scott Stevens invites you to join this Webex meeting.**




Meeting number (access code): 128 458 6910


Meeting password: uqMknEQ4?38


Tuesday, August 25, 2020

Exhibit_12
Page_3

**Join meeting**

**Tap to join from a mobile device (attendees only)**

8773046368,,1284586910## United States Toll Free

+12106069501,,1284586910## United States Toll

**Join by phone**

8773046368 United States Toll Free

+1 210 606 9501 United States Toll

Global call-in numbers  |  Toll-free calling restrictions

**Join from a video system or application**

Dial 1284586910@vector-group.webex.com

You can also dial 62.109.219.4 and enter your meeting number.

Need help? Go to http://help.webex.com

Exhibit_12
Page_4