THOMAS R. LUCCHESI (*admitted pro hac vice*)
*tlucchesi@bakerlaw.com*
TERRY M. BRENNAN (*admitted pro hac vice*)
*tbrennan@bakerlaw.com*
ANTHONY B. PONIKVAR (*admitted pro hac vice*)
*aponikvar@bakerlaw.com*
**BAKER & HOSTETLER LLP**
Key Tower, 127 Public Square
Suite 2000
Cleveland, Ohio 44114
Telephone:   (216) 621-0200
Facsimile:    (216) 696-0740

WILLIAM W. OXLEY (SBN 136793)
*woxley@bakerlaw.com*
RYAN D. FISCHBACH (SBN 204406)
*rfischbach@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, California 90025-0509
Telephone:   (310) 820-8800
Facsimile:    (310) 820-8859

*Attorneys for Defendants*
LORDSTOWN MOTORS CORP., *et al.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KARMA AUTOMOTIVE LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>LORDSTOWN MOTORS CORP., an Ohio corporation; STEVE BURNS, an individual, JOHN LEFLEUR, an individual, DARREN POST, an individual, RICH SCHMIDT, an individual, ROGER J. DURRE, an individual, HONG XIN HUAN (A.K.A. "GEORGE" HUAN), an individual, BEI QIN, an individual, STEPHEN PUNAK, an individual, CHRISTOPHER KIM, an individual, DAN ZHIHONG HUANG, an individual, PUNAK ENGINEERING, INC., a California corporation, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 8:20-cv-02104-JVS-DFM<br><br>**OPPOSITION TO PLAINTIFF KARMA AUTOMOTIVE LLC'S MOTION TO COMPEL THE RETURN OF A PRIVILEGED DOCUMENT AND STRIKE DEPOSITION TESTIMONY**<br><br>Complaint Filed:  October 30, 2020<br>Trial Date:          April 12, 2022 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2

**INTRODUCTION**

3    Karma's counsel admits under oath that "Karma does not know how
4 Defendants came into possession of Exhibit No. 133." (Coleman Decl., ECF No. 82-
5 1, ¶ 10.) But that lack of evidence does not deter Karma from repeatedly (and
6 unequivocally) accusing defendants Roger (Joe) Durre and Lordstown Motors Corp.
7 (LMC) of "stealing" that purportedly "privileged" document—not once, but at least
8 10 times in its 15-page brief. (Mem. in Supp. of Mot. to Compel ("Pl. Br."), ECF No.
9 82, 1; *see also id.* (alleging "unlawful theft" of Ex. 133; Ex. 133 an "example of
10 [alleged] theft"; "Durre stole the document from Karma"; Ex. 133 is "one example
11 of [a document] Durre stole from Karma"; Ex. 133 is "a document stolen from Karma
12 by Durre"); *id.* at 2 (Durre "stole the document from Karma"); *id.* at 3 ("Durre stole
13 the document from Karma"); *id.* at 4 (Durre was in "possession of the stolen
14 document"); *id.* at 12 (Ex. 133 "was . . . stolen by Durre").)

15    Those repeated conclusory accusations—like so many others leveled against
16 the Defendants in this case—are false. But they provide a convenient distraction from
17 Karma's true purpose: to conceal from the public and prevent Defendants from
18 making any reference to the fact that in early-to-mid 2020—the exact time when
19 Karma contends it was diligently working toward a potential engagement with
20 LMC—███████████████████████████████████████████████████
21 █████████████████████████████████████████. Not only did
22 Karma ██████████████████████, but numerous employees at Karma saw
23 portions of that ████████████ which solidified the rumors and fears that had been
24 circulating throughout the company for months.

