REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

THOMAS R. LUCCHESI (*Pro Hac Vice*)
*tlucchesi@bakerlaw.com*
TERRY M. BRENNAN (*Pro Hac Vice*)
*tbrennan@bakerlaw.com*
ANTHONY B. PONIKVAR (*Pro Hac Vice*)
*aponikvar@bakerlaw.com*
**BAKER & HOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, OH 44114
Telephone:   (216) 621-0200
Facsimile:   (216) 696-0740

WILLIAM W. OXLEY (SBN 136793)
*woxley@bakerlaw.com*
RYAN D. FISCHBACH (SBN 204406)
*rfischbach@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Ste. 1400
Los Angeles, CA  90025
Telephone:   (310) 820-8800
Facsimile:   (310) 820-8859

*Attorneys for Defendants*
LORDSTOWN MOTORS CORP., *et al.*

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARMA AUTOMOTIVE LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>LORDSTOWN MOTORS CORP., an Ohio Corporation; STEVE BURNS, an individual, JOHN LEFLEUR, an individual, DARREN POST, an individual, RICH SCHMIDT, an individual, ROGER J. DURRE, an individual, HONG XIN HUAN (A.K.A. "GEORGE" HUAN), an individual, BEI QIN, an individual, STEPHEN PUNAK, an individual, CHRISTOPHER KIM, an individual, DAN ZHIHONG HUANG, an individual; PUNAK ENGINEERING, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 8:20-cv-02104-JVS-DFM<br><br>[Assigned to the Hon. James V. Selna]<br><br>**MEMORANDUM IN OPPOSITION TO KARMA AUTOMOTIVE LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          Sept. 13, 2021<br>Time:         1:30 p.m.<br>Ctrm:        10C<br><br>Action Filed:   October 30, 2020<br>Trial Date:      April 12, 2022 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................. 1

II.     ARGUMENT ......................................................................................... 2

    A.      Karma's Burden of Proof. ........................................................... 2

    B.      Karma Cannot Establish the Existence of Any Trade Secret. .............. 3

    C.      Karma Cannot Demonstrate Any Use of its Alleged Trade Secrets. ..... 5

        1.      Power Moding ................................................................... 5

        2.      EE System Architecture .................................................. 8

        3.      Source Code ................................................................... 12

        4.      Karma Product Development System (KPDS) ........................ 15

        5.      Bill of Materials ............................................................. 17

    D.      Karma Will Not Suffer Irreparable Harm. ............................................ 19

    E.      The Balance of Equities Strongly Favors LMC. ................................ 21

    F.      Karma's Requested Injunction Would Harm The Public. .................. 23

    G.      Karma's Requested Injunction Demands a Substantial Bond. ........... 25

III.    CONCLUSION ................................................................................... 25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

## Cases

*Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011) ..................................................................................................................6

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........................2

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)...............21

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) ...............................22

*Apple vs. Samsung*, 877 F. Supp. 2d 838 (N.D. Cal. 2012) ....................................25

*Argo Grp. US, Inc. v. Pro. Governmental Underwriters, Inc.*, 2013 WL 11327772, (C.D. Cal. Dec. 6, 2013)...................................................................3, 4, 5, 15, 16

*Asset Mktg. Sys., Inc. v. Gagnon*, 2007 WL 2669482 (S.D. Cal. Sept. 6, 2007) .....12

*Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783 (N.D. Cal. 1994).....................24

*Backcountry Against Dumps v. Perry*, 2017 WL 3712487 (S.D. Cal. Aug. 29, 2017) ...............................................................................................................................22

*Behr Process Corp. v. RPM Int'l, Inc.*, 2014 WL 12581763 (C.D. Cal. Feb. 14, 2014) ...............................................................................................................................22

*Capitol Records, LLC v. Bluebeat, Inc.*, 2009 WL 10681964 (C.D. Cal. Dec. 16, 2009) .......................................................................................................................3

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, 2021 WL 1186335 (N.D. Cal. Mar. 1, 2021) ......................................................................................................24

ii

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Citcon USA, LLC v. RiverPay Inc.*, 2019 WL 2603219 (N.D. Cal. June 25, 2019) 19

*Coldwell Banker Real Est. LLC v. Smile Enterprises, Inc.*, 2011 WL 13220121 (C.D. Cal. Mar. 11, 2011) ...............................................................................24

*Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018), ...............................................................................24

*Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir. 1980) ............23

*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) .........................................................21

*Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC*, 2020 WL 4390380 (C.D. Cal. May 19, 2020) ...........................................20

*E Trade Fin. Corp. v. Agbonbhase*, 2019 WL 11497656 (N.D. Cal. May 2, 2019); . 3

*Earth Island Inst. v. Carlton*, 626 F.3d 462 (9th Cir. 2010) ......................................2

*Friends of the Wild Swan v. Christiansen*, 955 F. Supp. 2d 1197 (D. Mont. 2013). 23

*Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ...............................................................................18

*Keel v. Hedgpeth*, 2009 WL 4052707 (E.D. Cal. Nov. 19, 2009) .............................3

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ........................................22

*Leatt Corp. v. Innovative Safety Tech., LLC*, 2010 WL 1526382 (S.D. Cal. Apr. 15, 2010) ...............................................................................11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Nano-Second Tech. Co. v. Dynaflex Int'l*, 2011 WL 4502025 (C.D. Cal. Sept. 28, 2011) ...................................................................................................21, 24

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir. 1999); ...................................................20

*Pom Wonderful LLC v. Pur Beverages LLC*, 2015 WL 10433693 (C.D. Cal. Aug. 6, 2015) ...................................................................................................19, 21

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004)) ..........................................3

*Puricle, Inc. v. Church & Dwight Co.*, 568 F. Supp. 2d 1144 (C.D. Cal. 2008) .....22

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) ........................25

*See Hooked Media Group, Inc. v. Apple Inc.*, 269 Cal. Rptr. 3d 406 (Cal. App. 6th Dist. 2020) ................................................................................................11, 16

*SPS Tech, LLC v. Briles Aerospace, Inc.*, 2019 WL 1974902 (C.D. Cal. Mar. 11, 2019) ...........................................................................................................24

*Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 1142204 (N.D. Cal. Mar. 2, 2018) ...19

*Telephia Inc. v. Cuppy*, 2005 WL 588441 (N.D. Cal. Mar. 11, 2005) ....................10

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 (2008); ..............................23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## I.     **INTRODUCTION**

Nearly 10 months after Karma first sued Defendants for alleged trade-secret misappropriation and lost its *ex parte* bid for a temporary restraining order, Karma is back in court seeking a preliminary injunction: (1) requiring the Defendants to return five categories of alleged trade-secret documents currently in their possession; (2) barring Defendants from using those documents; and (3) prohibiting LMC from building or selling its Endurance electric pickup truck, which Karma claims (but entirely fails to establish) is being produced using its purported trade secrets.

