1  ROBERT B. MILLIGAN, SBN 217348 (rmilligan@seyfarth.com)
   DANIEL JOSHUA SALINAS, SBN 282065 (jsalinas@seyfarth.com)
2  SIERRA J. CHINN-LIU, SBN 322994 (schinnliu@seyfarth.com)
   SEYFARTH SHAW LLP
3  2029 Century Park East, Suite 3500
   Los Angeles, California 90067
4  Telephone: (310) 277-7200

5  MICHAEL D. WEXLER (*pro hac vice*) (mwexler@seyfarth.com)
6  KEVIN J. MAHONEY (*pro hac vice*) (kmahoney@seyfarth.com
   KATELYN R. MILLER (*pro hac vice*) (krmiller@seyfarth.com)
7  SEYFARTH SHAW LLP
   233 South Wacker Drive, Suite 8000
8  Chicago, Illinois 60606
   Telephone: (312) 460-5000
9
10 JESSE M. COLEMAN (*pro hac vice*) (jmcoleman@seyfarth.com)
   SEYFARTH SHAW LLP
11 700 Milam Street, Suite 1400
   Houston, Texas 77002
12 Telephone: (713) 225-2300
   *Attorneys for Plaintiff*
13 Karma Automotive LLC

14              **UNITED STATES DISTRICT COURT**

15             **CENTRAL DISTRICT OF CALIFORNIA**

16 KARMA AUTOMOTIVE LLC, a          **CASE NO.: 8:20-cv-02104-JVS-DFM**
   California limited liability company,
17                                  **PLAINTIFF'S RESPONSE IN**
                Plaintiff,          **OPPOSITION TO DEFENDANTS'**
18                                  **MOTION FOR SUMMARY**
        v.                          **JUDGMENT**
19
   LORDSTOWN MOTORS CORP., an
20 Ohio corporation; STEVE BURNS, an   Date Action Filed:  October 30, 2020
   individual, JOHN LEFLEUR, an
21 individual, DARREN POST, an         Trial Date:         December 6, 2022
   individual, RICH SCHMIDT, an
22 individual, ROGER J. DURRE, an
   individual, HONG XIN HUAN
23 (A.K.A "GEORGE" HUAN), an
   individual; BEI QIN, an individual;
24 STEPHEN PUNAK, an individual;
   CHRISTOPHER KIM, an individual;
25 DAN ZHIHONG HUANG, an
   individual; PUNAK ENGINEERING,
26 INC., a California corporation; and
   DOES 1 through 50, inclusive,
27
                Defendants.
28

1

## **TABLE OF CONTENTS**

2    FACTUAL BACKGROUND ............................................................................ 1

3    LAW AND ARGUMENT ............................................................................... 5

4    I.    DEFENDANTS VIOLATED THE CFAA. ........................................... 5

5          A.    The Former Employee Defendants Violated the CFAA .................. 6

6          B.    LMC Also Violated the CFAA. ....................................................... 8

7          C.    Karma Established CFAA Losses .................................................... 8

8    II.   DEFENDANTS VIOLATED THE CALIFORNIA PENAL CODE. ........ 9

9          A.    Karma Established Evidence For its Section 502 Claims. .............. 10

10         B.    Defendant Huang Improperly Took Information from Karma's
                 Computer Systems. ......................................................................... 10

11
12   III.  DEFENDANTS' MOTION ON KARMA'S DTSA AND CUTSA
           CLAIMS FAILS ................................................................................ 11

13         A.    Karma's Claims Based on Source Code that Defendant Punak
                 Misappropriated and Then Published are Valid. ............................. 11

14
           B.    Defendant Huang Stole Karma's Trade Secrets. ............................ 12

15
16   IV.   KARMA'S CONTRACT CLAIMS ARE SUPPORTED BY
           EXTENSIVE EVIDENCE. ................................................................ 13

17         A.    Karma's Contract Claims against Former Employee
                 Defendants Are Not Based on merely Accepting Employment
18               with LMC. ....................................................................................... 13

19         B.    Durre and Huan Breached Their Obligations to Karma by
                 Accepting Simultaneous Employment at LMC. .............................. 14

20
           C.    Defendant Kim Breached his Confidentiality Agreement ............... 16

21
           D.    Defendant Huang Breached his Confidentiality Agreement. .......... 17

22
     V.    LMC BREACHED THE MNDA AND KARMA
23         SUBSTANTIALLY PERFORMED ALL OF ITS OBLIGATIONS
           THEREUNDER. ................................................................................. 18

24
25   VI.   THE LETTER OF INTENT IS A BINDING AGREEMENT THAT
           LMC BREACHED ............................................................................. 19

26   VII.  KARMA'S TORTIOUS INTERFERENCE WITH CONTRACT
           CLAIMS ARE SUFFICIENTLY PROVEN TO PRECLUDE
27         SUMMARY JUDGMENT .................................................................. 21

28

i

A.   Karma's Tortious Interference Claims are Based on Evidence of Wrongdoing Other Than Trade Secret Misappropriation. .......... 22

B.   Defendants' Independent Wrongful Conduct is Established. .......... 23

C.   LMC and the LMC Individual Defendants Knew of the Operative Agreements and Evidence of Karma's Damages ........... 25

VIII.   SUBSTANTIAL EVIDENCE SUPPORTS KARMA'S TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE. ........... 26

A.   Karma's Tortious Interference Claim is not Preempted by CUTSA. ........... 26

B.   Karma Established a Probability of a Future Economic Benefit and Defendants' Independent Wrongful Conduct. ........... 27

IX.   SUBSTANTIAL EVIDENCE SUPPORTS KARMA'S SECTION 17200 CLAIM. ........... 28

X.   DEFENDANTS BREACHED THEIR DUTIES OF LOYALTY AND FIDUCIARY DUTIES. ........... 31

XI.   KARMA'S CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY IS SUPPORTED BY THE EVIDENCE. ........... 32

XII.   KARMA'S CONSPIRACY CLAIM IS SUPPORTED BY THE EVIDENCE. ........... 32

XIII.   KARMA'S FRAUD CLAIM IS NOT PREEMPTED AND AMPLY SUPPORTED. ........... 33

XIV.   KARMA'S RICO CLAIMS ARE SUPPORTED BY EVIDENCE AND FACTS. ........... 36

A.   The RICO Enterprise is Clearly Established: LMC's "West Coast Infotainment Team" ........... 36

B.   Karma Established a "Pattern" of Racketeering Activity. ........... 38

C.   Defendants Commit a RICO Conspiracy in Violation of 1962(d). ........... 40

XV.   KARMA'S CLAIM FOR VIOLATION OF THE LANHAM ACT IS SUFFICIENTLY PROVEN. ........... 41

XVI.   KARMA ESTABLISHED ITS DAMAGES. ........... 41

A.   Damages Relate to the Endurance Project with LMC. ........... 43

B.   Karma's Evidence of Unjust Enrichment Damages is Sufficient. ........... 46

C.   The LMC Individual Defendants' Unjust Enrichment ........... 49

CONCLUSION...................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACI Payments, Inc. v. Conservice, LLC*,
   No. 121CV00084RJSCMR) 2022 WL 622214 (D. Utah, Mar. 3,
   2022) ........................................................................................................ 6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................ 48, 49

*Aramark Mgmt., LLC v. Borgquist*,
   No. 818CV01888JLSKES, 2021 WL 9145423 (C.D. Cal. Dec.
   28, 2021) ................................................................................................. 31

*Arthur J. Gallagher & Co. v. Tarantino*,
   No. 20-CV-05505-EMC, 2022 WL 4092673 (N.D. Cal. July 27,
   2022) ......................................................................................... 22, 31, 32

*Attia v. Google LLC*,
   No. 17-CV-06037-BLF, 2018 WL 2971049 (N.D. Cal. June 13,
   2018) ...................................................................................................... 39

*B. Braun Med., Inc. v. Rogers*,
   No. 03-56193, 2006 WL 92879 ............................................................. 50

*Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.*,
   2011 WL 13143358 (N.D. Cal. Nov. 23, 2011) .................................... 44

*Bourns, Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003) ................................................................ 48

*Boyle v. United States*,
   556 U.S. 938 (2009) .............................................................................. 37

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   No. 10-3428, 2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ................... 46

*Capitol Audio Access, Inc. v. Umemoto*,
   980 F. Supp.2d 1154 (E.D. Cal. 2013) ................................................. 10

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
   287 F. Supp. 2d 1118 (C.D. Cal. 2003) ............................................ 43, 48

*Chagby v. Target Corp.*,
  No. CV 08–4425–GKH(PJWX), 2008 WL 5686105 (C.D. Cal.
  Oct. 27, 2008) aff'd, 358 Fed.Appx. 805 (9th Cir. 2009) .................................. 40

*ChromaDex, Inc. v. Elysium Health, Inc.*,
  369 F. Supp. 3d 983 (C.D. Cal. 2019) .............................................................. 22

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*,
  479 F.3d 1099 (9th Cir. 2007) ........................................................... 29, 30, 31

*Dastar v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) ...................................... 41

*Den-Mat Holdings, LLC v. CAO Grp., Inc.*,
  No. 18-6358, 2019 WL 3890825 (C.D. Cal. Aug. 19, 2019) .......................... 42

*Digital Envoy, Inc. v. Google, Inc.*,
  No. 04-1497, 2005 WL 2999364 (N.D. Cal. Nov. 8, 2005) ............................ 50

*Eurosemillas, S.A. v. PLC Diagnostics Inc.*,
  No. 17-CV-03159-TSH, 2019 WL 2088479 (N.D. Cal. May 13,
  2019) .................................................................................................................. 35

*Facebook, Inc. v. Power Ventures, Inc.*,
  No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. 2010) ............................ 10

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*,
  No. EDCV1504125VAPJEMX, 2016 WL 6562064 (C.D. Cal.
  Apr. 21, 2016) .................................................................................................... 25

*Gomez v. Guthy-Renker, LLC*,
  No. ED-CV-14-01425-JGB-KKX, 2015 WL 4270042 (C.D. Cal.
  July 13, 2015) ............................................................................................... 37, 38

*Goodness Films, LLC v. TV One*,
  No. 12-8688, 2014 WL 12594201 (C.D. Cal. Aug. 28, 2014) ........................ 45

*Gordian Med., Inc. v. Percival*,
  No. SACV 19-2244 JVS(ADSx), 2020 WL 5921947 (C.D. Cal.
  Aug. 27, 2020) .............................................................................................. 22, 27

*Grouse River Outfitters Ltd. v. Oracle Corp.*,
  No. 16-2954, 2019 WL 8918902 (N.D. Cal. June 21, 2019) .......................... 44

*GSI Tech. v. United Memories, Inc.*,
No. 5:13-CV-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) .................................................................................................. 39

*Herrejon v. Ocwen Loan Servicing, LLC*,
980 F. Supp. 2d 1186 (E.D. Cal. 2013) ............................................ 30

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ........................................................... 7

*Hirel Connectors v. United States*,
No. 01-11069, 2004 WL 5639770 (C.D. Cal. Jan. 23, 2004) ......... 12

*Howard v. Am. Online Inc.*,
208 F.3d 741 (9th Cir. 2000) ........................................................... 40

*In re Imperial Credit Industries Securities Litigation*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) ........................................... 49

*Kearney v. Foley & Lardner, LLP*,
607 F. App'x 757 (9th Cir. 2015) ..................................................... 39

*Lozano v. AT&T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) ........................................................... 30

*Luxul Tech. Inc. v. Nectarlux*,
LLC, 78 F. Supp. 3d 1156 (N.D. Cal. 2015) .................................... 41

*Marsu, B.V. v. Walt Disney Co.*,
185 F.3d 932 (9th Cir. 1999) ...................................................... 42, 45

*MCI Commc'ns Servs., Inc. v. Skanska-Traylor-Shea*,
No. 19-1294, 2021 WL 2170333 (C.D. Cal. May 18, 2021) ..... 42, 43

*Nelson Bros. Pro Real Est. LLC v. Jaussi*,
No. SACV 17-0158 DOC(JCGx), 2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) .................................................................................. 27

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F.Supp.3d 816 (N.D. Cal. 2014) ................................................... 8

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
420 F. Supp. 2d 1070 (N.D. Cal. 2006) ........................................... 12

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ................................................................ 36, 37

*Okada v. Nevada Prop. 1, LLC*,
    No. SA-CV-14-0307-DOC-DFMx, 2014 WL 12792233 (C.D.
    Cal. Sept. 24, 2014) ......................................................................... 38

*Otsuka v. Polo Ralph Lauren Corp.*,
    2007 WL 3342721 (N.D. Cal. Nov. 9, 2007) ................................... 31

*PerkinElmer Health Scis., Inc. v. SCR Living LLC*,
    No. 20-2083, 2022 WL 3130237 (C.D. Cal. June 22, 2022) ........... 44

*PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co.*,
    No. 21-2288, 2022 WL 3724094 (3d Cir. 2022) ............................. 48

*PQ Labs, Inc. v. Yang Qi*,
    No. C 12-0450 CW, 2012 WL 2061527 (N.D. Cal. June 7, 2012) ........... 27

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
    77 F.3d 309 (9th Cir. 1996) ........................................................... 20

*Resol. Tr. Corp. v. Keating*,
    186 F.3d 1110 (9th Cir. 1999) ....................................................... 36

*Sebastian Int'l, Inc. v. Russolillo*,
    162 F. Supp. 2d 1198 (C.D. Cal. 2001) .......................................... 26

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1529 (9th Cir. 1992) ....................................................... 39

*SHK Mgmt., Inc. v. Kilroy Realty Corp.*,
    2014 WL 12561096 (C.D. Cal. Oct. 2, 2014) ................................. 34

*Sonoma Pharms., Inc. v. Collidion Inc.*,
    No. 17-1459, 2018 WL 3398940 (N.D. Cal. June 1, 2018) ............ 46

