# EXHIBIT E

# Shen Zhang Deposition (8/30/2022)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                     *  *  *
 4   KARMA AUTOMOTIVE, LLC,
     a California limited liability
 5   company,
 6         Plaintiff,
 7         vs.            CASE NO. 8:20-CV-02104-JVS-DFM
 8   LORDSTOWN MOTORS CORP., an
     Ohio Corporation; STEVE BURNS,
 9   an individual; JOHN LEFLEUR,
     an individual; DARREN POST,
10   an individual; RICH SCHMIDT,
     an individual; ROGER J. DURRE,
11   an individual; HONG XIN HUAN
     (A.K.A. "GEORGE HUAN),
12   an individual; BEI QIN,
     an individual; STEPHEN PUNAK,
13   an individual; CHRISTOPHER KIM,
     an individual; DAN ZHIHONG HUANG,
14   an individual; PUNAK ENGINEERING, INC,
     a California corporation; and
15   DOES 1 through 50, inclusive,
            Defendants.
16
                        *  *  *
17
             Remote deposition of SHEN ZHANG,
18
     Witness herein, called by the Defendants for
19
     cross-examination pursuant to the Rules of Civil
20
     Procedure, taken before me, Kathy S. Wysong, a
21
     Notary Public in and for the State of Ohio, at
22
     9950 Jeronimo Road, Irvine, California, on
23
     Tuesday, August 30, 2022, at 11:00 a.m.
24
                        *  *  *
25
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 2

1                    EXAMINATION CONDUCTED          PAGE

2       BY MR. WALSH:.........................     4

3

4                         EXHIBITS MARKED

5       (Exhibit 0001, Plaintiff Karma

6       Automotive, LLC's disclosures

7       pursuant to Federal Rule of Civil

8       Procedure 26(a)(2) was marked for

9       purposes of identification.)..........    29

10      (Exhibit 0002, KARMA0013295-13304,

11      was marked for purposes of

12      identification.).....................    68

13      (Exhibit 0003, expert report of

14      Daniel McGavock, was marked for

15      purposes of identification.)..........   162

16      (Exhibit 0004, KARMA0322137, was

17      marked for purposes of

18      identification.).....................   175

19

20

21

22

23

24

25

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 3

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3          Seyfarth & Shaw
 4      By:  Michael D. Wexler
            233 South Wacker Drive
 5          Suite 8000
            Chicago, Illinois  60606
 6          312-460-5000
            mwexler@seyfarth.com
 7
        On behalf of the Defendants:
 8
            Baker & Hostetler LLP
 9
        By:  Joseph H. Walsh
10          Anthony B. Ponikvar
            Attorneys at Law
11          127 Public Square
            Suite 2000
12          Cleveland, Ohio  44114
            216-861-7099
13          jhwalsh@bakerlaw.com
            aponikvar@bakerlaw.com
14
     ALSO PRESENT:
15
            Robert Miller, Videographer
16
                      *   *   *
17
18
19
20
21
22
23
24
25
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 4

1              THE VIDEOGRAPHER:  We're on the

2     record.  You may swear the witness.

3                      SHEN ZHANG

4     of lawful age, Witness herein, having been first

5     duly cautioned and sworn, as hereinafter

6     certified, was examined and said as follows:

7                    CROSS-EXAMINATION

8     BY MR. WALSH:

9          Q.   Good morning, Mr. Zhang.  Would you

10    please state your full name for the record?

11         A.   Shen, S-H-E-N, Zhang, last name is

12    Z-H-A-N-G.

13         Q.   And you pronounce that Zhang?  I'm

14    sorry.

15         A.   Zhang.

16         Q.   Zhang.  Okay.  Well, thank you for

17    your time today.  My name is Joe Walsh.  I'm one

18    of the attorneys from BakerHostetler representing

19    the defendants in this case.  And before we begin,

20    I'd like to go over just some basic ground rules

21    which you may already be familiar with.

22              First, I'll be asking the questions

23    today and you'll be giving answers.  Kathy, the

24    court reporter, must record all our questions

25    and -- all my questions and your answers, and so

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 5

1    Kathy needs audible responses.  Head shakes and

2    nods will not do.  So can you please give audible

3    answers today?

4              A.   Yes, I will.

5              Q.   And second, I ask that you please

6    wait to start your answer until I finish my

7    question, and I will do the same for you.  I will

8    not ask another question until you finish your

9    answer, and that helps Kathy as well.  Does that

10   sound okay?

11             A.   Yes.

12             Q.   Third, if you do not understand one

13   of my questions, please let me know and I will try

14   and rephrase.  If you do answer one of my

15   questions, I will take that to mean that you

16   understood my question.  Does that sound okay?

17             A.   Yes.

18             Q.   And, fourth, if you need a break at

19   any point in time, please let me know.  You know,

20   whether you need to refresh that coffee or run to

21   the bathroom.  I'll plan to take a break every

22   hour or so and we'll go from there.  Does that

23   sound okay?

24             A.   Yes.

25             Q.   Okay.  Do you understand that you are

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 6

1    testifying under oath today?

2              A.    Yes.

3              Q.    Is there any reason that you are

4    unable to give accurate and complete testimony?

5              A.    No.

6              Q.    Where are you located today?

7              A.    I'm in Irvine, California at company

8    office.

9              Q.    Are those Karma's offices?

10             A.    Yes.

11             Q.    And what's the address?

12             A.    9550 Jeronimo Road, Irvine,

13    California.

14             Q.    Is there anyone else in the room with

15    you today?

16             A.    No.

17             Q.    Is that your personal office that you

18    are in?

19             A.    Yes.

20             Q.    You understand that you are

21    testifying today in a case filed by Karma

22    Automotive, LLC against Lordstown Motors Corp. and

23    certain individuals?

24             A.    Yes.

25             Q.    Are you okay if I refer to Karma

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 7

```
 1   Automotive, LLC as Karma?

 2          A.   Yes.

 3          Q.   And are you okay if I refer to

 4   Lordstown Motors Corp. as LMC or Lordstown?

 5          A.   Yes.

 6          Q.   And are you okay if I refer to the

 7   individual defendants just as defendants

 8   generally?

 9          A.   If you're talking about generally,

10   yes.

11          Q.   Okay.  And I guess if I talk

12   generally about defendants, is it okay -- you

13   understand that I'm referring to Lordstown and the

14   individuals; is that right?

15          A.   Yes.

16          Q.   Okay.  You have been deposed before,

17   correct?

18          A.   Correct.

19          Q.   You've been deposed before twice in

20   this case, right?

21          A.   Yes.

22          Q.   Have you been deposed in other cases?

23          A.   Yes.

24          Q.   How many times?

25          A.   Two times before this -- before this
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 8

```
 1   case.
 2          Q.   When were those depositions?
 3          A.   It's a long time ago.  Thirty years
 4   ago.
 5          Q.   Both of those depositions were thirty
 6   years ago?
 7          A.   Yes.  That was one case, yeah.
 8          Q.   What was that case about?
 9          A.   That was also related to intellectual
10   property between two companies.
11          Q.   Do you know -- what companies?
12          A.   That was between Mentor Graphics and,
13   if I remember correctly, it's Meta Systems or a
14   small -- a French company.
15          Q.   Did you work for one of those
16   companies?
17          A.   Yes, I was working for Mentor
18   Graphics.
19          Q.   Were you deposed as an employee then
20   in that case?
21          A.   Yes, and also as an expert.
22          Q.   What -- what -- what were your expert
23   opinions in that case?
24          A.   It was regarding their software, the
25   value of the software, the completeness of the
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 9

```
 1   software.

 2           Q.    What type of software?

 3           A.    It's EDA.

 4           Q.    E as in Edward, D as in dog, A as in

 5   apple?

 6           A.    Yes.

 7           Q.    And what is EDA?

 8           A.    It is electronic design automation.

 9           Q.    Can you explain what EDA software

10   does or relates to?

11           A.    The software is used to design

12   electronic chips, ICs, interconnect circuits.

13   It's -- the software runs a simulation.  It's a

14   software runs a hardware and it's to simulate your

15   design, the connectivities, the computings, and

16   what have you.

17           Q.    Is EDA software used in vehicles --

18   automotive vehicles?

19           A.    There's so many different type of EDA

20   softwares.  So from a -- the EDA, just say is very

21   broad term.  If you run a design in

22   microprocessor, you use EDA software.  If you

23   design an electrical circuit, you use EDA

24   software.  If you design wire harness for

25   electrical distribution -- distribution systems
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9940
ATTORNEY'S EYES ONLY

Page 10

1    for a vehicle, you use EDA software.

2            Q.    Does the EDA software in that case

3    that you testified -- or that you served as an

4    expert for, was that software related to a

5    specific industry?

6            A.    That -- mostly it's the software for

7    electronic circuitry design.

8            Q.    Okay.

9            A.    The semiconductor industry.  Sorry,

10   I'm a little bit under the weather so I have sore

11   throat.

12           Q.    Understood.  I'm sorry to hear that.

13                 Other than those two depositions in

14   that case from thirty years ago, any other

15   depositions?

16           A.    No.

17           Q.    Did you testify at trial in that case

18   from thirty years ago?

19           A.    No.  That was settled.

20           Q.    Have you ever testified at trial?

21           A.    No.

22           Q.    Did you submit an expert report or

23   disclosure in that case from thirty years ago?

24           A.    No.

25           Q.    Have you served as an expert in any

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 990352
ATTORNEY'S EYES ONLY

Page 11

```
1    other cases?

2           A.    No.

3           Q.    Do you know what court that case was

4    in from thirty years ago?

5           A.    I don't remember.  It was in Oregon,

6    and I think some of the lawyers came from France

7    or I --

8           Q.    Okay.  The best you can remember is

9    it may have been in an Oregon court?

10          A.    Yeah.  I don't know where it end up

11   with.  It's -- the company acquired this -- the

12   company from France.  I was getting involved

13   because I was sent to do a -- to do a technical

14   due diligence and a transition and I guess after

15   that there's some dispute --

16          Q.    Okay.

17          A.    -- on what -- what the IT bought

18   included.

19          Q.    Okay.  So your testimony -- your

20   testimony in that case was related to whether a

21   company paid the right price for certain software?

22          A.    Yeah, whether it's complete, whether

23   it did have this process as they kind of claimed,

24   you know, what have you.