25    For the reasons below, Exhibit 133 is neither privileged nor work product, and
26 to the extent any such protection ever existed, it has long since been waived or
27 forfeited given Defendants' substantial need to use the document in this case. But
28 just as importantly, the *facts* contained in or supported by Exhibit 133—namely, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES



1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████ cannot under any theory of privilege or work product be concealed from

5 discovery. Those facts are important parts of Defendants' defense to the myriad of

6 allegations in Karma's First Amended Complaint. The Court should not permit

7 Karma to hide its business decisions behind a claim of privilege and should deny

8 Karma's motion to compel the return of Exhibit 133.

9                           **STATEMENT OF FACTS**

10     In 2019, one of Karma's outside counsel, ████████████████, hired

11 consultant ████████████████ to conduct "a financial analysis"—

12 ████████████████████████████████████████

13 ████████████████ (Pl. Br. 2.) Using "financial data furnished by Karma," ████

14 prepared that ████████████, and provided it to Karma through its then-general

15 counsel, John Wilson. (*Id.*) Wilson sent the analysis to several Karma employees,

16 including Ron Ashpes (then CFO), Ron Samaco (Controller), Leo Lin (then-VP for

17 Global Finance and current CFO), and John Zavoli (former general counsel). (*Id.* at

18 3.) Wilson also sent it to then-Karma engineer, Roozbeh Hamidzad. (*Id.* at 3-4.)

19 Karma claims Wilson did this inadvertently, although Karma has not submitted a

20 declaration from Wilson attesting to that fact. (*Id.*) According to Karma's current

21 CFO, Leo Lin, "[b]ased on [his] recollection, [he] believe[s] Wilson contacted

22 Hamidzad to recall the email." (Lin Decl., Pl. Br. Ex. C, ¶ 8.)

23     Although a later "forensic analysis" confirmed that Hamidzad deleted the

24 email and apparently did not forward it to anyone else from his computer, it does not

25 appear that anyone from Karma ever actually asked Hamidzad what he did with the

26 ████████████████ after receiving it, or whether he disclosed it or shared any of its

27 contents with anyone else inside or outside of Karma.

28     If Karma had made those inquiries, it likely would have discovered that

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Hamidzad in fact took screenshots of at least two pages of the ███████████ and shared those screenshots with others. We may never know the full extent to which the screenshots spread through Karma's workforce and even beyond Karma's walls. What is known, however, is that those screenshots *were* shared with at least two other Karma employees: Srini Gowda and Joe Durre.

Specifically, on April 20, 2020, at 3:15 p.m., Gowda texted Durre that he "just got a document showing ██████████████████████████████████████ ██████████████████████████████ . . . but not sure how true that is as the document says 'draft.'" (Durre Decl., attached as Exhibit A, ¶ 3.) Shortly thereafter, Gowda sent Durre the two pages of the ████████████ in two separate screenshots via WhatsApp —one of which was later marked as Exhibit 133. (*Id.* ¶ 4.) Durre uploaded the screenshots to Microsoft OneNote by taking additional screengrabs of the substantive portions of the documents—and, in the process, inadvertently omitted any headers purporting to label the document as privileged and confidential.[1] (*Id.* ¶ 7.) Durre did not intentionally crop out the headings, nor did he ever share the documents with anyone else—including anyone at LMC. (*Id.* ¶¶ 8, 10.)

The next day, April 21, 2020, at 6:04 p.m., Durre responded to Gowda by text, asking: "How did you get this and are there more pages?" (*Id.* ¶ 5.) Gowda replied: "Got it as a forward . . . it was sent by mistake to an individual (can't say who) who quickly took a screenshot before he was asked to delete it." (*Id.* ¶ 6.)[2]

Where else the screenshots were sent from there is impossible to know, because Karma—ever eager to accuse Durre and LMC of "stealing" documents without any factual basis to do so—never fully investigated the extent to which the

---

[1] To avoid burdening the Court with yet another discovery dispute, LMC will produce both the WhatsApp and OneNote versions of both screenshots.

[2] The fact that Durre was mistaken at his deposition about the original source of the document is not evidence of theft or other ill-intent on his part—the fact is, the documents prove he received the screenshots from another employee, Gowda, who claimed to have received it from a third employee (presumably Hamidzad) who received the document in the manner described above.