Karma's first two requests can be easily resolved. The fact that a few individual Defendants retained Karma documents after leaving the company has never been in dispute. And aside from the challenged lines of LMC's source code—which, as explained below and in the accompanying declarations, were all either developed internally, copied from open-source repositories, or written by defendant Stephen Punak long before his tenure at Karma—Defendants are more than willing to return and refrain from using any Karma documents still in their possession, regardless of whether those documents actually constitute or contain any trade secrets.[1]

The crux of Karma's motion, then, is whether Karma can demonstrate with clear, concrete evidence that: (1) the five categories of Karma documents in Defendants' possession are trade secrets; (2) those trade secrets are *actually being used* to build the Endurance; (3) production of the Endurance is likely to cause Karma irreparable harm; (4) a preliminary injunction halting production will prevent that alleged harm; and (5) the balance of equities and the public interest both weigh in favor of such an injunction.

But Karma—relying almost exclusively on self-serving generalizations,

---

[1] In fact, Defendants have already largely done so. Specifically, Defendants have already provided Karma the removable storage devices containing Karma information that served as the basis for Karma's original TRO motion, as ordered by the Court on November 6, 2020. Any Karma information on those devices is therefore no longer in Defendants' possession.

1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   baseless conjecture, and outright misrepresentation of the facts—fails that test at

2   every turn. Both Karma's trade-secret and irreparable harm evidence consist of

3   nothing more than conclusory recitations of the legal definitions of those elements;

4   Karma offers evidence that certain Defendants *possessed* Karma information, but

5   none that shows LMC is actually using Karma's information to build the Endurance;

6   and Karma's requested "preliminary" injunction would likely drive LMC into

7   immediate bankruptcy, the fallout from which would be felt across LMC's network

8   of employees, vendors, and even the broader Northeast Ohio economy. All of that to

9   stop LMC from producing an electric fleet truck that, by Karma's own admission,

10  does not even compete with Karma's line of luxury hybrid sports cars.

11      For these reasons, Karma does not and cannot justify its request for an order

12  halting production of the Endurance, and its motion must be denied.

13  **II.    ARGUMENT**

14          **A.    Karma's Burden of Proof.**

15      A preliminary injunction is "an extraordinary remedy that may only be

16  awarded upon a clear showing that": (1) Karma is likely to succeed on the merits; (2)

17  Karma is likely to suffer irreparable harm absent an injunction; (3) the balance of

18  equities favors Karma; and (4) an injunction is in the public interest. *Earth Island*

19  *Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).[2] To demonstrate a likelihood of

20  success on its misappropriation claims, Karma must identify each trade secret with

21  particularity and establish: (1) that it derives independent economic value from not

22  being generally known; (2) it is the subject of reasonable efforts to maintain its

23  secrecy; and (3) LMC misappropriated it. *Argo Grp. US, Inc. v. Pro. Governmental*

24

25

26  [2] These elements apply on a sliding scale, such that "serious questions going to the merits and a
    balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

27  injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and
    that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

28  1135 (9th Cir. 2011). But which formulation of the test applies is irrelevant here—Karma fails
    under both.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Underwriters, Inc.*, 2013 WL 11327772, at *1–3 (C.D. Cal. Dec. 6, 2013).

If Karma satisfies its "heavy burden," *Earth Island*, 626 F.3d at 469, the Court has the discretion to issue a preliminary injunction, provided that injunction is "narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs." *Capitol Records, LLC v. Bluebeat, Inc.*, 2009 WL 10681964, at *3 (C.D. Cal. Dec. 16, 2009) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)). Thus, "Plaintiff must specifically identify what risk of irreparable harm he faces and . . . demonstrate how the Court's intervention will prevent Plaintiff from suffering [that] harm." *Keel v. Hedgpeth*, 2009 WL 4052707, at *1 (E.D. Cal. Nov. 19, 2009). So here, to justify an injunction stopping production of the Endurance, Karma must show that the LMC is actually using Karma's trade secrets, and that the absence of its requested injunction will cause Karma to suffer irreparable harm. Because it cannot do so, the Court should deny Karma's motion.

### B.    Karma Cannot Establish the Existence of Any Trade Secret.

Before reaching the issue of use or misappropriation of Karma's alleged trade secrets, the Court must first determine whether Karma has provided sufficient evidence to show a likelihood of success on the question of whether the five categories of documents allegedly being misappropriated qualify as trade secrets in the first place. In other words, Karma must prove that the five trade secrets it claims are being misappropriated: (1) derive independent economic value from not being generally known; and (2) are the subject of reasonable efforts to maintain their secrecy. *Argo Grp.*, 2013 WL 11327772, at *1–3. Here, Karma fails to satisfy even this basic element of its claim.

The "conclusory recitation of selected trade secret elements," even in a sworn declaration, "is not sufficient to establish that [a party] is likely to succeed on a claim for trade secret misappropriation." *E Trade Fin. Corp. v. Agbonbhase*, 2019 WL 11497656, at *5 (N.D. Cal. May 2, 2019); *see also Argo Grp.*, 2013 WL 11327772, at *1–3 ("conclusory statement" in declaration that information constitutes a trade

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  secret not sufficient to support injunction). Yet that is exactly what Karma does for

2  each of the five purported trade secrets at issue in its motion.

3      Specifically, Karma submits the declaration of its former chief of staff, Mikael

4  Elley, which contains only a generic description of various categories alleged to be

5  trade secrets, including: "source code, engineering plans, and cost structure" for

6  various vehicle components; "Karma's internal processes for developing a vehicle";

7  "Karma's files and records regarding customers, prospective customers, independent

8  contractors, subcontractors, vendors"; "analyses and forecasts of production capacity

9  and readiness to meet client and partner needs"; "financial and accounting

10  information"; and "other non-public information of Karma that would be valuable

11  for a competitor or other person or entity to have." (Elley ¶ 7(a)-(i) at p.4.)[3]

12      For each alleged trade secret, Elley gives the same blanket recitation of the

13  statutory elements—namely, that they "were compiled and developed by Karma over

14  many years through substantial efforts and expense, are not known to the public,"

15  "are not readily ascertainable in Karma's industry or . . . [from] any other source,"

16  were "generated with considerable time, effort and expense to Karma," are "not

17  readily ascertainable by others who would find this information to be valuable," and

18  "in the hands of a competitor would enable the competitor to bypass months and even

19  years of research and development." (Elley ¶ 7 at p.5.)

20      Although both Elley and Karma's Chief Innovation Officer Stefan

21  Gudmundsson go on to provide more detailed descriptions of the purported trade

22  secrets at issue here, they fail to give any further detail on Karma's efforts to develop

23  those purported trade secrets without reliance on standard industry knowledge, or

24  explain (other than in conclusory terms) how Karma derives value from keeping that

25  information secret. (*See* Elley ¶¶ 54, 58-61; Gudmundsson ¶¶ 26-27.) Indeed, their

26  declarations merely repeat verbatim the language above. (*Id.*)

27

28  _____

[3] Because Elley's declaration contains two paragraph 7s, those paragraphs are also referenced
herein by page number.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

In other words, Karma's "evidence" that the documents at issue constitute trade secrets consists of nothing more than rote, conclusory recitations of the statutory elements of a trade secret. Thus, Karma has failed to meet its burden to show a likelihood of success on the issue of the existence of a protected trade secret. Its motion should be denied for that reason alone.