*Spice Jazz LLC v. Youngevity Int'l, Inc.*,
    No. 19-CV-583-BAS-WVG, 2019 WL 4573705 (S.D. Cal. Sept.
    19, 2019) ......................................................................................... 25

*SSI Inc. v. Ferry*,
    No. CV 21-2073 JVS (PDX), 2021 WL 9315372 (C.D. Cal. July
    28, 2021) ......................................................................................... 24

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
No. 1:09-CV-00560-LJO, 2012 WL 6160468 (E.D. Cal. Dec. 11, 2012) .............................................................................................. 15

*Supreme Food, Inc. v. Hai Fend Corp.*,
No. CV149968DMGFFMX, 2016 WL 11746806 (C.D. Cal. Oct. 4, 2016) ......................................................................................... 41

*Swanson v. ALZA Corp.*,
No. C 12-4579 PJH, 2013 WL 968275 (N.D. Cal. Mar. 12, 2013) ............... 31

*United States v. Eddings*,
No. 5:19-CR-00535, 2021 WL 2527966 (E.D. Pa. June 21, 2021) .............. 6, 7

*Uthe Tech. Corp v. Allen*,
No. C 95-02377 WHA, 2016 WL 1427557 (N.D. Cal. Apr. 12, 2016) ......................................................................................... 39

*Van Buren v. United States*,
141 S. Ct. 1648 (2021) ............................................................... 5, 6, 8

*Vieste, LLC v. Hill Redwood Dev., Ltd.*,
No. 09-4024, 2011 WL 5914019 (N.D. Cal. Nov. 28, 2011) ........................ 46

*W. Pac. Elec. Co. v. Dragados/Fatiron*,
534 F. Supp. 3d 1209 (E.D. Cal. 2021) ............................................... 43

*Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*,
No. 18-1927, 2021 WL 4895977 (S.D. Cal. Oct. 20, 2021) .................... 48, 50

*Young v. Wideawake Death Row Ent. LLC*,
No. 10-1019, 2011 WL 12565250 (C.D. Cal. Apr. 19, 2011) ...................... 43

*Youngevity Int'l, Corp. v. Smith*,
No. 3:16-CV-704-BTM-JLB, 2021 WL 1041712 (S.D. Cal. Feb. 4, 2021) ......................................................................................... 13

**State Cases**

*Ajaxo Inc. v. E*Trade Fin. Corp.*,
187 Cal. App. 4th 1295 (2010) ......................................................... 46

*Angelica Textile Servs., Inc. v. Park*,
220 Cal. App. 4th 495 (2013) ........................................................... 29

viii

*California Food Serv. Corp. v. Great Am. Ins. Co.*,
  130 Cal. App. 3d 892 (1982) ................................................................. 43

*California Lettuce Growers v. Union Sugar Co.*,
  45 Cal. 2d 474 (1955) ........................................................................... 42

*Cedar Fair, L.P. v. City of Santa Clara*,
  194 Cal. App. 4th 1150 (2011) ............................................................. 20

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal.4th 163 (1999) ........................................................................... 30

*Copeland v. Baskin Robbins U.S.A.*,
  96 Cal. App. 4th 1251 (2002) ......................................................... 35, 43

*Copeland v. Baskin Robbins USA*
  (2002) 96 Cal. App. 4th 1261 ...................................................... 20, 21, 44

*Edwards v. Arthur Andersen LLP*,
  44 Cal. 4th 937 (2008) .......................................................................... 14

*Hansel v. Creative Concrete & Masonry Constr. Co.*,
  148 Ohio App.3d 53, 772 N.E.2d 138 (10th Dist.) ............................... 18

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) .......................................................................... 23

*John P. Timmerman Co. v. Hare*,
  2003 WL 22039329 (Ohio Ct. App. Sept. 2, 2003) .............................. 18

*Lutz v. Carter*,
  No. 2660, 1990 WL 147355 (Ohio Ct. App. Oct. 3, 1990) ................... 18

*Maggio, Inc. v. United Farm Workers*,
  227 Cal. App. 3d 847 (1991) ................................................................. 44

*Meister v. Mensinger*,
  230 Cal. App. 4th 381 (2014) ............................................................... 45

*Morgan v. AT&T Wireless Services, Inc.*
  177 Cal.App.4th 1235 (2009) ............................................................... 30

*S. Jon Kreedman & Co. v. Meyers Bros. Parking-W Corp.*,
  58 Cal. App. 3d 173 (1976) ................................................................... 45

*Sargon Enters., Inc. v. Univ. of S. California,*
  55 Cal. 4th 747 (2012) ............................................................ 41, 45

*Steen Elec. v. Homes of Elegance, Inc.,*
  2004-Ohio-6275 .............................................................................. 18

*Techno Lite, Inc. v. Emcod, LLC,*
  44 Cal. App. 5th 462 (2020) ................................................... 14, 31

*Tucker v. Pacific Bell Mobile Services,*
  208 Cal. App. 44th 201, 225 (2012) ............................................ 30

*Youst v. Longo,*
  43 Cal. 3d 64, 729 P.2d 728 (1987) ............................................. 27

*Zhang v. Superior Court,*
  57 Cal. 4th 364, 304 P.3d 163 (2013) .......................................... 30

**Federal Statutes**

18 U.S.C. 1962(c) ............................................................................ 36

18 U.S.C. 1962(d) ............................................................................ 36

18 U.S.C. § 1030 (e)(11) .................................................................... 8

18 U.S.C. § 1030(g) ............................................................................ 8

18 U.S.C. § 1961(1) .......................................................................... 38

18 U.S.C. § 1961(4) .......................................................................... 36

18 U.S.C. § 1961(5) .......................................................................... 38

18 U.S.C. § 1962 .............................................................................. 36

Lanham Act .............................................................................. 40, 41

Racketeer Influenced and Corrupt Organizations Act ........... 36, 39, 40

**State Statutes**

Cal. Penal Code § 502(e) ................................................................ 10

California Business and Professions Code § 16600 ..................... 13, 14

California Penal Code § 502.................................................................9, 10

California's Unfair Competition Law ...........................................*passim*

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 .......................................................................................28, 30

California Uniform Trade Secrets Act...........................................*passim*

Computer Fraud and Abuse Act ....................................................*passim*

Defend Trade Secrets Act........................................................11, 12, 17

Defendants seek to escape liability for their undeniably improper actions through a Motion for Summary Judgment that misstates both the law and the purportedly undisputed facts. Defendants' Motion should be denied.

**FACTUAL BACKGROUND**

In January of 2020, LMC[1] approached Karma about the latter developing an electric vehicle infotainment system for LMC's anticipated Endurance electric pickup truck. (ASOF, 106).[2] LMC had yet to produce a working vehicle but was under increasing pressure from both investors and the SEC to do so, as it was already significantly behind schedule to produce a vehicle and under investigation for falsely representing that it had thousands of pre-orders for the Endurance. (ASOF, 489). Prior to April 2019, there was no infotainment technology in place for the Endurance vehicle. (ASOF, 2, 520). Karma, with its years of experience in developing electric vehicles, was well-suited to design an infotainment system that fit LMC's needs, including LMC's demand for the use of ███████ ████████████████████████████████████████████████████████ ████████████████ (ASOF, 491-493). To protect the confidential and trade secret information exchanged in a potential deal, the parties entered into a Mutual Non-Disclosure Agreement ("the MNDA"). (ASOF, 115). Among other things, the MNDA required the parties not to use any information exchanged while the MNDA was in effect, and to destroy or return such information upon the termination of the MNDA. (SOF, 115).

Over the next several months, Karma's engineers devoted significant resources toward developing a proposal for LMC's infotainment system. (ASOF,

---

[1] Defendant Lordstown Motors Corp. is "LMC." Defendants Steve Burns, John LaFleur, Rich Schmidt, and Darren Post are the "LMC Individual Defendants." Defendants Roger J. Durre, Hong Xin Huan a.k.a. George Huan, Bein Qin, Stephen Punak, Christopher Kim, Dan Zhihong Huang, and Punak Engineering are the "Former Employee Defendants."

[2] Citations to Defendants' Statement of Material Facts are referenced herein as "SOF." Citations to Plaintiff's Statement of Genuine Disputes of Material Fact are "DSOF," and Plaintiff's Additional Statement of Material Facts are "ASOF."

150, 152, 498). Karma's engineer in charge of that project was Defendant Durre, who oversaw the work of Karma's other team members and was largely responsible for coordinating with LMC's own engineering team. (ASOF, 485, 501). Between February 2020 and August 2020, Karma allowed LMC to access significant volumes of its confidential and trade secret information under the protection of the MNDA. (SOF, 211; DSOF, 221; ASOF, 115, 144, 156, 161, 168, 505). Unbeknownst to Karma, in March of 2020 and barely a month after executing the MNDA, Durre began discussing with Post ways to cut Karma out of the Endurance project while still having Karma pay for months of engineering development. (ASOF, 126-129). On March 26, 2020, Durre met with LMC regarding a "Karma Infotainment System Proposal for LMC Endurance" (ASOF, 129). Yet that same day, Post sent Durre an email on his personal account with a presentation titled ███████████████████████████ (ASOF, 128) (emphasis added).  A few days later, Post and Durre exchanged texts messages about a time to discuss Durre's team working ***directly for LMC***, referring to the meeting as ███████████████ (ASOF, 133).

On April 7, 2020, Post told Burns, LMC's Chief Executive Office, that Durre (while still a Karma employee) and █████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████ (ASOF, 137) (emphasis added). For the next ***four months***, between April 2020 and August 7, 2020 Defendants regularly communicated in secret about the plan to hire Karma employees as part of the LMC ████████ in order to save LMC millions by taking advantage of all the work product they developed at Karma.  (ASOF, 134-143, 145-149, 153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-247, 250-251, 261, 263-268, 273-274, 281-284). During this time, Post assisted Durre with locating office space for this LMC "dream team", clandestinely putting Durre in touch with other officers of LMC

who assisted him in breaching his duties to Karma, and directing him as to what steps should be taken to avoid a lawsuit from Karma if it found out about their misconduct. (ASOF, 125, 132, 137-138, 198, 263, 264, 283-284, 327, 347). The Former Employee Defendants further exchanged emails about resumes, timing of their resignations so as not to arouse suspicion, and the importance of not telling Karma where they were going. (ASOF, 199-208, 210-211, 231-232, 235, 242-243, 267-268, 281, 302, 336, 461). Meanwhile, Durre remained heavily involved in Karma's Infotainment system configuration based on LMC's Endurance technical and feature requirements (ASOF 145, 151, 171, 228, 485) and intentionally hid his interactions with LMC from Karma. (ASOF 281, 293).

Defendants openly discussed how this scheme to take Karma's intellectual property would ██████████████████████████████████████ (ASOF, 481). On June 1, 2020, Durre emailed LMC with a specific confidential proposal and detailed design for the infotainment system solution that Karma developed for use in the Endurance, along with proposed component pricing. (ASOF, 159). Ten days later, on June 11, 2020, Karma and LMC entered into a letter of intent (the "LOI") which ██████████████████████████████████, and wherein the parties agreed to work in good faith towards a development contract. (ASOF, 166-167, 473-480, SOF, Ex. 1). Karma continued to refine that design, while unbeknownst to it, Defendants plotted to take all of that work for themselves. On July 19, 2020, Durre (while working for Karma) sent Post a business case as to why LMC should ***not*** purchase Karma's infotainment system, and instead take the project in-house using Karma's employees, ████████████████████████ (ASOF, 217, 218).

On August 6, 2020, LMC abruptly terminated the LOI with little explanation. (ASOF, 170, 286, 289, SOF, Ex. 76). While LMC promised, in its termination letter, to return or destroy Karma's confidential information and designs, it indisputably continued to use them: indeed, the ***day after*** LMC

3

terminated the LOI, its engineers were creating design documents that simply copied and pasted Karma's design into LMC's own vehicle architecture. (SOF, Ex. 76, ASOF, 287). Durre, despite still being a paid Karma employee, met with LMC employees on August 7th (again, ***the day after*** LMC terminated the LOI) to brainstorm about how to implement Karma's design into LMC's systems. (ASOF, 288).  At the same time, Durre and LMC engineers discussed the need to change Karma naming conventions in their design documents to hide their activities. (ASOF, 348, 354). Within weeks, several members of Karma's engineering team who were directly responsible for working on the proposed infotainment system left Karma to join LMC, after having coordinated with Durre on how to keep Karma in the dark about what they were doing. (ASOF, 194, 230, 275-279 290-295, 298, 300-302, 304, 308-314, 316, 318-319, 322, 325-326, 335-336, 343-346, 349-350, 361-362, 377-383). Just before leaving Karma, Durre and Huan deleted Karma data in an effort to cripple Karma's own operations. (DSOF, 115, ASOF, 512), then destroyed documents upon learning of this lawsuit. (ASOF, 398-415).

Through discovery in this lawsuit, Karma discovered thousands of its confidential and trade secret documents in Defendants' possession, and its confidential information incorporated into LMC's designs—and not just limited to an infotainment system. (ASOF, 103, 164, 172-187, 253-260, 269-272, 296-297, 303-307, 315, 317, 320-334, 337-342, 351-360, 363-370, 374, 375, 383-386, , 397, 416-422). LMC took Karma's proprietary specification for its vehicle power moding system and simply replaced all references to "Karma" with references to "LMC"—except for those instances where a "find and replace" search would not work (*e.g.* where the name "Karma" or its predecessor appeared in embedded images). (ASOF, 1, 510). Karma's bills of materials—which lay the exact cost of every one of the thousands of parts that go into Karma's vehicles—were not just found in LMC's possession, but were sent by Defendant Post to other LMC employees with ***explicit instructions to use them*** in negotiating LMC's own prices

with suppliers. (ASOF, 114, 116, 123, 262). To this day, LMC's design documents for its vehicle still contain references to "Karma" because Defendants failed to delete those references after stealing them. (ASOF, 509). Sections of Karma's source code also appear verbatim in LMC's source code: ████████████ ████████████████████████████████████████████████████ ██████ (ASOF, 470).