25          Q.    Got it.  Okay.  Have you ever
```

Page 12

1    published any papers, articles, or other writings?

2         A.   I don't remember or recall.  I may

3    have some in prior years.

4         Q.   Do you recall writing any

5    peer-reviewed articles?

6         A.   No.

7         Q.   Any peer-reviewed papers?

8         A.   No.

9         Q.   If you had written any papers or

10   publications, would they be stored somewhere?

11        A.   Yeah, if I -- if I did, of course.

12        Q.   Do you know where they might be?

13        A.   I don't remember.  I did a few talks

14   at conferences, but I don't remember I publish any

15   articles in technical journals or, you know, this.

16        Q.   Do you have, like -- do you have a

17   list of conferences or, you know, talks you've

18   given?

19        A.   I have to go back to my notes and

20   memory to remember.

21        Q.   Do you recall any specific talks

22   today that you gave?

23        A.   Last year I gave a talk to an

24   insurance company as a guest because the insurance

25   company want to see how from an automotive

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 13

1    industry looking at insurance and how the new

2    technology going to impact the insurance industry.

3            Q.   Got it.  Any other talks you remember

4    today?

5            A.   Yeah, I give talk in 2018 or '19.

6    It's a conference in China.  I gave talk on the

7    Karma -- the concept of the new -- the trends of

8    the industry and Karma's view of the trends for

9    electrical architecture.

10           Q.   Was that talk given to a specific

11   company or --

12           A.   That's a conference.

13           Q.   Okay.  Do you remember what the

14   conference was for or who hosted it?

15           A.   I think it's China Automotive -- I

16   don't remember exact name.  It's a yearly kind of

17   conference -- it's a yearly conference with

18   automotive companies and showrooms and mechanics

19   and they gather together and talk about the future

20   of automotive industry.

21           Q.   Where was that conference, if you

22   remember?

23           A.   It was in Shanghai, China.

24           Q.   You said 2018 or -- is that when?

25           A.   Yeah.  I think it's 2018.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 14

1          Q.    Do you have a copy of the talk that
2    you gave at that conference?

3          A.    I might be able to find it.

4          Q.    Okay.  Any other conferences or talks
5    come to mind today?

6          A.    No.

7          Q.    Okay.  Did you do anything to prepare
8    for today's deposition?

9          A.    I read my disclosure.

10         Q.    Anything else?

11         A.    I spoke to my lawyer, Mr. Wexler.

12         Q.    Anything else?

13         A.    Not much.

14         Q.    Okay.

15         A.    Get up early today to get to office
16    on time.

17         Q.    Yeah.  I'm sorry for the early start.

18               Did -- when did you speak with
19    Mr. Wexler?

20         A.    Last -- last Monday or Tuesday.

21         Q.    Last month you said or last week?
22    I'm sorry.

23         A.    No, last Monday or Tuesday last week.

24         Q.    Oh, last -- okay.  Last Monday or
25    Tuesday?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 15

1          A.    Yeah.

2          Q.    Do you recall how long that

3    conversation was?

4          A.    It's -- it's about an hour or so.

5          Q.    Okay.  And you said that you read

6    your disclosure, correct?

7          A.    Yes.

8          Q.    Did you read or review any other

9    documents before for today's deposition?

10         A.    No, nothing specific.

11         Q.    Did you review any documents cited

12   within your dec -- within your disclosure?

13         A.    No, I did not.

14         Q.    Did you review your deposition

15   transcripts or declarations?

16         A.    Transcript of -- sorry, I'm not

17   completely understanding your question.

18         Q.    Did you review your declarations that

19   you previously submitted in this case?

20         A.    Yes.

21         Q.    And did you review the printout of

22   your deposition testimony in this case before

23   today's deposition?

24         A.    No, not -- no.

25         Q.    Okay.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 16

1        A.   I read it before, but I -- I did not

2   re-read it.

3        Q.   Okay.  Did you speak with any current

4   or former Karma employees about today's

5   deposition?

6        A.   Only I let my boss know I will be --

7   skip all the meetings today.

8        Q.   And who is your current boss?

9        A.   Kevin Zhang.

10        Q.   Okay.  Mr. Zhang, you did not submit

11   or attach a resume with your disclosure; is that

12   right?

13        A.   I don't remember I did.

14        Q.   Okay.  I'll represent to you that you

15   did not submit a CV or resume with your

16   disclosure.  Is that fair?

17        A.   Yes.

18        Q.   Do you recall discussing your

19   LinkedIn profile at your first deposition?

20        A.   Yeah, I think the first time they

21   went through my LinkedIn, my prior experience.

22        Q.   Yeah.  Do you recall answering

23   questions from my colleague, Mr. Lucchesi about

24   your schooling and your work experiences?

25        A.   Yeah.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 17

1         Q.   Any reason to think that the answers

2    you provided at that first deposition are not true

3    and accurate today?

4         A.   No, that -- not, you know, I know of.

5         Q.   Okay.  You joined Karma in December

6    of 2015, correct?

7         A.   December or November.  Late November,

8    something.  Yeah.  Yeah, I remember right after

9    Thanksgiving.

10        Q.   Okay.  So right after Thanksgiving in

11   2015 is when you started at Karma?

12        A.   Yes.

13        Q.   And are you still employed by Karma?

14        A.   Yes.

15        Q.   What is your current title?

16        A.   My current title is vice president,

17   electrical engineering.

18        Q.   And has that been your title for the

19   entire time you've worked at Karma?

20        A.   Yes.

21        Q.   Can you explain what you do as the

22   vice president of electrical engineering?

23        A.   I oversee the entire design of the

24   electrical -- the whole vehicle electrical

25   architecture.  That includes from the electrical

Page 18

 1   distribution, communication, diagnostics, the

 2   power management, and the whole validation

 3   process.  Also I'm responsible for the vehicle

 4   level of software configuration management and

 5   release.

 6         Q.   Configuration management and release;

 7   is that right?

 8         A.   Yes.  I'm responsible for all the

 9   electrical component that comes into the vehicle

10   system, how the power get connected, how the data

11   get communicated.

12         Q.   Okay.

13         A.   The quality control side,

14   infotainment -- quality control electronics and

15   components, the cockpit control, infotainment,

16   hardware and software.  Also I'm responsible for

17   the connected service, software development and

18   release.

19         Q.   That's a lot of stuff.

20         A.   Yeah.

21   ████         ██████████████████████████████████

████   ███████████████████████████

████   ████         ██████████████████

████   ████         ████████████████████

████   ████         ██████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 19

1

4         Q.    I kind of want to get a better

5    understanding of some of the things you just said.

6    Electrical architecture relating to diagnostics,

7    what is that?

8         A.    It -- the arch -- the diagnostics is

9    part of the architecture.  Architecture is

10   defining how different communication taking place,

11   the protocols and how different modules talking to

12   each other.  Modern day age automotives or

13   electronics, we're able to detect or in many cases

14   remotely detect the failures or the conditions of

15   the component.  So that's part of the diagnostics.

16              It's also a protocol, you design --

17   you say, okay, if this happening, you should tell

18   me this.  So think about if a sensor, a sensor

19   malfunction, so what the -- how the system knows

20   the sensor is malfunction.  So the sensor need to

21   send a certain message to the system.  The system

22   need to understand where to capture that

23   information and how to interpret that.

24              Or if system detects something not

25   perform as designed, the system can send a set of

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9086
ATTORNEY'S EYES ONLY

Page 20

```
 1   command to the suspected modules, say, okay, tell
 2   me you rate one to three, a yellow or that's a
 3   blue.
 4            So based on this type of
 5   communications, you can make determination whether
 6   there's something wrong with the sensor or there's
 7   something else.
 8        Q.   Got it.  I think you also said
 9   communication -- electronic architecture
10   communication falls under your supervision.  Is
11   that communication within the vehicle or with the
12   outside world?
13        A.   Both.
14        Q.   Both.  What did you mean -- what do
15   you mean by connected service?
16        A.   A connected service is you have
17   vehicle, you have the Internet, you have your
18   desktop, you have the mobile phones, you have your
19   service portal, that's a service delivered through
20   the wireless connectivity.  That can be a WiFi,
21   that can be a cellular, that can be a Bluetooth
22   that remotely can access, whether near range or
23   far range to the vehicle, that can deliver
24   service.  Remote diagnostics is a typical one.
25   Over-the-air firmware updates.  We can do a
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 21

1    precondition of the vehicle.  You can extend that

2    to kind of telematics, fleet management, you know,

3    there are many publications now all kind of the

4    part of the connected service.

5            Q.   Got it.  And you also said

6    validation.  Is that relating to kind of

7    regulatory certifications?

8            A.   I do not own or responsible.  There's

9    a vehicle integration organization that owns the

10   commerce certification.

11           My responsibility is from a design

12   specification from a regulatory requirement, not

13   the certification.  I have to deliver to the

14   certification team that needs the -- for example,

15   the MFVSS requirements, right.  So there's design

16   targets and there's regulatory target, and when I

17   deliver the component, when I design the system,

18   it has to work together to meet these requirement.

19   We go through very rigid test procedures and go

20   through different cycles.  We validate everything.

21   Yeah.

22           Q.   I think you also said cockpit

23   control.  What is that?

24           A.   Yeah, the cockpit control is your --

25   you control the temperatures, you control your

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 22

```
1    radio, flip on/off your cameras, your IP lights,
2    turn on the audios.  That's all the cockpit
3    functionalities.
4            Q.   How -- how does that differ from
5    infotainment?
6            A.   The infotainment is -- mostly means
7    the radio audio, how you listen to music, how you
8    connect to navigations, and things, not
9    necessarily made for the in-vehicle comfort.
10           Q.   Are there any other components of
11   infotainment besides radio, audio, and navigation?
12           A.   That's traditional infotainment.
13   That's, you know, the -- it's really the dash
14   radio, that's what started, and now with the smart
15   infotainment system, you have connectivities, you
16   have other functionalities, but now the industry
17   talking about is really the cockpit control and
18   infotainment kind of combine because the
19   infotainment is from the information and
20   entertainment side, right.  So that's the driving
21   information and how it gets played, but now the
22   control the ergonomics, and how easy to control is
23   the moonlight and all the things not necessarily
24   in the traditional infotainment term.  But very
25   often these are the functionalities leverage from
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 23

1    the hardware -- the support -- the supported

2    hardware to implement.

3        Q.   Understood.  Have you been

4    responsible for all of these areas for your entire

5    time at Karma?

6        A.   I'm responsible for -- other than the

7    infotainment, that was kind of transitioned to

8    different organizations starting from January '19

9    to July 2020, I was not directly responsible.  But

10   for the rest I was responsible for the entire

11   time.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 24



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 25



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 28

1

12          Q.   Are you saying that -- no, strike

13      that.

14               Okay.  Mr. Zhang, I'm going to

15      introduce an exhibit here shortly.  Are you set up

16      with Exhibit Share on your screens?

17          A.   Yes.

18          Q.   Okay.  Oops.  You know what, let me

19      try this again.

20               MR. WEXLER:  Joe, will I see this on

21      my screen or do I have to log in to Exhibit Share

22      because I think Exhibit Share is for the witness,

23      but I'm not sure --

24               MR. WALSH:  Yeah, you need to log in

25      to Exhibit Share.

Page 29

1              MR. WEXLER:  Do you know how I do

2     that?  Let's see.

3              MR. WALSH:  I know if you go to --

4     sorry.  Well, can we go off the record for a

5     second?

6              MR. WEXLER:  Yeah, I think I got it.

7              THE VIDEOGRAPHER:  We're off the

8     record.

9              (Pause in proceedings.)

10    ██████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      ██████████████████████████████

14             THE VIDEOGRAPHER:  We're on the

15    record.

16    BY MR. WALSH:

17         Q.   Mr. Zhang, in the Exhibit Share

18    folder do you see a document Exhibit 0001?

19         A.   Yes.

20         Q.   Can you open that document?

21         A.   Yep.  I opened it.

22         Q.   And this is a document titled

23    Plaintiff Karma Automotive, LLC's disclosures

24    pursuant to Federal Rule of Civil Procedure

25    26(a)(2).  Are you familiar with this document,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 30

```
 1    Mr. Zhang?

 2              A.    Yes.

 3              Q.    Is this the disclosure document that

 4    you reviewed prior to today's deposition?

 5              A.    Yes.

 6              Q.    And then if you scroll through pages

 7    three through twelve, those pages include your

 8    expert disclosure, correct?

 9              A.    Correct.

10              Q.    Those pages reflect the subject

11    matter in which you are expected to testify as an

12    expert at trial, correct?

13              A.    Yes.

14              Q.    Those pages also include a summary of

15    the facts and opinions in which you are expected

16    to testify as an expert at trial, correct?

17              A.    Yes.

18              Q.    Did you draft pages three through

19    twelve of this document?

20              A.    I reviewed it.  I made a few edits,

21    if I remember correctly.

22              Q.    Someone else drafted it and you

23    reviewed it before it was submitted to opposing

24    counsel; is that correct?

25              A.    Correct.
```

```
 1            Q.   Do you know who initially wrote this
 2    document?
 3            A.   I do not know who exactly.  I know
 4    from my counsel.  I'm not good at writing a legal
 5    document.
 6            Q.   Understood.  Do you know that certain
 7    portions of your opinions in this document are
 8    word-for-word matches to the opinions of Mr. Elley
 9    and Mr. Gudmundsson's expert reports in this case?
10            A.   I do not know.  I did not do a
11    line-to-line comparison.
12            Q.   Did you review the expert reports of
13    Mr. Gudmundsson or Mr. Elley?
14            A.   I read them, yes.
15            Q.   Did you read them after they were
16    exchanged between the parties or before they were
17    sent to Lordstown's counsel?
18            A.   I do not know the time sequence.
19            Q.   So you may have reviewed them after
20    they were already signed by both gentlemen?
21            A.   I may, yeah.
22            Q.   If you can return to page three of
23    your disclosure, and let me know when you're
24    there.
25            A.   Yeah, I'm here.
```

Page 32

1          Q.    Toward the -- starting at line

2    nineteen it says that in addition to the documents

3    and testimony set forth below and elsewhere, your

4    testimony is based, without limitation, on your

5    education, training, expertise, and experience in

6    the automotive industry.  Do you see that?

7          A.    Yes.

8          Q.    Does that -- does that mean your time

9    with Karma Automotive?

10         A.    Also -- at Karma and before at Karma

11   also I had a good exposure to automotive from a

12   connected service telematics point of view.  My

13   previous -- my previous experience, the product I

14   developed -- or helped develop also serve

15   automotive industry.

16         Q.    And when -- when was this exposure to

17   the automotive industry?

18         A.    It's four or five years before I join

19   the Karma Automotive.

20         Q.    Were you -- what company were you

21   employed with then?

22         A.    I was employed by TeleCommunication

23   Systems.

24         Q.    How long did you work for

25   TeleCommunication Systems?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 33

1          A.   I worked for them for eight years or
2    close to nine years.
3          Q.   And you said at Tel --
4    TeleCommunication Systems you were exposed to
5    connected service and telematics; is that correct?
6          A.   Correct.
7          Q.   And that's the full extent of your
8    exposure to the automotive industry at
9    TeleCommunication?
10         A.   Yes.
11         Q.   Prior to Karma, did -- did you
12   have -- did you have any experience in
13   infotainment?
14         A.   Not automotive infotainment, not
15   in-car infotainment, no.
16         Q.   Prior to Karma, did you have any
17   experience in automotive power management?
18         A.   No.
19         Q.   Prior to Karma, did you have any
20   experience in automotive validation?
21         A.   I have many, many years experience in
22   software validation, electrical system validation,
23   not specific as automotive application.
24         Q.   Okay.  Prior to Karma, did you have
25   any experience in cockpit control?

Page 34

1          A.   I have some experience in instrument

2     control, not car cockpit control.

3          Q.   What do you mean by instrument

4     control?

5          A.   It's the measurement instrument is

6     user application.

7          Q.   Understood.  Prior to your

8     employment, at Karma did you have any experience

9     in automotive software?

10          A.   Not automotive software.  I have many

11     years experiencing embedded software, application

12     user interface software.

13          Q.   Prior to Karma, did you have any

14     experience in automotive body control?

15          A.   Not in automotive application.

16          Q.   So prior to Karma, your automotive

17     experience was limited to connected service and

18     telematics, generally; is that fair?

19          A.   From application point of view, yes,

20     that's fair.  But you have to understand that

21     modern days automotive, it's electronics, it's

22     software.  These are no different than many other

23     areas of electronics and software.

24          Q.   Understood.  Yeah, yeah.  I'm just

25     trying to understand what you meant by that

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 094055
ATTORNEY'S EYES ONLY

Page 35

1    sentence in your dec -- disclosure.

2          A.    Uh-huh.  Yes, I bring in over thirty

3    years of electronics and software experience,

4    that's why Karma hired me even though I haven't

5    worked at auto OEM.  It's -- I mean, ten years ago

6    no automotive understand high loaded battery.

7          Q.    Understood.  Okay.  If you look back

8    on page three, it also says that your opinions in

9    this case are based on the timeline attached to

10   the reports of Mikael Elley and Stefan Gudmundsson

11   as Exhibit B to each of those reports.  Do you see

12   that?

13         A.    Yes.

14         Q.    Do you recall reviewing timelines

15   attached to those reports?

16         A.    Yes.

17         Q.    What did you do to review those

18   timelines?

19         A.    I mean, the timelines, the fact, just

20   make sure things are line up as what the specific

21   facts say -- states, right?

22         Q.    I'm just trying to understand what --

23   you know, what type of review did you do?  Did you

24   just scan the document?  Did you review all the

25   documents noted in the timeline?  What did you do

Page 36

```
 1   with respect to those timelines?