1    ██████████████████ was disseminated. But word of █████████████

2    ████████████████ spread both inside and outside Karma. Indeed, by the

3    Summer of 2020, ████████████████████ was reported in several

4    automotive trade publications. ███████████████████

5    ███████████████████████████████████

6    ███████████████████████████████████

7    ██ ██ ██ ███ ████ ████ ████ ████ ████ ████

8    ██████████████████████████████

9    ███████████████████████████████████

10   ███████████████████████████████████

11   ███      ████████████████████████████

12   ███████████████████████████████████

13   ████████████████████████████████

14       Indeed, the ██████ article cited "multiple sources inside the company" in

15   reporting that, ██████████████████████████

16   ███████████████████████████████████

17   ███████████████████████████████████

18   ████████████████████████████. The same article noted

19   that "Karma, through its attorneys, . . . denied that it was considering a plan to reduce

20   its staff to 38 employees in contemplation of filing for bankruptcy." *Id*. And Dr.

21   Lance Zhou, Karma's CEO, sent an email to the Karma staff specifically addressing

22   the ██████ article, assuring employees that Karma had "directly refuted" the claims

23   made in the article, which contained "numerous mis-representations of facts." *Id*.

24       LMC produced Exhibit 133 on December 4, 2020. (Pl. Br. 3.) Two and a half

25   months later, it introduced Exhibit 133 at the deposition of Mikael Elley, giving rise

26   to this dispute and Karma's motion to compel.

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

4

OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL THE RETURN OF A PRIVILEGED DOCUMENT
AND STRIKE DEPOSITION TESTIMONY; CASE NO.: 8:20-CV-02104-JVS-DFM

**ARGUMENT**

**I.     Karma Is Not Entitled To Withhold Purely Factual Information.**

Along with the motion to compel the return of Exhibit 133, Karma seeks leave to file its motion and related papers under seal, while filing a redacted version on the public docket. Karma's proposed redactions reveal the true purpose of this motion—namely, to hide not only the contents of Exhibit 133, but also the mere fact that it ███████████████████████.[3]

Indeed, not only does Karma propose to redact references to the text of Exhibit 133, it also seeks to redact the name of its attorney, the name of the attorney's law firm, the name of the consultant, and even legal citations ████████████████—essentially eliminating from the filing anything that could divulge the fact that Karma's management team ████████████████████████████. (*See, e.g.,* Pl. Br. 5 (redacting "█████" and "████"), 6 (redacting "████," "███," and ██████ citations), 7 (same).)

None of this information is even arguably privileged. Courts have repeatedly held that things like "the identities of the lawyers providing advice," the "existence of the attorney-client relationship," and "the general purpose of the work performed" are not privileged. *See United States v. Blackman*, 72 F.3d 1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the fee arrangement between attorney and client are not protected from disclosure by the attorney-client privilege."); *In re Michaelson*, 511 F.2d 882, 887 (9th Cir. 1975) ("[I]t has generally been held that . . . the existence of the attorney-client relationship is not privileged[.]"); *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (Communications about "the identity of the client . . . and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege."); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, No. CIV.

---

[3] As discussed below, Defendants disagree with Karma's proposed redactions, but, out of an abundance of caution, have filed a similarly redacted version of this brief.

5

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

90-524-FR(LEAD), 1992 WL 55753, at *4 (D. Or. Mar. 3, 1992) ("The privilege does not extend to the identities of the lawyers providing advice.").[4]

Indeed, those categories of information are no different than what a party would be typically be required to disclose on a standard privilege log. *See Dixon v. Jefferson Capital Sys.*, No. 119CV02457JMSDML, 2020 WL 9607902, at *6 (S.D. Ind. Nov. 23, 2020) (noting that privilege log should generally contain "name/affiliation of all author(s) and recipient(s), date and type of document (letter, memo, report, etc), and general subject matter").