## C.  Karma Cannot Demonstrate Any Use of its Alleged Trade Secrets.

### 1.  Power Moding

Karma asserts that LMC is misappropriating Karma's trade-secret power moding system based on a single document from LMC's production which, according to Karma, contains a similar "structure" and "entire sections" that are identical to Karma's power moding specification. (Mem. 8.) That argument is baseless, for several reasons.

At a high level, "power moding" describes the system in every vehicle that determines when and in what order the vehicle's various electronic systems are activated. (Stelmaszek ¶ 11; Post ¶¶ 62-64; Porter ¶ 8.) By way of example, when a vehicle is locked and stationary with no occupants, it enters a "low power" state— often referred to as "OFF." (*Id.*) When the vehicle is unlocked, certain additional systems come to life—door locks, lights, power seats, etc. (*Id.*) That mode is often called "OFF-AWAKE," or something similar. (*Id.*) Other modes have similarly generic titles describing the various states of activity between fully off and fully on.

These mode titles are well-known, standard terms in the industry, and all power moding specifications have a similar structure and format. (Stelmaszek ¶ 11; Porter ¶¶ 8-9.); *Argo Grp.*, 2013 WL 11327772, at *1–3 (information "generally known to other persons skilled in the same field" is not a trade secret). Likewise, the different vehicle systems that are activated during each mode is not a trade secret, as it can be readily observed by any person who drives a Karma vehicle. (Stelmaszek ¶ 12; Porter ¶ 10); *Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1016 (E.D. Cal. 2011) (information "evident to anyone [using] the finished"

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

product is not a trade secret). So, to the extent Karma's claim is based on LMC's use of common nomenclature for the different power modes, or on the activation of the same vehicle systems under each power mode state, Karma's claim fails on its face.

Even assuming that the alleged "copying" goes beyond standard nomenclature or readily observable features, the evidence is clear that LMC has not incorporated Karma's alleged trade secrets into the *current* Endurance design—the one Karma seeks to enjoin LMC from putting into production. Nor does Karma even allege that the Defendants ever had access to Karma's actual power moding specifications.

The LMC document allegedly "copied" from Karma's proprietary power moding system is an LMC specification titled "Version 0.1"—a name chosen in lieu of "Version 1.0" to indicate that the document was merely a placeholder, the content of which had no relevance to the ultimate plans for the Endurance truck. (Stelmaszek ¶ 25; Porter ¶ 15.)

As Karma itself notes, Version 0.1 shows that portions of the document originated from power moding specifications drafted over a decade ago—in 2009. (Mem. 8.) And for good reason: the source document for Version 0.1 was originally created in 2009 for Fisker Automotive (Karma's predecessor purchased out of bankruptcy) by a third-party vendor/consultant called ESG Automotive. (Stelmaszek ¶¶ 22-24.) ESG never finished the project, however, because Fisker stopped paying its bills. (Stelmaszek ¶ 16.)

Zak Stelmaszek, the former ESG employee that worked on the Fisker project, now works at LMC. Stelmaszek still has in his possession his ESG work computer, which he bought from ESG in 2012 when leaving the company. (Stelmaszek ¶ 18.) When Stelmaszek joined LMC in 2020, Stelmaszek gave a copy of the 2009 Fisker power moding document to LMC engineer Bernie Porter so Porter could put together a shell power moding specification document. (Stelmaszek ¶¶ 22-23.)

Power moding specifications all have the same basic layout, so Stelmaszek sent Porter the 2009 Fisker document to use as a shell for the format of the LMC

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

specification document. (Stelmaszek ¶ 23; Porter ¶ 13.) The content of the 2009 Fisker document was of no use to Porter or LMC, because the system developed for Fisker was for a luxury hybrid sports car—a completely different system that, unlike the Endurance, uses a high voltage battery and an internal combustion engine (ICE) powered generator. (Porter ¶ 13.)

LMC has since made significant changes to its power moding specification—which is now on Version 2.2—wiping away the substantive content contained in the Fisker shell document and replacing it with specifications particular to the Endurance. These substantial changes were made initially in Version 1.0, the first "official" version of the LMC power moding specification. (Porter ¶ 18.) Among other things: (1) Version 0.1 contained ▮ power modes; Version 1.0 has only ▮, including a new "Flash" mode that was not one of the original modes; (2) Version 0.1 has ▮ physical power modes; Version 1.0 has only 2; (3) Version 0.1 had two "flags" or settings called ▮▮▮▮; Version 1.0 does not; (4) Version 0.1 has no specific "▮▮▮▮ Version 1.0 does; (5) Version 0.1 contained two bidirectional diagrams; Version 1.0 is simpler and has only one; (6) Version 0.1 has ▮ wake up sources; Version 1.0 has ▮; and (7) Version 0.1 references a ▮▮▮ Version 1.0 does not. (Stelmaszek ¶ 26.)

Simply put, any overlap between the content of Karma's current power moding specifications and the Version 0.1 placeholder is now moot. LMC replaced the content of Version 0.1—which was irrelevant given the differences between the two vehicles—with specifications particular to the current Endurance design.

Indeed, despite receiving Version 1.0 in discovery, Karma does not even attempt to argue that LMC's *current* power moding specifications are in any way similar to the 2009 document created for Fisker. Again, Karma has submitted no evidence that any of the Defendants even had access to a copy of the Karma power moding specification it claims LMC copied. Instead, the metadata makes clear that any similarities between Karma's specifications and LMC's Version 0.1—which is

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  now a dead letter, having been replaced by Version 1.0—were the result of a common
2  starting point: the 2009 specification prepared by ESG for Fisker, which LMC
3  received lawfully from a former ESG employee. To the extent similarities remain, it
4  is only in the formatting of the document, and the use of industry-standard
5  terminology for the different power "modes" and functions of the vehicle. (Porter ¶¶
6  28-31; Stelmaszek ¶¶ 26-28.)

7      Accordingly, because LMC's power moding specification was not copied from
8  Karma, and in any event the allegedly copied document is no longer in use at LMC,
9  the alleged "misappropriation" of Karma's power moding specifications does not
10  support an injunction halting production of the Endurance.

11      **2.    EE System Architecture**

12      Karma next argues that LMC has misappropriated Karma's "EE System
13  Architecture" (Gudmundsson Ex. 4) because LMC uses a similar high-level block
14  diagram to depict its own EE architecture (Gudmundsson Ex. 3), and because LMC
15  incorporated certain industry-standard elements that Karma suggested during the
16  parties' discussions about a potential infotainment partnership. (Post ¶ 22.)