## LAW AND ARGUMENT

## I.    Defendants Violated the CFAA.

Count One of Karma's First Amended Complaint is a claim for violations of the Computer Fraud and Abuse Act ("CFAA") against LMC and the LMC Individual Defendants. (Dkt. 72, ¶¶ 123-130). As shown below, LMC and the LMC Individual Defendants, acting through the Former Employee Defendants, accessed Karma's SharePoint system and other repositories of Karma's data without authorization in an effort to download and transfer files containing Karma's Confidential Information and Trade Secrets, and to delete files from Karma's systems. It is beyond dispute that Karma never authorized any employee or agent of LMC to access Karma's computer systems. (ASOF, 500).

Likewise, Count Two of Karma's First Amended Complaint is a claim for violations of the CFAA against the Former Employee Defendants for accessing Karma's computers, either without authorization or with authorization obtained under false pretenses in light of their failure to inform Karma of the material fact of their conflicting employment with LMC. (Dkt. 72, ¶¶ 131-137). Pursuant to Karma's written policies, any authorization the Former Employee Defendants had to access Karma's computer systems terminated the moment that the Former Employee Defendants became employed by LMC. Moreover, several of the Former Employee Defendants *continued* to access Karma's systems even after the termination of their relationship with Karma, *i.e.* after their authorization was undeniably terminated.  Defendants' Motion on these claims should be denied.

## A.     The Former Employee Defendants Violated the CFAA.

Defendants' Motion on Karma's CFAA claims against the Former Employee Defendants (Count Two) is almost entirely premised upon an erroneous reading of one case: *Van Buren v. United States*, 141 S. Ct. 1648, 1653 (2021). In *Van Buren*, a police officer was convicted under the CFAA after he accepted a bribe to use his access to a license plate database to obtain information on an individual for profit. The Supreme Court held that the "unauthorized access" requirement of the CFAA did not apply where someone with authorized access to a system uses that access in an unauthorized manner. *Id.* Rather, the Court found, a person only exceeds authorized access when they access part of a computer system that they lack permission to access, "such as files, folders, or databases . . . that are off limits." *Id.*

The Court in *Van Buren* did ***not*** address, however, circumstances where former employees continued to access an employer's computer systems after their authorization terminated by virtue of their employment being terminated—not simply just retaining confidential information. Indeed, several District Courts noted that *Van Buren*'s holding "applies only to the exceeds authorized access prong and did not similarly limit the scope of the other provisions of the CFAA, including the without authorization prong." *See ACI Payments, Inc. v. Conserive, LLC*, No. 121CV00084RJSCMR) 2022 WL 622214, at *9 (D. Utah, Mar. 3, 2022); *United States v. Eddings*, No. 5:19-CR-00535, 2021 WL 2527966, at *4–5 (E.D. Pa. June 21, 2021) ("the mere fact that [Defendant] retained possession of a password which allowed her to access the server post-employment does not, under *Van Buren*, mean that she necessarily was 'authorized' to access the server.")

That is precisely what occurred here. First, several of the Former Employee Defendants, including Defendants Lee and Punak undisputedly continued to access Karma's computer systems even after the termination of their employment

and/or independent contractor relationship with Karma. (ASOF 59, 60, 299, 376, 382). In fact, Defendant Punak readily admitted that he continued to access Karma's computer systems after the termination of his independent contractor agreement with Karma, without any explanation as to why he believed he was still authorized to do so. (ASOF 59, 60). There is also significant evidence that Kim retained access to Karma's systems after his termination, and that former Karma employee Young Lee also accessed Karma's systems after joining LMC. (DOF 181, ASOF 299, 376, 382, 390-395). Such access was undeniably without authorization from Karma, and a violation of the CFAA. Moreover, beyond those individuals, any authorization that Karma gave Defendants Durre and Huan to access Karma's computer systems in their capacity as employees ceased the moment they began working for LMC. *U.S. v. Eddings*, 2021 WL 2527966, at *5 (termination of employment ended authorization to access computer for purposes of CFAA claim, even if password remained functional). Had they been honest about when they started work at LMC, their access would have been immediately terminated. (ASOF, 500). The fact that they concealed their work for both companies does not negate the termination of that authorization.

In addition,  **all** of the Former Employee Defendants acknowledged when they received the Karma Code of Conduct, their authorized access to Karma's electronic systems was "**only** to conduct legitimate Company business." (ASOF 15-17, 19). (emphasis added). Karma employees, including the Former Employee Defendants, were required to attest to acknowledgment of the Karma Automotive Code and agree to comply with the policies contained therein. (ASOF 15-30). The Ninth Circuit's recent ruling in *hiQ Labs, Inc. v. LinkedIn Corp.* acknowledged that a user's authorization could be curtailed by limitations "contained in contracts or policies" for purposes of establishing a "without authorization" violation of the CFAA. 31 F.4th 1180, 1198 (9th Cir. 2022) (citing *Van Buren v. United States*, 141 S. Ct. at 1659, n.8 (2021)).

Finally, Durre and Huan deleted significant volumes of Karma material just prior to their resignations. (DSOF, 115, ASOF 512). To state the obvious, Durre and Huan were never authorized to actively destroy Karma's data in an effort to sabotage Karma's operations while they were still employees. Simply put, the Former Employee Defendants had limitations on their access to Karma's computer systems and exceeded those limitations in violation of the CFAA. The Former Employee Defendants' Motion misstates the Supreme Court's holding in *Van Buren*, and ignores the undisputed facts that several of the Former Employee Defendants accessed Karma's systems after any authorization they had to do so ended. Defendants' Motion should be denied on those grounds.

## B. LMC Also Violated the CFAA.

Defendants admit that LMC can be held liable for the CFAA violations of its employees if Karma establishes an underlying violation by the Former Employee Defendants. (Mot., p. 5). As shown above, evidence confirms LMC employees accessing Karma's systems without authorization while employed at LMC for LMC's benefit, and LMC is vicariously liable for the actions of its agents. *See NetApp, Inc. v. Nimble Storage, Inc.*, 41 F.Supp.3d 816, 835 (N.D. Cal. 2014) (an employer can be vicariously liable for an employee's violations of the CFAA if those violations "occur in the scope of employment or the employer directs the employee's conduct.") Defendants' Motion should be denied on those grounds.

## C. Karma Established CFAA Losses.

The CFAA provides a right of action to recover both damages *and* losses caused by a violation of the statute. *See* 18 U.S.C. § 1030(g) ("…[a]ny person who suffers damage *or* loss by reason of a violation of this section.") (emphasis added). While "damage" refers generally to the value of lost or corrupted data, the CFAA also specifically defines a loss as any "reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to

the offense…" 18 U.S.C. § 1030 (e)(11). In arguing that Karma failed to establish CFAA *damages* as a result of any Defendants' conduct, Defendants focus exclusively on "damages" under the CFAA and ignore the "loss" element.

As shown above, the Former Employee Defendants and LMC violated the CFAA by accessing Karma' systems without authorization: whether by accessing those systems well after their relationship with Karma ended (Punak, Kim, and Huang) or by accessing those systems without authorization because they were working for LMC at the time (Durre and Huan). Karma's evidence also shows substantial *losses* it incurred as a result of those CFAA violations.[3] Specifically, Karma incurred tens of thousands of dollars in losses in conducting a forensic analysis and investigation of its computer systems and data to determine when Defendants accessed the computer systems; assessing, recovering and restoring the data that Defendants damaged, deleted and destroyed; and determining with certainty the extent of the harm that the Defendants caused. (ASOF, 507-508). Those losses are set forth in the Declaration of Michael Kunkel, Director of Investigative Services at Setec Security Technologies, Inc. ("Setec") who analyzed devices used by Defendants to determine which Defendants accessed, altered, damaged, or deleted data from Karma's computer systems; the extent computer systems were tampered with, damaged, or accessed without authorization; and potential methods of remediation. (ASOF, 506-508). Because Karma's losses exceed $5,000, Defendants' Motion should be denied.

## II.   Defendants Violated the California Penal Code.

The evidence establishes Counts XXVII and XXVIII of Karma's First Amended Complaint for violation of California Penal Code § 502 ("Section 502") against LMC and the LMC Individual Defendants (Count XXVII) and against the Former Employee Defendants (Count XXVIII). (Dkt. 72, ¶¶ 338-360).

---

[3] Defendants cite no authority in support of their argument that Durre can escape CFAA liability because he destroyed Karma's data so thoroughly that a value cannot be assigned to it. (Mot., p. 7).

### A.     Karma Established Evidence For its Section 502 Claims.

Similar to its CFAA arguments, LMC's arguments that Karma allegedly failed to show Section 502 damages are misplaced. First, under Section 502, *any* amount of damages caused by the defendant's violation of the statute is enough to satisfy the required element of damages. *See Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *4 (N.D. Cal. 2010) (fact that plaintiff expended resources to stop further violations of § 502 sufficed to establish damages, even if such resources only comprised a few "clicks of a mouse" and some "keystrokes"); *Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp.2d 1154, 1160 (E.D. Cal. 2013) (same holding). Section 502 also recognizes that a victim's damages go beyond the value inherent in affected data, and includes "*any* expenditure reasonably and necessarily incurred…to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access."  Cal. Penal Code § 502(e) (emphasis added).

Here, Karma's damages incurred as a result of Defendants' violation of § 502 far exceed the resources needed for a few "clicks of a mouse." *Capital Audio Access, Inc.* at 1160. As explained in section I(A), *supra*, through its retention of Setec, Karma expended tens of thousands of dollars to determine the extent to which its computer systems were tampered with, damaged, or accessed without authorization by Defendants, which are sufficient under § 502. (ASOF, 507-508).

### B.     Defendant Huang Improperly Took Information from Karma's Computer Systems.

Count XXVIII of Karma's First Amended Complaint is a § 502 claim against *all* the Former Employee Defendants. (Dkt. 72, p. 86). Defendant Huang's individual motion for summary judgment on Karma's § 502 claim (Mot., pp. 8-9) ignores the fact that he copied Karma's confidential and proprietary ███████ ███████ that were transferred to LMC by him between April 25, 2020 and August 29, 2020. (ASOF, 471). Indeed, just weeks after accepting employment with LMC,

Huang committed or deposited hundreds of lines of code to LMC's repository that were copied from Karma's source code repository. (DSOF, 297). As with the other Former Employee Defendants, and pursuant to the applicable Karma written policy, Huang's authorization to access Karma's system ended when he began acting on behalf of LMC. Despite Defendants' unsubstantiated speculation that Huang "passively receiv[ed] information from one of the dozen other Defendants accused of misappropriation" (Mot., p. 9), the evidence shows that Huang affirmatively accessed Karma's systems without authorization in order to misappropriate source code for LMC. (ASOF, 471). Huang's Motion should be denied.

**III.    Defendants' Motion on Karma's DTSA and CUTSA Claims Fails.**

Evidence supports Karma's claims for Counts III and IV of the First Amended Complaint: claims for trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA") (Count III) and the California Uniform Trade Secrets Act ("CUTSA") (Count IV). (Dkt. 72, ¶¶ 138-160). Karma's evidence of damages, including those incurred in its DTSA and CUTSA claims, is addressed in Section XVI, *infra*, and Defendants' other arguments fail as well.

> **A.    Karma's Claims Based on Source Code that Defendant Punak Misappropriated and Then Published are Valid.**

Defendants concede that Defendant Punak posted to his publicly-available GitHub account, without Karma's knowledge or authorization, Karma's confidential, proprietary, and trade secret source code.  (ASOF, 467). Defendants' untenably rely upon Punak's unauthorized and clandestine posting of certain Karma source code on a public website in attempting to avoid liability. Critically, Defendants cannot dispute that this source code was Karma confidential information that Punak created in the course of his work as a Karma employee or contractor. (ASOF, 55, 466-67). Further, Defendants do not dispute that Punak placed the Karma source code on GitHub "without the permission or

1    knowledge of Karma." (SOF, 324, ASOF, 467).

2          Defendants provide no authority for their erroneous proposition that trade

3    secrets lose their protectable status by reason of the misappropriator's bad acts.

4    Moreover, Defendants are simply wrong that Punak's lack of authorization to

5    upload Karma source code to GitHub is "irrelevant."  In *Hirel Connectors v.*

6    *United States*, No. 01-11069, 2004 WL 5639770 (C.D. Cal. Jan. 23, 2004), this

7    Court rejected a nearly identical argument, finding that "unauthorized"

8    publication of a plaintiff's trade secrets does not destroy their protectable status

9    and did not "relieve [the defendants] of liability." *Id.* at *21 (characterizing as

10   "erroneous" argument "that publication on the Internet makes information

11   'generally known' thereby destroying a trade secret").

12          Moreover, the Karma source code Punak improperly uploaded to GitHub is

13   ████████████████████████████████████████████ and only one aspect

14   of Defendants' misappropriation of Karma trade secrets. (ASOF, 55, 466-67,

15   470). Contrary to Defendants' arguments, unauthorized publication of one portion

16   of one type of Karma's trade secrets does not insulate Defendants from liability.