 2          A.   I reviewed the document.  To be

 3   honest with you, I don't remember.  There's quite

 4   a few things happening --

 5               (Notary interrupted.)

 6               THE WITNESS:  Sorry, I did not hear

 7   you clearly.  Yeah, I said there -- you know, this

 8   is not just close the door, go through everything.

 9   I have a good memory.  A lot of things happening

10   and, you know, it's kind of on and off.

11               I did when things come up, I reviewed

12   it and make comments what's necessary.  You have

13   to bring specifics so I can refresh my memory so I

14   don't -- I can't make a general statement.

15   BY MR. WALSH:

16          Q.   Okay.  Understood.  I mean, yeah,

17   understood.

18               Do you recall seeing a list of

19   documents referenced as Exhibit A to the reports

20   of Mr. Elley and Mr. Gudmundsson?

21          A.   Yes.

22          Q.   Do you know who created the timelines

23   attached to the reports of Mr. Elley and

24   Mr. Gudmundsson?

25          A.   I do not know who -- I don't -- I
```

Page 37

1   don't think it's one person put it together.

2          Q.   Did you have any input in creating

3   those timelines?

4          A.   I may have some input over time.

5          Q.   And who were you providing comments

6   to?

7          A.   To my counsel.

8          Q.   Okay.

9               MR. WALSH:  We've been going for just

10  over an hour, would you guys mind taking a

11  five-minute break?  Would that be okay with

12  everyone?

13              THE WITNESS:  Sure.

14              MR. WEXLER:  That's fine.

15              THE VIDEOGRAPHER:  We're off the

16  record.

17              (Pause in proceedings.)

18              THE VIDEOGRAPHER:  We're on the

19  record.

20  BY MR. WALSH:

21          Q.   Okay.  Mr. Zhang, if you could keep

22  on looking at Exhibit 0001.  And you said that you

23  reviewed this document before today's deposition,

24  correct?

25          A.   Yes.

Page 38

1          Q.   And on pages four to five you include

2     your first opinion, correct?

3          A.   Yes.

4          Q.   Okay.  And that opinion is that

5     documents pertaining to various topics include

6     information that is valuable to Karma and would be

7     valuable to competitors because it provides

8     confidential details of Karma's current and

9     planned developments and specifications and would

10    allow a competitor to duplicate these developments

11    and specifications.  Is that a correct reading of

12    that opinion?

13         A.   Yes.

14         Q.   The information listed here relates

15    to twenty-nine different subject areas.  Would you

16    agree with that?

17         A.   Yes, there are many different areas.

18         Q.   Yeah, I'll represent to you that I

19    counted them and there are twenty-nine different

20    areas under opinion one.  Any reason to dispute

21    that there are twenty-nine areas of information

22    listed here?

23         A.   No.

24         Q.   Are you familiar with all twenty-nine

25    areas of information that are referenced here?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page PR094035
ATTORNEY'S EYES ONLY

Page 39

1          A.    To a certain degree, yes.

2          Q.    For example, battery lab testing

3    information, what -- what's your involvement with

4    battery lab testing?

5          A.    The battery lab testing use the same,

6    what we call, hardware and loop system.  So when

7    we test the whole system or the subsystem, we

8    connect from a system lab cell system to the

9    battery lab system.  The battery lab focus more at

10   the cell level and the software control level, and

11   we focusing on the system level.  The system level

12   control and management.

13   ████     ████████████████████████████

████  ██████████████████████████████████████

████  ████████████████████████████████████

████  ████     ██████████████████████████

████  ██████████████████████████████████████

████  ██████████████████████████

████  ████████████████████████████████

████  ██████████████████████████████████

████  ████████████████████████████████████

████  ██████████████████████████████

████  ████████████████████████████████

████  ██████████████████████████████

████  ██████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 40

1   ████████████████████████████

2        Q.   Would you consider yourself an expert

3   in electrical vehicle batteries?

4        A.   I do not consider myself a battery

5   because I'm not a chemist, I'm not mechanical

6   engineer, but from electrical control point of

7   view, yes, I'm competent to -- to understand and

8   be able to direct the teams to perform the job.

9        Q.   Did you review documents related to

10  all twenty-nine of these subject areas before

11  issuing this opinion?

12       A.   I've read many documents over the

13  years through our two complete cycle vehicle

14  design, yes, I'm familiar with all these areas.

15       Q.   I didn't ask if you were familiar.  I

16  asked if you reviewed information related to these

17  twenty-nine topic areas before issuing this

18  opinion?

19       A.   Not at one time I reviewed all the

20  document, no.  But this has something I went

21  through different whether evidence or document I

22  reviewed and that's why I offered my opinion.

23       Q.   Did you review documents -- did you

24  review the documents referenced in number --

25  opinion one to verify that it -- that they

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 41

1   actually do contain Karma confidential

2   information?

3           A.   You have to give me some specific.

4   You say opinion one.  That's -- you just mentioned

5   there's twenty-nine different areas.

6           Q.   Right.  So, I mean, I'm asking you,

7   your first opinion here is that the documents that

8   certain individuals copied related to twenty-nine

9   subject areas, and the information within those

10  documents provides confidential details of Karma's

11  current and planned developments and

12  specifications.  So I'm asking you, did you

13  actually review documents in all twenty-nine of

14  these subject areas and confirm that they include

15  confidential details of Karma's planned

16  developments and specs?

17          A.   Yes, I reviewed specific document

18  that all the list came from.

19          Q.   Did you review each document to see

20  if it contains information generally known in the

21  automotive industry?

22          A.   I'm not sure I understand, what do

23  you mean general known?

24          Q.   Sure.  Are you -- I guess the

25  documents that you reviewed, are you contending

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 42

1    that every line of that document is Karma's

2    confidential information?

3            A.    That's not fair.  I mean, not -- no

4    document I'm relying is Karma confidential

5    information, but each document, each topic contain

6    the Karma confidential information.

7            Q.    Let me just -- what documents did you

8    review -- what documents does opinion one pertain

9    to?  There's no specific documents referenced

10   here.

11           A.    I reviewed hundreds of document.  I

12   do not recall which specific one, and this is just

13   over time after review and, you know, I list all

14   the areas where the document covers.

15           Q.    Can you recall one specific document

16   that opinion one relates to?

17           A.    I reviewed the BOM list, the design

18   specifications, the software verification plan,

19   and I have to go back to the list to identify

20   those.

21           Q.    What list?

22           A.    There's many documents I think

23   through our counsel and -- that has shown what has

24   been copied by former Karma employees.

25           Q.    I understand that you've been

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 43

1    provided information by counsel, but I'm asking --

2    I'm trying to understand what specific documents

3    you reviewed and what specific documents opinion

4    one relates to.  So far you recall a BOM list,

5    software verification plan.  Any other documents?

6            A.    Yeah, I reviewed power moding

7    documents, the source code, and many PowerPoint,

8    many spreadsheet include the details, the Word

9    document, pdf document.  There's -- there's so

10   many.

11           Q.    Do you have any idea what the

12   PowerPoint, spreadsheets, Word documents, and pdfs

13   you just referenced related to?  What types of

14   developments and specifications?

15           A.    There's PowerPoint showing our

16   clients the high level design block diagrams, the

17   business supplies.  And Word document include

18   design specifications, diagram, the logics.  And

19   the DBC files include communication, the

20   protocols, and the coding for each message.  And

21   quite a few systems/subsystems design document.

22   Some information between Karma and our client, our

23   suppliers.

24           Q.    When you -- you've said design

25   specifications a few times.  What types of

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 44

1    specification did you review in relation to

2    opinion number one?

3          A.    There are design specifications for

4    our power moding, electrical system, control, and

5    the component.

6          Q.    What component?

7          A.    Component such as the -- the

8    microphone and speakers, the amplifiers.  The

9    CanShark, the vehicle diagnostics.

10         Q.    But sit -- sitting here today though

11   you can't recall -- you know, you can't point me

12   to a specific document related to these

13   twenty-nine subject areas that are listed in

14   opinion one; is that fair?

15         A.    I cannot name a specific one, and

16   this already has been collected and this has been

17   examed, and I went through the list of documents.

18   If you show me the list, I can point you to which

19   one I have reviewed and exam.

20         Q.    I mean, you know, I assumed that you

21   had a list of documents because you issued this

22   opinion so I'm --

23         A.    After I review all the document, I

24   issued opinion.  I did not issue opinion based on

25   one or two or three documents.  I read hundreds.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 093085
ATTORNEY'S EYES ONLY

Page 45

1    So that's why it's not just one document, it's --

2    it's many.  There are many documents.

3            Q.   Did you calculate how much time it

4    took to develop documents related to these

5    twenty-nine topics or any other topic?

6            A.   Can you repeat your question, please?

7            Q.   Sure.  There are twenty-nine subject

8    areas referenced in opinion one, and you say that

9    they relate to documents copied or downloaded by

10   certain individuals.  So I'm asking you, did you

11   do any type of analysis or calculations to

12   determine how much money Karma spent to develop

13   those documents?

14           A.   Not from this point of view, no.

15           Q.   Not -- what did -- so let me ask that

16   again.  Did you or did you not calculate the

17   amount of money it took to develop any of the

18   documents referenced in opinion one?

19           A.   No, I did not.

20           Q.   Did you calculate the time it took to

21   develop any of the documents referenced in opinion

22   number one?

23           A.   No, not to those documents.

24           Q.   Okay.  One of the reasons you said

25   that this information is valuable is because it

Page 46

1   would be valuable to competitors because it

2   provides confidential details and it would allow a

3   competitor to duplicate developments and

4   specifications.  Do you see that part of your

5   opinion here?

6          A.   Yes.

7          Q.   At your first deposition you said

8   that Lordstown and Karma are not competitors.  Are

9   you now opining that Lordstown and Karma are

10  competitors?

11         A.   I don't remember what -- what I said.

12  Lordstown develop a truck and Karma at time

13  develop its passenger car.  Karma also had plans

14  to develop a truck.  From a technology point of

15  view, from the area where Lordstown suppose to

16  work with Karma, we are competitor.  From the

17  market directly, no, we're not.  We target

18  different market.

19         Q.   So let me -- I just want to make sure

20  I understand what you're saying.  In the

21  automotive market, Lordstown and Karma are not

22  competitors; is that correct?

23         A.   From the product -- the current

24  product on the market, we're not direct

25  competitors.  But from the automotive technology

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 009401
ATTORNEY'S EYES ONLY

Page 47

1    point of view, we are.

2           Q.    What do you mean by automotive

3    technology?

4           A.    Why Lordstown came to Karma for

5    infotainment system, that's the same technology,

6    where regardless whether you have a passenger

7    vehicle or you have a truck, they use the same

8    technology.  The connectivity technology are the

9    same, the power train control probably similar,

10   right.  So if we both develop those technologies,

11   then we're competitor from technology point of

12   view, just different application.

13          Q.    So I heard automotive -- infotainment

14   technology and connectivity technology.  Any other

15   automotive technologies that you believe Lordstown

16   and Karma are competitors in?

17          A.    Can you rephrase your question,

18   please?

19          Q.    Sure.  You said that Lordstown and

20   Karma, in your opinion, are automotive technology

21   competitors, and you said that the technologies

22   were infotainment and connectivity.  Are there

23   other types of technologies that the companies are

24   competitors in?

25          A.    Yeah, these two are just examples.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 099408
ATTORNEY'S EYES ONLY

Page 48

```
 1   There are many other areas.  Power train control,

 2   for example.  Even the hatchback control.  There

 3   are many different areas from a technology point

 4   of view we're competitors.