Even documents must be produced in redacted form to the extent they contain—as Exhibit 133 clearly does—purely factual or business information about the state of the company and its plans for the future. *See Brown v. China Integrated Energy, Inc.*, No. CV112559BROPLAX, 2014 WL 12577130, at *3 (C.D. Cal. June 19, 2014) (documents "withheld based on the work product doctrine that contain any factual findings must now be produced, with only the non-factual portions being redacted"); *Simpson v. City of Upland*, 2009 WL 10687226, at *4 (C.D. Cal. Aug. 24, 2009) (holding that only information protected by privilege and/or work-product protection may be redacted); *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 231 F.R.D. 378, 385–86 (N.D. Ill. 2005) ("[T]he purely factual portions of the narrative are not opinion work product.").

Thus, regardless of how the Court rules on Karma's contention that Exhibit 133 is protected by the attorney-client privilege or the work-product doctrine, Karma cannot be allowed to hide references to any fact that happens to relate to Exhibit 133 or the *facts* that Karma ███████████████████████, that Karma's employees knew about it, and that Karma lied about it—both to its employees and to the press.

---

[4] Indeed, this Court recently rejected a similar attempt by Karma to seal the recording of the informal discovery based on the fact that the parties discussed—in general terms—the nature of Exhibit 133 and the basis for Karma's privilege claim. (Order, ECF No. 84.) The Court should do so again here.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**II.    Exhibit 133 Is Not Protected By The Attorney-Client Privilege.**

**A.    The Attorney-Client Privilege Protects Only Confidential Communications Providing Or Soliciting Legal Advice.**

It is axiomatic that the attorney-client privilege "extends only to communications," and not to every document created by or for an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *see also Hernandez v. Woodford*, No. CV 90-4638-RSWL, 2003 WL 27381791, at *2 (C.D. Cal. Oct. 29, 2003) ("The privilege protects only communications made between the attorney and client. It does not protect information that an attorney receives from a third party."); *Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 383–84 (D. Ariz. 2010) ("The attorney-client privilege exists to protect confidential communications[.]").

Exhibit 133, however, is not a "communication," let alone a communication made to provide or solicit legal advice. Exhibit 133 is simply a screenshot of a single page of a ███████████, taken by a Karma employee and shared with other Karma employees to inform them about ████████████████████████ ██████████████████████████████. The fact that, in another form, Exhibit 133 may have been part of an attorney-client communication is irrelevant—Karma has the burden to show the privilege "on a document by document basis." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 411CV05341YGRJSC, 2013 WL 5594474, at *2 (N.D. Cal. Oct. 10, 2013); *see also S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 550 (D. Ariz. 2002) ("[T]he burden to establish the applicability of any privilege is on the proponent, and" must be satisfied "with respect to each and every communication and each and every document claimed to be protected."). Karma has not met that burden.

Moreover, even if the issue before the Court were the discoverability of the *entire* ██████████████, the attorney-client privilege still would not apply. "An attorney's communications in the role of a business agent are not privileged." *Chicago Title Ins. Co. v. Sup. Ct.*, 174 Cal.App.3d 1142, 1151 (1985). To be

7

OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL THE RETURN OF A PRIVILEGED DOCUMENT
AND STRIKE DEPOSITION TESTIMONY; CASE NO.: 8:20-CV-02104-JVS-DFM

privileged, the dominant purpose of the communication must be to secure or render legal services, not advise on business decisions, such as whether it makes financial sense ███████████████████ *See Montebello Rose Co., Inc. v. Ag. Labor Relations Bd.*, 119 Cal.App.3d 1 (1981); *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996) (communications made by and to in-house lawyer with respect to business matters, management decisions, or business advice are not privileged).