17      As an initial matter, the EE architecture diagrams at issue here contain no trade
18  secret information. (*See* Andrews ¶¶ 15-23, Post ¶ 22, Durre ¶¶ 10-11.)  In contrast
19  to the technical *implementation* of the EE architecture, documentation for which can
20  be over 700 pages long on their own, the EE architecture document Karma claims is
21  a "trade secret" is merely one-page *overview* containing high-level visual
22  representations of the different modules within the vehicle and how they are
23  interconnected. (Andrews ¶¶ 16-17.)  Blocks show the different parts, and lines show
24  how those parts are connected. Examples of EE architecture diagrams with
25  essentially the same format and content that Karma's contends are trade secrets are,
26  in fact, widely available online. (Andrews ¶¶ 19-21; Post ¶¶ 40-42; Durre ¶ 19-22.)
27  And both Darren Post and Joe Durre were familiar with such diagrams—including
28  Karma's diagram—from their work at Karma and other auto manufacturers. (Post ¶

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

8

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

23, Durre ¶ 9.)

Indeed, the specific EE architecture diagram Karma claims LMC misappropriated only shows well-known or government-mandated elements of any vehicle system, such as the powertrain, infotainment system, diagnostics, and suspension and chassis control. (Andrews ¶¶ 17, 23-24.) Out of 43 "blocks" or modules in LMC's EE architecture diagram, it shares only 29 with Karma's version. (*Id.* ¶ 24.)

Of those 29 "blocks," 15 are either mandated by the government, or reflect features common to all passenger vehicles. (*Id.*) The other 14 are the result of LMC's use of a widely available General Motors (GM) body controller (also used by Karma)—the design of which is always consistent across different manufacturers because it is fixed by GM. (*Id.* ¶ 25.) In other words, everything the two diagrams have in common is either a required element or so ubiquitous as to render it ineligible for trade-secret protection. (*Id.* ¶¶ 26, 30-31, 33-34.)  It is the material *differences*, rather, between LMC's and Karma's EE architecture that sets them apart.  (*See* Andrews ¶¶ 27, 29-32.) For example, Karma's architecture reflects a hybrid luxury sedan, with components for both an internal combustion engine and electric motor, plus high-end features like blind spot monitoring, adaptive cruise control, and surround view cameras one would expect on a $140,000 car.  (*Id.* ¶ 27.)  LMC's architecture, in contrast, reflects its $52,000 all-electric work truck design with four independent HUB motors on each wheel and limited premium features.  (*Id.*  ¶¶ 26-27.) These differences stem from the simple fact that LMC's Endurance is, at its core, an entirely different vehicle than Karma's, and illustrates why LMC has little, if any, reason to wholesale copy Karma's inapposite architecture.  (*Id.* ¶ 28-29.)

Similar reasoning applies to LMC's alleged misappropriation of the additional features Karma suggested during the parties' infotainment development discussions. Specifically, Karma claims that Joe Durre—then at Karma—sent Darren Post a proposal for a revised EE architecture that added several features to LMC's existing

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

9

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

EE architecture—specifically: a CIC cockpit intelligence controller, a Connected Gateway, Ethernet connectivity, and an A2B radio.

But according to Durre, suggesting those features to LMC was his idea, in part because all of these "important improvements" were already well-known in the industry, and in fact had become standard features for modern vehicle infotainment systems. (Durre ¶ 13, Huan ¶¶ 10, 13, 17 Huang ¶ 33.) Publicly available diagrams show that car manufacturers have been consistently integrating controllers and gateways into their EE architectures for decades. (Andrews ¶¶ 37-42; Post ¶¶ 40-42; Durre ¶ 19-22.) Karma's claimed improvements in "███████████████████████" design is also baseless: the idea of adopting and using a revised processor configuration that combines several functions of earlier architecture was not discovered through Karma R&D.  Rather, this technology, and the added benefits Karma claims as its own, *were developed by third parties*. (Andrews ¶¶ 49-63.)

Similarly, the use of Ethernet connections has been ubiquitous in the electrical engineering field for years, not just in the automotive industry. (Durre ¶ 27; Post ¶ 47; Andrews ¶ 66.)  And A2B radio—an off-the-shelf product not created or manufactured by Karma—is explicitly advertised for use in "Automotive and Transportation" applications. (Durre ¶ 31; Post ¶ 46; Andrews ¶¶ 64-65.) Not surprisingly, Karma does not even contest that these features are widely known in the industry at the time LMC adopted them.[4]

LMC—specifically, Darren Post—was already well aware of these concepts before Durre suggested them. (Post ¶¶ 35-47.) The use of a gateway is even required by some of LMC's other vendors because they are a crucial protection for vehicles against hacking and cyber-attack. (Post ¶ 44; Andrews ¶¶ 43-48.)

In short, LMC's EE architecture does not incorporate any Karma trade secrets

---

[4] Moreover, to the extent Karma contends that the parties' MDNA prohibited LMC from using these concepts because they were disclosed during the parties' negotiations, its claim is really one for breach of contract, which is compensable by money damages. *Telephia Inc. v. Cuppy*, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005) ("[A] claim for breach of contract can be compensated by money damages, and does not warrant the issuance of a preliminary injunction.")

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   whatsoever, to the extent they even exist, and therefore does not support a
2   preliminary injunction based on purported misappropriation for that reason alone.

3        That said, even if Karma's generic EE architecture diagram or the high-level
4   modifications it suggested to LMC could constitute trade secrets, the evidence does
5   not support Karma's claim that LMC misappropriated those trade secrets in
6   developing the Endurance.

7        Darren Post drafted the first version of LMC's EE architecture diagram in 2019
8   based on his experience and memory of similar documents he had seen during his
9   career, including his time at Karma, as well by researching publicly available
10  diagrams. (Post ¶ 38.) Post wrote his draft before LMC ever approached Karma about
11  the development of its infotainment system and long before Karma alleges that LMC
12  and the other Defendants came into possession of its trade secrets. (Post ¶ 30.)

13       Then, in July 2019, LMC hired an outside consultant—RLE International—to
14  draft a new EE architecture for the Endurance. After completing two versions, Post
15  modified it to reflect which modules LMC intended to acquire from General Motors,
16  and sent that revised version to Karma. It is that document (Gudmundsson Ex. 3) that
17  Karma now falsely claims LMC "copied" from Karma's EE architecture diagram.

18        Part of Karma's claim that Exhibit 3 must have been copied was that the
19  connections for the front and rear windows were represented identically in both
20  Karma's and LMC's diagrams. (Post ¶ 31, Gudmundsson Decl. ¶¶ 44-45.) According
21  to Gudmundsson, Karma designed the window motors that way because it was using
22  parts manufactured by GM, but concluded that it was "extraordinarily unlikely" that
23  LMC was also using GM parts.