17   *See Hirel*, 2004 WL 5639770, at *21 ("publication of only a portion" of trade

18   secrets does not vitiate their protectable status); *see also O2 Micro Int'l Ltd. v.*

19   *Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089-90 (N.D. Cal. 2006) ("It

20   does not matter if a portion of the trade secret is generally known, or even that

21   every individual portion of the trade secret is generally known, as long as the

22   combination of all such information is not generally known."). Defendants'

23   Motion should be denied as to Punak's CUTSA and DTSA violations.

24     **B.    Defendant Huang Stole Karma's Trade Secrets.**

25          As with Karma's CFAA claim, its CUTSA and DTSA claims are pled

26   against ***all*** Defendants. (Dkt. 72, pp. 51, 54). Moving once again individually,

27   Huang mischaracterizes the significant evidence supporting Karma's claims.

28          Huang, shortly after arriving at LMC, copied ████████████████████

12

███████████████████████████████ source code regarding the exact same technologies he had been developing at Karma just weeks earlier. (DSOF, 297, 327, ASOF 471). As Karma's expert Robert Zeidman explained, the volume of source code creation is indicative of copying, and considering the timing of Huang leaving Karma and arriving at LMC, is copying of Karma's trade secret source code. (DSOF, 316, 339, ASOF 471, 496). Rather than contest that fact, Huang sets forth a number of alternative implausible possibilities while providing evidence for none of them.[4] With Karma having met its burden, Defendants cannot obtain summary judgment by creating *possible* alternative explanations for their conduct, and then claim that Karma failed to disprove rank speculation. Huang's Motion should be denied.

## IV.    Karma's Contract Claims Are Supported by Extensive Evidence.

Defendants only move for ***partial*** summary judgment on Karma's Counts V, VI, VII, VIII, IX, X, and XII breach of contract claims brought against the Former Employee Defendants (Counts V through X) and Defendant Post (Count XII). (Dkt. 72, ¶¶ 161-208). Defendants' arguments are against claims that Karma did not assert in the first place, and should be denied.

### A.    Karma's Contract Claims against Former Employee Defendants Are Not Based on merely Accepting Employment with LMC.

Karma's breach of contract claims have always been based on Former Employee Defendants' actions in conducting competing employment at LMC ***while they continued to work for Karma***, as well as their violation of the confidentiality restrictions and the requirement to return Karma's information contained in their Karma agreements. (Dkt. 72, ¶¶ 161-202, ASOF 72-80, 82-99). Defendants erroneously claim that California Business and Professions Code § 16600 renders void any contractual provision preventing Durre, Huan, Qin,

---

[4] Defendants suggest Huang may have copied code from open source or pre-existing LMC code, but never identify any such code. It is simply wishful thinking.

Punak, Kim, Huang, and Post from accepting employment with LMC. (Mot., p. 13).  They are wrong. Section 16600 "does not apply to restrictions on a person's ability to engage in a lawful business while that person is employed by the company to which he or she promised loyalty." *Youngevity Int'l, Corp. v. Smith*, No. 3:16-CV-704-BTM-JLB, 2021 WL 1041712, at *4 (S.D. Cal. Feb. 4, 2021); *see also Techno Lite, Inc. v. Emcod, LLC*, 44 Cal. App. 5th 462, 473–74 (2020) (noting that "[a]ppellants do not cite -- and we have not found -- a single case in which Section 16600 was held to invalidate an agreement not to compete with one's current employer while employed by that employer").

Defendants' reliance on *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008) is misplaced. "*Edwards* did not address -- much less invalidate -- agreements by employees not to undermine their employer's business by surreptitiously competing with it while being paid by the employer." *Techno Lite, Inc.*, 44 Cal. App. 5th at 472 (2020) ("Section 16600 is not an invitation to employees to bite the hand that feeds them.") Defendants' Motion for Summary Judgment on those grounds should be denied as well.

### B.  Durre and Huan Breached Their Obligations to Karma by Accepting Simultaneous Employment at LMC.

Section 4 of Durre and Huan's employment agreement with Karma states: "during the term[s] of [their] employment with [Karma]," Durre and Huan shall "not engage in any other employment, occupation or consulting directly related to the business in which [Karma] is now involved."  (ASOF 7, 9, 11). Defendants now erroneously argue that Durre and Huan's simultaneous employment at Karma and LMC does not violate this provision because Karma and LMC are not "competitors." (Mot, p. 13). But the term "competitor" never appears in Section 4 of Durre's or Huan's agreement with Karma, and whether or not Karma and LMC are currently "competitors" in selling electric pickup trucks is irrelevant to that provision. Karma is and was involved in the business of selling electric vehicles

14

and developing technology for use in electric vehicles.  (ASOF, 3, 491).  By

accepting employment with LMC, who was building an electric truck and seeking

to purchase from Karma electric vehicle technology to put into that truck, Durre

and Huan engaged in "employment, occupation, [and] consulting directly related

to the [same] business." *See Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,

No. 1:09-CV-00560-LJO, 2012 WL 6160468, at *5 (E.D. Cal. Dec. 11, 2012)

(rejecting, in context of discovery dispute, argument that plaintiffs were not direct

competitors with the defendant where disclosure of certain information to the

plaintiff's executives would harm the defendants). (ASOF, 11).

   Moreover, there is substantial evidence that Karma and LMC ***are***

competitors.  For example, Karma's former Chief Operating Officer, Mikael

Elley, testified extensively that ████████████████████████████████████

████████████████████████████████ (DSOF, 9-10, 38, 40).

████████████████████████████████████ (DSOF, 4, 9-10,

40).  Moreover, Karma ████████████████████████████████

████████████████████████████████████

██████ (DSOF, 1). Defendants also stole a Bill of Materials ("BOM") from

Karma that would allow Defendants and other competitors to bypass the 18

month expenditure of necessary time and resources to develop, build, and price

██████████████████ (ASOF, 252). Karma and LMC also compete in several

other respects.  For example, Karma is producing ████████████████

██████████████ (DSOF, 10, SOF, 25). Karma is also producing

████████████████████████████████████████

██████ (DSOF, 1, 8, 25).  As this evidence makes clear, Durre's and Huan's

overlapping employment with LMC and Karma was a direct breach of their

obligation to refrain from "other employment, occupation, or consulting directly

related to the business in which [Karma] is now involved."

Durre and Huan also breached other obligations under their employment agreements by working for LMC and Karma at the same time. Durre and Huan specifically "agree[d] to diligently adhere to the Conflict of Interest Guidelines attached" to their employment agreements. Those guidelines prohibited Durre and Huan from "[e]ngaging in any conduct that is not in the best interest of [Karma]" and required Durre and Huan to "avoid activities that are in conflict, or give the appearance of being in conflict, with . . . the interests of [Karma]." (DSOF, 83, 102). As detailed above, there is no dispute that, while employed by Karma, Durre and Huan worked for LMC, accessed Karma's confidential information and shared that information with LMC, and recruited Karma's employees to work at LMC. Those activities were plainly "not in the best interest of" Karma, and certainly gave "the appearance of being in conflict" with Karma's interest. Defendants' Motion should be denied as the contract is clearly breached.

### C.     Defendant Kim Breached his Confidentiality Agreement.

Defendant Kim was assigned to work at Karma by a staffing agency in 2019. (ASOF, 46). As part of his assignment to Karma, the staffing agency agreed to "ask [Kim] to observe all of [Karma's] rules and to sign a customary non-disclosure agreement." (ASOF, 47). Kim subsequently signed a binding mutual non-disclosure agreement with Karma confirming that he would not disclose confidential information to any third party. (ASOF, 48-50). That agreement continued from the effective date until terminated by Karma or Kim, but even after termination the confidentiality obligations in the agreement "remain[ed] binding for a period of five (5) years." (ASOF, 51). Despite agreeing to that restriction, Kim subsequently breached his agreement in repeated and material fashions. For example, a technical specification document regarding ███ ████████████████ was discovered on Kim's LMC workstation. (ASOF, 513). Dozens more confidential Karma documents were discovered on Kim's Google drive and in the recycle bin of Kim's LMC workstation. (ASOF,

418).  Perhaps more importantly, Kim readily admitted that, while employed by LMC, *he accessed Karma information to assist him with his work at LMC*. (ASOF 396).  Nor could Mr. Kim foreclose the possibility that he shared such documents with others.  (ASOF, 53). Thus, there is substantial evidence that Kim disclosed confidential information in violation of his agreement with Karma.

Defendants urge this Court to accept an impossibly narrow reading of Kim's agreement with Karma by referencing the boilerplate language regarding its purpose: a vague reference to "discussions regarding a potential business transaction." Defendants now erroneously argue that any confidential documents given to Kim by Karma could *only* have been for purposes of those discussions, and that Kim has no contractual obligations to any other confidential documents given to him by Karma. (Mot., p. 14). The plain language of Kim's agreement does not support such an interpretation. The "purpose" set forth in section 1 of Kim's agreement does not limit the scope of confidential information that might be disclosed to him by Karma—unsurprisingly, Section 2 of the agreement is broadly drafted to include *all* confidential information disclosed to Kim no matter what the purpose. Section 3 of the agreement then sets forth Kim's obligations with regard to *any* confidential information given to him by Karma: to only use it for the "purpose." (ASOF, 51). To the extent that the boilerplate "purpose" language in section 1 has any impact on the parties' obligation not to misuse confidential information, it is a limitation upon *Kim*, not Karma. Even under Defendants' narrow reading of that provision, taking Karma's confidential information and handing it over to LMC was not a permitted "purpose" under the agreement. Kim's request for summary judgment should be denied.

### D.     Defendant Huang Breached his Confidentiality Agreement.[5]

Defendant Huang also moves for summary judgment as to the contractual

---

[5] Defendants moved for summary judgment on the employee solicitation claims against Defendant Qin. In the interest of streamlining claims for trial Karma asked Defendants to stipulate to dismissing that limited claim but Defendants refused.

claims against him for the same reasons that he moved for summary judgment on Karma's CUTSA and DTSA claims against him. (Mot., p. 15). For the same reasons as set forth above in Section III(C), Huang's Motion should be denied.

## V.  LMC Breached the MNDA and Karma Substantially Performed All of its Obligations Thereunder.

Substantial evidence supports each element of Karma's claim for breach of the MNDA: (1) an indisputably binding contract with which Karma complied; (2) LMC's material breach of that agreement; and (3) Karma's resulting damages. LMC's attempt to escape the consequences of its breach of the MNDA by pointing to a handful of documents that Karma inadvertently retained but never used is unavailing. Under Ohio law, which governs the MNDA, a party must only show "substantial" performance of his promises "in order to maintain a claim for breach of contract." *John P. Timmerman Co. v. Hare*, 2003 WL 22039329, at *2 (Ohio Ct. App. Sept. 2, 2003) "When the facts of a case are undisputed, whether or not Plaintiff's actions constitute substantial performance is a matter of law." *Id.* However, when facts ***are*** in dispute, "[t]he issue of whether there has been substantial performance is a question of fact to be determined by the fact finder." *Lutz v. Carter*, No. 2660, 1990 WL 147355, at *7 (Ohio Ct. App. Oct. 3, 1990); *Steen Elec. v. Homes of Elegance, Inc.*, 2004-Ohio-6275, ¶ 9 ("Whether a party has substantially performed under the terms of a contract is a question of fact").

Defendants claim that Karma "materially breached" the MNDA by its inadvertently retaining a handful of LMC documents and not providing a certificate of compliance after LMC abruptly terminated the MNDA, to try an escape liability here. LMC never alleged a breach of contract by Karma as an affirmative defense (Dkt. 98, pp. 43-54), but even if it had, Karma's inadvertent retention of a handful of documents that it never used is not a material breach of the MNDA, particularly when set against LMC's undeniable retention and ***_use_*** of thousands, if not tens of thousands of pages, of Karma's documents exchanged under the protection of the

MNDA. (ASOF 416-22). Under Ohio law, a breach is only material if it "destroy[s] the value or purpose of the contract." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 148 Ohio App.3d 53, 772 N.E.2d 138, ¶ 12 (10th Dist.).  That Karma may have inadvertently retained (but indisputably did not *use*) a handful of email attachments possibly covered by the MNDA does not "destroy[] the value or purpose' of the MNDA, and does not excuse LMC from its obligations thereunder. To the extent that Defendants intend to argue at trial that their obligations were excused by Karma inadvertently retaining, but never using, a half-dozen emails and their attachments, Defendants should be obliged to make that case to the jury.

As with their arguments as to Karma's other claims, Defendants damages arguments regarding breach of contract do not take issue with damages so much as the exact amount and causality of damages. Neither is a question that should be decided upon summary judgment, and Defendants provide no support for their novel theory that Karma's experts were required to assign an independent dollar value to each document that LMC wrongfully retained after the termination of the MNDA. Sufficient evidence demonstrates that LMC both retained and used documents that it retained from the MNDA, including the very infotainment system design that LMC acknowledged was Karma's solution to its infotainment system problems. (SOF, Ex. 76, ASOF, 287). LMC's Motion should be denied.

## VI.    The Letter of Intent is a Binding Agreement That LMC Breached.

Count XIV of Karma's First Amended Complaint is a claim for breach of the LOI and specifically LMC's agreement therein to work with Karma "in good faith to negotiate, prepare, execute and deliver definitive agreements governing the Transactions" contemplated in the LOI. (FAC, Dkt. 68-2, ¶¶ 218-219). Put differently, LMC did not breach the LOI by failing to enter into a definitive, enforceable agreement—LMC breached the LOI because it never intended to negotiate in good faith in the first place, despite agreeing to do so. As set forth above, even before the LOI was executed, LMC conspired with Karma's

employees for ***months*** about their plan to form LMC's West Coast Infotainment team and use it to avoid ████████████ in payments to Karma. LMC never had any intention of negotiating in good faith because it was ***already*** acting on its plan to steal Karma's Trade Secrets and Confidential Information, and to poach Karma's key employees to enable LMC to develop an infotainment system in-house and avoid substantial time and costs. (Dkt. 72, ¶¶ 222-224).

The Court should reject Defendants' efforts to conflate LMC's specific agreement to negotiate with Karma in good faith with an "agreement to agree" in the future. "A contract to negotiate an agreement is distinguishable from the ultimate agreement that parties hope to eventually reach." *Cedar Fair, L.P. v. City of Santa Clara*, 194 Cal. App. 4th 1150, 1171 (2011). Although the latter is unenforceable, California courts specifically recognize a viable cause of action when, as here, "a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith." *Copeland v. Baskin Robbins USA* (2002) 96 Cal. App. 4th 1261.