 5          Q.   Do you -- do you still view Lordstown

 6   as an automotive technology competitor to Karma

 7   today?

 8          A.   Yes.

 9          Q.   Why is that?

10          A.   The same like I view Tesla as a

11   technology competitor and Lucid and Fisker and

12   Veritiv Future.  Each company working on the

13   automotive electrical technology.  EV technology

14   companies are competing with each other from a

15   different angle.

16          Q.   Would you consider Ford and GM also a

17   competitor?

18          A.   Yes, of course.

19          Q.   Are there any other -- are there any

20   automotive companies that you would not consider a

21   competitor to Karma?

22          A.   From technology point of view, all

23   automotive companies are competing with each

24   other.

25          Q.   Okay.
```

Page 49

1          A.   I mean, there -- there may be some

2    companies that just only doing the integration,

3    but less and less of.

4          Q.   If you go to the start of your first

5    opinion, it says that these documents that

6    defendants copied or downloaded to external

7    devices, uploaded to storage locations, or sent to

8    personal e-mail addresses, before terminating

9    their respective employment with Karma.  Do you

10   see that?

11         A.   Yes.

12         Q.   Are you opining that the documents

13   listed in opinion one are being used at Lordstown

14   today in developing the Endurance?

15         A.   From my review or examination of all

16   the evidence or all the document, not necessarily

17   the same document being used but the design are

18   still being used.

19         Q.   I think it would be helpful if you

20   read your first opinion, you can read it to

21   yourself, and tell me which -- what is listed here

22   that you are opining is being used in the

23   Endurance today.  Can you do that, please?

24         A.   Okay.  Let's go from the list and

25   maybe we can -- it's easier.  Start with the

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 50

1    information regarding Karma's suppliers and

2    pricing arrangements with those suppliers.  My

3    understanding, my belief is these are being used.

4            Q.   And what do you mean by it being

5    used?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9905
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 55

1          Q.    And how do you know that?

2          A.    That's by reviewing the -- the

3    specification from Lordstown.  I don't remember

4    which specific document.

5          Q.    Okay.  What other pieces of

6    information in opinion one are you opining that

7    Lordstown is using in developing the Endurance?

8          A.    We have, I think, studies on the

9    source code has been copied or used from a Karma

10   source code.  There's expert opinions on that.

11         And also we had spent quite a bit, I

12   think, of time looking at the power moding and the

13   communication protocols that has been used or

14   based to develop additional -- to develop on top

15   of what copied from Karma.

16         Q.    Did you do any source code comparison

17   or are you just relying on the other experts in

18   this case?

19         A.    I rely on other expert.

20         Q.    Okay.  Anything else?  Any other of

21   these information listed in opinion one that --

22         A.    I mean, all these listed here has

23   some element.  You know, we have to look at

24   specific, otherwise, I don't think I have listed

25   here anything.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 56

1          Q.   Okay.  If you could turn to your next

2     opinion, which starts on page five.

3          A.   Yeah, I'm here.

4          Q.   And in opinion two you opine that

5     LMC's old EE architectures dated November 1st,

6     2019 and March 11th, 2020 are based on Karma's own

7     architecture documents, including the February

8     3rd, 2019 document.  Is that correct?

9          A.   Correct.

10         Q.   Is that an accurate summary of your

11    second opinion here?

12         A.   Based off the information I have

13    seen, yes.

14    ██      ████████████████████████

██    ████████████████████████████████

██    ████████████████████████████

██    ██      ████████████████████

██    ██      ████████████████████████████

██    ████████████████████████████████████

██    ██      ████████████████████████████

██    ████████████████████████████████

██    ████████████████████████████████

██    ████████████████████████████████████

██    ██████████████

██    ██      ██████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9938
ATTORNEY'S EYES ONLY

Page 58



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9408
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9408
ATTORNEY'S EYES ONLY

Page 60

```
 1          Q.   Okay.  Did you do anything else
 2    besides just a document comparison?
 3          A.   Yeah, I read the content of what they
 4    have modified and non-modified.  And also
 5    supported by other evidence that -- because not
 6    just the design document.  The design document you
 7    can argue, yeah, that's just a piece of paper, but
 8    there is communication protocols, there is
 9    topologies, there's power modings, there's other
10    things, all part of the whole system design, you
11    have to look at that as a whole.
12          Q.   So I guess besides looking at the EE
13    architectures, what else did you look at to
14    conclude that the EE architectures at Lordstown
15    are based on Karma's EE architectures?  Are you
16    saying you looked at things unrelated to EE
17    architectures to determine that the EE
18    architectures were the copy -- or started with or
19    based upon?
20          A.   The EE architecture is not just one
21    design document, as I said, right, and --
22          Q.   No, but your -- sorry.  Your opinion
23    is about one -- one or two documents?
24          A.   Correct.
25          Q.   So I'm asking you how did you reach
```

Page 61

1    the opinion on those documents?  Did you -- I

2    think you said you just compared Lordstown's EE

3    architecture documents to Karma's EE architecture

4    documents; is that right?

5            A.    Yeah, if I just copied that document,

6    I may or may not draw the same conclusion.  But

7    after reviewing many other document, that gave me

8    the information to draw the conclusion.

9            Q.    What conclusion?

10           A.    They simply start and base on Karma's

11   EE architecture to develop their product.

12           Q.    And when you say EE architecture, you

13   mean the EE architecture diagram -- or the EE

14   architecture topology diagram dated February 3rd,

15   2019; is that correct?

16           A.    Again, when people talking about

17   architecture, that's not just one piece.  That one

18   piece doesn't represent the whole architecture.

19   The architecture is a system.  It's not just one

20   topology or one document, it's -- there's

21   communication to support, there's power moding to

22   support, there's -- it represents a different form

23   of the document, but when you're talking about EE

24   architecture, you cannot simply say oh, here's a

25   topology, that's EE architecture.  That's one

ATTORNEY'S EYES ONLY

Page 62



1    representation of the EE architecture but that's

2    not the whole EE architecture.

3         Q.   So I'm just trying to understand the

4    second opinion.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 63



Page 64

1          A.   It should have its own naming

2     convention.  It's just a name, but that's evidence

3     of the copying if you use the same name even

4     though that doesn't make any sense.

5          Q.   Would you agree that there's no

6     inherent value in just the name of something?

7          A.   Yeah, the name itself has no value,

8     but that shows why -- I mean, these are engineers,

9     they're smart engineers, they design a system,

10    they don't call that a, you know, jargon for

11    electrical component.

12         Q.   Okay.  You also based this second

13    opinion on the fact that Karma's existing EE

14    architectures were in the possession of certain

15    defendants after the termination of their

16    employment with Karma and produced by LMC in this

17    matter.  Do you see that?

18         A.   Yeah.

19         Q.   Are you aware that defendants and

20    Lordstown produced documents in this case

21    regardless of whether they were ever opened by

22    anyone?

23         A.   I do not know.

24         Q.   Are you aware that Lordstown and the

25    defendants produced documents in this case

Page 65

1    regardless of whether they were accessed by

2    anyone?

3            A.    I do not know.

4            Q.    Are you aware -- aside from being in

5    these defendants' possession, are you aware of any

6    evidence that Karma's EE architecture was actually

7    considered by any of the defendants?

8            A.    I'm aware that these having showed up

9    in multiple, not single defendant, and also being

10   commented by different person, reviewed, edited by

11   different person, so that tells me that being

12   used.  It's not just sitting there.

13           Q.    If a document had not been opened or

14   accessed, would that change your opinion on

15   whether or not something was based upon Karma's

16   documents?

17           A.    Yeah, if all the documents just is

18   sitting there, then I have no other way to

19   conclude.

20           Q.    So it would affect your opinion,

21   correct?

22           A.    It will.

23

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 66



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 68

1          Q.   Got it.  If you could turn to page

2     six.  And on page six -- page six includes your

3     third opinion; is that right?

4          A.   Yes.

5          Q.   And your third opinion is that LMC's

6     E -- current EE architecture is based upon the EE

7     architecture that Karma proposed on June 1st, 2020

8     as part of its proposal for an infotainment system

9     to be used in LMC's Endurance.  Is that a fair

10    summary of your third opinion?

11         A.   Yes.

12         Q.   And if you'd give me one second, I'd

13    like to introduce a document.

14    ████████████████████████████████

15 █  █████████████████████████████████

16    BY MR. WALSH:

17         Q.   Okay.  Mr. Zhang, if you refresh that

18    folder, there should be now a document 0002.  Do

19    you see it there?

20         A.   Yeah.  Should I open that?

21         Q.   Yeah, can you please open that and

22    let me know when you can view it.

23         A.   Yeah, I can see it.

24    ██  ██████████████████████████████

██ █████████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 70



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 73



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 76

10          Q.    Okay.  In opinion three you also

11   state that your opinions are based, in part, on

12   the testimony of witnesses in this matter

13   regarding the creation of LMC's EE architecture.

14   Do you see that?

15          A.    Uh-huh.

16          Q.    Do you know what witnesses you're

17   referring to there?

18          A.    I'm trying to remember the name.  I'm

19   sorry, I'm -- I think their -- oh, what's the

20   name.  If I recall, Sandeep.  What's his last

21   name?  He's the one and also they're from other --

22   I just don't remember other names.

23          Q.    Okay.  So Sandeep and you're not sure

24   who else right now; is that correct?

25          A.    I'm not sure who other names are,

Page 77

1    yeah.

2            Q.    In the last line of opinion three you

3    say that your opinion is based on a review of

4    additional documents produced in this litigation.

5    Do you see that?

6            A.    Uh-huh.  Yes.

7            Q.    Can you recall any specific

8    additional documents that you reviewed to form

9    your opinion in number three?

10           A.    I do not recall any specific one.  As

11   I said, I have been reviewing many, many document

12   in this case.

13           Q.    So how would I -- how would I

14   replicate the analysis you did to reach opinion

15   three here?  What would I need to do to test your

16   opinion?

17           A.    How I -- I -- let me explain how I

18   reached my opinion, right.  I rate and compare and

19   try to understand the evolution of the -- LMC's EE

20   architecture.  I think I list quite a few

21   examples.

22                If you see the changes from earlier

23   to our newer version, how that changed over time.

24   So that means you are making a modification based

25   on a previous existing design and you modify this

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 78

1    this, you modify that, you change this name, you

2    do that, right?

3              To give you example --

4         Q.   I'm just trying to -- I mean, these

5    expert opinions that you're rendering have to be

6    based on some sort of methodology or analysis that

7    can be verified and tested.

8         A.   Yes.  That's what I'm saying.  That's

9    why I list all these document, right, because I

10   read all these, I go through the sequence of the

11   changes.  I going back from the early copies to

12   newer ones and how that changed -- how things

13   change over time and now you may see a different

14   name, but that's exactly the same content even

15   though they just change the name.

16             There may be a document showing they

17   have discussions why the name should be changed.

18             You know, these are the document

19   reviewed that helped me to draw the conclusion.

20        Q.   And the documents you reviewed are --

21   so you started with the June 1st proposal and then

22   compared that proposal to the EE architectures

23   dated and listed in opinion three; is that fair?

24        A.   Yes, that's a summary of what I

25   believe and that most represent how I draw

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 79

```
 1   conclusion.

 2           Q.   Okay.

 3               MR. WALSH:  I think we've been going

 4   for a while now.  Would you guys like to take

 5   another break?

 6               THE WITNESS:  Yeah, I'm good.

 7               THE VIDEOGRAPHER:  Okay.  We're off

 8   the record.

 9               (Pause in proceedings.)

10               THE VIDEOGRAPHER:  We're on the

11   record.

12   BY MR. WALSH:

13           Q.   Mr. Zhang, if you could turn to

14   Exhibit 0001 which is the disclosures -- or your

15   expert disclosure?

16           A.   Yes.

17           Q.   If you could go to pages six to seven

18   and opinion number four, and let me know when

19   you're there.