Nor are documents created to aid in purely business decisions privileged. *See, e.g.*, *United States ex rel Schmuckley Jr. v. Rite Aid Corp.*, 2021 WL 1196250, *4-11 (E.D. Cal. 2021) (documents related to potential mergers and acquisitions not privileged where "in-house and outside counsel represented [the company's] interests in pursuing these business ventures"); *Byrnes v. Empire Blue Cross Blue Shield*, 1999 WL 1006312, at *5 (S.D.N.Y. Nov. 4, 1999) (data "intended to assist the business decision-makers to assess the economic impact of possible alternatives" does not reflect the performance of legal services); *Polaris Inn. Ltd. v. Kingston Tech. Co., Inc.*, 2017 WL 8220457, at *3 (C.D. Cal. June 16, 2017) (if a document "was prepared for purposes of simultaneous review by legal and [non-legal] personnel, it cannot be said that the primary purpose of the document is to secure legal advice").

The ████████████████ is merely a financial report "created by a third-party consultant," which "[a]s a general rule, the [attorney-client] privilege does not" cover. *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2018 WL 783808, at *4–5 (N.D. Cal. Feb. 7, 2018) (quotations omitted). Nor does it fall within the typical "exceptions where the privilege extends to communications involving a third party, such as certain situations in which the third party is necessary to interpret the client's statements to the attorney." *Id.* at *4. To the contrary, the "privilege does not extend to situations" like this one, "in which the [third party] is enlisted merely to give his or her own advice about the client's situation," or where the document "proves important to the attorney's ability to represent the client." *Id.* Third-party communications—if that label is even applicable to ████████████████—"must

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

be interpretive and serve to translate informative information between the client and attorney to be privileged." *Id.* (quotations omitted).

Nothing in Exhibit 133 suggests the ▮▮▮▮▮▮▮▮ performed that function. Rather, as in *Sidibe*, Exhibit 133 is merely part of a "consultant-created document" that "does not . . . contain or rely on any communications between [the party] and its attorneys, much less any confidential communications made for the purposes of seeking legal advice," and is "not interpreting or translating any information from [the party] for its attorneys." *Id.* at *5. "The fact that [Karma's] attorneys might have been the ones who retained the consultant and that the consultant's report was useful to the attorneys does not render the consultant's report privileged." *Id.*

For these reasons, the attorney-client privilege is the wrong framework through which to view Exhibit 133, and Exhibit 133 is not privileged in any event.

**B.     Karma Waived the Attorney-Client Privilege Over Exhibit 133.**

Even if the attorney-client privilege does extend to Exhibit 133, however, Karma has waived the privilege with respect to that document.

Karma first claims that Exhibit 133 remains privileged because its disclosure of the ▮▮▮▮▮▮▮▮ was "inadvertent," focusing on the disclosure from the purported "Control Group" to Hamidzad. (Pl. Br. 12.) But that does not account for how the document made its way into the hands of defendant Durre and others. Those subsequent disclosures by Hamidzad and Gowda, as outlined above, were clearly intentional, and were made by two Karma employees who—as far as the evidence shows—Karma either never actually contacted to ensure they had not disseminated the document, or Karma never knew had seen it in the first place.

Karma next argues that it "took reasonable steps" to prevent disclosure and to rectify the disclosure once it occurred. But the evidence shows otherwise.

Although Karma confidently proclaims that the inadvertent disclosure to Hamidzad "was the only instance where the document went outside the Control

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1 Group," that is clearly not the case, and Karma apparently never bothered asking
2 Hamidzad what he did with the document and never investigated whether he had
3 shared its contents. (Pl. Br. 4.) Karma's "forensic inspection"—while giving the
4 vague appearance of diligence—was simply insufficient to capture the spread by any
5 means other than Hamidzad forwarding the email he received from Wilson. Even the
6 contention that Wilson "recalled" the email from Hamidzad is based on a non-
7 participant's secondhand "belie[f]" that it occurred, and not supported by any
8 documentary evidence. (Pl. Br. at Ex. D, Lin. Decl., ¶ 8.) To the contrary, Gowda
9 indicated at the time that he understood the original recipient had merely been asked
10 to delete the email, which, according to Karma's analysis, is exactly what Hamidzad
11 did. (Durre Decl., Ex. A, ¶ 6; Pl. Br. 4.)