24        But Gudmundsson's analysis is flawed in many respects (*see, e.g.,* Andrews
25  ¶¶ 25, 35), and whether he thinks it unlikely or not, the fact remains that when LMC's
26  original EE architecture was drafted, LMC *was* planning on sourcing many of its
27  parts from GM or GM suppliers,[5] *including* the window parts that led Post and

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[5] GM is an investor and partner in LMC's development of the Endurance. (Andrews ¶ 25.)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

LMC's consultant RLE to design LMC's EE architecture diagram in the same way as Karma. (Post ¶ 32.) In short, any similarities between Gudmundsson Exhibits 3 and 4 were either the result of necessary design features, based on public information, or implemented based on Post's recollection of similar documents from his work experience. *See Hooked Media Group, Inc. v. Apple Inc.*, 269 Cal. Rptr. 3d 406, 413–14 (Cal. App. 6th Dist. 2020) (former employee's reliance on knowledge or information he gained as a result of his employment is not actionable as trade secret misappropriation); *Leatt Corp. v. Innovative Safety Tech., LLC*, 2010 WL 1526382, at *7 (S.D. Cal. Apr. 15, 2010) ("[r]everse engineering or independent derivation alone" is not misappropriation).

### 3. <u>Source Code</u>

As an initial matter, nowhere in the motion for preliminary injunction or supporting materials does Karma include any evidence that the source code it alleges LMC copied qualifies as a trade secret, such as what it does, how it was developed, whether it is open-source or known only to Karma, and, if the latter, how Karma derives economic value from it not being known to Karma's competitors.

At one point, Gudmundsson does describe a single allegedly unique feature of its own software—namely, a "sophisticated cloud system to send new software and software updates to the consumer over the air." (Gudmundsson ¶ 4.) But none of Karma's witnesses, including its source code expert, ever claim that LMC took any of that code, or otherwise describe in any detail the code LMC supposedly copied.

Even assuming—as Karma apparently does—that source code is categorically subject to trade secret protection,[6] Karma fails to adduce any credible evidence that LMC's current source code is copied from Karma's proprietary source code.

To support its claim that LMC "copied" source code from Karma, Karma relies entirely on the analysis of Robert Zeidman, a purported software expert. But

---

[6] This premise is, of course, false. *See, e.g.*, *Asset Mktg. Sys., Inc. v. Gagnon*, 2007 WL 2669482, at *1 (S.D. Cal. Sept. 6, 2007) (holding "that the computer programs including the source code" at issue "were not trade secrets").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Zeidman's analysis is flawed in several material respects, as detailed in the attached declaration of source code expert Jeffrey Miller, Ph.D and Scott Andrews (¶¶ 68-93.). Among other things, Zeidman did not even analyze the complete LMC Repository, but instead looked at a limited snapshot produced early in this case. (Miller ¶¶ 13-15.) Despite having every file and line of code from the LMC source code repository, Zeidman has only identified 19 allegedly "similar" files between the two codebases. (*Id.* ¶ 24.) To put this into perspective, LMC's source code repository has ▮▮▮▮▮ files in total. (*Id.* ¶ 21.) Thus, Karma's source-code misappropriation claim is based on the allegation that just **0.015%** of LMC's source code files are "similar" to files in Karma's repository. (*Id.* ¶¶ 25-27.) Moreover, Mr. Zeidman identified only 229 total lines of code he claims are similar between the two codebases. The LMC source code repository has over ▮▮▮▮▮ lines of code. (*Id.* ¶¶ 28-29.) Even assuming every single one of those 229 lines of code were copied (which they were not, as shown below), this code represents only **0.0004%** of the LMC repository. (*Id.*)

This infinitesimal correlation in and of itself shows no copying occurred. Coding, like writing a novel, uses a finite language. There are only so many ways to write code to perform similar functions. (Andrews ¶¶ 84-85.) So where, as here, two software programs involve the same subject matter, the amount of similar code can rise to 30% or more without any copying occurring–especially when the same developer is writing code in each program. (*Id.* ¶ 31.) Developers, just like authors, have their own personal style, so there is always going to be some similarity between two similar projects written by the same author. (*Id.* ¶¶ 31-35.) Those similarities do not constitute misappropriation.

Karma also does not provide any detail about the functionality of the 19 "similar" files, or even attempt to argue how these specific files are trade secrets. The obvious inference—and one supported by the evidence—is that they are not Karma trade secrets and instead consist of common, generic code that is either non-

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

13

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

functional and can be found in a wide variety of different projects and open-source repositories. (*Id.* ¶¶ 36-41; Andrews ¶¶ 70-76.) In fact, 14 of the 19 files identified by Karma have no functionality whatsoever. (*Id.* ¶ 37.) None of the files are specific to the automotive industry or the development of an infotainment system. (*Id.*) Karma has not pointed to a single file that is allegedly similar as between Karma and LMC that is not the result of open-source code, common coding structures, code that performs no function, or generic code that is used in a range of programs. (*Id.* ¶ 38. )

Unable to demonstrate that any of its code actually exists within LMC's repository, Karma nevertheless argues that LMC *must* have copied Karma's code because LMC's programmers were making large, single-day code commits that, according to Karma, were too big to have been written by a human programmer in a single day, and therefore can only have been the result of copying from Karma.

But that conclusion would require the Court to draw several implausible and unsupported inferences. First, large code commits are neither unusual nor indicative of copying of any kind. (Miller ¶¶ 48-52, Andrews ¶¶ 90-93, Durre ¶ 35, Qin ¶¶ 8-10, Huang ¶¶ 8-9, Punak ¶ 21.) Developers often write code over the course of days or even weeks, and then periodically make larger "commits" when moving on to a new task. (*Id.*) Large commits are also typical where the developer is using a tool that autogenerates certain code. (*Id.*) Indeed, many of the commits Zeidman flags as suspicious occurred for exactly those reasons. (Qin ¶ 10, Huang ¶ 9). Zeidman's assumption that large code commits are evidence of copying is simply untenable.

Second, even if the Court *could* reasonably assume that all large code commits demonstrate the committed code was copied, there is no basis to infer that the code was copied *from Karma*, which is exactly the inference Zeidman purports to draw, without *any* analysis of whether the code committed in those large batches overlapped Karma's code, or even whether it performed any of the same functions.

Karma next argues that defendant Stephen Punak misappropriated Karma's trade-secret source code by posting it to his public GitHub in 2019—while he was

MEMORANDUM IN OPPOSITION TO KARMA AUTOMOTIVE LLC'S MOTION FOR PRELIMINARY INJUNCTION
CASE NO.: 8:20-CV-02104-JVS-DFM

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

working for Karma—and then redeploying it at LMC once he was hired there. But that allegation is, once again, contrary to the facts.