Defendants' argument, that even the presence of language suggesting an agreement to work in good faith toward a final agreement does not create a binding contract, conflates an agreement to agree with an agreement to negotiate in good faith. In the LOI, Karma and LMC agreed that they would "work in good faith to ***develop the milestones and objectives***" and that they would "work together in good faith to ***negotiate***, prepare, execute and deliver definitive agreements." (ASOF, 167) (emphasis added). In contrast, the parties in the *Rennick* case that Defendants wrongly rely upon simply "confirm[ed] their intent to continue good faith discussions directed toward the creation of formal written contracts." *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (quotations omitted). In *Rennick*, the plaintiff argued that the letter of intent "was a mere memorialization of a contract already made," not that the defendants breached a distinct obligation to negotiate towards a final agreement in good faith. The issue in this case is

1   whether the LOI bound the parties to negotiate towards a contract in good faith, not

2   whether the letter of intent bound the parties to the "contemplated" contract.

3       There is ample evidence that LMC never intended to negotiate with Karma

4   in good faith and therefore breached its obligation to do so. *See Copeland*, 96 Cal.

5   App. 4th at 1261 (noting that "whether the defendant negotiated in good faith will

6   be a question of fact for the jury" in most cases). From nearly the outset of their

7   dealings, LMC's plan was to steal Karma's trade secrets, confidential information,

8   and employees and resources to set up its own in-house infotainment group staffed

9   mostly by Karma employees.  (ASOF, 81, 125-128, 137, 141, 147, ).  Indeed, LMC

10  entered into the LOI only after Durre told Post that he was ███████████████

11  ███████████████████████████ (ASO, 165). Even before the LOI

12  was executed, LMC and Karma employees were already discussing LMC's plans

13  to hire Karma's infotainment team to develop LMC's infotainment system

14  internally. (ASOF, 133, 137). As part of those discussions, Post, Durre, and other

15  LMC employees were openly discussing ████████████████████████

16  ███████ that LMC could save by hiring Karma's infotainment team to develop

17  LMC's infotainment system and stealing Karma's trade secrets instead of paying

18  Karma to develop the system contemplated by the LOI. (ASOF, 214).

19      LMC's misrepresentations and communications with Karma's employees

20  leading up to the execution of the LOI is more than sufficient evidence to show that

21  LMC never intended to or negotiated in good faith and breached the LOI. A party's

22  breach of its contractual obligation to negotiate in good faith toward an ultimate

23  agreement is, in and of itself, a breach of contract.  Summary judgment on Karma's

24  Breach of Letter of Intent claims against LMC should be denied.

25  **VII.   Karma's Tortious Interference with Contract Claims are Sufficiently**

26  **Proven to Preclude Summary Judgment.**

27      Substantial evidence supports Count XV of Karma's First Amended

28  Complaint asserting tortious interference with contract against LMC and the

1   LMC Individual Defendants.  Defendants' specious arguments fail at law.

2        **A.**    **Karma's Tortious Interference Claims are Based on Evidence of**
3             **Wrongdoing Other Than Trade Secret Misappropriation.**

4        "If a common law tort claim 'is not based on the existence of a trade secret,'
5   then CUTSA does not displace it."  *Gordian Med., Inc. v. Percival*, No. SACV 19-
6   2244 JVS(ADSx), 2020 WL 5921947, at *7 (C.D. Cal. Aug. 27, 2020) (quoting
7   *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 508 (2013)).  Karma's
8   claim for tortious interference with contract is based on theories of liability and
9   evidence independent of any trade secret claim, including tortious interference with
10  Karma's contractual right against its employees engaging in conflicts of interest
11  and acceptance of conflicting employment. Indeed, Karma's First Amended
12  Complaint states that Count XV is based upon "breach of contract, breach of the
13  duty of good faith and fair dealing, and unlawful raiding of Karma's workforce…"
14  (Dkt. 72, ¶ 232). Courts regularly recognize that such claims are not based on the
15  existence of a trade secret and thus not preempted by CUTSA.  *See*, *e.g.*,
16  *ChromaDex, Inc. v. Elysium Health, Inc.*, 369 F. Supp. 3d 983, 990 (C.D. Cal.
17  2019) (declining to preempt breach of fiduciary duty claim where based on a breach
18  of fiduciary duty through soliciting employees of plaintiff while its fiduciary);
19  *Arthur J. Gallagher & Co. v. Tarantino*, No. 20-CV-05505-EMC, 2022 WL
20  4092673, at *11 (N.D. Cal. July 27, 2022) (dismissing motion for summary
21  judgment relating to preemption under CUTSA where claim was based on
22  defendant's soliciting of employees while still employed by plaintiff).

23       Substantial evidence supports Karma's claim outside of the misappropriation
24  of confidential and trade secret information. LMC and the LMC Individual
25  Defendants directed Karma's employees to set up a "West Coast
26  Infotainment/Connectivity Team" for LMC while still employed by Karma,
27  assemble teams of employees and solicit them while still employed by Karma, and
28  accept conflicting employment with LMC while still employed by Karma. (ASOF

192). Defendant Durre even built ***an entire business case*** for LMC while working for Karma as to why LMC should ***not*** purchase Karma's infotainment system but instead take the project in-house using Karma's employees, thereby saving ███ ████████ of dollars in the process. (ASOF, 81, 217, 218, 461). Moreover, for certain Defendants (Durre and Huan), LMC and the LMC Individual Defendants had those employees stay on the payroll of Karma even after they formally began work at LMC, attending meetings at both organizations to develop competing products. (ASOF 71, DSOF, 99, SOF, 100). All of those actions by the Former Employee Defendants were in breach of their agreements with Karma, have ***nothing*** to do with confidential or trade secret information, and were directly instigated by LMC and the LMC Individual Defendants. Defendants' brief citation to ***some*** of Karma's interrogatory responses fails to account for Karma's interrogatory answers that identify at length LMC and the LMC Individual Defendant's tortious interference with Former Employee Defendants duties to Karma, beyond duties related to confidential information.  (ASOF, 490). Because the evidence shows LMC and the LMC Individual Defendants tortiously interfered with the Former Employee Defendants contracts with Karma, including their duty of loyalty and fiduciary duties, Defendants' Motion should be denied.

### B.   Defendants' Independent Wrongful Conduct is Established.

A party alleging tortious interference must establish "independently wrongful conduct" on the part of the defendant. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142 (2020). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id).* In arguing that Karma cannot show any "independently wrongful conduct" required for a tortious interference claim, Defendants again distort or outright ignore Karma's allegations and the evidence supporting them.  Again, Defendants cast their actions as simply "efforts to hire the Former Employee Defendants to work at LMC," without

anything more. In doing so, Defendants ignore the months-long campaign to sabotage the infotainment Endurance Project at Karma from the inside, despite the Former Employee Defendants' contractual and fiduciary obligations to Karma. (ASOF, 106-114, 120-121, 124-143, 145-149, 153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-247, 250-251, 261, 263-268, 273-274, 281-284 ). This Court recently addressed a similar issue in *SSI Inc. v. Ferry*, No. CV 21-2073 JVS (PDX), 2021 WL 9315372, at *10 (C.D. Cal. July 28, 2021). In that case, this Court found the plaintiff's claim for tortious interference was "not predicated on the 'breach or disruption' of an at-will employment relation (*i.e.*, the end of the employee's employment), but instead on the contractual obligations breached by the employees while still on [the plaintiff's] payroll."

Durre, Karma's Director of its infotainment division who was tasked by Karma to develop a low-cost infotainment system for use in LMC's Endurance, simultaneously negotiated a deal with LMC to build a "West Coast Infotainment/Connectivity Team" made up of Karma employees, all behind Karma's back *and while working for Karma*.  (DSOF, 84, ASOF, 192, 501). With LMC's express written encouragement, Durre and the Former Employee Defendants took steps to build a competing team and start working on LMC's designs *while* they were being paid by Karma: in Durre's case also collecting a paycheck from both companies for more than a month. (ASOF, 71, 238-39). Meanwhile, Durre continued to sabotage the project from within by pretending to be engaged on behalf of Karma and quoting overpriced parts for the infotainment system to the Karma team to prevent Karma from approaching LMC's stated price point.  (ASOF, 228). Durre maintained this façade and pretended to be engaged in the project on behalf of Karma even after Post informed him that LMC was cancelling the LOI.  (ASOF, 511).  As his last act at Karma, Durre deleted and then double deleted the contents of his Karma devices, further sabotaging efforts to continue building the Karma low-cost infotainment system without him and

resulting in the loss of Karma data. (ASOF, 512).

And Defendants cannot credibly claim that their actions were innocent, considering that Durre and Post both discussed the need not to tell anyone about their activities lest they be sued by Karma, as well as Durre's discussions on behalf of LMC with other departing Karma employees encouraging them to keep their departure a secret. (ASOF 235, 302, 314, 335).  The law is clear that "aiding and abetting others to breach their fiduciary duties" can constitute an "independent wrong." *Spice Jazz LLC v. Youngevity Int'l, Inc.*, No. 19-CV-583-BAS-WVG, 2019 WL 4573705, at *8 (S.D. Cal. Sept. 19, 2019).  Similarly, trade secret misappropriation is also sufficient to constitute an independent wrongful act. *See GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, No. EDCV1504125VAPJEMX, 2016 WL 6562064, at *12 (C.D. Cal. Apr. 21, 2016) (noting that "trade secret misappropriation . . . is sufficient to constitute an independent wrongful act").  Karma's claims for violation of California's Unfair Competition Law (the "UCL") are also sufficient to satisfy the requirement of an independently wrongful act.").[6]

Karma's claims are based upon Defendants' actions in breaching their contractual and fiduciary duties to Karma. Those breaches, as well as aiding and abetting them, are "wrongful acts" for which there is ample evidence, and Defendants' Motion should be denied.

## C.   LMC and the LMC Individual Defendants Knew of the Operative Agreements and Evidence of Karma's Damages.

The evidence shows LMC Individual Defendants clearly knew of the Former Employee Defendants' agreements with Karma:  Defendant Post knew of

---

[6] The Former Employee Defendants briefly argue a red herring that their decision to accept employment with LMC was not a breach of their agreements with Karma, such that Karma cannot establish an underlying breach of the agreements for its tortious interference claim. (Mot., p. 21). As explained above, not a single one of Karma's claims is based upon the Former Employee Defendants deciding to accept employment with LMC in and of itself. Rather, Karma's claims are based on all of the wrongful conduct that accompanied that decision.

those agreements because he had a similar one with Karma when he worked there, and LMC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (ASOF, 6, 488; DSOF, 78). Simply put, Defendants' claim that they had *no idea* that the Former Employee Defendants had agreements with Karma strains credulity considering that the ringleader of LMC's efforts, Darren Post, signed a nearly identical confidentiality agreement when *he* worked for Karma, and cannot possibly be a basis for summary judgment.  Indeed, it was Post's knowledge of that agreement that appeared to prompt him to remind multiple other Former Employee Defendants not to mention what they were doing so as to avoid being sued by Karma. (ASOF, 37, 235, 281).  LMC also required its employees to sign similar employee agreements. (ASOF, 4-14). The fact that LMC or the LMC Individual Defendants may not have known the "specific" terms of the contract is irrelevant. *See* S*ebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001) ("intent to interfere" can be inferred "if the defendant knows that contractual relations with a third party exist"). Similarly, Defendants' brief argument that Karma cannot establish damages on its tortious interference claim fails for the reasons explained in Section XVI below.

**VIII.  Substantial Evidence Supports Karma's Tortious Interference with Prospective Economic Advantage.**

Substantial evidence supports Count XVI of Karma's First Amended Complaint, which asserts a claim for tortious interference with its prospective economic advantage, and specifically with its anticipated contract with LMC to develop its infotainment system. (Dkt. 72, ¶¶ 233-240).

**A.    Karma's Tortious Interference Claim is not Preempted by CUTSA.**

Defendants' attempt to dismiss the tortious interference with future economic benefit claim on preemption grounds fails for similar reasons that their arguments for dismissal of tortious interference with contract fail. (*See* Section

VII, *infra*).  Karma's claims against the Former Employee Defendants are based on, *inter alia*, a breach of their duty of loyalty by making a side deal with LMC while still employed by Karma.  (FAC, ¶¶236-237). It is black letter law that such claims are not preempted by CUTSA. *See, e.g.*, *Gordian Med., Inc.*, 2020 WL 5921947, at *7 (common law tort claims, including breach of duty of loyalty, not based upon misappropriation of trade secrets are not preempted by CUTSA).

The cases cited by Defendants are inapposite.  In both cases, preemption was found where defendants used plaintiff's confidential information to solicit customers away from plaintiff.  *See Nelson Bros. Pro. Real Est. LLC v. Jaussi*, No. SACV 17-0158 DOC(JCGx), 2017 WL 8220703, at *7 (C.D. Cal. Mar. 23, 2017) ("The crux of this cause of action is that Defendants misappropriated Plaintiff's trade secrets which in turn allowed Defendants to solicit Plaintiff's clients."); *PQ Labs, Inc. v. Yang Qi*, No. C 12-0450 CW, 2012 WL 2061527, at *6 (N.D. Cal. June 7, 2012) (plaintiff alleged that defendants used confidential customer lists to solicit customers and made no allegations addressing a breach of contract).  Unlike these cases, Karma alleged, and the evidence supports, specific breaches by Former Employee Defendants that do not sound in trade secret misappropriation. (*See* Section VII(A), *supra*).