20           A.   I'm here.

21   ████     ███████████████████████████████

██  ██████████████████████████████████████████

██  █████████████████████████████████████

██  ███████████████████████████████

██  ███████████████████████████████████████████
```

Page 80



7        Q.    And is that an accurate statement of

8    your fourth opinion here?

9        A.    Yes, that's at the time based on the

10   information I have reviewed.

11       Q.    And you say that LMC's infotainment

12   system design is based upon Karma's own designs.

13   Do you see that?

14       A.    Yes.

Page 81

1 ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████

████    ████████

7          Q.    Okay.  And what do you mean by based

8    upon in terms of this opinion?

9          A.    When Karma started infotainment

10   system design way before the LMC and Karma

11   engagement, and then when LMC engaged Karma,

12   Karma, based on the requirement of LMC, made

13   proposal to meet the requirement.  And the

14   design -- the proposal is based on Karma

15   infotainment system design.  So after --

16         Q.    I understand that.  I guess my -- I'm

17   just trying to understand what do you mean by the

18   words based upon?

19         A.    Based upon is from the strategy from

20   the architecture, from the type of component, from

21   how different functionalities should be or can be

22   supported.

23   ████    █████████████████████████████████

████████████████████████████████████

████    ████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9909
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9906
ATTORNEY'S EYES ONLY

Page 86

1          Q.   And you can tell all those things

2     because you're -- you're familiar with how these

3     various components function; is that right?

4          A.   I can tell is because I understand

5     the technology and I understand how different

6     technology means to these kind of system.  If

7     someone with the same knowledge without knowing

8     what Karma has been develop and look at this can

9     also understand some of the design considerations

10    behind it.

11         Q.   Okay.  But you need some sort of

12    experience to know -- to understand any

13    functionality coming out of this diagram; is that

14    fair?

15         A.   That's fair.

16         Q.   Other than the names of certain

17    components or technologies, does this document

18    actually show anything about the technologies or

19    components?

20         A.   Sorry, can you repeat the question?

21         Q.   Sure.  Yeah.  Other than just names

22    of components, does there -- is there any other

23    technological information included in this

24    diagram?

25         A.   Yes.  I have mentioned a few earlier,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 87



1   right.   Using Ethernet as main communication

16          A.   Sorry, I'm not getting what --

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 88

1 ████████████████████████████

2 ████████████████████████████████

3 ██████████████████████

4          Q.   Again, I'm just trying to understand,

5   if I wanted to do the same analysis that you did

6   to reach opinion four, what would I have to do?

7          A.   Yeah, you have to review all the

8   document, and based on your knowledge and

9   understanding of the technology and how these kind

10  of systems developed, you can draw the same

11  conclusion.

12         Q.   And by all the documents, you mean

13  all -- every single document that has been

14  exchanged in this case?

15         A.   All the document relate to the

16  specific areas where what we believe has been

17  taken advantage by Lordstown.

18         Q.   Do you know what version or what date

19  of Lordstown's infotainment design you reviewed to

20  form your opinion?

21         A.   I do not remember specifically.  I

22  think in my disclosure probably list quite a few

23  document.

24         Q.   So the documents listed in your

25  disclosure form the bases for this opinion number

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 89

1   four; is that fair?

2           A.   That's the main document, yes.

3           Q.   All right.

4           A.   Again, I want to make sure what --

5   I'll explain myself here.  I reviewed a lot of

6   documents.  I don't draw a conclusion based on one

7   or two document, right.  But to present, I list a

8   select few document that most representative to

9   the point where or how I form my opinion.

10

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 90



17          Q.   Almost all cars have a center
18   information display; is that true?
19          A.   Correct.
20          Q.   Would you agree that almost all cars
21   have a driver information display?
22          A.   Most of the cars.
23          Q.   What cars don't have a driver
24   information display?
25          A.   Tesla doesn't.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 91

```
 1          Q.    Okay.

 2          A.    Combine -- Tesla combine both

 3    together.

 4          Q.    Okay.  Are you opining that Lordstown

 5    is using a cockpit intelligence controller that

 6    Karma developed?

 7          A.    No, Lordstown did not.  That's the --

 8    that's how this case start, I guess.

 9          Q.    Okay.  Are you opining --

10          A.    Supposed to use but then they went to

11    different way and took the design.

12          Q.    Okay.  Do most -- or strike that.

13                Are you opining that Lordstown is

14    using a connected gateway, the same connected

15    gateway that Karma is using?

16          A.    No.  The same thing as the cockpit

17    intelligence controller.

18          Q.    Okay.  Are you opining that Lordstown

19    is using telematics that Karma is using -- or

20    developed?

21          A.    Same answer.  No.

22          Q.    And would you agree that most cars

23    have an amplifier?

24          A.    Yes.

25          Q.    Would you agree that all cars have an
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 93 of 221
ATTORNEY'S EYES ONLY

Page 92

```
1    amplifier?

2           A.   No.

3           Q.   Okay.  Do you know which cars don't

4    have an amplifier?

5           A.   Many cars does not have a dedicated

6    or direct amplifier.  It use -- I mean, it still

7    have the amplifier function but it's built into

8    whether the CIC or some other component.

9           Q.   Got it.  And would you agree that

10   most cars have a radio?

11          A.   Yes.

12          Q.   What is ESM?

13          A.   External sound system.

14          Q.   Do most cars have an ESM?

15          A.   No.

16          Q.   So what's the function of an ESM?

17          A.   The ESM is only for electrical cars

18   and for newer cars because the revelation now

19   require you have to have a sound when you drive

20   because the electric car too quiet, you have to

21   have a sound system alert --

22               (Notary interrupted.)

23               THE WITNESS:  External sound system.

24   BY MR. WALSH:

25          Q.   So an ESM is not a unique component
```

Page 93

1    that Karma has; is that fair?



15         Q.    And are you opining that Lordstown is
16    using that ESM in the Endurance?
17         A.    Yes.   Based on the information I have
18    read at that -- whatever the point, yes, they have
19    used this same system that -- on their BOM list,
20    on their supplier list.
21         Q.    So your opinion is that Lordstown is
22    just using -- is using the same supplier as Karma,
23    correct, for its ESM?
24         A.    So let me -- let me add something
25    here.   I don't know your background, but it's not

1    just the same supplier.  When you say use same

2    supplier, there's a huge advantage of using same

3    supplier.

4                  When you start a new automotive

5    company of design, it takes a long time to work

6    with a supplier to define component, to validate

7    the component, right.  So while the practice in

8    the automotive industry is to go with an

9    established company -- like Fisker, when Fisker

10   started, it paid a lot of money to GM to what we

11   call access GM bing, car bing.  Why?  Because you

12   go -- that component has to be -- has already been

13   validated, tooled, you have the diagnostics, you

14   have the DTs, you have all the communications,

15   everything down.  Millions, millions, millions of

16   dollars spent to validate, qualify that component,

17   right.

18                  You pay money to the previous company

19   who already done that, and then you can use their

20   work, you integrate into your vehicle.  You save

21   time, you save cost, right.

22                  So when we say, yeah, they go to the

23   same suppliers, of course, but they are not paying

24   us the money for us to recover to share what we

25   paid.

Page 95

1          Q.   So what -- I guess what is -- who is

2    the relevant supplier for ESM?

3          A.   I -- if I remember called ECCO.

4          Q.   ECCO?

5          A.   E as in Edward, C-C-O.

6    ███      ████████████████████████

     █  ████████████████████

     █  ███     ██████████████████████

     █  █████████████████████████████████

     █  █████████████████

11         Q.   Do you know if there is any reasons

12   why ECCO couldn't work with Lordstown?

13         A.    I -- from their point of view, they

14   probably want to work with the different car

15   companies.  That's not just come from a phone

16   book.

17         Q.   Right, but there's nothing preventing

18   Lordstown and ECCO from working together, in your

19   opinion, right?

20         A.   No.  I mean, that's -- any company is

21   free to work with another company.

22         Q.   Okay.  How about ANC, what's ANC?

23         A.   They're called automatic noise

24   cancellation.

25         Q.   And are you opining that Lordstown is

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 96

1    using this ANC in its Endurance?

2           A.    I do not know specifically.

3           Q.    How about HFMIC, what's that?

4           A.    That's a type of microphone.

5           Q.    Is that a high beamforming

6    microphone?

7           A.    I think that's what it stands for,

8    yes.

9           Q.    Do you know if - are you opining on

10   whether Lordstown is using that microphone in its

11   Endurance?

12          A.    From the information I've reviewed,

13   yes, they're using the microphone, the same

14   microphone.  That's Karma design.

15          Q.    How do you --

16          A.    I design it, I inclined a company to

17   make it.  It's a Karma --

18          Q.    What company is that?

19          A.    I -- I do not recall.  I don't

20   remember the specific name.

21          Q.    And how do you know that Lordstown is

22   using this microphone?

23          A.    From some of the document I have

24   reviewed.

25          Q.    Can you be any more specific than

Page 97

1    that?

2           A.   I -- I do not remember which specific

3    document.  Again, I reviewed many, many, many

4    document over time.

5           Q.   What -- what is -- what's unique

6    about this microphone?

7           A.   The microphone design has many

8    considerations like the phone factor, how that be

9    controlled.  Using A2B, that's a newer technology,

10   for example.  And the -- how you manage them

11   together, what are you intending to use to

12   support -- for ANC, for example, you have to have

13   certain angles and distance and pairing.

14          Q.   Yeah, I'm sorry, I just want to focus

15   on the microphone.  What is -- what makes this

16   Karma designed microphone different than other

17   microphones?

18          A.   As I already explained, right,

19   there's --

20   ████        ████████████████████████████

████    ████████████

████        ████    █████████████████████████

████    ██████████████████████████████████████████

████    ██████████████████████████████████████

████    ███████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 98



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 99

1

7          Q.    And are you -- you are opining that

8     Lordstown is using the -- is using Karma-specific

9     microphone design; is that right?

10         A.    Yes.

11         Q.    And how do you know that, just by

12    reviewing the documents?

13         A.    By reviewing the documents, by seeing

14    how the BOM -- the BOM list and the supplier list.

15         Q.    Okay.  By it -- is it -- so by

16    looking at the BOM list and supplier list, you

17    concluded that they're using the same microphone?

18         A.    Yes.

19         Q.    Okay.  If you go back to Exhibit 0001

20    and to the fourth opinion.  You list, I guess,

21    three -- three parts of an infotainment system

22    design, Cloud services capabilities,

23    functionality, and off-the-shelf components.  Do

24    you see that?

25         A.    Yes.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

Page 100

1          Q.   What do you mean by Cloud service

2    capabilities?

3          A.   The Cloud service capability is -- is

4    with a separate gateway combined with a telematics

5    control module.

6          Q.   Sorry, could you say that again?  I

7    missed that one.

8          A.   It's a separated gateway logically

9    and a telematics control module.

10         Q.   Okay.  And what do you mean by

11   functionality?

12         A.   The functionality is -- it's how you

13   can build application, different -- from a --

14   looking from technology point of view, how you

15   provide a Cloud service, you have to have

16   connectivity, you have to have security, you have

17   to have means to control the data flow, you have

18   to have means to send and receive.

19         Q.   Okay.  And then specific

20   off-the-shelf components, do you see that?

21         A.   Yep.

22         Q.   What do you mean by off-the-shelf?

23         A.   I'm trying to remember what was -- so

24   it's -- the off shelf means something already

25   developed.  You don't develop from scratch.  You

Page 101

 1    purchase and intergrade.

 2         Q.   Got it.  And are the off-the-shelf

 3    components that you're discussing in this opinion,

 4    are they the MediaTek MT2712 central infotainment

 5    controller, the Quectel AG35 modem, and an NXP

 6    S32G board?

 7         A.   That's the off-shelf components.

 8    That's not inside the CIU or inside of the TCU.

 9         Q.   Right.  Are those the off-the-shelf

10    components that you're referring to in this fourth

11    opinion?

12         A.   No, that's not what I refer to.

13         Q.   Okay.  So what off-the-shelf

14    components are you referring to in Lordstown's

15    system that are based on Karma's designs?

16         A.   The displays, the antennas, and the

17    switches.  There are many others.

18         Q.   And when you say -- do you --

19    display, antennas, switches.  You mean that

20    Lordstown is just buying the same or similar

21    display, antennas, and switches off the shelf?

22         A.   Yeah.

23         Q.   And those three off-the-shelf

24    components and other off-the-shelf components are

25    not developed by Karma, correct?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 102

```
 1          A.    Correct.

 2          Q.    What is a MediaTek MT271 (sic)

 3    central infotainment control?

 4          A.    The MT2712, that's a processor

 5    designed for media applications, the audio, video,

 6    has graphic processor for renderings, Kodak,

 7    Bilbane, HSA, microchip.

 8          Q.    And is that chip an off-the-shelf

 9    component that can be purchased?

10          A.    Yes.

11          Q.    The Quectel AG35 modem, what is that?

12          A.    That's a cellular modem for cellular

13    communication.

14          Q.    And is that a component that can be

15    purchased off the shelf?

16          A.    Yes.

17          Q.    An NXP S32G board, what's that?

18          A.    NXP S32G is a -- it's a gateway

19    processor.

20          Q.    And is that a component that can be

21    purchased off the shelf?

22          A.    Yes.

23
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 4990525
ATTORNEY'S EYES ONLY

Page 103



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9924
ATTORNEY'S EYES ONLY

Page 104



```
24        Q.   And do other automotive companies use
25   a connected gateway?
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 105

1          A.    Yes.

2          Q.    So the use of a connected gateway is

3    not something that's unique to Karma, true?

4          A.    True.

5          Q.    How do you know other companies use a

6    gateway or A2B?

7          A.    Through the different readings.

8    There are a lot of published, a lot of technical

9    discussions, and sometime from newsletter.

10         Q.    Is it fair to say just from reading

11   kind of public news and information?

12         A.    Yes.

13         Q.    If you could turn to your fifth

14   opinion, which is on pages -- pages seven and

15   eight.  Let me know when you are there.