12    In any event, the evidence is clear that at least Gowda received screenshots of
13 the ███████, likely from Hamidzad. Gowda in turn forwarded the screenshots to
14 Durre, and perhaps others as well. The exact scope of the disclosure, however,
15 remains unknown because to ascertain the complete spread from Hamidzad, Karma
16 would have to ask Hamidzad what he did with the document, and analyze both his
17 computer and phone. The same for anyone else (like Gowda) who received the
18 document from Hamidzad, and so on. Karma did none of those things.

19    Instead, Karma performed a perfunctory search of its servers, and then not until
20 *months* after the initial disclosure to Hamidzad (which, by its own admission, Karma
21 identified immediately).[5] But that search could not have captured any spread via text
22 message or other messaging apps—which, as it turns out, is exactly what happened.
23 Nor could it have captured any oral dissemination of the information in the ███
24 ███, or email spread of a screenshot, which would not be text searchable and
25 would not have the same filename as the original report. In short, Karma's efforts to

26

27 [5] The affidavit from Karma's forensic analyst, Michael Kunkel, does not disclose the
date of the search for the document, but does state that the date range was February
28 1, 2020 to October 31, 2020, meaning that the search occurred—at the earliest—on
November 1, 2020. (Kunkel Decl., Pl. Br. Ex. F, ¶¶ 9-12.)

10

contain the ████████—particularly after it was disclosed to Hamidzad—were woefully inadequate and waived any privilege that may have attached to that document.

## III.   Exhibit 133 Is Not Protected By The Work-Product Doctrine.

### A.   Exhibit 133 Was Not Prepared In Anticipation Of Litigation.

The proper framework for considering whether Exhibit 133 can be clawed back is the work-product doctrine. Unlike the attorney-client privilege, which protects only communications made between the attorney and client, the work-product doctrine protects any document "prepared in anticipation of litigation" unless the party seeking disclosure "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). As this Court has explained: "One of the primary purposes of the work product doctrine is to prevent one party from exploiting the other party's efforts to prepare for litigation by 'borrowing the wits of their adversaries.'" *Arfa v. Zionist Org. of Am.*, No. CV 13-2942 ABC SS, 2014 WL 815496, at *2 (C.D. Cal. Mar. 3, 2014) (quoting *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992)).

Of course, that is no concern here. The purported "litigation" at issue was ██ ██████████████████████████████████████████████ that Karma was considering in Spring and Summer 2020. Assuming that ████████████████ constitutes "litigation" for purposes of the work-product doctrine—and not all courts agree that it does, ████████████████████████████████████████ ████—it is clear that any legal analysis performed in connection with ████████ ████████ has nothing to do with Karma's various corporate espionage claims against the Defendants in this case. Nor is Karma's ████████████ even part of this case.

Indeed, several courts have held that the work-product doctrine does not extend to cases like this one, where the document in question was purportedly created

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    in anticipation of unrelated litigation that has either terminated or never occurred. *See*

2    *Rsch. Inst. for Med. & Chemistry, Inc. v. Wisconsin Alumni Rsch. Found.*, 114 F.R.D.

3    672, 680 (W.D. Wis. 1987) ("[T]he protection afforded work product is not, and need

4    not be, permanent. When the litigation for which it was prepared is at end, the purpose

5    of the rule has been fulfilled and the need to protect the material from disclosure no

6    longer exists."); *Ferguson v. Lurie*, 139 F.R.D. 362, 368 (N.D. Ill. 1991) ("The work

7    product doctrine does not apply here because . . . the two documents in question were

8    not prepared in contemplation of the present litigation."); *Horizon Fed. Sav. Bank v.*

9    *Selden Fox & Assocs.*, No. 85 C 9506, 1988 WL 77068, at *1 (N.D. Ill. July 20, 1988)

10   ("The work-product doctrine does not apply here because . . . these documents were

11   not prepared in anticipation of the present litigation. . . . Rule 26 is concerned with

12   the discovery of materials created for use in the litigation at issue.").