Punak—like most software developers—maintains his own "toolbox" of utility code that performs routine, nonspecialized functions not specific to any one project, client, or industry. (Miller ¶ 46, Punak ¶¶ 6-7, Andrews ¶¶ 82-85.)  Punak brought that code with him when he was hired by Karma because, at that time, Karma did not have a similar reusable code library, and Punak thus implemented various aspects of his code at Karma with the approval of his supervisor, Weian Huang. (Punak ¶¶ 15-18.) Huang knew Punak had developed the code prior to joining Karma and that the code "was very basic in function, was not unique, and did not include any proprietary information or material".  (W. Huang Decl. ¶¶ 4-7.) After checking Punak's generic code, Karma made the decision to commit Punak's toolkit into the Karma repository. (*Id.*)

When he came to Karma, Punak had his coding "toolbox" saved locally to his computer; but in 2019, he decided to save it to the cloud, and thus saved a copy to his public GitHub repository. Since 2019, Punak's "toolbox"—including the code he had implemented at Karma—has been available to the public for free online. (Punak ¶ 21.)[7]

Thus, to the extent Karma is claiming that LMC misappropriated Karma's source code by using code found in Punak's GitHub repository, that claim is baseless. *See Argo Grp.*, 2013 WL 11327772, at *1–3 (no misappropriation where alleged trade-secret document "was created by Defendant [] before he joined Plaintiff [], and did not contain any of Plaintiffs' proprietary information").

### 4.    Karma Product Development System (KPDS)

Karma next alleges that LMC misappropriated Karma's product development

---

[7] Even if that code had been Karma's to begin with, Karma has long since lost any potential claim that it is a trade secret, since it has been public for over two years, and Karma has taken no steps to try and recapture it or otherwise limit its availability. *Stutz Motor Car of America, Inc. v. Reebok Intern., Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (trade secret protection is extinguished "[o]nce the information is in the public domain").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    system—called the KPDS—based on three documents LMC produced in discovery:

2    (1) a "complete KPDS for a newly-released Karma vehicle: the Revero GT Bev-T"

3    (Gudmundsson Ex. 13); (2) a ████████████████████████████████"

4    (Gudmundsson Ex. 14) and (3) a document titled "████████████████████████

5    ████████" (Gudmundsson Ex. 15). (Mem. 14-15.)

6        To begin with, Karma offers no evidence beyond the existence of these

7    documents in LMC's discovery production that LMC is actually using Karma's

8    KPDS, or anything like it. Of course, that comes as no surprise, because LMC is not.

9    To the contrary, LMC's product development system was created specifically by a

10   third-party vendor, RLE International. RLE's system is not gate-based, like Karma's,

11   but instead functions as a "critical path" system, which works backwards to assign

12   deadlines to certain tasks based on a final target production date. (Post ¶ 56.)

13       Indeed, forensic evidence confirms that the "complete KPDS" document

14   (Gudmundsson Ex. 13), is simply a temporary cache file generated automatically by

15   Microsoft OneNote on April 9, 2020—*which is also the last time that file was*

16   *accessed*. (Kelley ¶¶ 23-27.) Thus, there is no evidence that anyone at LMC—aside

17   from former Karma employees who had independent experience with KPDS—ever

18   saw a copy of the KPDS, let alone used or implemented it.[8]

19       The other documents Karma cites are equally bereft of evidence of

20   misappropriation. Gudmundsson Exs. 14 and 15 are essentially the same document—

21   namely, a software validation test plan that allegedly contains "unique software

22   release names" such as "BL 400, 500, 600, 700" that, according to Karma, indicate

23   that LMC has adopted Karma's proprietary KPDS. (Gudmundsson ¶ 80; Mem. 15.)

24       Setting aside the dubious proposition of whether a software release name could

25   ever be a trade secret, the evidence is clear that these software release names are

26   nothing more than generic milestones widely used throughout the industry. (Durre ¶¶

27

28   [8] Nor would such a plan be of any use to LMC in any event, given that its Endurance pickup and Karma's luxury Revero sedan have almost nothing in common. (Post ¶ 9.)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

16

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

44-45, Huan ¶ 27, Post ¶ 60, Huang ¶ 33.) Specifically, the use of the moniker "BL"—which stands for "baseline"—with a multiple of 100 to describe different software milestones is common in the industry, even among vendors and suppliers. (*Id.*) Post, Durre, and Huan all had independent knowledge of similar nomenclature, and their use of that standard terminology based on their own recollection of their experience at Karma does not constitute misappropriation in any event, ***as Karma's own executives have acknowledged.*** (Elley Dep., Ex. A, at 65:5–66:9; Gudmundsson Dep., Ex. B, at 262:4–263:6); *Hooked Media*, 269 Cal. Rptr. 3d at 413–14 (former employee's reliance on knowledge or information gained through employment not misappropriation); *Argo Grp.*, 2013 WL 11327772, at *1–3 (information "generally known to other persons skilled in the same field" is not a trade secret).

Finally, there is no evidence LMC is actually using the substance of any Karma software validation test plan. In fact, at the moment, LMC has no formal software validation test plan. (Post ¶ 59.) And given Defendants' position that is will return these documents to Karma, there is no lingering threat that LMC will rely on these documents in creating its own future software validation test plan.

### 5.    Bill of Materials

Finally, Karma alleges that LMC is misappropriating Karma's Bills of Materials (BOMs)—essentially, lists of parts used to build the vehicle, along with the name of the part supplier and the price of each part—by using the BOMs to identify and negotiate with vendors, thereby increasing its own profitability on the back of Karma's trade secrets. Once more, that is just factually incorrect.

Karma identifies three instances where Defendants allegedly misappropriated one of its BOMs. The first is a November 18, 2019 email from Darren Post to former LMC employee David Cripps, attaching a copy of a Karma BOM. (Elley Exs. 18, 19.) Karma characterizes this email as "alarming" because it allegedly took place while Post was still employed at Karma. (Mem. 16.) That is simply false. Post's last day at Karma was November 1, 2019—not December 1, 2019 as Karma claims. (Post

17

¶ 6.)

Regardless, Post's email to Cripps does not show that LMC is using Karma's BOM to assist in the production of the Endurance, or that it ever has. Post sent the BOM to Cripps in 2019 as an example of the *categories* of parts needed to build a vehicle from the ground up. (Post ¶ 20.) Cripps is no longer with the company, and Karma submits no evidence that Cripps (or anyone else for that matter) ever used the BOM that Post forwarded to him, or provided it to any other LMC employee to use.

The other alleged instances of misappropriation involved two emails from Post to Intellicosting, a consultant LMC hired for a flat fee to create a report that would help set target costs for the different components of the Endurance. (Post ¶ 11.) In those emails, Post pasted a handful of cells from the Karma BOM spreadsheet—itself comprised of approximately 85,000 active cells—which contained the pricing information for two components: (1) a charging port; and (2) brake calipers. But Intellicosting never negotiated with any vendors on behalf of LMC, and ultimately did not even include the information from the Karma BOM on the report it provided to LMC. (Post ¶¶ 15-21.)