## B. Karma Established a Probability of a Future Economic Benefit and Defendants' Independent Wrongful Conduct.

The requirement of a probable future economic benefit in tortious interference claims does not require certainty, especially when Defendants' actions prevented that certainty from occurring. *See Youst v. Longo*, 43 Cal. 3d 64, 71, 729 P.2d 728, 733 (1987) (tortious interference claim only requires "reasonable probability" of future economic benefit, not certainty). While LMC argues at length that there were still material contract terms left for the parties to iron out (Mot., pp. 23-24), LMC ***cannot*** deny that the parties were significantly on their way to reaching such an agreement, considering that the LOI itself

identified the system that Karma proposed as the solution to LMC's need for an

infotainment system. (ASOF, 514). LMC's claims that Karma did not have the

capacity to develop such a system again contradicts LMC's own internal emails.

Put differently, the Karma engineers whom LMC now claims were utterly

incapable of delivering the infotainment system that LMC needed (Mot., p. 24),

are the same engineers whom LMC's executives at the time described as their

██████████████████████████████████████ (ASOF, 364).

   LMC's claim that Karma failed to establish independent wrongful conduct,

which LMC frames as Defendants simply "accepting employment with LMC"

ignores the undeniable facts of this case. Defendants did not simply "accept

employment with LMC": they accepted employment with LMC **while continuing**

**to work at Karma** and then actively conspired to undermine Karma's interests.

(SOF, 81-82, 99-100, 143-144, 189-190). Similarly, Karma's allegations against

Durre are not just that he started employment at LMC before his last day at

Karma, nor that he deleted data or misappropriated Karma's trade secrets. Rather,

Karma's allegations are that Durre worked against Karma's interests covertly for

several months on LMC's behalf, while he was being paid to lead Karma's

development project with LMC. (ASOF, 106-114, 120-121, 124-143, 145-149,

153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-

247, 250-251, 261, 263-268, 273-274, 281-284 ). Such actions are undeniably

independent wrongful conduct, and the evidence supporting them is substantial.

Defendants' Motion should be denied.[7]

## IX. Substantial Evidence Supports Karma's Section 17200 Claim.

   Count XVII of Karma's First Amended Complaint asserts a claim for

violation of California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof.

Code § 17200. (Dkt. 72, ¶¶ 241-250). Karma's claims more than satisfy the

---

[7] Defendants' arguments as to damages on these claims are also addressed in
Section XVI, *infra*.

"unlawful' activity of the UCL, and Defendants' Motion should be denied.

First, Defendants' CUTSA preemption argument fails with regard to Karma's UCL claim for the same reasons as it fails with other claims. Specifically, Karma's claims are supported by evidence that Defendants violated the statute and acted unfairly through their breach of duties, breach of contracts, and assistance in the same. (*See* pp. 1-4 and Section III*, supra*).  Defendant Durre, at the same time he was working for Karma to develop its business case to present to LMC, was preparing a business case for LMC as to all the reasons it should not work with Karma and instead hire him and his team directly. (ASOF, 81, 217-218, 461). Indeed, Durre conspired for months with Post to effectuate this move through numerous emails and chats from February through August 2020 sent via Durre's private email account.  (ASOF, 106-114, 120-121, 124-143, 145-149, 153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-247, 250-251, 261, 263-268, 273-274, 281-284 ).  Even prior to cancelling the LOI, Post informed Durre that the LOI would be cancelled, and Durre continued to push the parties apart with overpriced parts and feigned efforts to close the deal, all in order to give him a cover to continue unlawfully soliciting his team to go to LMC. (ASOF, 228, 511).  LMC and the LMC Individual Defendants knew of the Former Employee Defendants obligations to Karma (including their obligation not to solicit their colleagues or accept conflicting employment while still employed by Karma), conspired with Durre to breach them, and tortiously interfered with those obligations anyway. As explained above, these actions fall outside of the scope of CUTSA, and are recognized violations of the UCL.  *See CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (intentional interference with plaintiff's employment contracts constitutes unfair competition); *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 510 (2013), as modified (Oct. 29, 2013), as modified on denial of reh'g (Nov. 7, 2013) ("the conduct needed to maintain a statutory or common law unfair competition cause of

1  action may consist of a tortious interference with business relations.")

2      Defendants' argument that to prevail on a UCL claim the business practice

3  must be both "unfair" ***and*** "deceptive" or "fraudulent" has no basis in law. (Mot.,

4  p. 26).  The scope of the UCL is broad. *Morgan v. AT&T Wireless Services, Inc.*

5  177 Cal.App.4th 1235, 1253 (2009). It governs "anti-competitive business

6  practices" as well as injuries to consumers, and has as its major purpose "the

7  preservation of fair business competition." *See Cel-Tech Communications, Inc. v.*

8  *Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999). Under the UCL

9  there are three types of unfair competition; business acts or practices which are: (1)

10  unlawful, (2) unfair, or (3) fraudulent. *Tucker v. Pacific Bell Mobile Services*, 208

11  Cal. App. 44th 201, 225 (2012) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 311

12  (2009)). Because the statute is framed in the disjunctive, a business practice need

13  only meet one of the three criteria to be considered unfair competition. *Morgan*,

14  177 Cal.App.4th at 1253; *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d

15  718, 731 (9th Cir. 2007) ("Each prong of the UCL is a separate and distinct theory

16  of liability" and "an independent basis for relief.").

17      An "unlawful" business practice under the UCL is "anything that can

18  properly be called a business practice and that at the same time is forbidden by

19  law." *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1107

20  (9th Cir. 2007). Section 17200 "borrows" violations from other laws by making

21  them independently actionable as unfair competitive practices. *Id.* The "unlawful"

22  prong of the UCL may also borrow obligations imposed solely by the common law.

23  *Zhang v. Superior Court*, 57 Cal. 4th 364, 369, 304 P.3d 163, 166 (2013) (finding

24  common-law insurance bad faith as grounds for UCL liability).

25      Defendants' argument that a UCL claim requires evidence of public

26  deception is also incorrect. (Mot., p. 27). As stated above, under the UCL, there are

27  three types of unfair competition: (1) unlawful, (2) unfair, or (3) fraudulent business

28  practices. While the third prong requires evidence of a likelihood of public

deception, the first two do not. *See Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1207 (E.D. Cal. 2013) (discussing that only the "fraudulent" prong of the UCL requires a plaintiff to deception to members of the public). California courts have emphasized that the first, "unlawful" prong "borrows" from violations of other laws, including some of the common law claims pled in this case, making them independently actionable. *See CRST Van Expedited, Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (involving intentional interference with existing employment contracts). Defendants' Motion as to that claim should be denied.

**X.    Defendants Breached Their Duties of Loyalty and Fiduciary Duties.**

Under California law, "[d]uring the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" *Techno Lite, Inc. v. Emcod, LLC*, 44 Cal. App. 5th 462, 471 (2020) (quoting *Fowler v. Varian Associates, Inc.*, 196 Cal. App. 3d 34, 41 (1987)); *see also Aramark Mgmt., LLC v. Borgquist*, No. 818CV01888JLSKES, 2021 WL 9145423, at *3 (C.D. Cal. Dec. 28, 2021).

Despite this undivided duty of loyalty, Defendants argue that Durre, Huan, and Qin had no fiduciary duty to Karma because they were not at a high enough level of the company. (Mot., p. 28). California law holds otherwise. *See Aramark*, 2021 WL 9145423, at *3 ("The Court will not distinguish 'between so-called lower-level and managerial employees in construing the duty of loyalty.'") (citing *Zayo Grp. LLC v. Hisa*, 2013 WL 12201401, at *7 (C.D. Cal. Sept. 17, 2013)); *see also Otsuka v. Polo Ralph Lauren Corp.*, 2007 WL 3342721, at *2 (N.D. Cal. Nov. 9, 2007) (all employees owe duty of loyalty to employer).

Even in the authority cited by Defendants, the question of whether an employee owed a fiduciary duty is a question of fact. *See*, *Arthur J. Gallagher & Co. v. Tarantino*, No. 20-CV-05505-EMC, 2022 WL 4092673, at *19 (N.D. Cal. July 27, 2022). "An implied duty may arise when confidence is imposed by persons in the integrity of others, if the latter voluntarily accepts or assumes the confidence." *Swanson v. ALZA Corp.*, No. C 12-4579 PJH, 2013 WL 968275, at

*9 (N.D. Cal. Mar. 12, 2013). Here, there is ample evidence showing that the former Employee Defendants owed fiduciary duties to Karma and breached those duties. Defendant Durre was explicitly involved in the effort to recruit Karma employees, including those he directly oversaw, for the benefit of LMC, while he was ***working for Karma***. (ASOF, 199-211). Defendant Huan, another senior employee of Karma with job duties that included overseeing younger employees, was on the payroll of both Karma and LMC for over a week, again without disclosing that separate employment to Karma. (DSOF, 99, SOF, 100). These are ***exactly*** the kind of circumstances in which California courts find a breach of fiduciary duty claim may stand separate from CUTSA preemption. *See*, *e.g.*, *Arthur J. Gallagher & Co.*, 2020 WL 4092673, *9 (N.D. Cal. July 27, 2022) ("[c]ompeting with [plaintiff] on behalf of a competitor while still employed with [plaintiff] is a clear-cut breach of fiduciary duty, regardless of whether Defendants used any trade secrets to do so").

## XI. Karma's Claim for Aiding and Abetting a Breach of Fiduciary Duty is Supported by the Evidence.

Counts XX assert claims against LMC and Post for aiding and abetting Durre, Huan, and Qin in breaching their duties of loyalty and fiduciary duties to Karma. (Dkt. 72, ¶¶ 265-273). Karma's evidence that LMC and Post not just aided and abetted, but actively directed, those breaches is substantial, and includes ***months*** of communications in which LMC and Post actively directed Durre and others to set up LMC's West Coast Infotainment team while those individuals were working for Karma. (*See* pp. 1-4, *supra*).  Defendants' sole argument on this claim, that there is insufficient evidence of "substantial assistance" given by LMC and Post, ignores that wealth of evidence and Defendants' Motion should be denied.

## XII. Karma's Conspiracy Claim is Supported by the Evidence.

Count XXII of Karma's First Amended Complaint asserts a claim for

common law conspiracy against the Defendants. (Dkt. 72, ¶¶ 284-288). Those
claims are not preempted by CUTSA for the same reason none of Karma's other
claims are preempted: they are supported by facts other than the misappropriation
of confidential and trade secret information. Moreover, contrary to Defendants'
arguments, the incredibly detailed "common plan" that Defendants developed is
set forth above, and Karma will not repeat it in its entirety here. (*See* pp. 1-4,
*supra*). Defendants' plan to hire former Karma employees that had done all the
work for the Endurance development project, and use Durre's position at Karma
in overseeing the Endurance Project to sabotage it and end the relationship
between LMC, is more than sufficient evidence of tortious interference with the
duties Karma's employees had to Karma and Karma's prospective economic
advantage from the Endurance Project. Summary judgment on Karma's
Conspiracy claims against Defendants should be denied.

**XIII.  Karma's Fraud Claim Is Not Preempted and Amply Supported.**

Count XXIII of Karma's First Amended Complaint is a claim for fraud.
(Dkt. 72, ¶¶ 289-296). Karma's claim is premised upon the evidence that LMC
fraudulently represented its intention to enter into a definitive agreement after the
Letter of Intent, then shared patently false and unsupportable vehicle production
numbers to induce Karma to work through the summer of 2020 to develop the
infotainment system LMC feigned interest in purchasing. All the while, in reality
Defendants were using their Karma moles, while those individuals were ***still
being paid by Karma***, to prepare a mass exodus of the Infotainment Division to
LMC, while having Karma pay the Former Employee Defendants to work for
LMC. (ASOF 71, DSOF, 99, SOF, 100, 463). Defendants seek summary
judgment on that claim on several grounds, none of which are availing.

First, LMC's argument that Karma's fraud claim is preempted under CUTSA
fails for the same reasons as it fails with Karma's other claims:  Defendants' fraud
claim is not based solely on the misappropriation of Karma's trade secrets, but

rather on LMC's misrepresentations throughout the due diligence period for the Endurance development project and in the LOI, that ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████ that LMC wished to enter into an agreement with Karma for the Endurance development project, that it and would "work together in good faith to negotiate, prepare, execute and deliver definitive agreements governing transactions contemplated therein." (ASOF, 167). The evidence shows that LMC never intended to enter into an agreement with Karma and that LMC's plan from the outset was to use Karma's employees and resources to set up its own in-house "West Coast Infotainment Group" in California, staffed largely with the Karma engineers who were assigned to work on the Endurance Project. (*See* pp. 1-4, *supra*). Despite knowing that it had no intention of retaining Karma for development of its Infotainment system, on February 24, 2020, LMC moved forward with the MNDA. (ASOF, 115), then worked for months to poach Karma's employees, sabotage its own efforts to build the very infotainments system it had asked Karma to tailor for use in the Endurance, and develop a West Coast Infotainment group while those employees were paid by Karma. (ASOF, 106-114, 120-121, 124-143, 145-149, 153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-247, 250-251, 261, 263-268, 273-274, 281-284). None of those actions have anything to do with trade secret misappropriation, and the only case cited by LMC does not allege any fraudulent acts **unrelated** to trade secret misappropriation. *See SHK Mgmt., Inc. v. Kilroy Realty Corp.*, 2014 WL 12561096, at *4–5 (C.D. Cal. Oct. 2, 2014).

Second, LMC's argument that it **did** negotiate in good faith, made without a specific citation to any portion of the record, fails. As set forth above, the evidence shows that LMC never had any intention of negotiating in good faith, but simply strung Karma along so that it could continue to solidify its scheme to poach Karma's employees while having them paid by Karma.