16         A.    Seven, eight, number five.

17         Q.    Yes.

18         A.    Okay.

19         Q.    Are you there?

20         A.    Yep.

21         Q.    Okay.  And this opinion relates to

22   power moding specifications; is that correct?

23         A.    Yes.

24   ▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 106

1    ███████████████████████████████████████

2    █████████████████████████████████████████████

3    █████████████████████████████████████████████

4    █████████████████████████████████████████████

5    ███████████████████████████

6         ████    █████

7         Q.    Is that an accurate statement of your

8    fifth opinion here?

9         A.    Yes.

10         Q.    Did you have any role in creating the

11    2011 power moding specification developed for

12    Fisker?

13         A.    No.

14         Q.    Did you have any role in creating the

15    November 3rd, 2016 power moding specification?

16         A.    Yes.

17         Q.    What was your role?

18         A.    I joined the company in late November

19    of 2015, and while my responsibility is the

20    electrical system, reporting to my team is a

21    electrical/electronic systems engineering team.

22    Their job is to update, develop, and maintain

23    power moding and the whole electrical/electronics

24    architecture.

25         Q.    So I guess what specifically did you

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 108 of 216
ATTORNEY'S EYES ONLY

Page 107

```
 1    do for the November 2016 power moding spec?
 2            A.    I review and approve all the changes.
 3            Q.    You didn't -- you didn't write -- you
 4    didn't create or draft the specification?
 5            A.    No.
 6            Q.    Have you ever drafted or created a
 7    power moding specification?
 8            A.    Not from scratch.
 9            Q.    But, again, have you ever drafted a
10    power moding specification?
11            A.    No.
12            Q.    You say that Lordstown's September
13    16th, 2020 specification and every subsequent
14    version of that specification is based on Karma's
15    or Fisker's spec.  Do you see that?
16            A.    Yes.
17            Q.    Do you know how many versions of
18    power moding specifications Lordstown has?
19            A.    I do not know how many versions.
20            Q.    Have you reviewed all the versions of
21    Karma -- or of Lordstown's power moding
22    specification?
23            A.    I've reviewed every one presented but
24    not -- I can't say whether that's all or not.
25            Q.    And what do you mean by presented?
```

Page 108

1  Are you saying the power moding specifications

2  that someone gave to you?

3          A.   Correct.

4          Q.   Did counsel give you those

5  specifications?

6          A.   Yes, they're collecting from whatever

7  means, right.

8          Q.   Okay.  And, again, here you say that

9  Lordstown's specifications are based upon Karma's

10 and Fisker's specifications.  What do you mean by

11 based upon in relation to this opinion?

12         A.   When first I read it, I say how can

13 someone so stupid and copy everything.  It's

14 almost word by word, just simply replace some of

15 the key wording.  Even, you know -- even some of

16 the so obvious ones are left there.

17

Page 109

1  ████████████████████████████████████████

██  ████

██         ██  ███████████████████████████

██  ███████████████████████████████████████

██  ███████████████████████████████████████

6         Q.   So your analysis in relation to

7  opinion five, would you agree that you opened one

8  document and opened another document and just kind

9  of read them and compared them?

10        A.   I opened many document.  The specific

11  version I compared side by side.  I read the

12  document and I tried to understand the evolution,

13  the chain of history.

14        Q.   So, again, I'm just trying to -- if I

15  had to replicate what you did to reach opinion

16  five, what would I need to do?

17        A.   Just read through all the listed

18  document.

19         ██  ██████████████████████████

██  ████████████████████████████████████

██         ██  █████████████

██         ██  ████████████████████

██  ███████████████████████████████████████

██         ██  █████████████████████████

██  █████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

Page 110

1        Q.   So are you saying more than -- what
2    do you mean by that?  The words are the same.
3    What else is the same?
4        A.   Yeah.  The word reflect the design.
5    So if I copy article when I write my thesis, I
6    copy article somewhere I find from the Internet,
7    right.  You know, that's why I say how stupid it
8    can be is to copy almost word by word.  My
9    professor it going to say, hey, you cheated,
10   right?
11       Q.   Got it.
12       A.   Probably the same concept, change a
13   few word, but that's still a copy.
14       Q.   Understood.  So I think you said if
15   you look in your opinion five, you know, you say
16   your opinions are based, without limitation, upon
17   word-for-word copying reference to Karma and
18   Fisker, the structure and ordering of LMC's
19   specification, and certain other information.  The
20   structure and ordering of Karma's specification,
21   is there anything, you know, unique about how a
22   power moding spec is structured or organized?
23       A.   I don't think anything specific.
24   It's just how you logically order different
25   things.  You can order for people to review it so

Page 111

1    easy to understand the content, that's mostly

2    important.

3          Q.   The content is what matters as

4    opposed to how this document is structured; is

5    that fair?

6          A.   That's fair.  Also I will say a good

7    structure, easier to -- make easier for people to

8    understand the content.

9          Q.   Can you turn to page eight and

10   opinion six?

11         A.   Yes, I'm here.

12         Q.   Before we get there, have you --

13   setting aside Karma and Lordstown, have you

14   reviewed power moding specifications from any

15   other companies?

16         A.   No.

17         Q.   No?  Just Karma and power moding --

18   or I'm sorry, just Karma and Lordstown?

19         A.   Yeah, I mean, I don't see a basis --

20   it's safely guarded as secret.

21         Q.   Okay.  Have you seen other, you know,

22   specification-type documents from other companies?

23         A.   Yeah, in my previous life I've dealt

24   with quite a bit of specifications, yes.

25         Q.   Do the -- does the structure and the

Page 112

1   order of specification documents generally follow

2   the same kind of structure and order?

3           A.   Different industry, they follow kind

4   of structure.  For example, a software

5   specification versus an electronics hardware is a

6   little bit different.

7           Q.   Right.  You know, I didn't know --

8   you know, in law school we're all taught to kind

9   of structure a brief the same way.  I'm assuming

10  the same is true in the automotive industry, that

11  most people structure their design specs the same

12  way?

13          A.   Yeah, I agree.

14          Q.   Okay.

15          A.   They're similar.

16          Q.   Okay.  So turning to the sixth

17  opinion here.  Excuse me.  You state that LMC's

18  most recent power moding specs continue to be

19  based upon Karma's existing designs for its own

20  power moding specification.  Do you see that?

21          A.   Yes.

22      ██      ████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████

██  ████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 113



15        A.    I do not know.  I don't recall, but

16    for this context, that's the -- probably the

17    latest I reviewed.

18        Q.    Do you recall reviewing any Lordstown

19    power moding specs dated after January 14th, 2021?

20        A.    I do not remember.  I do not recall.

21        Q.    Okay.  And again you note the power

22    moding specs continue to be based upon Karma's

23    existing designs.  What do you mean by based upon

24    here?

25        A.    To the -- as I stated, if you look,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 115 of 216
ATTORNEY'S EYES ONLY

Page 114

1    the early version is a word-by-word copy.  Over

2    time some of the sections get modified, the name

3    may have changed.  So even as the January 14th,

4    2021 version that almost -- you know, many months

5    after the first what I've seen, there still has

6    the kind of Karma-specific naming or content

7    there.

8            Q.   Got it.

9            A.   I know last Endurance does not have a

10   hybrid controller.

11           Q.   Got it.  So the Karma-specific naming

12   conventions that form the bases of this opinion

13   are hybrid control unit and vehicle control

14   module; is that correct?

15           A.   Correct.

16           Q.   And you agree that Lordstown is not

17   developing a hybrid vehicle?  Do you agree?

18           A.   Yes.

19           Q.   And you agree that Lordstown is

20   not -- so, therefore, Lordstown is not using a

21   hybrid control unit, you agree?

22           A.   Yes.

23           Q.   A -- are you -- and then the other

24   specific naming convention is vehicle control

25   module.  Do you see that?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 99935
ATTORNEY'S EYES ONLY

Page 115

1          A.    Yes.

2          Q.    What is a vehicle control module?

3          A.    There's -- a vehicle -- a vehicle --

4     we call vehicle body control, like your doors,

5     windows, the lighting, your access, security, and

6     all that, these are vehicle control.

7               Not just the name -- not just the

8     three letter name here, the document also include

9     how the communication taking place, what are the

10    code, which component talking to which component.

11    So it's not simply say, hey, I just happen to use

12    the same name --

13         Q.    Right.  Right, right.

14         A.    -- but it's the other content behind

15    the name.  That's why it's -- you can't simply

16    just find and replace because other communication,

17    other method, other logic is behind it, you have

18    to change it.  I guess that takes time or sloppy.

19         Q.    Is the -- the name vehicle control

20    module or VCM, you know, there's no value in just

21    the name, right, it's just a name?

22         A.    Yeah.  I mean, if just say what's a

23    VCM, what VCM -- how significant is the VCM?  No,

24    not just the name.  The name --

25         Q.    Right.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 116.035
ATTORNEY'S EYES ONLY

Page 116

```
1              A.   -- tells you there's certain areas,
2      it gives you clue, help from a design product
3      point of view when people refer to someone.  They
4      have a list of hand results acronyms and very
5      difficult to remember.  If you apply meaning, of
6      course it helps.
7              Q.   Yes, the acronyms, even in this case,
8      are a little mind blowing.
9              A.   Yeah.
10             Q.   What -- I think you said -- is a
11     vehicle control module also called a body control
12     module?
13             A.   Yes.
14             Q.   And do most cars have a vehicle
15     control module or body control module?
16             A.   Yes.
17             Q.   Okay.  If you go to the page -- or
18     line seventeen -- I'm sorry, line nineteen, and
19     you -- you write, LMC's use of Karma's designs is
20     confirmed in later versions of LMC's power moding
21     specs, which remove references to the HCU and VCM
22     modules but continue to use language and
23     specifications that are identical to language and
24     specifications used in Karma's power moding specs.
25     Do you see that?
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
HIGHLY PROPOSED
ATTORNEY'S EYES ONLY

Page 117

1          A.    Yes.

2          Q.    What language and specifications are

3     still identical in LMC's power moding specs --

4     specifications?

5          A.    I do not recall specifically.  I

6     believe what I mean is looks like someone simply

7     replaced the three letter acronym but the

8     contents, what the modules perform, how that

9     module connects are -- stay the same and not

10    changed.

11         Q.    Today though, you don't recall any

12    specific language or specifications that remain --

13         A.    No, we have to -- we have to look at

14    these two documents and just see.

15         Q.    Okay.

16         A.    At that time when I read, that's my

17    opinion that someone over time, just to change.

18    From here I can't tell a specific timing that at

19    least from January document, those names are still

20    there, and later versions and the name get changed

21    but the content of the paragraph not even

22    modified.

23         Q.    Understood.  And you -- you -- you

24    don't know what -- right, which -- what is the

25    most recent version of Lordstown's power moding

Page 118

1   specification that you reviewed?

2          A.   I do not recall specific version or

3   date.

4          Q.   Do you know if your -- if you

5   reviewed Lordstown's current power moding

6   specification?

7          A.   Whatever presented at that time.

8          Q.   So whatever --

9          A.   I have to go back to when I wrote

10  this opinion, right.  Today -- if current is

11  today, they may have something completely

12  different.  I did not review.  I don't know.

13         Q.   Okay.  And to -- just one last

14  question on this opinion.  To form your opinion

15  that there is identical language and

16  specifications still being used in Lordstown's

17  recent power moding specs, what analysis did you

18  do?  Was it the same document comparison analysis?

19         A.   Yes.

20         Q.   Okay.  Did you do anything else

21  except kind of just read the two docs together?

22         A.   I just read the two -- the different

23  version of the docs together and tried to

24  understand what changed.

25         ■■   ■■■■■■■■■■■■■■■■■■■■■■■■■■

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 119



Page 120

1          Q.    Okay.  If you could go to page nine

2    and opinion seven, and let me know when you're

3    there.

4          A.    Yeah, I'm here.

5          Q.    Starting on line twelve, you note

6    that you may opine that several of LMC's CAN

7    message matrices are based upon and/or copied from

8    Karma's designs.  Do you see that?

9          A.    Yes.

10   ██     ████████████████████████████

██  ████████

██  ██     ████████████████████████████

██  ████████████████████████████████████

██  ██████████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████

██  ██████████

██        ██████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████████

██  ██████████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 11399551
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 122

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9945
ATTORNEY'S EYES ONLY

Page 123



1

25              Q.    Got it.  Do you know if other

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 124
ATTORNEY'S EYES ONLY

Page 124

```
1    companies split its CAN messaging databases?

2            A.   I assume, yes.

3            Q.   Why do you assume yes?

4            A.   Based on my engineering logic, you

5    know, very common for -- that's why you have a

6    system, you have subsystem, you have a component,

7    and you kind of split down, down, down, you divide

8    into different pieces so you can help people focus

9    on more and bring their expertise in.  People

10   worrying about invertor probably don't care about

11   how the body get controlled.

12           Q.   Got it.  So, yeah, the concept -- I

13   guess the concept of splitting a CAN database into

14   separate DBC files is not like a novel thing --

15           A.   No.

16           Q.   -- is that fair?

17           A.   No.

18           Q.   Okay.  No, that's true, it's not

19   novel?