13       But Exhibit 133 does not qualify for work-product protection for an even more

14   fundamental reason: according to Karm's own witnesses, the company never

15   seriously contemplated ▮▮▮▮▮▮▮▮▮. As this Court has explained, "[t]he

16   anticipation of litigation test requires more than a remote possibility of litigation."

17   *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, No. SACV1502034JVSJCGX,

18   2019 WL 11743217, at *4 (C.D. Cal. Mar. 1, 2019) (quotations omitted); *see also*

19   *Arfa*, 2014 WL 815496, at *4 ("The work product rule does not apply merely because

20   there is a remote prospect of future litigation."); *Health v. F/V ZOLOTOI*, 221 F.R.D.

21   545, 549 (W.D. Wash. 2004) ("More than the mere possibility of litigation must be

22   evident for materials to be considered immune from discovery under the work-

23   product doctrine.") (citation and internal quotations omitted); *Fox v. Cal. Sierra Fin.*

24   *Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988) ("There is no requirement that the

25   litigation have already commenced in order for the work-product doctrine to be

26   operative, however, there must be more than a remote possibility of litigation.");

27   *Hooke v. Foss Mar. Co.*, No. 13-CV-00994-JCS, 2014 WL 1457582, at *4 (N.D. Cal.

28   Apr. 10, 2014) (holding that "the mere contingency that litigation may result is not

1   determinative" of whether a document is prepared in anticipation of litigation).

2   Here, Karma has taken the position that the purported "litigation"—███

3   ████████████████—was no more than a "remote" possibility when

4   ███ prepared ███████████. Specifically, Mikael Elley—Karma's chief of

5   staff—testified repeatedly that Karma had never "been at a point where we've

6   seriously said . . ., or seriously discussed, . . . ██████████████ We

7   have just -- we haven't been there." (Elley Dep., Pl. Br. Ex. 2, 302:21-25; *see also*

8   *id.* at 304:22-24 ("I don't think we were seriously considering doing a ████

9   ████████"); 309:22-24 ("I don't think the company seriously considered

10  ████████████"); 312:15-16 ("It wasn't something we were seriously

11  considering.").) According to Elley, if Karma was truly contemplating ████

12  ███, "I would have known. I would have been in the loop if we were seriously

13  considering ███████ at that point in time." (*Id.* at 305:5-7.)

14  Elley explained that Karma had done ██████████ planning "a couple

15  times before" between 2017 and 2020—never once resulting in ████████.

16  (*Id.* at 308:19-12.) Like the Court in *Hooke*, he described the ████████ as a

17  mere "contingency." (*Id.* at 302:16.) In fact, Elley claimed that "at the end of the day,

18  there is no way that" Karma's owners would "█████████ . . . . [W]e've been

19  close, ████████████. That's the bottom line." (*Id.* at 325:10-

20  16.)

21  In short, Karma cannot satisfy its burden of showing the ████████

22  ████—let alone the single screenshot reflected in Exhibit 133—was created "in

23  anticipation of litigation" as required to invoke the work-product doctrine.

24  **B.   Defendants Have A Substantial Need For Exhibit 133 And Cannot**

25  **Obtain It By Other Means.**

26  Even if Exhibit 133 could be considered attorney work product, it would

27  nevertheless be subject to disclosure in this instance because Defendants have a

28  "substantial need for the materials to prepare [their] case and cannot, without undue

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

13

1   hardship, obtain their substantial equivalent by other means."[6] Fed. R. Civ. P.

2   26(b)(3)(A)(ii).

3     In its latest Complaint, Karma accuses several of the individual defendants of

4   breaching their contractual obligations by, among other things, "accepting

5   employment with LMC" and "soliciting, recruiting, or inducing Karma's employees

6   to leave Karm and join LMC," and accuses LMC of aiding and abetting those efforts.