Aside from the above emails, there is no evidence that the Karma BOM was ever used by anyone at LMC—whether to identify vendors, negotiate with vendors, or for any other purpose. (Woods ¶ 10 (Karma BOM never given to or used by purchasing department).) Nor would Karma's BOM, which reflects the parts needed to build a luxury hybrid sports car, not a $50,000 electric work truck, be of any real use to LMC in building the Endurance. (Post ¶¶ 9-10.) Karma's hybrid luxury sports car is no more similar to LMC's all-electric work truck than a Tesla sedan is to a Volkswagen Bus. The vehicles are different in almost every way: the power sources, frames, bodies, wheels, accessories, suspensions, batteries, powertrains, motors, interiors, hardware—all built differently using different components. (Post ¶ 9; Durre ¶ 7.) So not only does Karma have no evidence that LMC used the Karma BOM, it also cannot show that LMC would have any reason to do so. (Post ¶¶ 9-10.)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

In short, there is no evidence that LMC has used or incorporated Karma's BOM in any aspect of the production of the Endurance. Thus, Karma's request to enjoin production based on alleged misappropriation of the BOM should be denied.

### D.    Karma Will Not Suffer Irreparable Harm.

A party "seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm"; "unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer" are not enough. *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) (quotations omitted; emphasis in original); *see also Pom Wonderful LLC v. Pur Beverages LLC*, 2015 WL 10433693, at *4-18 (C.D. Cal. Aug. 6, 2015) (same).

Karma has no such evidence. Indeed, the only facts cited in support of its allegation of irreparable harm are: (1) a three-month-old article quoting former LMC CEO Steve Burns as saying LMC intends to begin production of the Endurance in "late September"; and (2) a generic statement by former Karma chief of staff Mikael Elley about the growth of the electric-vehicle market as a whole. (Mem. 22-23, citing Elley ¶ 69 and Coleman ¶ 4.) Neither fact shows that LMC's production of the Endurance poses any threat to Karma—let alone any threat of *irreparable* harm.

In lieu of evidence, Karma relies on two cases involving companies competing in the nascent autonomous-vehicle market—*WeRide* and *Waymo*—for the proposition that misappropriation of trade secrets may better position LMC to compete with Karma "for investors and talented engineers," and that Defendants' mere possession of alleged trade secrets increases the risk of exposure. (Mem. 23.)

But "citation to a different case with a different record does not meet the standard of showing 'likely' irreparable harm." *Herb Reed*, 736 F.3d at 1251.[9] And

---

[9] Even the author of *Waymo* later distinguished it from cases outside "nascent" industries where economic harm "would likely have been impossible to quantify" because the relevant technology had yet to be "commercialize[d]," and declined to find irreparable harm based on generalized allegations that misappropriation would undercut the plaintiff's competitive position in an industry with "abundant competition"—much like the electric-vehicle market Karma's own witnesses describe and in which Karma has admittedly sold cars in for "years." *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 1142204, at *5-6 (N.D. Cal. Mar. 2, 2018).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Karma offers no evidence that it is competing with LMC for engineers or funding (or, for that matter, that Karma, after conducting mass layoffs last year, is currently hiring engineers or seeking funding at all). *See Citcon USA, LLC v. RiverPay Inc.*, 2019 WL 2603219, at *3 (N.D. Cal. June 25, 2019) (contrasting the evidence produced in *WeRide* and holding that plaintiff failed to establish likelihood of irreparable harm based on testimony arguing that "the industry [is] 'crowded'" and "now has five companies offering similar products" without any "concrete examples of harm it will endure without injunctive relief").

Nor can Karma show that allowing LMC to proceed with sales of the Endurance would damage Karma's competitive position in the electric-vehicle market. By its own admission, "Karma specializes in high-end, luxury sedans and sports cars," sold to individual customers around the world, "whereas LMC is developing an electric pickup truck" marketed to commercial fleet customers at one-third to one-half the price of Karma's cars. (Mem. 2; *see also* Coleman Ex. 1 ¶ 16; Am. Compl. ¶¶ 18, 62.) The vehicles have different frames, different bodies, different wheels, different suspensions, different batteries, different powertrains, different motors, different interiors, and different software. (Post ¶ 9.) Simply put, ***by Karma's executives' own admissions***, Karma and LMC are not competitors. (Elley Dep., Ex. A, at 79:19–81:15; Gudmundsson Dep., Ex. B, at 92:6–93:13; 94:12-21.)

Finally, Karma's "delay in seeking injunctive relief further demonstrates the lack of any irreparable harm." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1080, 1090 (C.D. Cal. 1999) (five-month delay), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *see also Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC*, 2020 WL 4390380, at *3 (C.D. Cal. May 19, 2020) (trade secret plaintiffs' "seven-month delay in bringing this preliminary injunction motion further cuts against a finding of irreparable harm"). That is especially true here, where Karma initially sought a TRO in October 2020 (ECF No. 1-10) and was granted leave to take expedited discovery ostensibly to support a follow-up motion for preliminary

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

injection (*see* ECF No. 25 at 9-10). Although the parties did take substantial discovery following the denial of the TRO, Karma has waited almost 10 months to file this motion—hardly an indication that it faces any ongoing and imminent risk of irreparable harm.

Karma attempts to justify its delay by tying the timing of its motion to LMC's plans to start producing vehicles in September. But that logic does not withstand even superficial scrutiny, because the interests that Karma seeks to protect through an injunction—namely, its ability to compete for investors and engineers—bears no relationship to when LMC's trucks start rolling off the production line. Tying irreparable harm to production only makes sense if Karma and LMC are competing for *customers*—something Karma does not even argue, let alone prove.

That argument also misunderstands the facts. Although LMC does plan to begin production of the Endurance in September, that early production run will be for the limited purposes of regulatory clearances, testing, and validation—not commercial sales. (Strand ¶ 5.) LMC does not anticipate beginning commercial production of the Endurance until the second quarter of 2022—in other words, contemporaneous with the April trial date. (*Id.*) Thus, even if Karma could establish a threat of irreparable harm tied to commercial sales of the Endurance, those sales are not imminent, contrary to Karma's arguments. For this reason as well, preliminary injunctive relief in advance of trial is not warranted.

In short, because Karma "failed to adduce evidence . . . that it will likely suffer irreparable harm" absent a preliminary injunction, its motion "must be denied." *Pom Wonderful*, 2015 WL 10433693, at *18.

### E.    The Balance of Equities Strongly Favors LMC.

Even if Karma had evidence of misappropriation and irreparable harm, the Court should only grant its motion if the injunction sought will "do more good than harm (which is to say that the 'balance of equities' favors the plaintiff)." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011) (citation omitted).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Courts have repeatedly held that the "balance of hardships weighs against the issuance of a preliminary injunction that"—as is the case here—"would effectively stop Defendant from operating its business[.]" *Nano-Second Tech. Co. v. Dynaflex Int'l*, 2011 WL 4502025, at *4 (C.D. Cal. Sept. 28, 2011); *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548, at *14 (N.D. Cal. Oct. 20, 2014) (denying injunction where defendant "would suffer significant injury if it was enjoined from its current marketing and sales of its only profitable product"); *Puricle, Inc. v. Church & Dwight Co.*, 568 F. Supp. 2d 1144, 1147 (C.D. Cal. 2008) (balance of harm sharply favored nonmoving party where injunction would prevent sale of nonmoving party's only product and source of income, and "it was extremely likely that nonmoving party would be forced out of business").