Finally, Karma reasonably and justifiably relied upon LMC's promises to negotiate in good faith as embodied in the LOI. The sole case cited by LMC, *Eurosemillas, S.A. v. PLC Diagnostics Inc.*, did not involve a written LOI like the one in this case, but instead a naked oral promise to potentially make an investment in a venture at some point in the future, without any evidence that the promise was baseless when it was made. No. 17-CV-03159-TSH, 2019 WL 2088479, at *11 (N.D. Cal. May 13, 2019) California law has long recognized a claim for fraud under circumstances like those presented by Karma here, where "[a] promise made without any intention of performing it." *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1261 (2002). LMC's plan to hire former Karma employees that had done all the work for the Endurance Project, and use Durre's position at Karma in overseeing the Endurance Project to sabotage the project and end the relationship between LMC and Karma, is more than sufficient evidence that LMC never had any intention of performing on its promise to negotiate in good faith.

With regard to the damages that it suffered as a result of LMC's fraud, Karma wasted an entire summer of work developing a business model in detrimental reliance on Defendants' false production numbers that could never have occurred: work that Karma never would have undertaken had LMC been honest about its intentions from the start. On April 29, 2020, LMC sent Karma a Request for Quotation ("RFQ") specifically representing ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████ (ASOF, 152). In that RFQ, ████████████████ ███████████████████████████████████████████ ██████████████████████████████ (ASOF, 152). In response,  Karma provided a directional quote in response to the RFQ, ██████████ ███████████████████████████████████████████

(ASOF, 156).   Karma then devoted significant resources toward developing a proposal for LMC's infotainment system and Karma's business development team spent dozens of hours discussing and negotiating the project internally and with LMC. (ASOF, 229, 502). Karma also developed source code for ████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ (DSOF, 237, 248-249, 285, 304, 503). Simply put, Karma would never have expended the resources that it did had LMC not falsely represented that it would negotiate in good faith, and had LMC not falsely represented its vastly inflated production numbers in its RFQ. (ASOF, 155-162, 504, 505). Summary judgment should thus be denied.

## XIV.  Karma's RICO Claims are Supported by Evidence and Facts.

Counts XXIV and XXV of Karma's First Amended Complaint assert claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c) and (d). (Dkt. 72, ¶¶ 297-329). Defendants argue that Count XXIV relating to the violation of 18 U.S.C. § 1962 fails for three reasons, none of which are correct.

### A.    The RICO Enterprise is Clearly Established: LMC's "West Coast Infotainment Team"

In order to establish liability under § 1962(c), a plaintiff must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *See Resol. Tr. Corp. v. Keating*, 186 F.3d 1110, 1117 (9th Cir. 1999) (citation omitted). Defendants argue, without any support, that Karma cannot establish the second prong of a RICO "enterprise" because LMC cannot constitute an enterprise for the purposes of RICO. Defendants are incorrect. An enterprise is clearly defined as "any individual, partnership, corporation, association, or *other legal entity* . . ."  18 U.S.C. § 1961(4) (emphasis added). Moreover, the sole purpose of the enterprise does not need to be conducted through the alleged pattern of racketeering activity.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 548

(9th Cir. 2007) a single "partnership," a single "corporation," a single

"association," and a single "other legal entity" are all enterprises.").

There is ample evidence that the LMC Individual Defendants and the

Former Employee Defendants conducted the affairs of LMC in an unlawful way

to, *inter alia*, misappropriate Karma's trade secrets, defraud Karma, and

tortiously interfere with its contracts and prospective economic advantage.

Indeed, emails between LMC's Chief Executive Officer, Steve Burns, and Chief

Technology Officer, Darren Post, discussed LMC's intention to hire away

Karma's employees even *prior to* executing the LOI. (ASOF, 104-120, 122, 125-

143, 145-149). In addition, the LMC Individual Defendants used LMC to hire

Former Employee Defendants in furtherance of the scheme to misappropriate

Karma's trade secrets.  (ASOF, 192).

Beyond LMC itself, the LMC Individual Defendants, LMC, and the

Former Employee Defendants constitute an enterprise through an association-in-

fact.  "To establish the existence of such an enterprise, a plaintiff must provide

both 'evidence of an ongoing organization, formal or informal,' and 'evidence

that the various associates function as a continuing unit.'" *Odom v. Microsoft

Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (*en banc*).  The Supreme Court

explained that "an association-in-fact enterprise is 'a group of persons associated

together for a common purpose of engaging in a course of conduct.'"  *Boyle v.

United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452

U.S. 576, 583 (1981)).  To prove an association-in-fact enterprise a party must

show "at least three structural features: a purpose, relationships among those

associated with the enterprise, and longevity sufficient to permit these associates

to pursue the enterprise's purpose." *Id.*

Ninth Circuit law is "unsettled as to whether the common purpose must be

fraudulent." *Gomez v. Guthy-Renker, LLC*, No. ED-CV-14-01425-JGB-KKX,

2015 WL 4270042, at *9 (C.D. Cal. July 13, 2015) (quoting *Chagby v. Target

*Corp.*, No. CV 08–4425–GKH(PJWX), 2008 WL 5686105, at *2 (C.D. Cal. Oct. 27, 2008) aff'd, 358 Fed.Appx. 805 (9th Cir. 2009). In this case, however, it is indisputable that the LMC Individual Defendants, LMC, and Former LMC Defendants created an association-in-fact with a purpose, a relationship among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.  The purpose was to create competing electric vehicles based on Karma's electric vehicle technology and the infotainment system similar to Karma's system. (ASOF, 100-379). The relationship among the LMC Individual Defendants, LMC, and Former Employee Defendants is a confined group of individuals that work together daily to create accomplish the purpose of the enterprise many of which moved from Karma to LMC as part of the enterprise. *Id.* The enterprise has the longevity to sufficient to pursue the enterprise's purpose, *i.e.*, developing an electric truck and an infotainment system similar to Karma's system.

### B.    Karma Established a "Pattern" of Racketeering Activity.

A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" within a ten-year period.  18 U.S.C. § 1961(5).  A plaintiff must show that these facts are sufficiently related and create a threat of continuing criminal activity.  *Okada v. Nevada Prop. 1, LLC*, No. SA-CV-14-0307-DOC-DFMx, 2014 WL 12792233, at *9 (C.D. Cal. Sept. 24, 2014).  Trade secret misappropriation and mail and wire fraud each constitute a "racketeering activity" as defined in § 1961(1).  The LMC Individual Defendants, LMC, and Former Employee Defendants acted together in having the Former Employee Defendants steal Karma trade secrets and do so using email and cloud-based platforms in violation of the Wire Fraud statutes.  (ASOF, 106-114, 120-121, 124-143, 145-149, 153-154, 159-160, 163, 165, 169, 186, 188-193, 195-214, 216-228, 232-236, 240-247, 250-251, 261, 263-268, 273-274, 281-284, 460-465; 466-472 ). Moreover, these acts were done while the Former Employee Defendants were still

employed at Karma. (SOF, 81-82, 144-145; 190; DSOF, 99-101, 143, 189). The evidence shows that the enterprise engaged in a pattern consisting of multiple Defendants on separate occasions steal Karma's trade secrets through email, external devices, and uploading to cloud based platforms before bringing them to LMC. (ASOF, 91, 100, 101, 175-182). Moreover, LMC continues to use and misappropriate Karma's trade secrets to this day: ████████████████ ██████████████████████████████████ ████████████████ (ASOF, 458).

The cases cited by Defendants do not support their argument that numerous related acts Defendants took to steal Karma's trade secrets do not amount to a pattern. In *Sever v. Alaska Pulp Corp.*, the Ninth Circuit, without discussing the alleged acts, determined that the defendants' actions blacklisting plaintiff from obtaining employment amounted to a single act. 978 F.2d 1529 (9th Cir. 1992). The Northern District similarly found no pattern where the alleged fraud was in service of the single goal of obtaining a Cisco contract. *GSI Tech. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG, 2014 WL 1572358, at *5 (N.D. Cal. Apr. 18, 2014). However, this exact argument was subsequently considered and rejected by later authority. *See Uthe Tech. Corp v. Allen*, No. C 95-02377 WHA, 2016 WL 1427557, at *3 (N.D. Cal. Apr. 12, 2016) (distinguishing *GSI Tech.* and holding that continuous acts to steal business form a single entity supported RICO claim); *see also*, *Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 759 (9th Cir. 2015) (reversing and remanding district court's dismissal of RICO claim explaining that plaintiff "was not required to show multiple schemes and multiple victims to demonstrate a pattern of racketeering activity") (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). Moreover, Defendants mischaracterize the court's decision in *Attia v. Google LLC* through altering the language. The court, in a footnote, reasoned that defendant's, which had no knowledge of the alleged trade secret theft, "'ongoing use' of trade secrets can somehow constitute

*two* predicate acts under RICO is entirely unsupported and illogical." *Attia v. Google LLC*, No. 17-CV-06037-BLF, 2018 WL 2971049, at *18 (N.D. Cal. June 13, 2018) (italics in original).  In other words, the court reasoned that pure use alone cannot constitute the *two* predicate acts required by the statute.  The defendants were not, as here, alleged to have stolen those trade secrets through several individuals over an extended period of time.[8]

### C.   Defendants Commit a RICO Conspiracy in Violation of 1962(d).

Contrary to Defendants' argument, and as set forth above, there is ample evidence to support Karma's RICO conspiracy claims. While Defendants claim that LMC cannot conspire with its own employees to violate RICO, this ignores the fact that the Former Employee Defendants were not employees of LMC at the time of their alleged acts. Indeed, some of the Former Employee Defendants still are not employees of LMC, and the presence of a single outside party is enough to satisfy the conspiracy requirement. (ASOF, 515). *See Chagby v. Target Corp.*, No. CV 08-4425-GKH(PJWX), 2008 WL 5686105, at *2 (C.D. Cal. Oct. 27, 2008), aff'd, 358 F. App'x 805 (9th Cir. 2009) (noting that adding a third party advertising agency working with the defendant corporation and employees satisfies the "distinctiveness requirement.") As to the other RICO conspiracy elements, a RICO conspiracy claim requires either (1) "an agreement that is a substantive violation of RICO," or (2) "that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  As explained above, Karma has provided evidence of both, and Defendants' Motion should be denied.

---

[8] With regard to Karma's RICO claims, Defendants again make a vague reference to their entitlement to summary judgment as to damages while referring generally to the same section of their brief alleging damages as a whole. (Mot., p. 38). Karma's response to those arguments are, as with other sections, addressed in further detail in Section XVI, *infra*.

**XV.   Karma's Claim for Violation of the Lanham Act is Sufficiently Proven.**

Count XXVI of Karma's First Amended Complaint is a claim for unfair competition under the Lanham Act based on Defendants' use of Karma's Trade Secrets to brand products as LMC products in commercial advertisements or promotions in interstate commerce.  (Dkt. 72, ¶¶ 330-337). The Lanham Act permits claims where "[t]he producer misrepresents someone else's goods or services as his own." *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28–30, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). This type of claim is known as a "reverse passing off" claim, which, in the Ninth Circuit, "requires the alteration of a product and a subsequent sale." *Luxul Tech. Inc. v. Nectarlux*, LLC, 78 F. Supp. 3d 1156, 1171 (N.D. Cal. 2015).  Contrary to Defendants' arguments, in a reverse passing off claim, there is no requirement for Karma to produce evidence that any Defendant "is using Karma's trademark."  (Mot., p. 39). Evidence that LMC is marketing a product designed, developed, and manufactured based on Karma's technology is sufficient. *Luxul Tech. Inc.*, 78 F. Supp. 3d at 1171. Here, there is evidence that Defendants stole substantial Karma code and passed that code off as its own for the design, development, and manufacturing of the Endurance. (ASOF, 466-472). Karma's source code is not simply an idea or concept that LMC incorporated into its products as LMC claims.  LMC used Karma's actual source code and passed it off as its own in designing, developing, and manufacturing the Endurance.  Because LMC took Karma's actual source code and passed it off as its own, Karma's reverse passing off claim is actionable and constitutes an Lanham Act violation. As far as likelihood of confusion, "many courts presume the likelihood of confusion when deliberate copying is proven." *Supreme Food, Inc. v. Hai Fend Corp.*, No. CV149968DMGFFMX, 2016 WL 11746806, at *4 (C.D. Cal. Oct. 4, 2016). Defendants' Motion should be denied.

**XVI.   Karma Established its Damages.**

Lastly, Defendants' Motion for Summary Judgment attempts to challenge

the **exact amount** of damages claimed by Karma and the **causal nexus** of those damages, neither of which is valid or ripe for resolution at summary judgment.

Under California law, "[w]here the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." *Sargon Enters., Inc. v. Univ. of S. California*, 55 Cal. 4th 747, 774 (2012). Rather, the law "requires only some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Den-Mat Holdings, LLC v. CAO Grp., Inc.*, No. 18-6358, 2019 WL 3890825, at *12 (C.D. Cal. Aug. 19, 2019) (denying summary judgment); *accord MCI Commc'ns Servs., Inc. v. Skanska-Traylor-Shea*, No. 19-1294, 2021 WL 2170333, at *3 (C.D. Cal. May 18, 2021) (same). That the amount of damages "may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999) (applying California law); *see also California Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 486-87 (1955) ("[W]hen it clearly appears that a party has suffered damage a liberal rule should be applied in allowing a court or jury to determine the amount . . . uncertainty as to the exact amount is no reason for denying all recovery.").

Here, Defendants, without authority and in contravention of their contractual and common-law duties, stole Karma trade secrets and confidential information. (ASOF, 4-70). Defendants then used this Karma information—namely, Karma source code, bills of material data, and technical specifications—to aid LMC's development of its Endurance truck. *Id.* In support of its damages assessment, Karma provided the comprehensive report of its expert, Daniel McGavock, an accountant and IP-valuation expert with over thirty-five years of experience. (DSOF, 213, ASOF, 443, 494). McGavock's report employs "reasonable"—and, indeed, industry standard—methods of calculation and is supported by competent evidence, including historical financial data of both

1    Karma and LMC and ███████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████ (ASOF 443, 447).

4            It is well-settled that the amount of damages is a question of fact, not

5    proper for summary adjudication. *Young v. Wideawake Death Row Ent. LLC*, No.

6    10-1019, 2011 WL 12565250, at *12 (C.D. Cal. Apr. 19, 2011). Causation,

7    likewise, is generally a question of fact for the jury. *Carson Harbor Vill., Ltd. v.*

8    *Unocal Corp.*, 287 F. Supp. 2d 1118, 1200 (C.D. Cal. 2003). Even accepting

9    them at face value, Defendants' arguments, "disputing the calculations made and

10   conclusions reached" in McGavock's report "merely establish [] a genuine issue

11   of material fact," precluding summary judgment. *W. Pac. Elec. Co. v.*

12   *Dragados/Fatiron*, 534 F. Supp. 3d 1209, 1257-58 (E.D. Cal. 2021); *see also*

13   *MCI*, 2021 WL 2170333, at *3 (whether damages can be "calculated to the

14   requisite degree of certainty" is a "factual dispute [that] precludes summary

15   judgment"). Each of Defendants' challenges to Karma's categories of damages

16   fail or, at most, present genuine issues of fact, defeating Defendants' Motion.

17          **A.      Damages Relate to the Endurance Project with LMC.**

18          Defendants' argument that Karma is foreclosed from damages flowing

19   from LMC's breach of the LOI contradicts controlling case law. (Mot. at 18-19).

20   In fact, in *Copeland v. Baskin Robbins*, 96 Cal. App. 4th 1251 (2002), the sole

21   authority Defendants cite for this proposition, the court ***recognized*** a cause of

22   action for a breach of contract to negotiate an agreement. *See id.* at 1255.

23   Relevantly, the LOI obligates LMC to, *inter alia*, "in good faith negotiate" certain

24   ancillary agreements, which it failed to do when it unjustifiably terminated the

25   LOI. (ASOF, 167). California law is also clear that a "letter of intent can

26   constitute a binding contract." *California Food Serv. Corp. v. Great Am. Ins. Co.*,

27   130 Cal. App. 3d 892, 897 (1982). Most importantly, Defendants' classification

28   of Karma's damages as being only ones for lost profits is ***false***. Karma's losses

with respect to Defendants' improper motives for entering into, and unjust termination of, the LOI stem from Karma's lost business opportunities and detrimental reliance on Defendants' representations and conduct. *See* 96 Cal. App. 4th at 1262-63 (allowing for opportunity and reliance damages). In this way, the amounts reflected in Section 6 of McGavock's report are projections based on the value of Karma's proprietary and confidential technologies used in the ill-fated Endurance project stolen, not lost profits. It is a measure of the damages, or value, because of the conduct, not lost profits.

Similarly unpersuasive is Defendants' reliance on the "new-business rule" in damages evaluations. (Mot. at 43). It is undisputed that Karma is ***not*** an "unestablished" or "new" business and in fact has been operational, developing, producing, and selling electric vehicles—including the technologies therein—for years. (ASOF, 2, 491). *PerkinElmer Health Scis., Inc. v. SCR Living LLC*, No. 20-2083, 2022 WL 3130237, at *5 (C.D. Cal. June 22, 2022) (where business is "operational," new-business rule does not apply). "The ultimate test is whether there has been operating experience sufficient to permit a reasonable estimate of probable income and expense," a test decidedly met by the historical data and projections outlined in McGavock's report. *Maggio, Inc. v. United Farm Workers*, 227 Cal. App. 3d 847, 870 (1991) (rejecting "new business rule" as being "completely without merit," noting plaintiff "was not a new business").

Meanwhile, Karma's damages—supported by historical financial data and credible expert opinion—are nowhere near as specious as those in the cases Defendants cite, many of which were not determined on summary judgment. *See Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.*, 2011 WL 13143358, at *3 (N.D. Cal. Nov. 23, 2011) (granting Rule 50 motion, after presentation of evidence, where damages claims were based on speculative assumptions, including that Chinese company would be able to sell medicine in highly regulated U.S. market and that new business would attract "major investors");

*Grouse River Outfitters Ltd. v. Oracle Corp.*, No. 16-2954, 2019 WL 8918902, at *8 (N.D. Cal. June 21, 2019) (granting motion *in limine* where expert did "not point to any facts or data" to support claims); *Goodness Films, LLC v. TV One*, No. 12-8688, 2014 WL 12594201 (C.D. Cal. Aug. 28, 2014) (granting summary judgment where plaintiffs presented "*no* admissible evidence capable of proving the extent of their lost-profit damages") (emphasis in original).

Although "there will always be an element of uncertainty" when evaluating profit-related damages, the California Supreme Court cautioned that "[c]ourts must not eviscerate the possibility of recovering lost profits by too broadly defining what is speculative." *Sargon*, 55 Cal. 4th at 775. While Karma will never know precisely the financial gain it would have realized but for Defendants' misconduct, that is not the test when calculating damages. Karma must only show a reasonable approximation, especially where, as here, "it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits." *Marsu*, 185 F.3d at 938-39.

Finally, Defendants' attempts to discredit McGavock on the basis that he relied on Karma business projections when rendering his opinions fail because such projections are routinely used in calculating damages. *See S. Jon Kreedman & Co. v. Meyers Bros. Parking-W Corp.*, 58 Cal. App. 3d 173, 185 (1976) (describing such projections as "routine in calculating" future damages); *see also Meister v. Mensinger*, 230 Cal. App. 4th 381, 397 (2014) ("working experience of business" and "data reflecting probable future volume" acceptable proxies for ascertaining lost profits). These Karma projections appropriately took into consideration the prices ███████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████ (ASOF, 448).[9] That McGavock relied on

---

[9] While Defendants seize on McGavock's alleged description of the projections as not being ██████████████████ that was not McGavock's testimony. As McGavock noted in the errata sheets to his deposition, it was Defendants' counsel

prelitigation projections developed by Karma—who was in the best position to contemporaneously assess costs and revenue—does not negate the reasonableness of his valuations. *See Vieste, LLC v. Hill Redwood Dev., Ltd.*, No. 09-4024, 2011 WL 5914019, at *9 (N.D. Cal. Nov. 28, 2011) (denying summary judgment where plaintiff's expert relied on prelitigation projections developed by party).

### B. Karma's Evidence of Unjust Enrichment Damages is Sufficient.

Karma sufficiently demonstrated evidence of unjust enrichment. Importantly, Defendants do not dispute that Karma may recover unjust enrichment or "head start" damages—i.e., damages reflecting the time and money LMC "saved from not having to develop the trade secrets itself." *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-3428, 2013 WL 890126, at *8 (N.D. Cal. Jan. 23, 2013); *see Sonoma Pharms., Inc. v. Collidion Inc.*, No. 17-1459, 2018 WL 3398940, at *6 (N.D. Cal. June 1, 2018) (collecting cases that availability of such damages is well-settled).

As to damages based on "avoided costs" or ill-gotten savings on research and development costs, Defendants only argue that Karma ███████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████ (Mot. at 45). This argument fails primarily because LMC offered no explanation as to how the materials Defendants misappropriated were only a "small part" of each of the systems at issue. And, this contrived argument misses the point of the unjust enrichment theory of damages: that, because of Defendants' theft of trade secrets, LMC realized a head-start benefit of reduced time and costs ***in the aggregate***. *See Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1305 (2010) (unjust enrichment can be calculated based on cost savings or increased productivity and "[r]ecovery is not prohibited just because the benefit cannot be precisely measured").

---

who characterized those projections as ███████████████ (ASOF, 449).

1   The unfair benefit accruing to Defendants by virtue of their stealing and

2   using Karma's trade secrets is clear. As to the key systems of infotainment, power

3   moding, and E/E architecture, for example, the record shows that LMC ████████

4   ████████████████████████████████████

5   ████████████ (ASOF, 444, 445). Karma, meanwhile, spent ████████

6   ████████████████████████████████████████

7   ████████████████████ (ASOF, 446). Tellingly, Defendants'

8   purported expert, Scott Andrews, admitted that LMC ████████████████

9   ████████ the power moding specifications Defendants unlawfully took from

10  Karma. (ASOF, 458). Again, the fact of Defendants' misappropriation is not in

11  dispute, and Defendants' arguments as to the amount of damages and the causal

12  link between their misconduct and their unjust gains are for the trier of fact.

13  Karma also brought forth more than sufficient evidence showing the

14  accelerated development timeline Defendants enjoyed as a result of their unlawful

15  conduct. Defendants argue that Karma cannot, as a matter of law, establish

16  damages premised on LMC's accelerated development because the ████████████

17  ████████████████████████████████ (Mot. at 46).

18  Framing McGavock's opinion as relying only on ████████████████—

19  which LMC itself embraced and promoted—is overly simplistic and obscures the

20  bases of McGavock's calculations. McGavock's report explains ████████

21  ████████████████████████████████████████

22  ████████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████ (ASOF 516). Rather than being "hopelessly flawed," as

26  Defendants suggest, McGavock's report sets a foundation for damages—*i.e.*, a

27  reasonable calculation—and properly reserves for the trier of fact a determination

28  of the amount of damages to be awarded. (ASOF, 450-453).

Similarly, Defendants' general argument that LMC is not profitable "does not mean [LMC] was not unjustly enriched" or avoided time and costs to develop its electric vehicle technology. *PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co.*, No. 21-2288, 2022 WL 3724094, at *4-5 (3d Cir. 2022) (affirming award of damages based on costs defendant "avoided by misappropriating the fruits of [plaintiff's] work"). The benefit inured to LMC "need not be a profit that was realized; it can be a cost that was avoided." *Id.* at *4; *see also Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 709-10 (9th Cir. 2003) (affirming $ 9 million judgment where evidence showed that defendant saved years in development by virtue of misappropriation).

Finally, Defendants' argument that capital raised by LMC is not causally related to Defendants' misconduct ignores █████████████████████████ ██████████████████████████████████████████████ █████████████████████████ (ASOF, 517). Moreover, Karma presented evidence that certain of LMC's representations to investors— including that ██████████████████████████████████████████ █████████—were based upon gaining access to Karma's trade secrets and confidential information. (ASOF, 456). The questions of whether, and how much of, LMC's ████████████████ can be attributed to Defendants' misconduct are ones for the jury. *See Carson*, 287 F. Supp. 2d at 1200. Causation is "rarely an issue suitable to disposition by summary judgment when material facts are disputed," as in the instant case. *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, No. 18-1927, 2021 WL 4895977, at *17 (S.D. Cal. Oct. 20, 2021) (denying summary judgment on trade secret and breach of contract claims).

Defendants' challenges to Karma's claims for damages are either incorrect or are predicated on "[c]redibility determinations, weighing of evidence," or drawing inferences from facts, all of which are fact issues. Summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### C.     The LMC Individual Defendants' Unjust Enrichment

Karma has also set forth more than sufficient evidence of the LMC Individual Defendants' unjust enrichment. Karma has proffered competent evidence showing that Defendants used, and continue to use, Karma confidential, proprietary, and trade secret information to solicit and obtain investors. For example, LMC used and relied on the Karma misappropriated Karma technologies to represent to potential investors ███████████████████ ████████████████████████████████████ (ASOF ¶ 454-459, 495). LMC's also realized substantial investment and capital infusion resulting from Defendant's misappropriation of Karma trade secrets, ████████ ████████████████████████████████ ██████████████ (ASOF, 280, 423). Significantly, and as detailed in McGavock's report, ████████████████████████ ████████████████████████████████████████ ████████████████████████████ ███████████████ (ASOF, 423-442). McGavock's report uses publicly available shareholder information in tandem with well-settled methods to compute the LMC Individual Defendants' realized gains. *Id.*

Defendants' insistence that Karma must present a "sophisticated statistical analysis of [] various factors" is not only a vague and undeveloped argument, but is also predicated entirely on inapposite authority. (Mot. at 48). The case of *In re Imperial Credit Industries Securities Litigation*, 252 F. Supp. 2d 1005 (C.D. Cal. 2003), described the "method for the evaluation of materiality damages to a class of stockholders" in securities litigation and spoke to the way to calculate "[d]amages in a securities fraud case." *Id.* at 1014. This is not a securities-fraud case, and Defendants provide no authority for their blanket proposition that the method of calculation in securities litigation is the ***only*** acceptable way of calculating unjust enrichment damages in a trade-secret misappropriation case. In

fact, the cases discussing unjust enrichment calculations promote a much more flexible approach, which holds especially true at the summary judgment phase. *See B. Braun Med., Inc. v. Rogers,* No. 03-56193, 2006 WL 92879, at *3 (explaining that a plaintiff can still recover unjust enrichment damages even though an appropriating party's gains "are not entirely traceable to its misappropriation"); *Digital Envoy, Inc. v. Google, Inc.*, No. 04-1497, 2005 WL 2999364, at *5 (N.D. Cal. Nov. 8, 2005) ("[A] party's trade secret need not be the sole source of a defendant's [gains] where a plaintiff has shown some causal nexus between such [gains] and use of its trade secrets.").Construing all inferences in its favor, Karma has established damages based on the LMC Individual Defendants unjustly-acquired capital gains. Defendants' arguments are only ones related to causation, an issue that typically resists resolution on summary judgment. *See Workplace Techs.*, 2021 WL 4895977, at *17. Whether and to what extent Defendants' representations and promises to investors—informed, in part, by Defendants' theft of Karma trade secrets—resulted in the LMC Individual Defendants' sizeable stock gains present triable issues of fact.

## CONCLUSION

WHEREFORE, Plaintiff Karma Automotive, LLC respectfully requests that this Court deny Defendants' Motion for Summary Judgment in its entirety, and grant Plaintiff any other relief that the Court deems appropriate.

DATED: October 10, 2022                    Respectfully submitted,


                                           SEYFARTH SHAW LLP
                                           By: */s/ Michael D. Wexler*
                                           Attorneys for Plaintiff

50