20           A.   Not novel.

21           Q.   Okay.  I think I've got them all, you

22   said B-CAN is body CAN, C_CAN is chassis, INV_CAN

23   is invertor CAN.  What is PT CAN?

24           A.   It's a power train.

25           Q.   Power train.  Okay.  What CAN does
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 125

1    infotainment fall under?

2          A.    The infotainment is -- connect to

3    every CAN. ███████████████████████████████████

     ██████████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████████████

     ██████████████████████████████████████████████████

           ████████████████████████████████████

     ████████████████████████████████████████████

            █████████████████████████████████████████

     ████████████████████████████████████████████

            ████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████████████

     ███████████████████████████████

17          Q.    Got it.   Okay.   Again, I'm showing my

18   non-engineering background with that question

19   probably.

20          So have you -- have you actually

21   reviewed CAN messages that have come out of the

22   Endurance?

23          A.    I read a few small examples showing

24   the CAN messages, but mostly I reviewed the CAN

25   message matrix.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
HIGHLY CONFIDENTIAL
ATTORNEY'S EYES ONLY

Page 126

1          Q.    What small examples do you recall

2     reviewing?

3          A.    There's thirty CAN messages how

4     different -- some of the tests performed showing

5     the different communications.

6          Q.    What tests?

7          A.    I do not recall specifically.   A

8     typical CAN message is a thousand, ten thousand

9     line of code.

10         Q.    Can you -- can you state how many

11    lines?

12         A.    Excuse me.

13         Q.    Sure.

14         A.    Sorry, I'm back.

15         Q.    No, that's okay.  Do you know how

16    many lines of CAN messages that you reviewed from

17    the Lordstown Endurance as part of that small

18    example?

19         A.    Oh, I probably reviewed a few hundred

20    lines.

21         Q.    Okay.

22         A.    I only tried to get examples.

23         Q.    Do you know the date of those CAN

24    messages that you reviewed, how recent they were?

25         A.    I do not recall.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 127

1          Q.   Were they from -- do you know if they

2     were from 2020, 2021, 2022?

3          A.   I do not remember.  I assume it's

4     earlier than 2022.  It was probably -- it can't be

5     2019, they don't have anything yet.

6          Q.   So either 2020 or 2021; is that fair?

7          A.   That's fair.

8          MR. WALSH:  I think we've been going

9     for about ninety minutes so we can go off the

10    record and take a quick break.

11          THE VIDEOGRAPHER:  We're off the

12    record.

13          (Pause in proceedings.)

14          THE VIDEOGRAPHER:  We're on the

15    record.

16    BY MR. WALSH:

17          Q.   Mr. Zhang, at page -- at line twelve

18    of -- on page nine of your disclosure you state

19    that you may opine that several of LMC's CAN

20    message matrices are based upon and/or copied from

21    Karma's designs.  Do you see that?

22          A.   Yes.

23          Q.   Do you actually intend to offer that

24    opinion or have you decided not to offer that

25    opinion given that you use the word may?

Page 128

1          A.    I offer that opinion based on what I

2     have seen.

3          Q.    So you do intend to offer an opinion

4     regarding LMC's CAN message matrices; is that

5     true?

6          A.    Yes, that's true.

7          Q.    Okay.  Which -- which LMC CAN message

8     matrices are based upon and/or copied from Karma's

9     designs, in your opinion?

10         A.    From the document I have reviewed,

11    there's a list of version one of zero is based on

12    Karma design as evidenced by all the -- many of

13    the same component in Karma design, simply copied.

14    The message header, ID, contents are identical.

15    ██        ████████████████████████████

██    ██████████████████████████████████████

██    ████████████████████████████████

██    ████████████████

██        ██    ████████████████████████

██        ██    ████████████████████████

██    ██████████████████████████████████

██    ████████████████████

██        ██    ██████████████████████████

██    ██████████████

██        ██    ██████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 129



24          Q.   And if you -- if you look at page
25     nine and ten of your disclosure --

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 132 of 216
ATTORNEY'S EYES ONLY

Page 130



1        A.    Yes.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 99991
ATTORNEY'S EYES ONLY

Page 131



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 132



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9934
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 136

1              Let me give you an example.  If --

2    if -- let's use the example of ESM we talk about

3    earlier, right.  If I say when I drive at fifteen

4    miles per hour, the module need to sound at this

5    volume at this frequency.  That's the content,

6    right.  So I can use the same module as long as

7    the module understand when I say one, two, five,

8    that means, you know, I'm driving twelve miles per

9    hour volume five.  I react to that code.  That's

10   the content.  That's a specific design.

11

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 137



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:99588
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 139



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 136868
ATTORNEY'S EYES ONLY

Page 140



Case 8:20-cv-02104-JVS-DFM    Document 347-7    Filed 10/24/22    Page 142 of 216
REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 141

ATTORNEY'S EYES ONLY

Page 141

1    vehicles.

2            Q.    Yeah, but they -- these DBC files

3    might have come from a vehicle that isn't even a

4    Lordstown vehicle?

5            A.    Yeah, but if that's true, then it

6    doesn't have other Lordstown vehicle design

7    information.  I mean, there's not just this one

8    indicator, there are many others.

9            Q.    Right.  Okay.

10           A.    Because, I mean, this is something --

11   for any --

12           Q.    That's okay, we can move on to a

13   different topic.  Just, you know, keep things

14   moving.

15   ████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████████████████

     ███████████████████████████████████████

     ████████████████████████████████████████████

     █████████████

     ████    ██████████████████████████

     ████    ██████████████████████████████

     ████    █████

     ████    █████████████████████████████████████

     ████████████████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 142 — PROPOSED
ATTORNEY'S EYES ONLY

Page 142



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY
Page HHMI-99585

Page 143



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 144



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 145



```
 7          Q.    Okay.  Let's move on.  If you go to
 8   the next -- if you go to page eleven.
 9          A.    Okay, I'm here.
10          Q.    And you have an opinion number eight.
11   Do you see that there?
12          A.    Yes.
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 146



Page 147

16          Q.    Okay.  Well, if you look down at --
17    if you look down at line twelve, right, you state
18    that you may offer opinions regarding the
19    functionality, proprietary nature, and competitive
20    value of the portions of Karma's source code that
21    were copied into LMC's repository.  Do you see
22    that?
23          A.    Yes.
24          Q.    So are your opinions regarding source
25    code in this case based on the portions of Karma's

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 1 of 100,005
ATTORNEY'S EYES ONLY

Page 148

1   source code that were copied into LMC's

2   repository?

3           A.   Yes.

4           Q.   And those portions are the ones that

5   have been identified in the report of Robert

6   Zeidman, correct?

7           A.   Yes.

8           Q.   And have you formed any opinions

9   about how much time it took to develop those

10  portions of source code?

11          A.   Yes.

12          Q.   You have formed an opinion on the

13  specific time it took to develop those portions of

14  source code?

15          A.   Yes.

16          Q.   What is -- how much -- what is that

17  opinion?

18          A.   Again, it depends on the area of --

19  it's not everything -- use example here, CanShark,

20  that starts around two thousand I'd say nineteen,

21  so that's probably a couple many years' worth of

22  work.

23          Q.   But you don't know that for sure,

24  right?  You just said probably.  You're just

25  speculating right now.

Page 149

1          A.   I know that for sure based on the

2     level of resource we spend under my management.  I

3     know how many engineers assigned and work on it.

4          Q.   What I want to know is how much time

5     did Karma spend developing all the source code

6     referenced in Robert Zeidman's reports?  Have you

7     done that calculation?

8          A.   I haven't done that calculation.

9          Q.   Okay.  So you don't have an opinion

10    on the time it took Karma to develop the source

11    code referenced in Mr. Zeidman's report; is that

12    fair?

13         A.   Not specific -- no.

14         Q.   Okay.  And have you done any type --

15    do you have -- have you done any type of

16    calculations or analysis to determine how much

17    money Karma spent to develop the source code

18    referenced in Mr. Zeidman's report?

19         A.   No.

20         Q.   Okay.  So you have no opinions

21    regarding the amount of money Karma expended to

22    develop the source code referenced in

23    Mr. Zeidman's report, true?

24         A.   True.

25         Q.   Okay.  So if you turn to line

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 150

1    fifteen.

2         A.    Page eleven?

3



Page 151

1

8          Q.    Is it -- it's your opinion without

9     zero calculation?  What math did you do to form

10    that opinion?

11         A.    I use a percentage.

12         Q.    And where -- where is that

13    calculation written down?  Is that calculation --

14    is that calculation written down somewhere?

15         A.    Not when I formed this opinion, no.

16         Q.    So if I wanted to see your

17    calculations, where would I look to find them?

18         A.    There's a different document I have

19    estimated the total cost and what applied, that's

20    probably more information.

21         Q.    Right.  So you're just referencing

22    the R&D cost calculations that you did for

23    Mr. McGavock, is that correct?

24         A.    Yes.

25         Q.    You didn't do any type of separate

Page 152

1    analysis to determine the amount of time or money

2    Karma expended in developing the source code

3    referenced in Zeidman's report, true?

4           A.    True.

5           Q.    Okay.  You -- at lines -- on page

6    eleven in line twelve and -- twelve through

7    fourteen you state that you may offer opinions

8    regarding the functionality, proprietary nature,

9    and competitive value of the portions of Karma

10   source code that were copied into LMC's

11   repository.  Do you see that?

12          A.    Yes.

13   ▮▮    ██████████████████████████████████

██   ████████████████████████████████████████

██   ████████████████████████████████████

██   ▮▮    ██████████████████████████████

██   ██████████████████████████████████████

██   ██████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████████████████

██   ██████████████████████

██   ▮▮    ██████████████████████████████

██   ██████████████████████████████████

██   ████████████████████████████

██   ████████████████████

Page 153

1    ███  ███████████████████████████

2          Q.   Okay.

3          A.   I reviewed some of the sections and

4    he's the expert that make the final determination.

5          Q.   Did you actually look at any of the

6    source code referenced in Mr. Zeidman's report?

7          A.   I looked at some of the examples,

8    yes.

9          Q.   Do you recall what examples or what

10   specific segments of code?

11         A.   Just in general area.  I don't

12   remember specifics.

13         Q.   Okay.  It says you may also offer

14   opinions regarding the proprietary nature of the

15   portions of Karma's source code.  Do you see that?

16         A.   Yes.

17         Q.   What is your opinion regarding the

18   proprietary nature of the source code referenced

19   in Mr. Zeidman's report?

20         A.   In the example I gave earlier, and

21   these are very specific proprietary Karma design.

22   We -- Karma was the second company offered this

23   type of functionality after Tesla.  The

24   implementation is completely in house.

25         Q.   Right.  But did you do anything --

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 154

1    did you do any type of analysis over the source

2    code to see if it was, you know, publicly

3    available?

4         A.   If the functionality only is showing

5    the few vehicles, I haven't seen anything

6    published.  Not at the code level.  Maybe concept

7    been published, talk about it in industry.

8         Q.   Okay.  Maybe an easier way, did you

9    do any type of analyses over the -- regarding the

10   portions of source code that are referenced in

11   Mr. Zeidman's report in addition to what

12   Mr. Zeidman himself did?

13        A.   No.

14

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 155 of 215
ATTORNEY'S EYES ONLY

Page 155

1

8          Q.    Okay.    That's fair.    If you go to

9     page twelve of the disclosure document.

10         A.    Yes.

11         Q.    And I think you have your ninth

12    opinion there.    Do you see that?

13         A.    Yep.

14         Q.    And you opine that LMC's use of

15    Karma's designs and technologies, including but

16    not limited to those listed above, saved LMC

17    thousands of hours and hundreds of millions of

18    dollars in development time and costs that Karma

19    incurred in developing those technologies.    Do you

20    see that?

21         A.    Yes.

22         Q.    And is that an accurate statement of

23    your ninth opinion?

24         A.    Yes.

25         Q.    Besides, you know -- you reference

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 156

1    here Karma's designs and technologies, including

2    but not limited to those listed above, meaning the

3    designs and technologies listed in the opinions we

4    just discussed.  What other designs and

5    technologies are related to your -- this opinion,

6    if any?

7            A.   I don't think I list every areas what

8    I've read for my opinion.  I only gave opinion on

9    the areas I'm responsible for or familiar with.

10   There are other document I have read, there are

11   other things are being leveraged by LMC I haven't

12   gave my opinion on.

13           Q.   Okay.  So we -- we discussed EE

14   architecture, infotainment system design, power

15   moding specifications, CAN message matrices, and

16   source code.

17           A.   Correct.

18           Q.   Can you think of any other designs or

19   technologies that form -- that form part of your

20   opinion number nine here?

21           A.   Their leverage of Karma's development

22   process.

23           Q.   That's the KPDS?

24           A.   Yes.  The supply chain information.

25   The BOM costs.

Page 157

1          Q.   Is the supply chain information the
2    same thing as BOM information?
3          A.   Not the same thing.  The BOM has --
4    BOM only lists what component.  The supply chain
5    include a lot more.  It's the contact information,
6    which company.  It's, yes, the company may offer
7    the same thing to others, but you have to vet the
8    company, you have to value the company, you have
9    to go through a PAPP, and there are many steps
10   before a company is selected.  So that all takes
11   time and money to do.
12         Q.   Okay.  So we have -- in addition to
13   the ones we discussed today were KPDS, BOM, and
14   supply chain information, anything else?
15         A.   That's what I remember now.
16

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 159

6        Q.   Okay.  In your experience, you know,

7   with these designs and technologies and how long

8   it takes to develop that, that experience has

9   solely been with Karma, correct?

10       A.   From a whole vehicle system point of

11  view, yes.  From technology, I have been with

12  different companies and different industry.

Page 160

1  █████████████████████████████████████████

   █  ███  █████████

   █  ███  ███████████████████████████

   █  ███████████████████████████

   █  ███  ███████████████████

6        Q.   Okay.  Have you been asked to do any

7   type of detailed analysis to determine the time or

8   money Lordstown allegedly saved?

9        A.   Not directly.  I estimated how much

10  money Karma spent that applied to the development

11  of specific areas of technology and of product.

12       Q.   Right.  But at this time you haven't

13  been asked to offer an opinion on the time or

14  money that Lordstown allegedly saved, correct?

15       A.   No.

16       Q.   And you don't -- you don't intend to

17  offer a specific opinion on the time or money

18  Lordstown saved, correct?

19       A.   Correct.

20       Q.   Okay.

21       A.   I'm not qualified.  I'm not

22  economist.

23       Q.   Understood.  Okay.  At this time,

24  Mr. Zhang, do you intend to offer any other expert

25  opinions other than the nine opinions that we

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 161

1  walked through today through this disclosure?

2         A.   Based on what I have reviewed, these

3  are the areas I can offer my opinion.  Unless

4  there's new materials presented, I have no others

5  to offer.

6         Q.   Okay.  So right now -- right now

7  these nine opinions that are listed here are your

8  expert opinions in this case; is that true?

9         A.   Yeah.

10         Q.   Okay.  Mr. Zhang, do you know who

11  Daniel McGavock is?

12         A.   I don't know him personally.  I read

13  his report.

14         Q.   Okay.  You understand that

15  Mr. McGavock has submitted an expert report in

16  this case evaluating Karma's potential damages,

17  correct?

18         A.   Yes.

19         Q.   Do you recall having any discussions

20  with Mr. McGavock?

21         A.   I do not remember specifically have

22  conversation with him directly.

23         Q.   Do you recall having any

24  conversations with anyone on Mr. McGavock's staff

25  or team?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 162

1          A.   I do not recall.  We may have

2     exchanged some information, but I don't have

3     direct contact.

4          Q.   You have not had any direct contact

5     with Mr. McGavock, true?

6          A.   True.

7          Q.   I'm going to introduce another

8     exhibit, if you give me one second.

9

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:39588
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 165985
ATTORNEY'S EYES ONLY

Page 165

1 ████████████████████████████████████████

2 ██ ██████████████████

3          Q.   Okay.  Do you know when those

4    discussions with Frank took place?

5          A.   May, June, or even earlier.  I think

6    it's maybe in May, June time frame this year.

7          Q.   Okay.  And taking one step back, who

8    is Frank Paulson?

9          A.   Frank Paulson is our kind of

10   controller.

11         Q.   And by our, you mean he's Karma's

12   controller?

13         A.   I do not remember his exact title but

14   he's in finance.

15         Q.   Is he still with Karma?

16         A.   Yeah, he's still with Karma.  He

17   reports to Ron.

18         Q.   Do you know when Mr. Paulson joined

19   Karma?

20         A.   I do not know exactly, but he has

21   been with Karma for a long time.

22         Q.   Was he there -- was he at the company

23   when you joined Karma?

24         A.   Around the same time.  I do not

25   remember exactly, but --

Page 166

1          Q.    Okay.

2          A.    -- I'm thinking, yes.

3          Q.    Okay.  And who is Ron Samaco?

4          A.    Ron Samaco is the senior vice

5    president of finance.  Equivalent to a CFO.

6          Q.    Is he still employed by Karma?

7          A.    Yes.

8          Q.    Do you know when he joined the

9    company?

10         A.    He also a very long time there.  I

11   think by the time I was here, he was here already.

12         Q.    Okay.

13         A.    Longer than me.

14   ██    ████████████████████████████████████████

██ ███████████████████████████████████████

██ ████████████████████████████████████████

██ █████████████████████████████████████████

██ ████████████████████████████████████

██ ███████████████████████████████████████

██ █████████████████████████████████████████

██ ███████████████████████████████████████

██ ███████████████████████████████████████

██ ██████████████████████████████

██      ██    ████

██      ██    █████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 167



18          Q.   Is this the first time that you've

19   done this type of work, estimating costs related

20   to certain technologies?

21          A.   No, I have done a couple times.

22          Q.   Okay.  When -- can you describe when

23   you've done this same analysis before?

24          A.   My previous employment with Networks

25   in Motion I have helped to estimate the

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 168868
ATTORNEY'S EYES ONLY

Page 168

1   engineering investment for a different part of the

2   technology that got built into product.  That's

3   when the company used to -- to the investment

4   market.

5              Q.   Any other times?

6              A.   And others it's mostly more from not

7   evaluate what the investment but looking at how

8   different technology, what was, and how long that

9   takes to complete, or so far do in a certain

10  stage, more evaluate a technology company.

11             Q.   I guess, have you ever taken

12  historical cost data and applied percentages of

13  that data to specific technologies like you've

14  done in this case?

15             A.   I have done that, as I said, from a

16  Networks in Motion.  When the company looking for

17  investors, we have to do very similar exercise to

18  understand the cost investment of technology in

19  different areas and how that valued.

20             Q.   Was that -- that analysis was not

21  done for purposes of litigation, correct?

22             A.   Correct.  But the method applied is

23  similar.

24             Q.   Do you have any specific training or

25  experience -- I'm sorry, strike that.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 170 of 215
ATTORNEY'S EYES ONLY

Page 169

1          Do you have any specific training in

2     conducting these types of estimated cost analyses?

3          A.   I'm not sure what specific training

4     is.  I have my MBA and I also went through

5     executive training that's a year-long training and

6     a lot of areas are trained by the topnotch expert.

7     Finance is part of that.  And technology

8     development -- and my MBA is management technology

9     development.

10    ██      ███████████████████████████████████

██    ████████████████████████████████████████████

██    ███████████████████████████████████████

██    ██████████████████████████████████

██    ██████████████████████████████████████

██    ██████████████████████

██    ██    ████

██    ██    ████████████████████████

██    ████████████████

██    ██    ████████████████████

██    ███████████████████████████████████

██    █████████████████████████████████

██    ████████████████████████

██    ██    ███████████████████████████████████

██    ██████████████████████████████

██    ███████████████████████████



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 171



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9952
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9956
ATTORNEY'S EYES ONLY

Page 173



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9934
ATTORNEY'S EYES ONLY

Page 174



1

25       Q.    And did you do any type of analysis

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Document 399-35
ATTORNEY'S EYES ONLY

Page 175

1    or calculations to determine the costs that Karma

2    expended in relation to that project?

3        A.    Not to that project specifically, no.

4        Q.    Okay.  So you have no opinions

5    regarding the costs that Karma expended or

6    incurred in relation to the Endurance project,

7    correct?

8        A.    Correct.

9            MR. WALSH:  I think we've been going

10   for another hour and a half or so.  Can we go off

11   the record?

12           THE WITNESS:  Yes.

13           THE VIDEOGRAPHER:  We're off the

14   record.

15           (Pause in proceedings.)

16           THE VIDEOGRAPHER:  We're on the

17   record.

18   BY MR. WALSH:

19       Q.    Okay.  Mr. Zhang, I'm going to

20   introduce another exhibit here.  Give me one sec.

21   ████████████████████████████████████████████

     ██████████████████████████████████████████

23   BY MR. WALSH:

24       ███  ████████████████████████████████████

     ███  ██████████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 177



24          MR. WEXLER:  I don't mean to

25   interrupt you.  You said thirty-seven.  By looking

Page 178

1    at the document, there appears to be more line

2    numbers.  Are you coming up with a number

3    differently than the line numbers?

4                    MR. WALSH:  If you go --

5                    MR. WEXLER:  Do you see what I'm

6    saying?

7                    MR. WALSH:  Yes.

8                    THE WITNESS:  Forty minus three

9    headers.

10                   MR. WALSH:  Right, is thirty-seven.

11                   MR. WEXLER:  Oh, I see.  I'm sorry.

12   So it starts at four.  I see.  I apologize.  It

13   starts at four and then I see, it gets to -- got

14   it.  My bad.  Thank you.  I just wanted to know

15   where you got that representation from, that's

16   all.  All good.

17   BY MR. WALSH:

18         ██    ████████████████████████████████

██   ████████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████████

██         ██   ██████████████████████████

██   █████████████████████████████

██   ████████████████████████████████████████

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 179



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 189000
ATTORNEY'S EYES ONLY

Page 180



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 181



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 182



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 183



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9964
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:99635
ATTORNEY'S EYES ONLY

Page 185



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:99666
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 187



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 99608
ATTORNEY'S EYES ONLY

Page 188



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:99035
ATTORNEY'S EYES ONLY

Page 189



Page 190



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 191 of 990 PageID
ATTORNEY'S EYES ONLY

Page 191



Page 192

1    ████████████████████████████

     ████████████████████████████████

     ██████████████████████████████████████████

     ████████████████████████████

5            Q.    Well, you would agree that you don't

6    have firsthand experience related to Karma's R&D

7    costs prior to the time you worked there, right?

8            A.    Yes.

9            Q.    And you don't have firsthand

10   experience or knowledge --

11           A.    Yeah.  My firsthand after that, I can

12   go extrapolate, and based on my experience and my

13   understanding of how different technologies

14   develop at different stage of the program.

15           Q.    Did you review any documents or

16   materials to gain an understanding of the R&D

17   costs during those time periods in which you were

18   not involved?

19           A.    I reviewed quite a bit document as --

20   as I mentioned earlier.  I -- I mean, that's also

21   my way of work.  When I join new company, I spend

22   a lot of time going through a lot of documents.  I

23   even went through all of the defect reports to

24   understand what are major issues or what has been

25   fixed or what other process, and how the company

Page 193

1  I'm working for conduct different type of reviews

2  or, you know, fixing the bugs or design new --

3  yes, I spent a lot of my time study on trying to

4  understand, learn how the company works and how

5  different technology develop -- developed,

6  validated and integrate into the product.

7           Q.   Okay.  Did you speak with anyone that

8  worked at Karma prior to your time there to help

9  you determine the costs for 2014 and early part of

10 2015?

11          A.   I did not speak to anyone.

12          Q.   Did you speak to --

13          A.   Other than discuss, you know, the

14 general -- how I apply with Mr. Paulson.

15          Q.   Okay.  Did you speak with anyone who

16 was directly involved in the infotainment R&D

17 between January 2019 and July of 2020?

18          A.   No.

19          Q.   Okay.

20          A.   Again, even with I not direct in

21 charge, I still -- I was still heavily involved

22 into the development.

23

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 990804
ATTORNEY'S EYES ONLY

Page 194



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 195

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 196



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 198



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page 201

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 202



Page 203



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page PR990024
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 205



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



Page  208



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 209



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Page ID #:9903

ATTORNEY'S EYES ONLY

Page 211



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page ID #:9903
ATTORNEY'S EYES ONLY

Page 212



REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 213

1

2

3

4          MR. WALSH:  Okay.  If we could go off

5     the record for a moment.

6          THE VIDEOGRAPHER:  We're off the

7     record.

8          (Pause in proceedings.)

9          THE VIDEOGRAPHER:  We're on the

10    record.

11    BY MR. WALSH:

12         Q.   Mr. Zhang, aside from the analysis

13    that we just discussed related to estimated R&D

14    costs, have you done any other calculations or

15    analyses related to Karma's potential damages in

16    this case?

17         A.   No.

18         MR. WALSH:  Okay.  No further

19    questions.

20         MR. WEXLER:  We'll reserve signature,

21    and we'll declare this entire deposition

22    attorneys' eyes only.

23         THE VIDEOGRAPHER:  Okay.  We're off

24    the record.

25         (Deposition concluded at 6:46 p.m.)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
Page 213034
ATTORNEY'S EYES ONLY

Page 214

1   STATE OF OHIO          )

2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3            I, Kathy S. Wysong, a Notary

4   Public within and for the State of Ohio, duly

5   commissioned and qualified,

6            DO HEREBY CERTIFY that the

7   above-named SHEN ZHANG, was by me first duly sworn

8   to testify the truth, the whole truth and

9   nothing but the truth.

10           Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14           I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
ATTORNEY'S EYES ONLY

Page 215

1          IN WITNESS WHEREOF, I have hereunto set

2     my hand and seal of office at Dayton, Ohio, on

3     this 13th day of September, 2022.

4

5                    _Kathy S. Wysong_

6          _____

          KATHY S. WYSONG, RPR

7          NOTARY PUBLIC, STATE OF OHIO

          My commission expires 12-25-2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25