7   (Am. Compl. ¶¶ 165 (Durre), 171 (Huan), 177 (Qin), 183 (Punak), 195 (Kim), 201

8   (Huang), 229 (LMC).)

9     To rebut those allegations, Defendants must be able to show that not only were

10  rumors ███████████████████████ swirling at Karma, but that those rumors

11  were well-founded. Indeed, LMC has already made similar arguments to defeat

12  Karma's application for TRO. (Opp. to Ex Parte App., ECF No. 24, at 1 (noting that

13  "former Karma employees chose to leave Karma and pursue employment at LMC

14  because" of cutbacks in engineering and manufacturing, including reductions in

15  headcount, ██████).)

16    Not only that, but the ████████████ and surrounding publicity helps

17  explain why LMC may have been reluctant to put the fate of its infotainment system

18  in Karma's hands, with Karma ████████████████████████████

19  ████████████████████████████. Although Karma

20  now claims that it was both willing and able to move forward with the infotainment

21  project for LMC, the fact that it was simultaneously ████████████████

22  ██████████ casts serious doubt on that contention.

23    Indeed, Exhibit 133 confirms that any assurances Karma gave to LMC or its

24  employees ██████████████████████ were themselves false.

25

26  [6] There is no question that, because it was prepared enti████████████rty
    consultant based on "financial data" provided by Karma, the ████████████ is

27  "ordinary work product" and not "opinion work product" c███████tal
    impressions or theories of counsel, which would be subject to greater protection. *See*

28  *U.S. E.E.O.C. v. Pioneer Hotel, Inc.*, No. 2:11-CV-01588-LRH, 2014 WL 4987418,
    at *5 (D. Nev. Oct. 6, 2014).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

14

And a number of courts have recognized that the "substantial need" test is satisfied if the alleged work product is necessary for impeachment. *See In re EHR Aviation, Inc.*, No. 16-MC-80093-JCS, 2016 WL 5339802, at *5–8 (N.D. Cal. Sept. 23, 2016) (recognizing a "substantial need" for disclosure of work product to "impeach" witness testimony); *Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (listing "impeachment or corroboration" as sufficient reasons for discovery of work product); *U.S. E.E.O.C. v. Pioneer Hotel, Inc.*, No. 2:11-CV-01588-LRH, 2014 WL 4987418, at *5 (D. Nev. Oct. 6, 2014) (defendant had "substantial need" for work product "for impeachment"); *Young v. United Parcel Serv.*, 88 F.R.D. 269, 271–72 (D.S.D. 1980) ("substantial need" satisfied where information "could be used to impeach a witness" and there was "a strong possibility" that witnesses' prior statements "differ significantly from their deposition testimony").

Defendants are already aware of similarly false statements made by Karma and its CEO ███████████████████████████████████. Exhibit 133 is the only document produced in discovery to date that can refute Karma's claims that ██████████████████████████████████████████████ ███████████████████████, but instead was fully capable of creating an infotainment system for LMC. Accordingly, even if Exhibit 133 qualified for work-product protection as an initial matter—which it does not—it would nevertheless be subject to the "substantial need" exception set forth in Rule 26(b).

## CONCLUSION

For all of the foregoing reasons, the Court should deny Karma's motion.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Dated: May 28, 2021

**BAKER & HOSTETLER LLP**

By:   */s/ Thomas R. Lucchesi*
Thomas R. Lucchesi (Pro Hac Vice)
Terry M. Brennan (Pro Hac Vice)
Anthony D. Ponikvar (Pro Hac Vice)
Ryan D. Fischbach (SBN 204406)
William D. Oxley (SBN 136793)

*Attorneys for Defendants*
LORDSTOWN MOTORS CORP., STEVE
BURNS, JOHN LAFLEUR, DARREN POST,
RICH SCHMIDT, ROGER J. DURRE, and
HONG XIN HUAN (A.K.A. "GEORGE"
HUAN).

16