Likewise, the balance tips against an injunction where a defendant has made a substantial investment of capital that would be "lost without chance of recovery" in the event an injunction is granted. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (injunction on further oil exploration reversed when enjoined party had already spent $70 million that could not be recovered).

LMC faces both types of harm in the event it is enjoined from further production of the Endurance. LMC has raised *considerable* private and public investment capital to date and has spent over $605 million to place itself in a position where it can begin limited production. (Strand ¶ 8-11.) Karma's requested injunction would cause that investment to be lost or, at a minimum to be severely jeopardized—all before LMC had the chance to defend against Karma's allegations. (*Id*. ¶¶ 6-7, 11.) Moreover, an injunction would all but cripple LMC's ability to raise the necessary capital to secure LMC's long-term viability, and irreparably jeopardize the current marketplace advantage LMC has over its true competitors. (*Id*. ¶¶ 12-13.)

The balance against Karma is particularly lopsided here, because Karma's alleged irreparable harm—that it will be disadvantaged when competing with LMC for engineering talent and funding—is only speculative, whereas LMC "will face

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

22

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

certain harm" if enjoined from producing the Endurance. *Behr Process Corp. v. RPM Int'l, Inc.*, 2014 WL 12581763, *8 (C.D. Cal. Feb. 14, 2014) (denying TRO).

### F.    Karma's Requested Injunction Would Harm The Public.

Shuttering production of the Endurance would not just harm LMC, it would devastate LMC's many vendors and employees—not to mention deal a devastating blow to the local economy. *See Backcountry Against Dumps v. Perry*, 2017 WL 3712487, at *5 (S.D. Cal. Aug. 29, 2017) (injunction not in public interest where it would "hurt the local Mexican economy by eliminating paying jobs" and cause significant loss of tax revenue and other economic benefits); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (affirming denial of preliminary injunction due to "the public's interest in aiding the struggling economy and preventing job loss"), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Friends of the Wild Swan v. Christiansen*, 955 F. Supp. 2d 1197, 1203 (D. Mont. 2013) (public interest weighs against injunction where it would "negatively affect the local economy" by, among other things, inducing layoffs).

When GM vacated the plant that LMC now occupies, over 1,300 well-paying manufacturing jobs disappeared from Lordstown overnight. (Strand ¶ 14.) The damage rippled through the local economy, which lost an estimated 8,000 total jobs—many belonging to ancillary that supported or serviced the plant and its workers—over $800,000 in taxes, and over $8 billion in total economic activity. (*Id.*)

Now, not only has LMC revitalized the GM facility, it has also hired 580 employees, 365 of which reside in Lordstown, Ohio or adjacent communities.  This number is only expected to rise once production of the Endurance begins in earnest, and for or each local employee hired, the Village of Lordstown gains a 1% income tax per employee. (*Id.* ¶¶ 15-17.)  This is in addition to the hundreds of thousands in annual state and local taxes that LMC expects to generate.  (*Id.* ¶ 18.)  LMC is also contributing to several local initiatives such as workforce and STEM training

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

facilities for the community. (*Id.* ¶ 19.)    Finally, LMC has contracted with over 1,000 vendors or suppliers to assist its operations. (*Id.* ¶ 20.) All of that is severely threatened if the Court were to grant a preliminary injunction prohibiting LMC from continuing with the production of its Endurance truck.

Nevertheless, Karma argues that an injunction serves the public interest because it would merely require compliance with trade-secret laws. (Mem. 24.) But as another court explained: "If the interest in the enforcement of [legal] obligations were the equivalent of the public interest factor in deciding whether or not to grant a preliminary injunction, it would be no more than a makeweight for the court's consideration of the . . . probability of eventual success on the merits." *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 357–58 (3d Cir. 1980). Such "general and abstract" interests cannot outweigh the public's "much more concrete and specific" interest in avoiding devastating economic harm. *Id.*; *see also Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783, 792 (N.D. Cal. 1994) (noting that "the principle that one who elects to build a business on a product found to infringe cannot object to an injunction is ***limited to a permanent injunction issued after trial*** and is not remotely related to a potential destruction of [an alleged infringer] without its day in court") (quotations omitted).

Even accepting that on some level the public is served by enforcing valid trade secrets, "the public interest is also served by promoting competition, free from judicial intervention that is improvident or warranted by only insubstantial grounds," particularly where—as here—"the issuance of an injunction would jeopardize the existence of a company, there are serious questions about the likelihood of success on the merits, and there is little indication of irreparable harm." *SPS Tech, LLC v. Briles Aerospace, Inc.*, 2019 WL 1974902, *17 (C.D. Cal. Mar. 11, 2019) (quotations omitted); *see also Nano-Second Tech. Co. v. Dynaflex Int'l*, 2011 WL 4502025, at *5 (C.D. Cal. Sept. 28, 2011) (public interest in "market competition" weighs against preliminary injunction). Thus, an injunction will not serve the public interest here.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

### G.    Karma's Requested Injunction Demands a Substantial Bond.

Rule 65(c) requires the party seeking a preliminary injunction to "give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "'When setting the amount of security, district courts should err on the high side'" because setting the bond too low "'produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.'" *Coldwell Banker Real Est. LLC v. Smile Enterprises, Inc.*, 2011 WL 13220121, at *3 (C.D. Cal. Mar. 11, 2011) (quoting *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000)).[10]

Karma's suggested bond of $10,000 is *categorically* inadequate, and fundamentally unfair, given the costs to LMC and the community of a wrongful injunction barring production of the Endurance, as explained above. (*See* Stand ¶¶ 8-20.) In the unlikely event that the Court grants a preliminary injunction barring the production of the Endurance, the Court should require Karma to post a bond of no less than $600 million, given LMC's investment in the Endurance to date. (*Id.* ¶ 11.) *See also Apple vs. Samsung*, 877 F. Supp. 2d 838, 918 (N.D. Cal. 2012) ($95 million bond); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) ($400 million bond).

## III.    CONCLUSION

Based on the foregoing, Plaintiff's motion should be denied.

---

[10] The cases cited by Karma granting nominal or no bond are inapposite. (Mem. 24-25.) In both *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, 2021 WL 1186335, at *12 (N.D. Cal. Mar. 1, 2021) and *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018), the defendants had agreed in their respective contracts that the plaintiffs would be entitled to an injunction without a bond. And in neither case did the defendant argue that the injunction at issue would cause them to suffer any tangible harm.

25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Dated:    August 23, 2021          Respectfully Submitted,


**BAKER & HOSTETLER LLP**


By:    */s/ Thomas R. Lucchesi*
      Thomas R. Lucchesi *(Pro Hac Vice)*
      Terry M. Brennan (*Pro Hac Vice*)
      Anthony B. Ponikvar (*Pro Hac Vice*)
      William W. Oxley (SBN 136793)
      Ryan D. Fischbach (SBN 204406)

*Attorneys for Defendants*
LORDSTOWN MOTORS CORP., *et al.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES